**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**CASE NO. 22-14301-CIV-CANNON**

SARABETH DEMARTINO,

        Plaintiff,

v.

EMPIRE HOLDINGS &INVESTMENTS, LLC
and JUAN CARLOS MARRERO,

        Defendants.

_____/

**DEFENDANTS' NOTICE OF FILING APPENDIX OF EXHIBITS**
**IN  SUPPORT  OF  MOTION  FOR  SUMMARY  JUDGMENT**

Defendants, Empire Holdings & Investments, LLC ("Empire") and Juan Carlos Marrero

("Marrero") (collectively "Defendants"), by and through undersigned counsel, files this Notice of

Filing Appendix of Exhibits in Support of Defendants' Motion for Summary Judgment and

Incorporated Memorandum of Law.

Dated: October 11, 2023

Respectfully submitted,

JACKSON LEWIS P.C.
One Biscayne Tower, Suite 3500
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone:  305-577-7600
Facsimile:   305-373-4466

*s/ Ranjiv Sondhi*_____
Pedro Torres-Díaz, Esq.
Florida Bar No. 19327
E-mail: *pedro.torres-diaz@jacksonlewis.com*
Ranjiv Sondhi, Esq.
Florida Bar No. 105581
E-mail:  *ranjiv.sondhi@jacksonlewis.com*
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of October 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/ Ranjiv Sondhi*
Ranjiv Sondhi, Esq.

## SERVICE LIST

Bryan Arbeit, Esq.
Florida Bar No. 1010329
Email: barbeit@forthepeople.com
Allison Rattet, Esq.
Florida Bar No. 1023573
Email: arattet@forthepeople.com
MORGAN & MORGAN
8151 Peters Road, 4th Floor,
Plantation, Florida 33324
Telephone (954) 694-9610

*Counsel for Plaintiff*

Pedro Torres-Díaz, Esq.
Florida Bar No. 19327
E-mail: *pedro.torres-diaz@jacksonlewis.com*
Ranjiv Sondhi, Esq.
Florida Bar No. 105581
E-mail:  *ranjiv.sondhi@jacksonlewis.com*
JACKSON LEWIS, P.C.
One Biscayne Tower, Suite 3500
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone (305) 577-7600

*Counsel for Defendants*

**APPENDIX**

| EXHIBIT | DESCRIPTION |
|---|---|
| A. | Deposition transcript of Sarabeth DeMartino dated April 13, 2023 (Volume I) including Exhibits 1, 3, 6, 8, 14, 16, 18, 19, 20, 21, 22, and 23 thereto. |
| B. | Deposition transcript of Sarabeth DeMartino dated September 13, 2023 (Volume II) including Exhibits 29, 30, 31 and 32 thereto. |
| C. | Deposition transcript of Leah Molino dated May 24, 2023 (Volume I). |
| D. | Deposition transcript of Leah Molino dated August 1, 2023 (Volume II) including Exhibit 7 thereto. |
| E. | Deposition transcript of Leah Molino dated September 13, 2023 (Volume III). |
| F. | Deposition transcript of Juan Carlos Marrero dated May 18, 2023 (Volume I) including Exhibits 3 and 5 thereto. |
| G. | Deposition transcript of Juan Carlos Marrero dated June 12, 2023 (Volume II) including Exhibits 10 and 14 thereto. |
| H. | Deposition transcript of Juan Carlos Marrero dated September 14, 2023 (Volume III). |
| I. | Deposition transcript of Anthony Messina dated June 2, 2023. |
| J. | Deposition transcript of Johnathan Jenkins dated August 1, 2023. |
| K. | Deposition transcript of Dan Labelle dated August 1, 2023. |
| L. | Declaration of Leah Molino, including Exhibits LM-1 and LM-2 thereto. |
| M. | Declaration of Johnathan Jenkins, including Exhibits JJ-1 and JJ-2 thereto. |

# EXHIBIT B

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                  FORT PIERCE DIVISION
 3                    CASE NO.:  22-14301-CIV-CANNON
 4   SARABETH DEMARTINO,
 5        Plaintiff,
 6   -vs-
 7   EMPIRE HOLDINGS AND INVESTMENTS,
     LLC and JUAN CARLOS MARRERO,
 8
          Defendants.
 9   _____/
10
11                    Zoom Videoconference
12
                      DATE:  Wednesday,
13                    September 13, 2023
                      TIME:  2:00 p.m. - 3:08 p.m.
14
15
16
              DEPOSITION OF SARABETH DEMARTINO
17
18
19
20
21
22            Taken on behalf of the DEFENDANTS before
23   Jennifer L. Bush, RPR, Notary Public in and for the State
24   of Florida at Large, pursuant to Notice of Taking
25   Deposition in the above cause.
```

Page 2

```
1              A P P E A R A N C E S
2    APPEARING ON BEHALF OF THE PLAINTIFF:
3
              Allison Marcene Rattet, Esquire
4             Bryan Arbeit, Esquire
              Morgan & Morgan, P.A.
5             8151 Peters Rd Ste 4000
              Plantation, FL 33324-4012
6             954-807-7774
              Arattet@forthepeople.com
7
8    APPEARING ON BEHALF OF THE DEFENDANTS:
9
              Ranjiv Sondhi, Esquire
10            Jackson Lewis P.C.
              2 S Biscayne Blvd Ste 3500
11            Miami, FL 33131-1802
              305-577-7600
12            Ranjiv.sondhi@jacksonlewis.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                  INDEX OF PROCEEDINGS

2

3    DEPOSITION OF SARABETH DEMARTINO

4    DIRECT EXAMINATION BY MR. SONDHI:                    4
     CROSS-EXAMINATION BY MS. RATTET:                    35
5    REDIRECT EXAMINATION BY MR. SONDHI:                 38

6

7

8    CERTIFICATE OF NOTARY PUBLIC                        40
     ERRATA SHEET                                        41
9    CERTIFICATE OF OATH OF WITNESS                      42
     CERTIFICATE OF REPORTER                             43
10   READ LETTER                                         44

11

12

13

14

15                 DEFENDANTSS EXHIBITS

16    Number              Description              Page

17     Exhibit 29  Bates DEF 2556-2591              6
       Exhibit 30  Bates DEF 2661-2662             11
18     Exhibit 31  Bates DEF 2775                  23
       Exhibit 32  Bates DEF 2916                  26

19

20

21

22

23

24

25

```
                                                    Page 4

 1   WHEREUPON,

 2                    SARABETH DEMARTINO,

 3   called as a witness on behalf of the DEFENDANTS, after

 4   having been first duly sworn, was examined and testified

 5   as follows:

 6                    THE WITNESS:  I do.

 7                    DIRECT EXAMINATION

 8   BY MR. SONDHI:

 9        Q.    All right.  Thank you.  Ms. DeMartino,

10   hello again to you.

11        A.    Hello.

12        Q.    I think there is a little lag in the video.

13        A.    Yeah, I noticed that too.

14        Q.    I think it is fine as long as I can hear

15   your voice just clearly.

16        A.    Should we test that out first before we

17   continue?

18        Q.    Okay.  Now, you are freezing, actually.

19              (Video Interference.)

20   BY MR. SONDHI:

21        Q.    So I know you've been through this before,

22   and you've heard the instructions, but I'll briefly just

23   remind you again.  This is a deposition, and you are

24   oath.  So please listen carefully to the questions and

25   pause.  Your counsel may have an objection before you
```

Page 5

1   respond.  And I need your responses to be verbal, and I
2   know we're getting into the habit or we have habits to
3   nod sometimes or say, uh-huh.  They need to be
4   affirmative responses or yes or no.
5              If you don't understand a question, just
6   let me know, and I'll rephrase it for you.  But if you do
7   answer a question, I will assume that you understood it.
8         A.    Okay.
9         Q.    I will be showing you some documents right
10  now.  I'd like you to take your time, read the documents
11  before I start asking questions.  If you need any more
12  time to review, just -- just let me know, okay?
13        A.    Okay.
14        Q.    If you need a break, let me know, but I ask
15  that if there is a question pending, that you answer the
16  question first before I proceed.  But I don't anticipate
17  this taking too long today, okay?
18        A.    Okay.
19        Q.    All right.  So I'll just dive right in and
20  I'll share my screen and show you a document.
21              Okay.  Are we all seeing this?  Are you
22  seeing, this Ms. DeMartino?
23        A.    It is a little fuzzy but I see it kind of.
24        Q.    Well, I can zoom in if that helps.
25        A.    Yep, that's better.

```
                                                  Page 6

 1        Q.    That helps, okay.  All right.  So this is a

 2   few pages, so I will -- looks like it is 36 pages, but

 3   I'll let you read this right now.  It's May 12, 2021, an

 4   e-mail.  It looks like it is from Leah Molino to Anthony

 5   at the top here, but that's a forwarding -- originally on

 6   April 20, 2021, looks like it is an e-mail from Leah

 7   Molino to a few recipients over here.

 8             Is that your e-mail address when you were

 9   at Empire right over?

10        A.    Yes.

11        Q.    Okay, great.  I'll scroll through it just

12   to get you familiar with it.  I know this was back in

13   2021.  You haven't seen this in a while.

14        A.    Uh-huh.  Okay.

15        Q.    All right.  These are images but I'll slow

16   down if you want me to.

17        A.    Okay.

18             MR. SONDHI:  And I'll mark this as

19        exhibit -- I'm going to go off the previous

20        numbering.  We left off at 28 in your last

21        deposition.  I'll start this numbering as

22        Exhibit 29.  Just for the record, it is

23        defendant's numbering 2556 to 2591.

24             (Defendants Exhibit 29, Bates DEF 2556-2591,

25   was marked for identification.)
```

Page 7

```
 1   BY MR. SONDHI:
 2          Q.    Does this look familiar to you so far?
 3          A.    Yeah.  Yes.
 4          Q.    Okay.  All right.  I'll just go all the way
 5   to the bottom.  Okay.  Does this look familiar to you,
 6   customer service manager job description?
 7          A.    Yes.
 8          Q.    Okay.  What are the duties of a customer
 9   service manager?
10          A.    Mostly customer service, so they would, you
11   know, perform duties having to do with billing, with -- I
12   mean, it was basically anything having to do with a
13   member account.
14                It was also front desk.  They oversaw the
15   front desk and babysitting and clean team.  They would do
16   the hiring, the interviewing.  Obviously, I would also
17   share in that from time to time.  But it was really they
18   helped with whatever I needed them to help with, and then
19   they had their regular duties.
20                So they did what I mentioned before; and
21   then if there was something that I needed them to do
22   extra, they would.
23          Q.    Okay.  Would you say you had overlapping
24   duties as a general manager over the customer service
25   manager or some overlap?
```

Page 8

1           A.      How do you mean?

2           Q.      Well, I'm looking at some descriptions over

3  here, like you said, that -- or you just testified that

4  you would ask them to help you or assist you.  So was

5  that -- kind of helping with your duties that you had and

6  you would kind of delegate to them?

7           A.      Yeah, from time to time, if I was in a

8  meeting or there were, you know, I had a lot on my plate

9  on that particular day, and a member came to the club.

10  They needed to be helped, I would ask them to help the

11  member.  Or if there was a billing issue and a call came

12  in, I would ask them to take the call.  They shared in

13  those duties with me.

14          Q.      Okay.  Does that differ from a sales

15  manager?

16          A.      Yes, sales manager focuses more so on

17  sales, sales team.

18          Q.      Okay.  And again, would you delegate duties

19  to a sales manager also?

20          A.      Sure, depending on what their workload was

21  and depending on what their sales numbers were.

22          Q.      Okay.  So would you have overlapping duties

23  with the sales manager also on the parts that you

24  delegated?

25          A.      Sure.

Page 9

1          Q.    All right.  So this e-mail on April 20th --
2    do you remember this e-mail on April 20, 2021, just to be
3    clear?
4          A.    Yes.
5          Q.    Do you know what the purpose of this e-mail
6    was?
7          A.    To recruit new hires, new talent.
8          Q.    Okay.  And I scrolled through a lot of
9    things.  Those are the attachments to the e-mail, those
10   job descriptions.  It's -- the subject is "recruiting
11   tools"?
12         A.    Uh-huh.
13         Q.    As far as you can remember -- I know this
14   was 2021 -- did this help you, you know, in your
15   reference to -- for recruiting or did you implement them
16   or use it?
17         A.    We did implement them.  We put them
18   wherever he could, mostly around the club.  It did
19   attract some talent.  A lot of it was from within.  So we
20   would get more responses to what we had put at the front
21   desk.
22         Q.    Okay.  What do you mean by "we"?
23         A.    Well, if it was for welcome team, if it was
24   for sales team, then the sales manager or the customer
25   service manager would be able to interview those

Page 10

1    candidates.

2          Q.    Okay.  But you didn't perform any

3    interviews on your own or you would delegate that out?

4          A.    No, that's why I say "we."  We would share

5    in that.  If someone came, depending on if I had someone

6    there for personal training at the time, if I didn't have

7    someone, then I would take someone that was interested or

8    someone that was dropping off a resume.  If it was for

9    the sales team, I would do that as well.  I would do all

10   of them if there was no one there.  So it depended on

11   availability.

12         Q.    Okay.  All right.  Do you remember or was

13   it your job to post on social media or did you have that

14   ability when it says that over here?

15         A.    I had that ability, but I did have

16   difficult -- no, actually, I didn't have the ability to

17   post anything on social media.

18         Q.    Okay.  Was that -- you're saying you didn't

19   have the ability to post on -- such as a LinkedIn account

20   it says over here?

21         A.    No, I -- I think we did more Indeed.

22         Q.    Okay.  And you had the ability to post on

23   Indeed, right?

24         A.    I had the assistance of another employee,

25   Anthony Slaughter when I first came on.  He showed me how

Page 11

1    to do it for free.  And then within time that expired and

2    then I cannot remember the details, but I was unable to

3    post again for free in the future.  So I did have

4    difficulty doing that and later on Leah helped me with

5    that.

6            Q.    Okay.  It says over here, "I hope this

7    helps you in keeping the club well staffed."  Would it be

8    fair to say this was kind of a focus for Empire or

9    keeping -- keeping a well-staffed club for the success of

10   the club?

11           A.    Yes.

12           Q.    Okay.  And did Leah or anybody forward a

13   resume to you through the postings?

14           A.    Yes.

15           Q.    Okay.  All right.  I'm going to move on

16   to -- I'll mark this as or enter it as Exhibit 30.

17                 (Defendants Exhibit 30, DEF 2661-2662, was

18   marked for identification.)

19   BY MR. SONDHI:

20           Q.    All right.  This is an e-mail dated

21   August 12, 2021.  It appears it is from you.  You can

22   confirm if that's your e-mail address again, right?

23           A.    Uh-huh.

24           Q.    Your prior e-mail address?  Is that a yes?

25           A.    Uh-huh.

Page 12

1         Q.    Is that yes?

2         A.    Yes, I'm sorry.

3         Q.    Yeah, I know.  We fall in these habits, I

4    know.  To somebody named Calah Milliman, is that right?

5         A.    Yes.

6         Q.    Okay.  Who is Calah Milliman?

7         A.    She was our -- she had a dual role.  She

8    was the sales manager and the customer service manager at

9    the time.

10         Q.    Okay.  You can go ahead and read the

11    e-mail.  I know it's been a while, to review it for a

12    minute.  Am I going too fast?

13         A.    No, I'm okay.  Okay.

14         Q.    Does this look familiar now, do you

15    remember this?

16         A.    Yes, I do.

17         Q.    Okay.  Here's the last part.  I'll let you

18    just read that real fast.

19         A.    The last sentence?

20         Q.    Or the last -- I don't think I showed this

21    or I just popped this up on the screen for you.  If you

22    want to read it.

23         A.    You want me to read it out loud?

24         Q.    No, no.  It looks familiar though, right,

25    do you remember this?

Page 13

1          A.    Yes.

2          Q.    And what was the purpose of kind of sending

3    this to Calah, kind of a description of it?

4          A.    At this point in time, it was obvious to me

5    that Calah was not doing her job.  And I was giving her

6    specific duties to do -- to see if she would actually do

7    them, kind of prove to myself that she was or was not

8    doing her job.

9                So I gave her a specific task to do.  She

10   gave it off to someone else.  I would track her calls

11   from her phone.  So she would come in early in the day at

12   a specific time.  And when she left for the day, I would

13   look to see how many calls she made from her phone.

14               I specifically asked her to call members.

15   I don't remember if it was for billing or what the

16   situation was.  But when she told me that it was

17   completed, I checked her phone and there weren't any

18   calls to any of the people that I asked her to call.

19               And then I discovered that she gave that

20   task to a front desk person.  So it was kind of just

21   like -- I wasn't able to accomplish what I was trying to

22   do.

23               I was trying to get her to understand that

24   I needed her to do certain things a certain way because I

25   was trying to monitor her productivity without letting

1  her know that I was monitoring her productivity.

2         Q.    Okay.  I see.  And you decided to kind of

3  just e-mail this to her instead of having a discussion

4  with her?

5         A.    Yes, I wanted to have it in writing.

6         Q.    And that task you are talking about was

7  given to another Kayla but spelled differently?

8         A.    Yes, front desk Kayla.

9         Q.    K-A-Y-L-A, just for the record.

10               When you say, "Info based on Moso notes and

11  not the first time."  Can you help me -- describe what

12  that means?

13         A.    Well, I gave direction to anyone in the

14  club that if they had any kind of interaction with a

15  member, whether it be in person in the club or over the

16  phone, to just make a little note.

17               At the end of the day, I would be able to

18  run a report that would show me what notes -- what had

19  happened during the day with any member.  So I would be

20  able to kind of review it and see what went on.

21         Q.    Okay.  So were there other instances also

22  where you were giving Calah Milliman some direction and

23  she was not following it or delegating it out to somebody

24  else?

25         A.    Yes.

Page 15

```
 1          Q.    Do you remember what those are off the top
 2    of your head?
 3          A.    One example would be the morning
 4    walkthrough.  She would come in -- she was one of the
 5    earliest people in the club.  I asked that she -- I would
 6    imagine -- expect that a manager would have more of
 7    attention to detail than say a front desk person.
 8                I asked her to do that, walk through the
 9    club and make sure everything looked good and nothing
10    needed any attention, and I found out that she was also
11    having a front desk person do that as well.
12          Q.    Okay.  How many managers did you have at
13    this point working under you?
14          A.    At that point, I believe we had three.
15    Yes, three.
16          Q.    Okay.  Well, do you remember their names?
17          A.    There was Calah Milliman, Brittany Bellovo
18    and myself.
19          Q.    Okay.  You were the general manager, right,
20    so you had two managers under you?
21          A.    Yes.
22          Q.    Okay.  And what was Brittany's role, what
23    type of manager?
24          A.    She was the gymnastics -- I don't know if
25    it was a supervisor, coordinator.  She headed up the
```

1    gymnastics department.

2          Q.    Okay.  Now, you are saying that business is

3    suffering.  What did you mean by that?

4          A.    Well, we weren't doing well.

5          Q.    Okay.  So what do you mean by not doing

6    well, like, revenues were short or what -- could you kind

7    of detail that out?

8          A.    Net member gain.  I'm not sure what the

9    case was in that particular month or which metric exactly

10   we were suffering in that particular month, but it could

11   have been -- could have been a range of things.  It could

12   have been net member gain, and it could have been, you

13   know, just our bottom line.  It could have been lots of

14   things.

15         Q.    Okay.  So over here I suppose this is

16   the -- you are giving her a checklist of things that she

17   needs to be doing, right, over here?

18         A.    Yes.

19         Q.    Just for the record, this was marked

20   Defendant's 2661 to 2662.

21               So about -- are these things that you were

22   delegating to her that were part of your job or these --

23   you are telling her that these are her duties and not

24   yours?

25         A.    Well, above it says, "Below is a list of

1   things that you can do when you find you have the time on

2   your hands."  So it wasn't necessarily something that I

3   was delegating for her, meaning, it was her job; but that

4   meant if she had nothing else to do, because she often

5   would tell me that her work was done, if she had nothing

6   else to do, these are things that she could pay attention

7   to.

8           Q.    Uh-huh.

9           A.    But these are also things that I shared in

10  doing.

11          Q.    Okay.  Such as -- I was going to mention,

12  like running an AR report.  Was that something you would

13  do also?

14          A.    Almost every day.

15          Q.    Okay.  Holding meetings with staff

16  regarding performance.  Were you doing this in addition

17  to her, or were you just delegating this out?

18          A.    I did that in addition.  I have asked her

19  to do it a little more frequently than, you know, I would

20  sit in every so often if I ever felt it was necessary.

21          Q.    Okay.  And what instances would you think

22  it was necessary for you to sit in?

23          A.    If we were having issues with front desk

24  people, if they were constantly caught on their phones or

25  something like that and weren't listening -- listening to

Page 18

1   Calah and I felt that she may have needed a little bit,
2   you know, a little bit of a hand.
3        Q.   Okay.  She was kind of wearing two hats,
4   customer service and sales manager?
5        A.   Yes.
6        Q.   What were the things that you needed some
7   help with in her role as a sales manager that you would
8   ask for assistance with her on?
9        A.   Well, she was the sales manager, so it was
10  really her duty.  What do you mean things that I needed
11  help with?
12       Q.   Well, what did you -- what were the sort of
13  tasks?  I see you are kind of delegating things out to
14  her in terms of, you know, customer service.  But I'm
15  specifically asking about sales.  Efforts to drive
16  revenue up and things like that.  Would you ask her to do
17  -- come up with ideas to do that or anything like that?
18       A.   Yes, I would ask her frequently to take
19  anyone in sales and anyone that was available at the
20  front desk out prospecting to make sales calls, to follow
21  up with people that have come into the club as guests and
22  got a guest pass that didn't actually join the club, to
23  follow up with them.  So that's really something that a
24  salesperson would do but something I asked her to do as
25  well.

Page 19

1          Q.    Okay.  That was part of your duties also?

2          A.    Yes.

3          Q.    Do you remember what the outcome of this

4    was after you sent this e-mail to Calah?

5          A.    I believe she e-mailed me back, and she

6    wasn't very happy.

7          Q.    Did you have a verbal discussion then

8    afterwards?

9          A.    Yes.

10         Q.    Do you remember what was discussed?

11         A.    I remember the conversation being

12   uncomfortable.  I remember her trying to explain herself

13   a lot.  I remember her saying that the things I listed

14   were things that she had been doing.

15               We ended off on a good note.  She said she

16   would try harder, and I said, you know, I assured her

17   that I would help her; and if she needed things to be

18   productive, I would be there for her and help her out.

19   That's pretty much all I remember.

20         Q.    Okay.  Did you follow up at any point to

21   see if she was actually performing the tasks that you

22   delegated?

23         A.    Constantly.

24         Q.    All right.  And was she correct that she

25   was doing the tasks or not correct?

Page 20

1          A.     Well, she would -- when I would bring these

2     things up to her, she would do a really good job of them

3     for a short period of time.  I suppose when she felt I

4     relaxed and wasn't focusing on her anymore, she would go

5     back to her usual shopping online at work.

6          Q.     When she left Empire, was she terminated?

7          A.     She -- once I -- I believe the way it went

8     to my -- from what I remember, she -- I issued her a

9     performance notice.  I can't remember if it was a

10    performance notice or it was a specific e-mail.  I don't

11    think it was this one.  It couldn't have been this one.

12    She just stopped coming to work.

13         Q.     Okay.  After you gave her a performance

14    notice you said?

15         A.     It was -- either I gave her a performance

16    notice or I sent her another e-mail similar to this one,

17    and she just didn't like it.  And instead of having a

18    conversation with me, she just -- she showed up -- I

19    think it was an e-mail.  Because she showed up to work --

20    if I remember correctly, showed up to work one day, and I

21    believe she read an e-mail from me and she left before I

22    got to the club, and she never came back, and she never

23    called.

24                I'm sorry, not that she never came back.

25    She did days later to get her paycheck, and she never

Page 21

1    called and she just stopped coming to work.

2         Q.    Okay.  Did she ever have any communication

3    that you recall with Patrick Walsh?

4         A.    Yes, she did.

5         Q.    What do you remember about -- do you

6    remember an e-mail or something like that, that she

7    discussed issues with the club to Patrick?

8         A.    Yes.  Yes, I remember her complaining about

9    conditions in the club but it were things -- mostly,

10   cleanliness, which I couldn't understand because the

11   cleanliness -- it was her responsibility to make sure

12   that the club was clean.  So I didn't understand why she

13   was going to Patrick Walsh to basically tell on herself.

14        Q.    Do you know how that was addressed by

15   Patrick or anybody else?

16        A.    Patrick came to the club to speak with her.

17        Q.    Were you part of that conversation?

18        A.    I was.

19        Q.    What was discussed, if you recall?

20        A.    I remember again it being a very awkward

21   conversation.  Jonathan Jenkins was there.  Patrick Walsh

22   was there, myself, Calah and I believe one other person

23   but I can't remember.  I remember her airing her

24   grievances, cleanliness being one of them, equipment

25   being another, and I believe she complained a lot also

Page 22

```
 1   about the gymnastics equipment, and Patrick -- I remember
 2   him doing a walkthrough of the club, making mentions of
 3   the condition -- nothing was really -- nothing looked
 4   bad.  The club wasn't dirty.  I think the most he had
 5   to -- the most he did was look at gymnastics.  Felt like
 6   that was the biggest callout.  A lot of the equipment was
 7   old and needed to be replaced.
 8          Q.    Okay.  Was it ever replaced?
 9          A.    Not in my time there.
10          Q.    Okay.  All right.  So eventually, I mean,
11   from what I'm gathering is that, a lot of the things that
12   she was complaining about were not issues such as -- one
13   area was the cleanliness part.
14                Do you remember any other complaints?
15   Gymnastics and cleanliness were the ones that you
16   mentioned.
17          A.    Those are the only two that stand out for
18   me.
19          Q.    Her job was to clean it.  Does that mean
20   she ensures that, you know, the people responsible for
21   cleaning actually get their job done or --
22          A.    Yes, not that she has to do it herself.  It
23   is every manager's responsibility to make sure the club
24   is clean.  But if she does her walkthrough in the morning
25   and notices that the toilets are dirty, then it is her
```

Page 23

```
 1   responsibility to go to the housekeeper and make sure it
 2   gets done.
 3            Q.    Would you do a walkthrough also?
 4            A.    Always.
 5            Q.    And did you notice these issues also and
 6   report it to Calah or not?
 7            A.    On occasion, yes.
 8            Q.    Okay.  All right.  I'm going to mark this
 9   31.
10            (Defendants Exhibit 31, Bates DEF 2775, was
11   marked for identification.)
12   BY MR. SONDHI:
13            Q.    This is defendants' -- marked 2775.  This
14   is what appears to be an e-mail dated March 25, 2021.
15   Well, let me scroll down to the original e-mail.  That
16   makes more sense.  Also, March 25th from you to Leah.
17   I'll let you read it before we talk about it.
18            A.    Okay.  Okay.
19            Q.    All right.  Subject line is Kayleigh Fee;
20   is that right?
21            A.    Yes.
22            Q.    So this was an employee that you were
23   talking about in this e-mail, right?
24            A.    Uh-huh.
25            Q.    Describe to me the circumstances behind
```

Page 24

1    this e-mail.

2         A.    Kayleigh Fee was a front desk employee, and

3    she was very unreliable and would often leave the club

4    gapped.  She would call out at the last minute, and I had

5    to pick up her shift several times and -- or try to find

6    someone else to pick up for her.  It was just causing

7    scheduling trouble.

8         Q.    Okay.  Is that why you wanted to terminate

9    her?

10        A.    I was moving to, yes.

11        Q.    For that reason alone?

12        A.    There had been other issues at the club,

13   attitude and not doing what she was supposed to be doing,

14   being on her phone a lot.

15        Q.    So it says she has a doctor's note putting

16   her out of work from 3-22 to 3-29, right?

17        A.    Uh-huh.

18        Q.    Did you want to terminate including the

19   doctor's note?

20        A.    No.  As you can see in the next sentence, I

21   told her no problem.  And we would take care of it

22   because she had a doctor's note.

23              But then she said she didn't need to be off

24   that long.  It was just a very complicated situation.

25        Q.    Okay.  Well, what -- did you end up

Page 25

1   terminating her later on?

2       A.   I don't believe I did.  You know, I don't

3   recall.

4       Q.   Did you write her up or discipline her in

5   any way?

6       A.   I don't remember.  I believe -- what month

7   was this?

8       Q.   This is March of 2021.

9       A.   June, July, August.  I don't recall if

10  Calah was still with us or not.  I know Calah -- because

11  if she was, then it would have been her responsibility to

12  handle it.

13           I think I was just looking for a little

14  more guidance.  I didn't want to handle it the wrong way

15  or have her handle it the wrong way.

16      Q.   Okay.  I think in response to your e-mail

17  then you got this e-mail back from Leah?

18      A.   That makes sense.

19      Q.   Okay.  And I guess just asking to loop in

20  Arzu at that time, Arzu Kanner?

21      A.   Yes.

22      Q.   Do you remember if a discussion was had

23  between you and Arzu?

24      A.   I'm sure it did but I don't recall what the

25  actual conversation was.

Page 26

1          Q.   Okay.  All right.  I'll move on.  I'll mark
2     it Exhibit 32, and it is defendant's -- marked
3     Defendant's 2916.
4               (Defendants Exhibit 32, Bates DEF 2916, was
5     marked for identification.)
6     BY MR. SONDHI:
7          Q.   I guess these are -- go to the original
8     e-mail, it is dated October 4, 2021.  And I'll let you
9     review that.
10         A.   Okay.
11         Q.   And then -- well, I'll start with, this is
12    regarding somebody named Reagan or Reagan, I'm not sure,
13    Gibbons?
14         A.   Reagan.
15         Q.   What was the situation with her?
16         A.    It was another complicated situation
17    because I had been getting one story from Jose and
18    another story from Reagan.
19              What I would see of Reagan wasn't half as
20    bad as what Jose was reporting to me.  I wanted to make
21    sure I was handling this the right way because I didn't
22    want to just ignore what Jose said.
23              So Reagan apparently was giving Jose a hard
24    time and not doing her job and he mentioned her being on
25    her phone and putting her feet on the desk.

Page 27

```
 1              And they were always having little
 2    disagreements and he -- he just painted her in a really
 3    bad light but nothing that I ever really saw for myself.
 4              Q.   Okay.  There were no write-ups involved in
 5    this or anything documented?
 6              A.   No.
 7              Q.   Could Jose do a write-up -- you are talking
 8    about Jose Roto {sic}, right?
 9              A.   Yes.
10              Q.   Could Jose do a write-up or was that only
11    you?
12              A.   No, absolutely.  Any manager has the
13    ability to -- to put someone on a performance notice.
14              Q.   All right.  And this was just not done at
15    that time?
16              A.   Right.
17              Q.   But based on -- so you didn't witness these
18    incidents, is that what you just said, about her
19    behavior?
20              A.   No.  I never noticed.
21              Q.   Okay.  So you bring it up to Leah.  What
22    was the -- what was the concern?  Did you just move to
23    term on your own without having -- having consulted Leah?
24              A.   Well, I sent this is to Leah.  I'm asking
25    her what she thinks.
```

Page 28

1      Q.    Yeah.

2      A.    So I'm consulting with her now.

3      Q.    Would you always consult to make a decision

4   for termination or this was a special situation?

5      A.    It really depended on the situation.  But

6   most of the time we would partner with HR.  That was the

7   direction given.

8      Q.    So what was the concern about this

9   situation?

10     A.    Well, a manager was telling me that someone

11  else was not doing their job, and I wasn't seeing it for

12  myself.  So I didn't want to -- I didn't want to make any

13  moves without asking her what she thought.

14     Q.    Well, you are saying she's pregnant, and I

15  have the thought that she could claim that she was term

16  because of the pregnancy.  Was that part of a concern?

17     A.    Of course.

18     Q.    Well, I know I have -- did anybody make any

19  comments regarding her pregnancy?

20     A.    No, not that I recall.

21     Q.    Did -- why did you -- why did you have the

22  thought that this was would be a concern because she was

23  pregnant?

24     A.    Well, I was afraid -- this had been a

25  conversation in the company before, and when we were -- I

Page 29

```
1    was moving to start that process with Calah Milliman, I
2    was instructed by Leah, you know, she -- whenever we talk
3    about terming everyone, they always want to make sure
4    everything is in writing.  They always want to make sure
5    that we follow the protocol to make sure that we did the
6    right thing, to make sure that they couldn't take legal
7    action after the fact.
8                 So she always wanted to make sure that the
9    PNs were there, coaching was there, and that we did the
10   right thing.  So if there was a situation where someone
11   would sue, the company had proof that they did nothing
12   wrong by them.
13        Q.    Okay.  So is it fair to say that Empire can
14   terminate a pregnant employee for behavior issues?
15        A.    If that was the fact, I mean, I think -- I
16   think it is kind of a case-by-case basis.  There are lots
17   of things that would contribute to that.
18        Q.    To what?
19        A.    To a term.
20        Q.    Okay.  So you are moving to terminate her
21   and that's solely based on behavior issues that you
22   haven't witnessed you said?
23        A.    Right.  That I'm just getting from -- I'm
24   relying -- most GMs do rely on other managers to be
25   honest with them when they are coming to report something
```

Page 30

1   like this, and I did investigate.  I did sit down with

2   the employee before that happened and determined that she

3   was to stay, that she was not to be termed.

4        Q.   Who did you -- oh, when was that, after

5   this e-mail or before this e-mail to Leah?

6        A.   Well, I needed -- I don't know if it was

7   Leah's direction or not, but I mean, I needed to find out

8   for myself what was actually going on, so I wanted to

9   hear from Reagan.

10        Q.   So what did Reagan tell you?

11        A.   Reagan came in and she cried.  And she said

12   that it's not true, that he's totally just taking things

13   the wrong way and that he was bullying her and giving her

14   a hard time.  And he was saying things that were untrue.

15             And on more than one occasion, I had this

16   conversation with employees because things that Jose was

17   saying were inaccurate, and I found that more as time

18   went on.  I did speak to JC about it also.

19        Q.   Okay.  So initially but -- still not

20   understanding the timeline.  So that discussion was had

21   after that e-mail?

22        A.   Yes.

23        Q.   So if Jose is lying to you about this,

24   that's when you changed your mind about termination and

25   decided that you would not move to terminate her because

Page 31

1    you found out that Jose was lying?

2          A.    Well, I don't want to call it lying.  I

3    mean, he -- maybe he misunderstood her personality.  I'm

4    not really sure what was going on.  It's kind of hard

5    when it is like one person says one thing and the other

6    person -- it is hard to know what to believe.

7                So I just -- in sitting down and speaking

8    with her, she seemed genuine, and I agreed to let her

9    stay because I wanted to see her performance for myself.

10   And I just kept better tabs on it going forward.

11         Q.    Right.  But over here you are saying that

12   you would move to term without even judging her

13   performance, that was your initial reaction to this,

14   right?

15         A.    It was because I was taking Jose's word for

16   it, and this may have just been poorly worded.

17         Q.    So is it fair to say that Empire can

18   terminate a pregnant employee for performance issues?

19         A.    They can terminate someone for anything.

20   Doesn't mean it's -- they can terminate people for lots

21   of reasons.

22         Q.    Okay.  I'm just not understanding.  So if

23   somebody is having a behavorial issue, such as over here

24   in this e-mail, your opinion was, you could move to

25   terminate for that, right?

Page 32

```
 1          A.    It wasn't my opinion.  I -- not sure what I
 2    was feeling or thinking or going through at the time that
 3    this e-mail was sent.  Maybe I was believing him strongly
 4    and shouldn't have.  And maybe I was just jumping the
 5    gun.
 6          Q.    Okay.  Did you -- during that conversation
 7    with Reagan, did she talk about her pregnancy with you?
 8          A.    No.
 9          Q.    Did you bring her pregnancy up?
10          A.    No.
11          Q.    Did she allege anything about a high risk
12    pregnancy?
13          A.    No.
14          Q.    You are making allegations that you had a
15    high risk pregnancy, right?
16          A.    That's correct.
17          Q.    Did you let anybody at Empire know about
18    your high risk pregnancy?
19          A.    I did.
20          Q.    Who did you tell?
21          A.    Leah and JC.
22          Q.    By e-mail or how?
23          A.    I don't recall.  Leah and I spoke quite
24    often over the phone and we texted a lot.  I'm not really
25    sure.
```

Page 33

1        Q.    Okay.  Did you tell JC you said?

2        A.    Yeah.  It was verbal.

3              MR. SONDHI:  Okay.  I just need a couple

4        minutes, and then I'll wrap it up probably.

5              THE WITNESS:  Okay.

6              (A brief recess was taken from 2:49 p.m. to

7    2:55 p.m.)

8    BY MR. SONDHI:

9        Q.    We're back on the record and again, a

10   reminder.  You are still under oath, Ms. DeMartino.  I

11   just have a couple questions.  I'm wrapping up.

12             During this time with this e-mail I showed

13   you, October 4, 2021, were you aware that you were

14   pregnant at this time?

15       A.    Yes.

16       Q.    Okay.  And had you disclosed your pregnancy

17   at that time?

18       A.    Yes.

19       Q.    Okay.  What date did you disclose your

20   pregnancy?

21       A.    I don't remember the exact date.  It was

22   either late September, early October.

23       Q.    Who did you disclose it to?

24       A.    Leah was first and then Anthony.

25       Q.    And you don't recall an approximation of a

1    time frame on that date?

2          A.    Not off of the top of my head.  I would

3    have to look into it.

4          Q.    Okay.  You informed JC?

5          A.    I did, during his first visit to the club.

6          Q.    Okay.  Do you know when that was?

7          A.    That was also in October.

8          Q.    Okay.

9          A.    Yes.

10         Q.    You don't have a specific date or you can't

11   recall?

12         A.    I don't recall, sorry.

13         Q.    Okay.  Do you know when JC was hired?

14         A.    I don't -- I don't know.  I know that he

15   was doing consulting first and -- you mean like hired for

16   the company or hired to his...

17         Q.    Well, for the company.  He was a consultant

18   first, right?  Did you have any dealings with him at that

19   time?

20         A.    No, I didn't even know he was with us.

21         Q.    Okay.  Do you know when he was -- so the

22   first time you met JC was in October, and that's when you

23   disclosed your pregnancy?

24         A.    To him, yes.

25         Q.    Okay.

Page 35

1              MR. SONDHI:  All right.  I don't have
2         anything else, anything further.
3              MS. RATTET:  Okay.  I just have a couple of
4         follow-up questions.
5                        CROSS-EXAMINATION
6    BY MS. RATTET:
7         Q.    Ms. DeMartino, you testified that Calah
8    Milliman performed a dual role as a customer service
9    manager and a sales manager, is that right?
10        A.    Yes.
11        Q.    Was she always performing a dual role
12   during your time at Empire?
13        A.    No.
14        Q.    What was her original role before she
15   became the CSM/SM?
16        A.    If my memory serves me correctly, I believe
17   she was a sales manager, I believe.
18        Q.    Why was she promoted to or why did she
19   assume a dual role?
20        A.    She wanted more money, so she asked for a
21   raise and the only way that I could justify that raise to
22   Empire was to give her more responsibility.
23        Q.    Was there anyone else at Empire who
24   participated in discussions about, you know, promoting
25   Calah Milliman to the customer service manager's

Page 36

1   position?

2            A.    Yes, it was mostly with Arzu Kanner.

3            Q.    And what was discussed with Arzu?

4            A.    Initially it didn't -- they weren't

5   interested in the dual role.  They were just going to

6   give her a raise, but it was very small.  It was

7   something that Calah wasn't interested in.  And she said

8   that she would walk.

9                 And at that time, I was still fairly new

10  and wasn't aware of the issues that we were having, and

11  so we kind of -- I needed the help and was able to

12  negotiate with Arzu and express the need for a customer

13  service manager, someone to also assist with customer

14  service and Arzu agreed.

15           Q.    Did you have the option to hire a customer

16  service manager independent of promoting Ms. Milliman?

17           A.    No, I didn't.

18           Q.    Was there ever any discussion about hiring

19  another management level employee upon or shortly after

20  your hire at Empire to your recollection?

21           A.    I believe I asked but I don't believe the

22  club was budgeted for both.

23           Q.    And when you say you don't believe the club

24  was budgeted for both, what do you mean by that?

25           A.    We just didn't have enough money in the

Page 37

1  budget to pay two full-time managers.

2        Q.    Was that issue or request for hiring a

3  second manager ever elevated to anyone else at Empire

4  above Arzu Kanner?

5        A.    I believe there was talk of it with Patrick

6  as well.  And he approved it at first and then later had

7  a conversation with someone else.  I don't remember if it

8  was Mike Montella or Leah, I'm not sure, or Anthony but

9  then Patrick -- it wasn't even Patrick that said no.

10  Someone else said -- I believe it was Anthony, that we're

11  not budgeted, so we can't do it.

12        Q.    Were there any other restrictions on your

13  ability to hire employees while you were the general

14  manager at Christi's?

15        A.    We also were not budgeted for a fitness

16  manager.

17        Q.    Would you agree that the status as a

18  pregnant woman cannot be a consideration in a company's

19  decision to terminate that employee?

20        A.    I'm sorry, say that again.

21        Q.    Sure.  Would you agree that someone's

22  status as a pregnant woman cannot be a consideration in a

23  company's decision to terminate that employee?

24        A.    Yes, I agree.

25              MS. RATTET:  I think that's it for me.

Page 38

```
 1              MR. SONDHI:  Just a couple follow ups.
 2                  REDIRECT EXAMINATION
 3   BY MR. SONDHI:
 4        Q.    You said that Calah asked for a raise?
 5        A.    Yes.
 6        Q.    And did you need permission to give raises?
 7        A.    To management, yes, because it was -- would
 8   be a considerable amount.
 9        Q.    I'm sorry.  I didn't catch that last
10   amount.
11        A.    Management, yes, because it was always a
12   considerable amount.  They were paid -- they were
13   salaried.  So it was thousands, not...
14        Q.    Okay.  Have you ever seen a written budget
15   for Christi's?
16        A.    Eventually we got a P&L but no, I don't
17   recall ever seeing a written budget.
18        Q.    Okay.  So when you are saying it is not in
19   the budget, what do you mean by that?
20        A.    Well, that's just what they always told me,
21   that you weren't budgeted.  That was the words they
22   always used.  That just meant to me that there wasn't
23   enough money for that club to pay another salaried
24   employee.
25        Q.    Would that be due to revenues or shortfall
```

Page 39

1    revenues coming into the club?

2            A.     Could be.  Could be due to expenses.

3                   MR. SONDHI:  Okay.  Nothing further.

4                   MS. RATTET:  I think that's it for me.

5                   MR. SONDHI:  We'll order.

6                   MS. RATTET:  We'll get a copy.

7                   (The proceeding is adjourned at 3:08 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 40

CERTIFICATE OF NOTARY PUBLIC

1

2

3    STATE OF FLORIDA

4    COUNTY OF _____

5

6            I, SARABETH DEMARTINO, certify that I have

7    read the foregoing transcript of my deposition and that

8    the statements contained therein, together with any

9    additions or corrections made on the attached Errata

10   Sheet are true and correct.

11

12           Dated this _____ day of _____, 20__.

13

14                    _____

                      SARABETH DEMARTINO

15

16           The foregoing certificate was subscribed to

17   before me this _____ day of _____, 20__, by

18   the witness who has produced a _____ as

19   identification and who did not take an additional oath.

20

21                    _____

                      NOTARY PUBLIC

22

23

24

25

Page 41

```
 1                      ERRATA SHEET
 2    IN RE:  DeMartino vs. Empire
 3    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE:
 4    Page No.      Line No.    Change        Reason
 5    _____/_____/_____/_____
 6    _____/_____/_____/_____
 7    _____/_____/_____/_____
 8    _____/_____/_____/_____
 9    _____/_____/_____/_____
10    _____/_____/_____/_____
11    _____/_____/_____/_____
12    _____/_____/_____/_____
13    _____/_____/_____/_____
14    _____/_____/_____/_____
15    _____/_____/_____/_____
16    _____/_____/_____/_____
17    _____/_____/_____/_____
18    _____/_____/_____/_____
19    _____/_____/_____/_____
20    _____/_____/_____/_____
21    _____/_____/_____/_____
22    _____/_____/_____/_____
23    I have read my deposition in this matter and entered any
      changes in form or substance as reflected above.
24
          _____   _____
25        DATE        SARABETH DEMARTINO
```

```
                                                        Page 42

 1                 CERTIFICATE OF OATH OF WITNESS

 2

 3   STATE OF FLORIDA          )

 4   COUNTY OF ST. LUCIE       )

 5

 6                I, the undersigned Notary Public, in and

 7   for the State of Florida, hereby certify that SARABETH

 8   DEMARTINO personally appeared before me and was duly

 9   sworn.

10

11                WITNESS MY HAND and official seal in the

12   City of Fort Pierce, County of St. Lucie, State of

13   Florida this September 28, 2023.

14

15

16

17

18                     Jennifer L. Bush, RPR, FPR

                       Notary Public

19                     State of Florida at Large.

                       My Commission: #HH 002112

20                     My commission expires:  9/24/24

21

22

23

24

25
```

```
                                                        Page 43

 1                  CERTIFICATE OF REPORTER

 2

 3   STATE OF FLORIDA          )

 4   COUNTY OF ST. LUCIE       )

 5              I, Jennifer L. Bush, Registered Registered

 6   Registered Professional Reporter, do hereby certify that

 7   I was authorized to and did stenographically report the

 8   deposition of SARABETH DEMARTINO; and that a review of

 9   the transcript was requested; and that pages 1 through

10   44, inclusive, are a true record of my stenographic

11   notes.

12              I further certify that I am not a relative,

13   employee, attorney or counsel of any of the parties, nor

14   am I a relative or employee of any of the parties,

15   attorneys or counsel connected with the action, nor am I

16   financially interested in the action.

17

18              Dated this September 28, 2023.

19

20              Jennifer Bush, RPR, FPR

21

22

23

24              The foregoing certification of the
     transcript does not apply to any reproduction of the same
     by and means unless under the direct control and/or
25   direction of the certifying reporter.
```

Page 44

```
1                 VERITEXT LEGAL SOLUTIONS
                     ONE BISCAYNE TOWER
2           2 SOUTH BISCAYNE BLVD., SUITE 2250
                       MIAMI, FL 33131
3                      800-726-7007
4
   September 28, 2023
5
   SARABETH DEMARTINO
6  C/O Allison Marcene Rattet, Esquire
   Morgan & Morgan, P.A.
7  8151 Peters Rd Ste 4000
   Plantation, FL 33324-4012
8
   RE:  DeMartino vs. Empire
9  Deposition of SARABETH DEMARTINO
10 Dear Ms. DeMartino:
11           This letter is to advise you that the
   transcript of the deposition listed above is completed
12 and is awaiting reading and signing.  Depending on the
   length of the transcript, you should allow yourself
13 sufficient time.
14           If the reading and signing has not been
   completed prior to the time of trial, we shall conclude
15 that you have waived the reading and signing of the
   deposition transcript.
16
             Your prompt attention to this matter is
17 appreciated.
18 Sincerely,
19
20
21 Jennifer L. Bush, RPR, FPR
22 CC:  All counsel on appearance page
23
24
25
```

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

| | |
|---|---|
| **Date:** | Wednesday, May 12 2021 03:09 PM |
| **Subject:** | FW: Recruiting tools |
| **From:** | Leah Molino |
| **To:** | Anthony Messina <Anthony.Messina@empireholdings.com >; |
| **Attachments:** | We're Hiring Collateral - Empire Brands.zip; Babysitter job description.docx; Clean team job description.docx; Customer Service Manager job description.docx; Fitness Manager Job Description.docx; MC description_job posting.docx; PT job descriptions.docx; WT description.docx |

Leah Molino
Empire Holdings & Investments, LLC
1001 U.S. Highway 1, Suite 602
Jupiter, FL 33477

---

**From:** Leah Molino
**Sent:** Tuesday, April 20, 2021 2:05 PM
**To:** Anthony Addeo <Anthony.Addeo@tmplclubs.com >; Anthony Testai <anthony.testai@palmbeachsportsclubs.com >; Anthony Slaughter <anthony.slaughter@palmbeachsportsclubs.com >; Paul Sullivan <paul.sullivan@tmplclubs.com >; Jane Nielsen <jane.nielsen@tmplclubs.com >; Melissa Archut <Melissa.Archut@tmplclubs.com >; Kristina Amato <kristina.amato@tmplclubs.com >; Sara DeMartino <Sara.DeMartino@christisfitness.com >; Amarilis Perez <amarilis.perez@livfitnessclub.com >; Sylvia Rodriguez <sylvia.rodriguez@livfitnessclub.com >
**Cc:** Arzu Kaner <Arzu.Kaner@empireholdings.com >; Anthony Messina <Anthony.Messina@empireholdings.com >; Enjam Hossain <Enjam.Hossain@empireholdings.com >; Mario Curcio <mario.curcio@empireholdings.com >; Phillip Juhan <phillip.juhan@empireholdings.com >; Amy Davis <amy.davis@empireholdings.com >; Derek Gale <derek.gale@empireholdings.com >
**Subject:** Recruiting tools

Hi All,

Attached you will find job descriptions/postings, as well as graphics that can be used in conjunction with the job descriptions for LinkedIn or social media posts (thank you Derek and Amy!)

For the job descriptions, please review the highlighted sections to make sure brand name and location is correct. Also please review the Covid-19 precautions section and update to correctly reflect your state's guidelines.

We will be implementing an applicant management system and virtual onboarding experience in future. In the meantime, please feel free to use the e-mail addresses below for any job postings. I will be monitoring the mailboxes and sending resumes your way.

careers@empireholdings.com
careers@christisfitness.com
careers@livfitnessclub.com
careers@palmbeachsportsclubs.com
careers@tmplclubs.com

I hope this helps you in keeping the club well-staffed. Please let me know if you have any questions or need additional support in this area.

Thanks!
Leah

Leah Molino
Empire Holdings & Investments, LLC
1001 U.S. Highway 1, Suite 602
Jupiter, FL 33477

DEF 002556

**EXHIBIT**

29



**Babysitter Job Description**

TMPL Fitness, a leading brand in health and wellness, is looking for Babysitters to join our growing team. Babysitters play a key role in member satisfaction and club success, by creating a fun and safe environment for children.

We are in the business of helping others achieve their fitness goals and live their best life! We achieve this through our innovative training programs, the latest equipment, and a knowledgeable and friendly staff. You will succeed in this role if you:

- Possess a strong work ethic and attention to detail.
- Able to effectively communicate with members and coworkers.
- Model integrity, teamwork, and an all-in attitude.
- Have a passion for fitness, health and wellness.
- Enjoy working with and engaging with children.

Responsibilities include:

- Work with the entire club team to ensure high levels of member service and cleanliness are met.
- Supervise children of various ages and ensure each is engaging in age-appropriate activities.
- Greet members and their children by name.
- Ensure all safety protocols outlined by the club and by the State are met.

Required Skills and Experience:

- High School diploma or GED equivalent.
- 1-2 years experience working with children, in a supervisory or educational role.
- Ability to work nights, weekends and holidays as need.

At TMPL fitness we are committed to the health and wellbeing of our team members. Our goal is to create a workplace that allows employees to live their best life. Our culture is one that encourages both personal and professional growth.

Benefits of a career at TMPL fitness include, but are not limited to:

- Free membership for all team members.
- Discounts on personal training services.
- Competitive compensation.
- Opportunities to grow within the organization.

**COVID-19 precautions**
- Personal protective equipment provided or required.
- Plastic shield at work stations.
- Temperature screenings
- Social distancing guidelines in place
- Sanitizing, disinfecting, or cleaning procedures in place

DEF 002580

**Clean Team Job Description**

TMPL Fitness, a leading brand in health and wellness, is looking for Clean Team members to join our growing team. Clean team members play a key role in member satisfaction and club success, by working to meet and exceed club cleanliness standards.

We are in the business of helping others achieve their fitness goals and live their best life! We achieve this through our innovative training programs, the latest equipment, and a knowledgeable and friendly staff. You will succeed in this role if you:

- Possess a strong work ethic and attention to detail.
- Able to effectively communicate with members and coworkers.
- Model integrity, teamwork, and an all-in attitude.
- Have a passion for fitness, health and wellness.
- Exhibit great time management skills.

Responsibilities include:

- Work with the entire club team to ensure high levels of member service and cleanliness are met.
- Make eye contact and great members while working.
- Complete cleaning duties, outlined by the Manager on Duty.
- Maintain locker room and restroom facilities.
- Walk the fitness floor and wipe down equipment regularly.
- Abide by all safety procedures associated with cleaning products, tools and chemicals.

Required Skills and Experience:

- High School diploma or GED equivalent.
- 1-2 years experience cleaning a large store or high traffic facility.
- The ability to meet physical demands, which include the ability to lift up to 45 pounds with or without reasonable accommodations, walkthrough all areas of facility, repetitive squatting, bending and lifting, restacking of weights, and moving of equipment if needed.
- Ability to work nights, weekends and holidays as need.

At TMPL fitness we are committed to the health and wellbeing of our team members. Our goal is to create a workplace that allows employees to live their best life. Our culture is one that encourages both personal and professional growth.

Benefits of a career at TMPL fitness include, but are not limited to:

- Free membership for all team members.
- Discounts on personal training services.
- Competitive compensation.
- Opportunities to grow within the organization.

**COVID-19 precautions**
- Personal protective equipment provided or required.
- Plastic shield at work stations.
- Temperature screenings
- Social distancing guidelines in place
- Sanitizing, disinfecting, or cleaning procedures in place

DEF 002581



**Customer Service Manager Job Description**

TMPL Fitness, a leading brand in health and wellness, is looking for Customer Service Managers to join our growing team. Customer Service Managers acts as a leader of the club in partnership with the General Manager, with a goal of delivering the best possible member.

We are in the business of helping others achieve their fitness goals and live their best life! We achieve this through our innovative training programs, the latest equipment, and a knowledgeable and friendly staff. You will succeed in this role if you:

- Dedicated to delivering the best member experience throughout all phases of the member lifecycle (prospective member, current member, and former member)
- Able to coach others to achieve their goals and company goal.
- Understands billing and AR practices.
- Able to effectively communicate with members and coworkers.
- Possess a strong desire to deliver an elevated member experience.
- Have a desire to lead and develop others.
- Model integrity, teamwork, and an all-in attitude.
- Have a passion for fitness, health and wellness.
- Unafraid to try new things and to think outside the box.
- Possess attention to detail.
- The ability to empathize with and diffuse escalated member issues.

Responsibilities include:

- Proactively seeking ways to positively impact the member experience and address member feedback.
- Hire and develop a team that's dedicated to delivering a memorable member experience.
- Effectively communicate feedback and direction across multiple departments.
- Work with the entire club team to ensure high levels of member service and cleanliness are met.
- Organize and prioritize billing efforts.
- Lead by example in all customer service and member facing activities.
- Call current members to ensure they are getting the most out of their experience. Constantly seek member feedback so we can proactively improve.
- Conduct regular walkthroughs of the club and address any equipment or cleaning issues with urgency.

Required Skills and Experience:

- 2-4 years prior fitness industry experience in a manager role.
- Prior collections/AR responsibility.
- Ability to work nights, weekends and holidays as needed.
- Experience using a membership management system.
- Experience developing self and others.

At TMPL fitness we are committed to the health and wellbeing of our team members. Our goal is to create a workplace that allows employees to live their best life. Our culture is one that encourages both personal and professional growth.

Benefits of a career with TMPL fitness include, but are not limited to:

- A competitive salary.
- A free membership to our gyms.
- Paid time off.
- Comprehensive health benefits

DEF 002582



**COVID-19 precautions**
- Personal protective equipment provided or required.
- Plastic shield at workstations.
- Temperature screenings
- Social distancing guidelines in place
- Sanitizing, disinfecting, or cleaning procedures in place



**Fitness Manager Job Description**

TMPL Fitness, a leading brand in health and wellness, is looking for Fitness Managers to join our growing team. Fitness Managers play a key role in member satisfaction and club success, by working with the General Manager and Personal Trainers to deliver a spectacular fitness experience to all members, by helping them meet their health and wellness goals.

We are in the business of helping others achieve their fitness goals and live their best life! We achieve this through our innovative training programs, the latest equipment, and a knowledgeable and friendly staff. You will succeed in this role if you:

- Truly care about helping others make positive changes in their life.
- Are motivated to hit sales goals.
- Possess a strong work ethic.
- Able to effectively communicate with members and coworkers.
- Possess a strong desire to coach and educate others.
- Model integrity, teamwork, and an all-in attitude.
- Have a passion for fitness, health and wellness.
- Possess the fitness knowledge and experience to deliver specific, goal-oriented programs for clients.
- Exhibit great time management and organization skills.

Responsibilities include:

- Meeting revenue goals and consistently growing revenue through client retention and new member PT sales.
- Develop personal trainers to sell fitness services and deliver goal-oriented client programming.
- Assist in documenting and organizing client fitness evaluations and programs. Ensuring all documentation processes are followed.
- Maintaining PT certifications and continuing education requirements.
- Effectively communicate promotions and services, so that each client gets the most out of their training experience.
- Conducting fitness assessments as part of the new member experience.
- Partnering with the sales team to ensure a member of the personal training department is available to meet new members and help them understand how you can help them meet their fitness and wellness goals.
- Work with the entire club team to ensure high levels of member service and cleanliness are met.
- Work with the General Manager and Fitness Director to grow and learn in your area of expertise.
- Report directly to General Manager. Works closely with the Fitness Director for support and development.
- Navigate and complete PT admin duties in the member management software.

Required Skills and Experience:

- High School diploma or GED equivalent.
- Bachelor's degree in Exercise Physiology, Kinesiology, Recreation or P.E. related field preferred
- Previous personal training experience.

DEF 002584



- 2-4 years experience managing and developing a team.
- Maintain active, approved Certifications.
- Child & Adult AED/CPR certified.
- The ability to meet physical demands, which include the ability to lift up to 45 pounds with or without reasonable accommodations, walkthrough all areas of facility, repetitive squatting, bending and lifting, restacking of weights, moving of equipment if needed, the ability to demonstrate exercise movements as part of client training sessions.
- The ability to write and deliver programming that meets specific client goals.
- Computer literacy. Comfortable navigating a member management system, Microsoft excel, and basic computer functions.
- Ability to work nights, weekends and holidays as need.

At TMPL fitness we're committed to the health and wellbeing of our team members. Our goal is to create a workplace that allows employees to live their best life. Our culture is one that encourages both personal and professional growth.

Benefits of a career with TMPL fitness include, but are not limited to:

- A competitive salary.
- A free membership to our gyms.
- Paid time off.
- Comprehensive health benefits

**COVID-19 precautions**
- Personal protective equipment provided or required.
- Plastic shield at work stations.
- Temperature screenings
- Social distancing guidelines in place
- Sanitizing, disinfecting, or cleaning procedures in place

DEF 002585



### Membership Consultant Job Description

Palm Beach Sports Clubs, a leading brand in health and wellness, is looking for Membership Consultants to join our growing team. Membership Consultants play a key role in membership sales and retention by providing a spectacular and seamless joining experience for all new members.

We are in the business of helping others achieve their fitness goals and live their best life! We achieve this through our innovative training programs, the latest equipment, and a knowledgeable and friendly staff. You will succeed in this role if you:

- Are a sales driver with the determination to hit sales goals.
- Possess exceptional organization skills.
- Able to effectively communicate with members and coworkers.
- Possess a strong desire to deliver an elevated member experience.
- Have a desire to work along others as part of a team.
- Model integrity, teamwork, and an all-in attitude.
- Are committed to resolving member inquiries.
- Have a passion for fitness, health and wellness.
- Are unafraid to try new things and to think outside the box.
- Enjoy speaking with, engaging with, and getting to know others.

Responsibilities include:

- Proactively seeking ways to positively impact the member experience and address member feedback.
- Effectively communicating new promotions and services, so that each member gets the most out of their visit.
- Respond to phone inquiries and assist members over the phone.
- Work with the entire club team to ensure high levels of member service and cleanliness are met.
- Complete outreach activities inside and outside of the club so that the community is aware of and feels welcome to visit our facility.
- Call prospective members to invite them into the club.
- Call current members to ensure they are getting the most out of their experience.

Required Skills and Experience:

- 1-2 years prior fitness industry experience in a member-facing role and/or prior customer service role.
- 1-2 years prior sales experience and experience meeting quotas.
- Ability to work nights, weekends and holidays as needed.
- Experience using a membership management system and CRM software.
- Exceptional phone etiquette.

DEF 002586



At Palm Beach Sports Clubs we're committed to the health and wellbeing of our team members. Our goal is to create a workplace that allows employees to live their best life. Our culture is one that encourages both personal and professional growth.

Benefits of a career with Palm Beach Sports Clubs include, but are not limited to:

- A competitive salary.
- A free membership to our gyms.
- Paid time off.
- Comprehensive health benefits

**COVID-19 precautions**
- Personal protective equipment provided or required.
- Plastic shield at work stations.
- Temperature screenings
- Social distancing guidelines in place
- Sanitizing, disinfecting, or cleaning procedures in place

DEF 002587



### Personal Trainer Job Description

TMPL Fitness, a leading brand in health and wellness, is looking for Personal Trainers to join our growing team. Personal Trainers play a key role in member satisfaction, by working one-on-one or in small groups with members to help them achieve their health and fitness goals.

We are in the business of helping others achieve their fitness goals and live their best life! We achieve this through our innovative training programs, the latest equipment, and a knowledgeable and friendly staff. You will succeed in this role if you:

- Are motivated and have a strong work ethic.
- Truly care about helping other make positive changes in their life.
- Able to effectively communicate with members and coworkers.
- Possess a strong desire to coach and educate others.
- Model integrity, teamwork, and an all-in attitude.
- Have a passion for fitness, health and wellness.
- The fitness knowledge and experience to deliver specific, goal-oriented programs for clients.

Responsibilities include:

- Documenting and organizing client fitness evaluations and programs.
- Maintaining PT certifications and continuing education requirements.
- Effectively communicate promotions and services, so that each client gets the most out of their training experience.
- Conducting fitness assessments as part of the new member experience.
- Partnering with the sales team to meet new members and help them understand how you can help them meet their goals.
- Work with the entire club team to ensure high levels of member service and cleanliness are met with specific attention to the fitness floor.
- Work with the club fitness leader to grow and learn in your area of expertise.
- Navigate and complete PT admin duties in the member management software.

Required Skills and Experience:

- High School diploma or GED equivalent.
- Previous personal training experience not required, but preferred.
- Maintain active, approved Certifications.
- Child & Adult AED/CPR certified.
- Meeting physical demands, which include the ability to lift up to 45 pounds with or without reasonable accommodations, walkthrough all areas of facility, repetitive squatting, bending and lifting, restacking of weights, moving of equipment if needed, the ability to demonstrate exercise movements as part of client training sessions.
- The ability to write and deliver programming that meets specific client goals.

At TMPL fitness we're committed to the health and wellbeing of our team members. Our goal is to create a workplace that allows employees to live their best life. Our culture is one that encourages both personal and professional growth.

DEF 002588



Benefits of a career with TMPL fitness include, but are not limited to:

- A competitive salary.
- A free membership to our gyms.
- Paid time off.
- Comprehensive health benefits

**COVID-19 precautions**
- Personal protective equipment provided or required.
- Plastic shield at work stations.
- Temperature screenings
- Social distancing guidelines in place
- Sanitizing, disinfecting, or cleaning procedures in place

DEF 002589



**Welcome Team Job Description**

TMPL Fitness, a leading brand in health and wellness, is looking for Welcome Team members to join our growing team. Welcome Team members play a key role in membership and retention by providing a lasting first impression.

We are in the business of helping others achieve their fitness goals and enjoy a luxury fitness experience. We achieve this through our innovative training programs, the latest equipment, and a knowledgeable and friendly staff. You will succeed in this role if you:

- Able to effectively communicate with members and coworkers.
- Possess a strong desire to deliver an elevated member experience.
- Have a desire to work along others as part of a team.
- Model integrity, teamwork, and an all-in attitude.
- Committed to resolving member inquiries.
- Have a passion for fitness, health and wellness.

Responsibilities include:

- Proactively seeking ways to positively impact the member experience and address member feedback.
- Welcome all members and nonmembers into the club with a smile and personalized greeting.
- Maintain security measures and Covid-19 related safety protocols.
- Effectively communicate new promotions and services, so that the member gets the most out of their visit.
- Respond to phone inquiries and assist members over the phone.
- The ability to multitask.

Required Skills and Experience:

- 1-2 years prior fitness industry experience in a member-facing role and/or prior customer service role.
- Experience working with computer systems and navigating through work screens.
- Ability to work nights, weekends and holidays as needed.

At TMPL fitness we are committed to the health and wellbeing of our team members. Our goal is to create a workplace that allows employees to live their best life. Our culture is one that encourages both personal and professional growth.

Benefits of a career at TMPL fitness include, but are not limited to:

- Free membership for all team members.
- Discounts on personal training services.
- Competitive compensation.
- Opportunities to grow within the organization.

**COVID-19 precautions**
- Personal protective equipment provided or required.
- Plastic shield at work stations.



- Temperature screenings
- Social distancing guidelines in place
- Sanitizing, disinfecting, or cleaning procedures in place

DEF 002591

Date:           Thursday, August 12 2021 06:42 PM
Subject:        Fwd: Production and Performance
From:           Leah Molino
To:             Anthony Messina <Anthony.Messina@empireholdings.com >;
Attachments:    image001.png

Sent from my iPhone
Begin forwarded message:

> **From:** Sara DeMartino <Sara.DeMartino@christisfitness.com >
> **Date:** August 12, 2021 at 6:34:52 PM EDT
> **To:** Calah Milliman <calah.milliman@christisfitness.com >
> **Subject: Production and Performance**
>
> Hey Calah,
>
> After discovering today that you gave Kayla a task that I specifically asked you to do (info based on Moso notes and not the first time), I feel it my responsibility to call you out a little. I know calls aren't being made by you and this is a concern.
>
> I ask you to do certain things because I need to know that a manager is handling them and to ensure you are making the most of your time while on the clock. I have asked you several times to personally call and not email members and these activities are just not happening. You tell me yourself that you often don't have things to do. As a manager, there's always something to do. We find things to do. We are always busy.
>
> The business is suffering, and it is our job to do the best we can to create and retain business. As the Customer Service Manager/Sales Manager, you are directly responsible to ensure that the club runs as a well-oiled machine and sales are always a focus. This means the front desk is 100% trained on all things and are delivering friendly, accurate service. The club is clean. A plan is in place to increase member count. Your personal sales have dropped to 0. As the sales manager, you need to come up with a way to get something on the board. Your production will need to be self-generated if no one is walking in.
>
>
> Below is a list of things you can do when you find you have time on your hands. These are things that should be done on a regular basis, but not all necessarily every day.
>
> -Check for members coming off freeze and call them to remind them.
> -Run the AR report and call past dues beginning with 3 months (soon to be cancelled). Give only 30 day past dues to desk to push and call to update credit cards.
> -Call each new member after checking their check in history. Ask them how their experience has been so far, if they have any questions, and if they haven't been in, ask them why not.
> -Run guest pass report and follow up.
> -Run a check in report and look for members checking in with a past due balance. Call the member and address the check in with the responsible WT member.
> -Create a prospecting activity for every day of the week, indoors and outdoors, that you will accompany MC on.
> -Hold 1 on 1 meetings with staff regarding performance. Upskill.
> -Take time to be at the front desk. Check for practices that may need adjustment and take the opportunity to coach in the moment.
> -Do a thorough walk through. Check for ripped pads. Sit on machines and check for cleanliness from the members POV.

DEF 002661

**EXHIBIT**

30

Check for paper and soap products that need to be refilled. Check studios. Check for lights out. Damaged ceiling tiles. Let the members see you on the floor.

-Personally talk to every single member trying to cancel (even gymnastics) and try to save them. At the end of the day, it is still your responsibility to protect the business no matter the department.

In addition to these items, I have received feedback from several different sources, members and staff, one of which claims she will be contacting Patrick about the way she was talked to at the desk (not sure who this was, I didn't hear it myself). I know you get stressed out and overwhelmed sometimes as do most of us, but Customer Service is your actual title. Be patient, be kind, be helpful and understanding even when you wanna scream. Its just how we roll in the service industry. Theres no such thing as "I don't know" or "I can't help you with that". This goes for members and staff alike. If theres something you don't know how to do, just ask me and I will teach you and this includes how to handle ADP issues. When I'm not here, you are the MOD and everything is your job. I do appreciate how you have been helping more lately and working your hours, but there are still a few things that we need to work on. Let me know if there is anything in this email you would like to discuss.

Please don't take this personal. It's my job to address this.

Thank you,

Sara DeMartino
General Manager
Office: 772-563-0905
1250 Old Dixie Highway
Sara.demartino@christifitness.com



Ok thank you. I'll speak to Arzu moving forward. Thought this was an HR issue.

Thank you,

**Sara DeMartino | General Manager**
**Christi's Fitness**
sara.demartino@christisfitness.com
<image001.png>

---

**From:** Leah Molino <Leah.Molino@empireholdings.com >
**Sent:** Thursday, March 25, 2021 4:54 PM
**To:** Sara DeMartino <Sara.DeMartino@christisfitness.com >
**Cc:** Arzu Kaner <Arzu.Kaner@empireholdings.com >
**Subject:** RE: Kayleigh Fee

Hi,

Looping in Arzu. You should really make any termination decisions with her. I would suggest getting things in writing as much as possible though. Even if you're just e-mailing her a recap of the fact that she's declining work without finding coverage and this is a policy violation. Also, you can start removing her from the schedule as much as possible for April to limit being in this situation again. Maybe she will resign at that point.

Leah Molino
Empire Holdings & Investments, LLC
1001 U.S. Highway 1, Suite 602
Jupiter, FL 33477

---

**From:** Sara DeMartino <Sara.DeMartino@christisfitness.com >
**Sent:** Thursday, March 25, 2021 4:29 PM
**To:** Leah Molino <Leah.Molino@empireholdings.com >
**Subject:** Kayleigh Fee

Hey Leah,

I know we mentioned previously that Florida is an at will state and the process for termination is far easier than in NY but I'd like to run this by you first.

This employee has called out on weekends for the last month.
On Sunday morning, she texted me that she was in the hospital and couldn't work her shift that day. I couldn't find coverage so I would up working for her (why I took off Monday). She sent me a doctors note putting her out of work from 3-22 to 3-29. I told her no problem that we would handle it but she said that she didn't need off that long and would come to work after just 2 days out. I found coverage for her Monday and Wednesday shift and she should have been back today.

Yesterday I got a text from her saying that it has been a crazy week for her and her boyfriend has court this week and couldn't come in. I asked if she could at least work her Saturday shift since courts are closed and she has not responded.

I would like to term her at this point. Although she did have a doctors note and I offered the suggested days off to her, she declined and only wanted 3 days off just to turn around and stick me with them. I am now stuck working them. Please let me know what you think.

Thank you,

**Sara DeMartino | General Manager**
**Christi's Fitness**

DEF 002775

EXHIBIT
31

| | |
|---|---|
| **Date:** | Monday, October 4 2021 09:36 PM |
| **Subject:** | Re: Reagan Gibbons |
| **From:** | Leah Molino |
| **To:** | Sara DeMartino <Sara.DeMartino@christisfitness.com >; |

Hi Sara,

These situations all really should have been documented. I know you know that, but just stressing the importance for future situations. I would recommend documenting her going forward. If she's behaving that badly if shouldn't take long to get the proper documentation together to terminate her for the behavior. I'm not sure if Jose has experience with performance management so I think it would be good for you to be involved in the process.

If there were issues today (or on her most recent shift) you can start documenting from there so expectations are clear going into her next shift.


Sent from my iPhone


On Oct 4, 2021, at 9:11 PM, Sara DeMartino <Sara.DeMartino@christisfitness.com > wrote:


Hello Leah,

Jose and I are having some trouble with an employee and we were hoping you could give us a little guidance.

Reagan Gibbons has been with us for about 4 months now. A month ago, she told us she is pregnant and had about a month to go before she goes out on maternity. Reagan has been ignoring Jose's requests to get off her phone and address members when they walk in and she continues to do what she wants. On two occasions, she has left the gym after being reprimanded by Jose claiming to be tired or not feel well leaving someone else to cover the desk. Today, Jose asked her to take her feet off the desk (not on top of the desk but resting on a shelf under the desk) and get off her phone. Minutes later, she was right back in the same position with her phone in hand. Now here's the tricky part.... Reagan says that she said she was tired and Jose told her to go home.... Jose says Reagan got an attitude and declared she was going home and left after being reprimanded by Jose.

None of these incidents have been documented. Jose and I would move to term but I want to see what you think first. She is pregnant and I have the thought that she could claim she was termed because of the pregnancy. I suggested possibly cutting down her shifts but Jose is convinced that she will not change and should go. What do you think?


Thank you,

**Sara DeMartino | General Manager**
**Christi's Fitness**
sara.demartino@christisfitness.com

DEF 002916

EXHIBIT

32

# EXHIBIT C

```
 1

 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
 3   FORT PIERCE DIVISION
     - - - - - - - - - - - - - - - - - x
 4   SARABETH DEMARTINO,

 5
                         Plaintiff,
 6
               vs.
 7                            Case No.
                           22-cv-14301-CANNON
 8

 9   EMPIRE HOLDINGS AND INVESTMENTS, LLC;
     and JUAN CARLOS MARRERO,
10
                         Defendants.
11   - - - - - - - - - - - - - - - - - x
             DATE:  Wednesday, May 24, 2023
12           TIME:  10:00 a.m.

13           Volume I

14           Deposition of LEAH MOLINO,

15   Defendant, taken by Plaintiff, in the

16   above-entitled action, held via Zoom, pursuant

17   to notice, taken before Elizabeth A. Stella, a

18   Stenographer and Notary Public within and for

19   the State of New York.

20

21

22

23

24

25
```

```
 1

 2    R E M O T E   A P P E A R A N C E S:

 3           MORGAN & MORGAN, PA
                   Attorneys for Plaintiff
 4                 8151 Peters Road, 4th Floor
                   Plantation, Florida 33324
 5                 (954)807-7774

 6           BY:  ALLISON M. RATTET, ESQ.
                   arattet@forthepeople.com
 7
             BY:  BRYAN ARBEIT, ESQ.
 8                 barbeit@forthepeople.com

 9
             JACKSON LEWIS, P.C.
10                 Attorneys for Defendant
                   One Biscayne Tower, Suite 3500
11                 2 South Biscayne Boulevard
                   Miami, Florida 105581
12                 (305)577-7600

13           BY:  RANJIV SONDHI, ESQ.
                   ranjiv.sondhi@jacksonlewis.com
14
             BY:  PEDRO TORRES-DIAZ, ESQ.
15           Pedro.torres-diaz@jacksonlewis.com

16

17

18    ALSO PRESENT:  Sarabeth DeMartino, Plaintiff

19

20

21

22

23

24

25
```

```
 1
 2                    STIPULATIONS
 3            It is hereby stipulated and
 4    agreed by counsel and among counsel for the
 5    respective parties hereto, that the filing,
 6    sealing, and certification of the witness'
 7    deposition shall be and the same are hereby
 8    waived; it is further stipulated and agreed
 9    that all objections, except as to the form of
10    the question, shall be reserved to the time of
11    trial; it is further stipulated and agreed
12    that the within deposition may be signed
13    before any notary public with the same force
14    and effect as if signed and sworn to before
15    the Court.
16
17
18
19
20
21
22
23
24
25
```

1   L E A H   M O L I N O, the witness herein,

2   having been sworn, remotely, upon being

3   examined testified as follows:

4   EXAMINATION BY MS. RATTET:

5        Q    Hi, good morning, Ms. Molino.  How

6   are you today?

7        A    Good morning.  How are you?

8        Q    I'm well, thank you.  My name is

9   Allie Rattet, and I'm the attorney for Sara

10  DeMartino in her case against Empire and J.C.

11  Marrero.  Can you please state and spell your

12  name for the record.

13       A    It's Leah, L-E-A-H, Molino,

14  M-O-L-I-N-O.

15       Q    And have you ever gone by any other

16  names or aliases?

17       A    I went by the name Leah Wilson up

18  until I was 18 years old.

19       Q    Okay.  And that was your maiden

20  name, Leah Wilson?

21       A    No.  It was my father's last name,

22  and I changed it to Molino as a Christmas gift

23  to my mom when I turned 18.

24       Q    Approximately when was that, what

25  year?

```
1        A    I think it was 2006 or 2007.
2        Q    Okay.  And what is your current
3   residential address?
4        A    4162 Deep Creek Terrace, Parish,
5   Florida 34219.
6        Q    And have you always lived in the
7   State of Florida?
8        A    I have not.
9        Q    Where did you previously live?
10       A    I lived in New Jersey.
11       Q    Okay.  For what years were you
12  living in New Jersey?
13       A    I lived in New Jersey my entire
14  life up until 2021.  I moved to Florida April
15  2021.
16       Q    Okay.  And what was the reason for
17  your move to Florida?
18       A    Mostly to be closer to family that
19  I have here and just better quality of life
20  with year-round sunshine.
21       Q    I understand.  I did the same.
22  Have you been previously deposed ever in a
23  lawsuit?
24       A    I have.
25       Q    Okay.  When was the last time that
```

```
 1   you were deposed?
 2        A    January.
 3        Q    Of 2023?
 4        A    Yes.
 5        Q    And what was the reason for the
 6   deposition?
 7        A    I was a witness in -- I was deposed
 8   as a witness in a case not involving this
 9   company.  It was against, I guess, UTSI and
10   Patrick Walsh and involved the Massachusetts
11   attorney general.
12        Q    Okay.  And do you remember what the
13   claims in that case were?
14        A    I don't know the specific claims,
15   but I do know that it was in relation to
16   billing that occurred in April 1st, 2020, when
17   the clubs were shut down unexpectedly due to
18   COVID.
19        Q    Okay.  And was that a civil or a
20   criminal matter?
21        A    I believe civil, but -- I believe
22   civil.
23        Q    And was Mr. Walsh a named defendant
24   in that matter?
25        A    I believe so, but I'm not 100
```

```
1    percent sure.
2         Q    Okay.  So seeing that you've had
3    your deposition taken rather recently, I'm
4    sure that you're familiar with the ground
5    rules and trying not to talk over one another.
6    Allow me to finish my question before you
7    start answering, and also that allows your
8    attorney to lodge any objections that he may
9    have.  Also, I'm bound to ask poorly-worded
10   questions during the course of today, so if
11   you don't understand a question, please let me
12   know.  I'm happy to rephrase.  If you do
13   provide an answer though, I will understand
14   that you understood the question asked.
15        From time to time, the attorney, or
16   your attorney will object, so I'm still
17   entitled to your response.  If he instructs
18   you not to answer, then that's the only point
19   at which you would not have to give a response
20   to me.
21        Is there any reason that you would not
22   be able to testify truthfully today?
23        A    No, there is not.
24        Q    Okay.  Any reason why the
25   deposition should not move forward today?
```

```
 1        A     No, there is not.

 2        Q     Okay.  Are you taking any

 3   medications that would interfere with your

 4   ability to testify truthfully or remember

 5   events clearly?

 6        A     No, I am not.

 7        Q     Okay.  And do you understand that

 8   you're here today both in your individual

 9   capacity and also as the corporate

10   representative for Empire?

11        A     Yes, I understand.

12        Q     Okay.  And when I say Empire today,

13   you will know that I'm referring to Empire

14   Holdings and Investments, LLC, the defendant

15   in this lawsuit?

16        A     Yes.

17        Q     Okay.  Let's do just a little bit

18   of background.  Are you married, Ms. Molino?

19        A     I am not.

20        Q     Do you have children?

21        A     I do.

22        Q     How many children do you have?

23        A     I have one child.

24        Q     Okay.  And what is the age of your

25   child?
```

```
 1        A    Four.
 2        Q    Okay.  Have you ever been convicted
 3   of a crime?
 4        A    No, I have not.
 5        Q    Have you ever been charged with a
 6   crime of dishonesty?
 7        A    No, I have not.
 8        Q    Have you ever filed a lawsuit or
 9   been the plaintiff in a lawsuit?
10        A    No.
11        Q    Have you ever had a lawsuit filed
12   against you such that you were the defendant
13   in the lawsuit?
14        A    No.
15        Q    Have you ever filed for bankruptcy?
16        A    No.
17        Q    Have you ever filed for divorce?
18        A    No.
19        Q    Okay.  What is your highest level
20   of education?
21        A    Bachelor's degree.
22        Q    Okay.  And where did you obtain
23   your bachelor's degree from?
24        A    Monmouth University in Long Branch,
25   New Jersey.
```

1       Q    Okay.  And what was the degree for?

2       A    Communications and a minor in

3  English.

4       Q    Okay.  Any other classes or

5  certifications that you've taken?

6       A    No.

7       Q    Have you taken any continuing

8  education courses related to your current

9  position?

10       A    No.

11       Q    And just to be clear, your current

12  position is the HR director at Empire?

13       A    My current title is vice president

14  of operations and finance.

15       Q    Okay.  And when did you become the

16  vice president of operations and finance?

17       A    In December 2022.

18       Q    Okay.  And what was the reason for

19  the change to that role?

20       A    I took over more responsibilities.

21  So I still oversee the HR functions.  We have

22  that under the operations umbrella, but I took

23  over more responsibilities on the finance side

24  and operations side.

25       Q    Are there any other departments

```
 1    within the Empire organization, and we'll get
 2    to that later today, you understand what I
 3    mean under Empire or within the organization?
 4         A    Yeah.  Any other departments you're
 5    asking?
 6         Q    Yeah.  So are there any other
 7    departments that you oversee now as the VP of
 8    finance and operations?
 9         A    No.
10         Q    No?
11         A    No.
12         Q    So you would just oversee the HR
13    department then?
14         A    I mean, yes.  I am the HR
15    department.
16         Q    Okay.  So there's no separate
17    department for HR, it just all is kind of
18    within --
19         A    Yeah.  Yeah.  We're a relatively
20    small organization, so there's not a bunch of
21    different departments.
22         Q    Okay.  When you say relatively
23    small, how many employees?
24         A    Approximately 500 across the ten
25    clubs.
```

```
1          Q    Okay.  And prior to being the VP of
2     operations and finance -- I mean vice
3     president when I say VP -- you were the HR
4     director at Empire?
5          A    I was.  Yes.
6          Q    And when did you become the HR
7     director?
8          A    I was hired as the HR director in
9     December 2020.
10         Q    Had you previously worked in human
11    resources prior to December of 2020?
12         A    Not formally.
13         Q    What do you mean when you say not
14    formally?
15         A    I worked closely with the HR
16    department and was involved in some HR
17    functions at my previous employer.
18         Q    Okay.  And who was your previous
19    employer?
20         A    Town Sports International.
21         Q    And when you say that you were
22    involved in some of the HR functions at Town
23    Sports International, what do you mean by
24    that?
25         A    Well, I was involved in learning
```

1   and development as a facilitator of classes.

2   I was involved in creating training programs

3   with the learning and development team.  In my

4   market leader role there, I was responsible,

5   you know, for the hiring and termination of a

6   pretty large team.  I did work alongside an HR

7   director with that, but, you know, we worked

8   very closely together, so that was my

9   involvement.

10          Q    Okay.  So your title at TSI when

11  you were performing some of these HR functions

12  was market leader?

13          A    That was one of my titles at TSI,

14  yes.  I worked there for a long time, so I

15  held many titles.

16          Q    Okay.  So from what years were you

17  the market leader?

18          A    I want to say maybe 2017 to 2018.

19          Q    And prior to that, did you have any

20  HR function?

21          A    I was a business director then, so

22  again, I worked closely with the HR team, but

23  no, not as much HR function in that role.

24          Q    Okay.  And what years were you the

25  business director at TSI?

```
 1          A     Probably, I want to say 2015 to
 2     2017.
 3          Q     Okay.  So in your role as the
 4     market leader, you said that you were involved
 5     in training programs, creating training
 6     programs.  What did that entail?
 7          A     I was involved in developing
 8     success profiles for various roles, different
 9     training, such as sales management training,
10     trainings for our sports club for kids
11     department.  Those are the ones that I
12     remember.  There may be others, but that's
13     what I remember.
14          Q     Okay.  What do you mean when you
15     say you helped to develop success profiles?
16          A     Um-hum.  That was a tool we used at
17     the previous company, and it was an outline of
18     what success -- we still do have it actually,
19     we brought something similar over to here, but
20     it was a tool to outline what success looks
21     like for different roles within the
22     organization.
23          Q     Okay.  What, for a GM, for example,
24     a general manger within the organization, what
25     would a success profile look like?
```

1      A      It's a pretty, you know, long

2   document.  It has what it looks like to meet

3   expectations, exceed expectations, that type

4   of thing.

5      Q      So general job duties and

6   responsibilities?

7      A      Yes.

8      Q      Did you ever or were you ever

9   involved in developing trainings related to

10  antidiscrimination, antiharassment,

11  antiretaliation?

12     A      I was not.

13     Q      Were you involved in creating any

14  equal employment type policies?

15     A      I was not.

16     Q      And just to be clear for the

17  record, this is relating to your job as the

18  market leader at TSI, correct?

19     A      Yes.

20     Q      How did you come to be the director

21  of human resources at Empire?

22     A      I was looking for a new job.  I was

23  laid off from TSI.  My position was eliminated

24  there, and -- I was offered a different

25  position but I declined it -- and then I was

```
 1   interviewing for a few jobs.  I interviewed
 2   with the CFO at the time who was Phil Juhan,
 3   and he offered me the job.
 4        Q    Did you have any HR experience
 5   prior to him offering that, aside from what
 6   we've already discussed in your role as the
 7   market leader?
 8        A    Well, I was very involved in HR as
 9   well.  After I became the market leader I
10   transitioned to a club services role where I
11   worked to support all the clubs in the
12   organization.  So I was involved in policies,
13   training on, you know, payroll, implementing a
14   new payroll system, and then during the
15   closure, I was kept on and I worked closely
16   with the HR team.  I was responsible for, you
17   know, some of the layoffs that occurred as
18   part of the club closers during COVID, as well
19   as bringing people back on and training them
20   for the COVID policies and procedures we had.
21   It varied state by state.  So I was
22   responsible for that in New Jersey, where I
23   lived at the time, so I had definitely more
24   exposure during that time as well.
25        Q    Okay.  And when you say -- you
```

```
 1   mentioned something about policies.  Can you
 2   explain that a bit more.
 3        A    Yeah.  I mean all kinds of
 4   different policies that impact the club,
 5   membership policies.  I'm not -- struggling to
 6   give a specific example, but membership
 7   policies, employee policies, sales policies,
 8   processes as well.  Those types of things.
 9        Q    And which specific employee
10   policies were you involved with?
11        A    I can't recall any off the top of
12   my head.
13        Q    Okay.  Were you involved in
14   preparing or drafting any antidiscrimination
15   policies?
16        A    No.
17        Q    Were you involved in preparing or
18   drafting any policies related to
19   antiretaliation?
20        A    No.
21        Q    Were you involved in any policies
22   related to taking leave under the FMLA?
23        A    No.
24        Q    Were you involved in any policies
25   related to pregnant workers?
```

```
1          A     No.
2          Q     Did you have any exposure to any
3    policies related to antidiscrimination or
4    antiharassment prior to your role as the HR
5    director in 2020?
6          A     Yes.  I mean, we were always
7    exposed to those policies as part of working
8    for a large company.
9          Q     Sure.  That makes sense to me.  But
10   did you have any, you know, hands-on
11   involvement in creating those policies?
12         A     No.
13         Q     Did you have any training related
14   to implementing those policies?
15         A     No.
16         Q     Did you attend any courses related
17   to, you know, antidiscrimination or
18   antiharassment to bring yourself up to speed
19   as the HR director?
20         A     No. Well, I did in this role, not
21   at the old company.  I've gone through the New
22   York State antiharassment trainings.
23         Q     Okay.  And that's what I'm talking
24   about, your role in December 2020.
25         A     Oh, yes.  Yes.  Yep.  Yes.
```

```
 1          Q    Okay.  So you took classes at the
 2   -- New York harassment training classes?
 3          A    Yes.
 4          Q    Okay.  Are those mandatory courses?
 5          A    For our New York employees they
 6   are.
 7          Q    Okay.  And when did you take those
 8   courses?
 9          A    December 2020.  And then I've taken
10   it every year since, in July of every year.
11   So most recently I took it July 2022, and I'll
12   take it again this year.
13          Q    As the HR director at Empire, did
14   you have any employees who reported directly
15   to you?
16          A    No.
17          Q    Have you ever had any employees who
18   are your direct reports?
19          A    In my career?
20          Q    Let's go at TSI, when you were the
21   market leader --
22          A    Yes.
23          Q    -- in that role?
24          A    Yes.
25          Q    Okay.  How many employees?
```

```
 1        A    I had about, probably, I don't
 2   know, five to ten business directors that
 3   reported directly to me overseeing 30 gyms, 30
 4   locations.
 5        Q    So who else -- so if I'm
 6   understanding you correctly, no employees
 7   reported to you in your role as the HR
 8   director.  Did anyone assist you in handling
 9   the HR functions at Empire?
10        A    No.  I mean, if we needed
11   assistance, we would seek legal counsel.
12        Q    Okay.  So we discussed earlier that
13   you're here today in your role as both an
14   individual and as the corporate representative
15   for Empire, correct?
16        A    Yes.
17        Q    Okay.  So, and you currently work
18   for Empire, right?
19        A    I do.
20        Q    I'm going to share a document.
21   This will be marked as Exhibit 1.
22        (Corporate representative Exhibit 1 was
23         introduced for the record.)
24        Q    Ms. Molino, are you seeing that
25   clearly on your screen?
```

```
 1          A     Yes.

 2          Q     Have you seen this document before?

 3          A     Yes.

 4          Q     And I can represent that it may

 5     have been slightly changed since --

 6            (Technical disruption.)

 7          Q     So before we had that slight

 8     technical issue, I was about to share my

 9     screen.  So I think I said that this document

10     may have been slightly changed since you may

11     have seen it.  Actually -- strike that.

12            When was the first time that you saw a

13     document that looked like this?

14          A     So this is the corporate

15     representative document; is that right?

16          Q     That's correct.

17          A     I just saw that, I believe,

18     yesterday or the day prior for the first time.

19          Q     Okay.  And when you saw this

20     notice, did you review each topic in detail?

21          A     Yes.

22            MR. SONDHI:  I'm just going to object on

23        the term -- for anything that -- and to

24        instruct Leah that anything that we discussed

25        is attorney-client privilege and you don't have
```

```
1           to answer any questions related to any

2       communications between us.

3           Q    Yeah.  I don't want to hear

4   anything that you discussed specifically with

5   your attorney.  I simply want to know, you

6   know, the basics.  Nothing else.  And if we're

7   veering into that territory, I'm sure that

8   Mr. Sondhi will cut me off.

9           Okay.  So you saw this for the first

10  time either yesterday or the day prior?

11      A    Yes.  I believe I looked at it

12  briefly the day prior, but I didn't really

13  review it until yesterday.

14      Q    Okay.  And when you say review, how

15  much time did you take to look at this

16  document?

17      A    Maybe an hour.

18      Q    And since when have you known that

19  you would be the corporate representative

20  testifying here today?

21      A    Since yesterday.

22      Q    And you understand that you have an

23  obligation to be prepared to testify regarding

24  the topics in this notice?

25      A    Yes, I understand.
```

```
 1          Q     And you understand that you're
 2  testifying as the corporate representative
 3  with the most knowledge and information
 4  available to the company on those topics?
 5          A     Yes.
 6          Q     And I'm going to ask you
 7  specifically for each topic, but in general,
 8  approximately how long in total did you spend
 9  preparing for today's deposition in the
10  capacity as the corporate representative?
11          A     An hour.
12          Q     An hour total?
13          A     Yes.
14          Q     Did you spend the same amount of
15  time, approximately, preparing for each one of
16  the topics included in this deposition notice?
17          A     Meaning like did I spend the same
18  amount of time for each one, like, whatever,
19  five minutes, five minutes, five minutes?  Is
20  that what you mean?
21          Q     That's what I mean.
22          A     Yes.
23          Q     Ms. Molino, can you see what is
24  Topic 1 on the second page of this document?
25          A     Yes.
```

```
1          Q     Are you the corporate
2     representative with the knowledge and
3     information available to Empire Holdings and
4     Investments, LLC, Empire, regarding
5     plaintiff's job duties and responsibilities?
6          A     Yes.
7          Q     Did you speak with anyone to
8     prepare for this topic, other than your
9     attorney?
10         A     No.
11         Q     Did you review any documents to
12    prepare for this topic?
13         A     No.
14         Q     So you're going to be testifying as
15    the corporate representative specifically from
16    your own memory about plaintiff's job duties
17    and responsibilities?
18         A     Based on the job descriptions that
19    we have provided.
20         Q     Okay.  But did you review that
21    document in preparation for this topic?
22         A     No, I did not.
23         Q     When was the last time you reviewed
24    the job description as the general manager?
25         A     Within the last week or two.  I
```

1    review it pretty regularly.

2          Q    Okay.  Did you bring any documents

3    with you relevant to this particular topic?

4          A    I did not.

5          Q    What were Ms. DeMartino's job

6    duties as the general manager for Empire?

7          A    So the general manager has P&L

8    responsibility for their location.  They are

9    to act as an owner/operator and contribute to

10   revenue growth, as well as controlling

11   expenses.  They're responsible for hiring, as

12   well as any performance management or

13   terminating of employees.  They are

14   responsible for running the day-to-day

15   operations of the club, including any facility

16   issues that may come up, and driving sales

17   revenue through personal training, general

18   membership, and any other ancillary revenue

19   streams.

20         Q    And when you say that a general

21   manager is to act as the owner/operator, what

22   do you mean by that?

23         A    Owner/operator mindset, so, you

24   know, if this was my business, how would I

25   make it profitable.  If my family were to

```
 1   depend on this business to be profitable for
 2   me to put food on my table, how would I make
 3   it profitable.  So it's really about the
 4   mindset of driving profitability through
 5   increasing revenue and also controlling
 6   expenses.
 7         Q    Okay.  And if the owner, if you're
 8   supposed to have an owner/operator mindset as
 9   a general manager at Empire, is it Empire's
10   position that that gives the general manager a
11   lot of control over the day-to-day operations
12   of the particular club?
13         A    Yes.  So, I mean, it's a vague
14   question, so I mean... If you want to be --
15   can you be more specific?
16         Q    I can be more specific, but you
17   just answered yes.
18         A    Okay.  So yes.
19         Q    Okay.  So does the general manager
20   report to anyone, even though they're in this
21   owner/operator role?
22         A    Yes.  They have a business director
23   typically or somebody who supports them on the
24   corporate level.
25         Q    So in typical situations, a
```

```
 1   business director would oversee the general

 2   manager.  Who else might oversee a general

 3   manager if no business director is involved?

 4        A    Well, the way everything is now,

 5   the general managers report to me.  At the

 6   time that Sara was employed, we had a business

 7   director and vice president of sales, Anthony

 8   Messina.

 9        Q    And what do you mean when you say

10   that part of the job duties and

11   responsibilities of a general manager is to

12   contribute to revenue growth?

13        A    It is their job to make sure that

14   revenue is growing.

15        Q    Right, but are there specific

16   things that they are required to do in order

17   to effectuate revenue growth?

18        A    Yeah.  Selling memberships,

19   personal training, ancillary revenue services,

20   whether that be babysitting, you know, pro

21   shop at the front desk with waters in it,

22   whatever that is.

23        Q    And with respect to hiring and

24   firing, given that it's Empire's position that

25   the general manager is to act as an
```

1    owner/operator, does the -- is the general

2    manager allowed or permitted to delegate

3    hiring and firing authority to other managers

4    within that particular club?

5         A    Yes.  They can, but it's ultimately

6    their responsibility.

7         Q    So even if a general manager were

8    to delegate hiring responsibilities, say, for

9    instance, a personal training department or

10   that type of function, then is there any

11   responsibility on the manager of personal

12   training or the personal training manager if

13   those hiring things, or hiring requirements

14   are not effectuated?

15        A    Yes.  But it's up to the general

16   manager to hold their team accountable because

17   they're ultimately accountable to the results

18   and the P&L results.

19        Q    Okay.  And what would be the

20   example of holding someone accountable if the

21   duty was delegated, for instance, the personal

22   training hiring delegated to the personal

23   training manager?

24        A    Could be performance management in

25   the terms of coaching conversations,

```
 1   performance notice.  If it was repetitive, it
 2   could lead to termination.
 3        Q    And if the general manager were to
 4   initiate any of those things that you just
 5   mentioned, like performance management and the
 6   like, would that absolve the general manager
 7   of those responsibilities so long as he or she
 8   were handling the consequences --
 9        A    No.
10        Q    -- or the performance of that
11   particular PT manager?
12        A    No.
13        Q    And when you say day-to-day
14   activities as one of the job duties and
15   responsibilities of a general manager, what
16   specifically do you mean by that?
17        A    Overseeing the sales process that
18   call drives were happening, that the AR calls,
19   meaning accounts receivable, calls are
20   happening to people who are past due, that
21   people are checking into the club, their
22   questions are being answered, the welcome team
23   is greeting them, as per their job
24   description, so day-to-day activities of the
25   club, walk-throughs are happening, if there's
```

```
1    a facility issue they are taking the
2    appropriate steps to resolve it, whether that
3    is reaching out to a vendor themselves or our
4    facility technician for the area to come in
5    and do a repair.  That type of thing is what
6    goes into running a gym on a day-to-day basis.
7          Q    And are there any other things that
8    may go into running a gym on a day-to-day
9    basis and/or fall within the purview of the
10   job duties of a general manager that may not
11   be included in the job description for the
12   general manager?
13         A    No, not that I can think of.
14         Q    So if a general manager had job
15   duties and responsibilities not described in
16   her job description, for example, ones only a
17   supervisor might know about, would you know
18   about those things?
19         A    I'm not understanding the question.
20         Q    Sure.  It was a poorly-worded
21   question.  So basically what I'm trying to
22   find out is, you told me or your testified
23   earlier that you did not -- or that you
24   reviewed a general manager job description,
25   not in preparation for this -- today 's
```

```
1    deposition as the corporate representative,
2    correct?
3         A    Yes.
4         Q    And you did not speak with anyone
5    in preparation for today's deposition as the
6    corporate representative for Empire, correct?
7         A    Correct.
8         Q    Okay.  So my question for you is:
9    If a general manager, and in this case the
10   plaintiff, had job duties and responsibilities
11   not described in the job description that you
12   reviewed, not in preparation for today's
13   deposition, you wouldn't know what those were
14   then, right?
15             MR. SONDHI:  Object to form.
16                  You can answer.
17        A    I'm still not sure I'm completely
18   understanding the question, but if I am, if
19   the supervisor assigned a general manager job
20   duties that were not in the job description,
21   would I know about it, and the answer to that
22   is no.
23        Q    Okay.  Did you think that in
24   preparation for today's deposition as the
25   corporate representative for Empire that that
```

```
 1   would be an important thing to ask?
 2              MR. SONDHI:  Object to form.
 3        A    Ask who?
 4        Q    A supervisor of Ms. DeMartino?
 5        A    Like talking to J.C. is what you
 6   mean?
 7        Q    Yeah.  I mean talking to any
 8   supervisor that Ms. DeMartino had while she
 9   was a general manager at Christi's.
10        A    No.  I didn't think that was
11   something that I needed to ask anybody.
12        Q    And is it possible that there are
13   things that are included in the job
14   description for the general manager that may
15   not be the actual day-to-day functions of a
16   general manager, and particularly plaintiff,
17   given, you know, the fact that some clubs are
18   a bit different than others?
19        A    The day-to-day expectations of a
20   general manager are the same regardless of
21   what amenities the club has.  I'm assuming
22   that's what you mean by different, so
23   regardless of whether the club has a pool, no
24   pool, the general manager is responsible for
25   the facility.
```

```
 1        Q    Right, I understand that.  But if a
 2   club, would you agree that if a club doesn't
 3   have a pool, then a general manager whose club
 4   may have a pool may have additional job duties
 5   and responsibilities than someone whose club
 6   does not?
 7             MR. SONDHI:  Object to form.
 8        A    The general manager is responsible
 9   for overseeing the facility.  If their
10   facility happens to include a pool, then they
11   are responsible for that.  If their facility
12   happens to include a staircase, then they're
13   responsible for that.  I don't really
14   understand what the difference is based on the
15   amenities of the club.
16        Q    Ms. Molino, are you the corporate
17   representative with the knowledge and
18   information available to Empire regarding the
19   job duties and responsibilities of Patrick
20   Walsh, Juan Carlos Marrero, yourself, Leah
21   Molino, and Anthony Messina during any time
22   such individuals were employed by Empire
23   between 2018 and the present time?
24        A    Yes.
25        Q    Other than your attorney, did you
```

```
 1   speak with anyone to prepare for this topic
 2   today?
 3        A    No.
 4        Q    Did you review any documents to
 5   prepare for this topic today?
 6        A    No.
 7        Q    So are you able to testify to this
 8   topic solely based on memory today?
 9        A    Yes.
10        Q    And you understand that you're the
11   corporate representative and that your
12   responses bind the entity, Empire?
13        A    I understand.
14        Q    And did you bring any documents
15   with you today --
16        A    No.
17        Q    -- about that topic?
18        A    No.
19        Q    What was Patrick Walsh's job title
20   in 2018?
21        A    He -- well, we weren't at this
22   company.  He was at a different company in
23   2018.
24        Q    What was his job title?
25        A    It was CEO.
```

```
 1            Q    And that was at TSI?

 2            A    Yes.

 3            Q    And was Mr. Walsh the CEO of TSI in

 4    2019?

 5            A    Yes.

 6            Q    What was Mr. Walsh's role in 2020?

 7            A    CEO.

 8            Q    Was he the CEO in 2021?

 9            A    He was the CEO of Empire in 2021.

10            Q    And was he the CEO of Empire in

11    2022?

12            A    Yes.

13            Q    And is he currently the CEO of

14    Empire?

15            A    Yes.

16            Q    Did Mr. Walsh hold any other job

17    titles in 2021 when he was the CEO of Empire?

18            A    Not that I'm aware of.

19            Q    What about in 2022?

20            A    Not that I'm aware of.

21            Q    And currently, in 2023?

22            A    Not that I'm aware of.

23            Q    Did you do anything -- did you ask

24    Mr. Walsh if he held any other job titles in

25    2021?
```

```
 1        A     No, because I believe this is in
 2   relation to Empire.
 3        Q     Well, you just testified that he
 4   was the CEO at Empire in 2021, correct?
 5        A     Yeah.
 6        Q     So did he hold any other job
 7   titles?
 8        A     Not that I'm aware of.
 9        Q     Okay.  And did you ask him?
10        A     I did not.
11        Q     Why not?
12        A     Because I believe, based on what
13   this is saying, that the knowledge and
14   information available to Empire, this is --
15   and responsibilities -- at Empire.
16        Q     Right.  So if the knowledge -- what
17   are you defining as knowledge and information
18   available to Empire?
19        A     Knowledge and information available
20   to Empire as Patrick Walsh's employer.  I
21   don't know what his business dealings outside
22   of Empire are.
23        Q     I'm not asking about Mr. Walsh's
24   business dealings outside of Empire.  I'm
25   asking specifically if he held any other
```

```
 1   titles in 2021 aside from his role as the CEO
 2   of Empire?
 3              MR. SONDHI:  Objection.  Asked and
 4        answered.  Object to form.
 5        A    At Empire, no.
 6        Q    And you did nothing to educate
 7   yourself as to whether or not he did?
 8        A    I don't need to educate myself on
 9   Patrick's role at Empire.
10        Q    Well --
11        A    It's not my place to ask employees
12   about their roles outside of our business.
13        Q    Well, as the corporate
14   representative for Empire, who has the
15   knowledge and information available to testify
16   on the job duties and responsibilities of
17   Patrick Walsh, wouldn't you think it would be
18   important to know if Mr. Walsh held additional
19   roles at Empire in order to know if there were
20   any additional job duties and responsibilities
21   associated with those roles?
22        A    Yes.  But I said he didn't hold
23   additional roles at Empire.  His role at
24   Empire was CEO.  You're asking about outside
25   of Empire.  I do not have knowledge of his
```

```
 1   roles at any other companies or any other
 2   business dealings outside of Empire.  His role
 3   at Empire is CEO.
 4        Q    And his role at Empire is CEO and
 5   he has no other roles?
 6        A    No.
 7        Q    Okay.  Within the organizational
 8   structure of Empire, who reports to Mr. Walsh?
 9        A    I do, and so does Jonathan Jenkins.
10        Q    Anyone else?
11        A    No.
12        Q    And aside from you and Jonathan
13   Jenkins, are you -- strike that.
14         Are you the only two people, you and
15   Jonathan Jenkins, who have reported to
16   Mr. Walsh as the CEO in 2021?
17        A    No. In 2021, Anthony Messina
18   reported to Patrick Walsh, so did Michael
19   Montella.
20        Q    Did you report to Patrick Walsh in
21   2021?
22        A    And so did Jonathan Jenkins.
23        Q    In 2022, who reported to Patrick
24   Walsh?
25        A    The same people that I just
```

1    mentioned, Anthony Messina, myself, Jonathan

2    Jenkins, and Michael Montella.

3         Q    Okay.  And in 2023, just you and

4    Jonathan Jenkins?

5         A    Jonathan Jenkins.  Anthony Messina

6    did until March 2023.

7         Q    What are Mr. Walsh's job duties as

8    the CEO of Empire?

9         A    He oversees any major financial

10   business decisions in terms of club closures,

11   club opening, and, you know, sets expectations

12   in terms of, you know, what he expects to see

13   from a profit-and-loss standpoint.  From a

14   high-level, he drives the profitability, but

15   he's not involved in the day-to-day of the

16   business.

17        Q    What does a day look like in the

18   life of Patrick Walsh as the CEO?

19        A    Reviewing financial statements,

20   meeting with landlords of current locations

21   or, you know, clubs that could be opening in

22   the future.

23        Q    Anything else?

24        A    No.

25        Q    Does he attend weekly management

 1   meetings?

 2       A    Yes.  He does attend weekly

 3   management meetings.

 4       Q    Okay.  So there is something else.

 5   Is there anything else besides reviewing

 6   financial statements, meeting with landlords,

 7   and attend weekly management meetings?

 8       A    No.

 9       Q    Does he ever visit clubs under his

10   purview?

11       A    Yeah, he goes to the clubs.  He

12   works out in the clubs, on his own personal

13   time of course, and he does go to the clubs.

14       Q    You said he works out on his

15   personal time.  Does he ever visit clubs for

16   business-related purposes?

17       A    Yes.

18       Q    Okay.  So is there anything else

19   that you can think of that Mr. Walsh would do

20   on a day-to-day basis?

21       A    No.

22       Q    Is Mr. Walsh required to authorize

23   hiring and firing of employees?

24       A    No.

25       Q    Does he have any involvement in the

```
1    hiring and firing of Empire employees?
2         A    No.
3         Q    No involvement at all?
4         A    No.
5         Q    Does Mr. Walsh give input into
6    performance management of employees?
7         A    No.
8         Q    Mr. Walsh has never given input
9    about performance management of any employee
10   at Empire or as the CEO of Empire?
11        A    No.
12        Q    With respect to Juan Carlos
13   Marrero --
14        A    Yes.
15        Q    -- what was his -- what were his
16   job titles when he was hired by Empire?
17        A    Business director.
18        Q    Did Mr. Marrero work for Empire in
19   any role other than as the business director?
20        A    He was a 1099 employee for a month
21   prior to becoming the business director where
22   he was just a consultant.
23        Q    And what was -- I'm sorry.  I
24   didn't mean to cut you off.
25        A    A business consultant.
```

```
1          Q    And what were his job duties and
2    responsibilities as a business consultant?
3          A    To spend time in the two Palm Beach
4    Sports Clubs and offer his insight on areas of
5    opportunity, where we could improve operations
6    and sales.
7          Q    And what did his day-to-day look
8    like as the business consultant for Empire?
9          A    It was just working in the clubs
10   alongside the team, primarily making
11   observations, for those four weeks on areas
12   where he thought we could improve.
13         Q    Were you or who -- strike that.
14          As the corporate representative, do you
15   have knowledge and information available as to
16   who was involved in his hiring as a
17   consultant, the business consultant?
18         A    Patrick brought him on as the
19   business consultant.
20         Q    And you were at the time the
21   director of human resources, correct?
22         A    Yes.
23         Q    Did you have any knowledge about
24   Patrick bringing -- I'm sorry, Mr. Walsh
25   bringing on Mr. Marrero as a business
```

1   consultant?

2         A     Yes.

3         Q     And what was your understanding of

4   that?

5         A     I was made aware that he was coming

6   on as a business consultant and he was going

7   to, you know, offer his expertise on where we

8   could improve in the Florida market based on

9   the previous experience that he had in the

10   industry.

11         Q     And you said -- when was he hired

12   as the business consultant?

13         A     He was brought on as the business

14   consultant in September 2021, and that was for

15   four weeks, and then he was formally hired as

16   the business director in October 2021.

17         Q     Okay.  And when were you made

18   aware, as HR director, that he was going to be

19   brought on as a business consultant?

20         A     In September 2021.

21         Q     Was it before he started in that

22   role?

23         A     No.

24         Q     Was it after --

25         A     Maybe like a day or two before I

```
 1   was told he was coming on to, you know, get
 2   him whatever information he needed to get
 3   started, but I wasn't part of that decision or
 4   made aware well in advance or anything like
 5   that.
 6        Q    At that point, when you became
 7   aware that he was going to be the business
 8   consultant in September of 2021, did the
 9   company intend on hiring him on in a more
10   permanent role?
11        A    No.
12        Q    When was the decision made that Mr.
13   Marrero would transition from business
14   consultant to business director?
15        A    I believe it was about three weeks
16   into his business consultant position.
17        Q    And what is your basis of knowledge
18   to say that it was three weeks in?
19        A    I am going off of memory of when it
20   was brought up to me.
21        Q    So you don't know the date on which
22   you learned that he would be transitioning
23   from a business consultant to a business
24   director?
25        A    No, I don't recall.
```

```
 1          Q    And you didn't review any documents
 2    to educate yourself on this particular topic
 3    as it relates to his job duties and
 4    responsibilities, correct?
 5          A    No.
 6               MR. SONDHI:  Object to form.
 7          A    I don't believe I have such
 8    documents.
 9          Q    So is it Empire's position that
10    there would be no documents to evidence the
11    date on which the decision was made to
12    transition Mr. Marrero from business
13    consultant to business director?
14          A    Yeah, I don't have any documents
15    that would confirm the exact date that
16    decision was made.
17          Q    When you say you don't have any
18    documents --
19          A    Empire doesn't have any documents
20    to confirm the exact date that decision was
21    made.
22          Q    So there would be no e-mails, you
23    know, confirming that he would be brought on
24    as a business director or the role would
25    transition?
```

```
1          A     I don't believe so.

2          Q     Well, did you check?

3          A     Yes, and I didn't see any.

4          Q     When did you check?

5          A     Yesterday.

6          Q     And what did you do to look for

7     that information?

8          A     I looked in ADP.

9          Q     I'm sorry, what was that?

10         A     I looked in ADP.

11         Q     And ADP is the employment software

12    that Empire uses?

13         A     Yes.

14         Q     Okay.  Did you search any e-mails

15    to see if you could locate an approximate

16    date?

17         A     I did not.

18         Q     Did you ask anyone or seek to find

19    out when the job transitioned from consultant

20    to business director?

21         A     I did not.

22         Q     Okay.  And on what date did Mr.

23    Marrero become the business director?

24         A     I believe that it was October 5th,

25    2021.
```

```
 1          Q     So you don't know for sure?
 2          A     No.   I did look at it in ADP.
 3   Quite honestly, I didn't know that I was
 4   allowed to bring notes or if I should bring
 5   notes so I didn't, but it is in ADP and can be
 6   provided.
 7          Q     You testified earlier that you
 8   reviewed this document, correct, or something
 9   that looked similar?
10          A     Yes, I did.
11          Q     Did you review this portion of the
12   notice that says, it's the heading following
13   Topic No. 24, documents to be produced at
14   deposition, to the extent not already produced
15   in discovery, any documents not previously
16   produced providing information upon which the
17   corporate representative may rely or which
18   educated or refreshed the recollection of the
19   corporate representative regarding topics on
20   which he or she is designated to testify.   Do
21   you recall reading that?
22          A     I've read it.   I don't know that I
23   fully understood it, but I read it.
24          Q     Did you ask anyone -- and I don't
25   want to know specifically what was discussed
```

```
 1   with your attorney -- but did you seek to find
 2   out if you didn't understand what this meant?
 3       A    No, I did not.  I thought that I
 4   understood, and clearly, I didn't.  Quite
 5   honestly, I didn't know that I was being
 6   deposed as the corporate representative today.
 7   I thought that this was my own.  I did prepare
 8   for this and met with my attorney, but I
 9   thought that this was my own deposition today.
10       Q    Well, your attorney and I had
11   discussed trying to merge both of --
12       A    Yeah, I wasn't aware of that.  I
13   thought this was my own deposition today and
14   that there would be a separate deposition as
15   the corporate representative.
16           MR. SONDHI:  I'll make a note that the
17       final version of the areas of inquiry was
18       served to us at 3:39 p.m. yesterday.  I just
19       want to make a note for the record for that.
20           MS. RATTET:  Sure.  And I'll also make a
21       note for the record that all conferral
22       discussions consented to and all things that
23       counsel requested for the defense to have
24       plaintiff removed from the notice were abided
25       by and there were no significant substantive
```

```
 1        changes to this notice.
 2              We have been going for a little over an
 3        hour.  I need to take about five minutes.
 4        Could we go off the record please.
 5              MR. SONDHI:  Yeah.
 6              MS. RATTET:  I'll be back on 11:10.
 7              (A brief recess was taken.)
 8              MS. RATTET:  Okay.  So during the break
 9        the parties discussed rescheduling the
10        corporate representative deposition for a later
11        date, so today, we are not going to move
12        forward with that deposition and we will turn
13        to the deposition of Ms. Molino as a fact
14        witness and not as the corporate
15        representative.
16              MR. SONDHI:  Agreed.  And we also
17        stipulated that Ms. Molino would be given the
18        opportunity to clarify any testimony already
19        that she's testified to today in terms of the
20        topics of the notice of the corporate rep.
21              MS. RATTET:  Yes.  That's agreed.
22   EXAMINATION BY MS. RATTET:
23        Q    Okay.  So Ms. Molino, when we were
24   talking earlier today, just going over your
25   background and experience in working as an HR
```

```
 1    professional, we discussed some trainings that
 2    you attended, and I believe you testified that
 3    every year since December of 2020, when you
 4    became the HR director at Empire, you have
 5    attended an HR conference type of thing in
 6    July.
 7         A    So it's the New York State sexual
 8    harassment training that is mandated for New
 9    York employees, and all of our employees go
10    through it in New York.  And it is provided
11    through a newyork.gov website.
12         Q    Okay.  Did you attend any other HR
13    or harassment discrimination type trainings in
14    Florida?
15         A    No.
16         Q    And I understand that the company
17    also has businesses located in Puerto Rico; is
18    that correct?
19         A    Yes.
20         Q    Did you attend any HR trainings in
21    Puerto Rico or related to employment laws of
22    Puerto Rico?
23         A    No.
24         Q    Have you ever attended, since you
25    became the HR -- or since you were hired as
```

```
1    the HR director in December of 2020, have you
2    ever attended any other HR conferences?
3         A    Yes.
4         Q    So is it fair to say that your
5    understanding of, you know, federal employment
6    laws is just based off of experience?
7         A    It's based off of experience, and I
8    also have a membership to SHRM, which is an HR
9    professional organization, so I read various
10   articles there as well.  And, of course, yes,
11   experience.  I was going to say exposure to
12   the laws over the years, but experience I
13   think covers that.
14        Q    Sure.  And when did you -- is it,
15   do you subscribe to the SHRM website?
16        A    Yes.
17        Q    And what does SHRM stand for?
18        A    I don't know specifically.  I don't
19   recall.
20        Q    And when did you first subscribe to
21   that website?
22        A    Some time in 2021.  I'm not sure
23   the exact date.  I don't recall.
24        Q    And other than reading articles
25   published to that website, are there any other
```

```
 1    features that you use, for instance, are there
 2    training modules or things like that?
 3         A     There are.  Not that I have used,
 4    no.
 5         Q     As the HR director of Empire, does
 6    the company put on any, you know, company-wide
 7    trainings that were not mandated by New York
 8    law, Florida law?
 9         A     No.
10         Q     Have they ever?
11         A     No.
12         Q     And that goes for all level of
13    employees so just, you know, staff, and
14    trainers, and management as well?
15         A     Yes.
16         Q     Do you have any training, formal
17    training, in conducting investigations into
18    complaints of discrimination or retaliation?
19         A     No.
20         Q     Have you ever conducted an
21    investigation into a complaint of
22    discrimination or retaliation in your capacity
23    as an HR director?
24         A     Yes, in partnership with our legal
25    counsel.  If we receive a complaint like that,
```

```
 1    I would involve our legal counsel.
 2         Q    So what is your process or what was
 3    your process in your capacity as the HR
 4    director when an employee would make a
 5    complaint about either discrimination or
 6    retaliation?
 7         A    I typically would consult our legal
 8    counsel, and based on their advice, conduct
 9    various interviews and circle back with them
10    for additional support.
11         Q    Are there any other components that
12    you would do in the course of an investigation
13    into a complaint of discrimination or
14    retaliation?
15         A    If there was something that, like,
16    involved, like, something where cameras or
17    video footage would be helpful, that type of
18    thing, again, I would, at the advice of our
19    attorneys, preserve that or review it.
20         Q    And when you say that you would
21    conduct interviews, how would you determine
22    which individuals you would interview in the
23    course of your investigation?
24         A    I would determine that in
25    partnership and at the advice of the legal
```

1    counsel, of our attorneys.

2         Q    Does Empire have a procedure in

3    place when an employee wants to make a

4    complaint of discrimination or retaliation?

5         A    Yes.  They would reach out to -- we

6    have an open-door policy, so they could reach

7    out to whoever they feel comfortable reaching

8    out to, of course, but typically, most

9    employees would reach out to me.

10        Q    And when you say open-door policy,

11   what do you mean by that?

12        A    Meaning that if they want to

13   connect with their direct supervisor, if they

14   want to reach out to another member of the

15   corporate team or to me directly, you know,

16   they could reach out to whoever they feel

17   comfortable reaching out.  That person would

18   loop me in, but, you know, they could reach

19   out to whoever they feel comfortable reaching

20   out to.

21        Q    Are you typically or -- are you

22   always looped into situations where there is a

23   complaint made, even if it's not directed

24   towards you or initially directed towards you?

25        A    If it's a complaint of

```
 1   discrimination, yes, I am looped in.
 2        Q    And how do you make a determination
 3   as to whether or not there's a complaint of
 4   discrimination that's made?
 5        A    If someone says, I'm being treated
 6   differently as part of a protected class
 7   because of my sex, sexual orientation, gender
 8   disability, race, religion, ethnicity.
 9        Q    And in order to investigate -- or
10   what is the catalyst that kind of triggers an
11   investigation into such complaint?  And what I
12   mean by that is, is the person who is making a
13   complaint required to use specific words or
14   language such that it would, you know, trigger
15   you to reach out to counsel and seek advice or
16   kind of what is that process like and how is
17   it determined that you're going to investigate
18   a complaint?
19        A    Well, we would investigate any
20   complaint, and I can't say that there's
21   specific language that triggers.  I need to
22   call counsel, you know, if it's something
23   that's being brought to my attention, highly
24   escalated matter, so, for example, if someone
25   comes to me and says, I caught my employee
```

```
 1   clocking in from home, right, that's not
 2   something I need to involve counsel on.  I'm
 3   clear on what we want to do there.  But if
 4   it's something where I feel I'm being treated
 5   unfairly, that type of thing, I typically
 6   would involve counsel.
 7        Q    Okay.  Are there circumstances
 8   where you would not involve counsel?
 9        A    Around discrimination retaliation
10   complaints, no.
11        Q    So you would always involve counsel
12   if there was any suggestion that somebody was
13   treated differently based on a specific
14   classification?
15        A    Yes.
16        Q    And going back to what you said,
17   you know, the procedure about, you know,
18   typically an employee who wanted to make a
19   complaint about discrimination would either go
20   to their supervisor or go to you, is there a
21   written procedure or policy that Empire has
22   that outlines the steps that an employee needs
23   to take in order to lodge a complaint?
24        A    Yes.  It's in the employee
25   handbook.
```

```
 1          Q    Okay.  And when, I understand that

 2    the, you know, the company changed from TSI to

 3    Empire, and we don't need to get into that

 4    today, but at some point, an employee handbook

 5    -- are you referring to the employee handbook

 6    that Empire has?

 7          A    Yes.

 8          Q    That was produced in this lawsuit?

 9          A    Yes.

10          Q    Okay.  And when was that handbook

11    created?

12          A    In 2021.

13          Q    When in 2021?

14          A    I don't have the exact date.

15          Q    Can you give me an estimate?  Was

16    it early?  Later?

17          A    I want to say early 2021, but it's

18    guessing.

19          Q    Okay.  So it was created in -- I

20    don't want you to guess.

21          A    Okay.

22          Q    So if you don't know, then that's

23    fine.

24          A    Okay.

25          Q    Just say that.  Did you have or did
```

```
1    you participate in the creation of the Empire
2    employee handbook?
3         A    Yes.
4         Q    And what was your level of
5    involvement?
6         A    Very involved.
7         Q    How so?
8         A    I would say that I was solely
9    responsible for it.  I did get feedback from
10   other people, but it was probably done by me.
11        Q    And who did you receive feedback
12   from?
13        A    Other directors at the company, so
14   Anthony Messina, Mario Curcio, who is the
15   fitness director at the time, Arzu Kaner, who
16   was an operations director.
17        Q    Anyone else?
18        A    No.
19        Q    And with respect to the feedback
20   that you received from Anthony Messina, was
21   it -- what was the feedback that he gave?
22        A    That it looked good to him.
23        Q    And was it your understanding that
24   he reviewed all of the policies included in
25   the draft that you had prepared?
```

```
 1        A    Yes, I believe so.  That is my
 2   understanding.
 3        Q    And with respect to Mario Curcio --
 4   is it Curcio?
 5        A    Yes.  C-U-R-C-I-O.
 6        Q    Thank you.  With respect to
 7   Mr. Curcio, what feedback did he provide?
 8        A    I believe he said everything looked
 9   good to him too.  I don't think anybody had
10   any major changes that I can recall.
11        Q    Okay.  And fair to say that -- is
12   it Arzu?
13        A    Arzu.
14        Q    Didn't have any major changes or
15   significant feedback either?
16        A    Yes.  Agreed.  Yes.
17        Q    Does Anthony Messina have any
18   experience in human resources?
19        A    No.
20        Q    Does Mario Curcio have any
21   experience in human resources?
22        A    No.
23        Q    Does Arzu Kaner have any experience
24   in human resources?
25        A    No.
```

```
 1          Q    So after you created the handbook
 2     and received feedback from Anthony,
 3     Mr. Curcio, and Arzu, did you or did the
 4     company roll out the handbook company-wide?
 5          A    Yes.
 6          Q    Do you know approximately when that
 7     happened?
 8          A    No, I'm not sure.
 9          Q    Some time in 2021 also?
10          A    Yes.
11          Q    And do you recall, you know, or --
12     strike that.
13           Did you prepare an e-mail notifying the
14     employees that there was a new handbook in
15     place?
16          A    I'm not sure if it was an e-mail or
17     over a phone call.  I'm not sure.
18          Q    Okay.  When you say a phone call,
19     would that have been a company-wide phone
20     call?
21          A    Yes.
22          Q    And would there be a meeting invite
23     that would show the date of that phone call
24     for the handbook rollout?
25          A    Yeah.  Most likely, I would have
```

1    been invited to hop on an existing call.  It

2    wasn't like -- it wouldn't have been just like

3    a call about the handbook.  I would have asked

4    to or have been invited to jump on an existing

5    call that I was not regularly on at that time.

6         Q    And when you say existing call, was

7    there, you know, a scheduled call where the

8    entire company would participate?

9         A    The GMs. There is.  And there was a

10   GM call.  I was not on them.  I am on them

11   regularly now.  I was not on them regularly at

12   the time, so I don't know exactly when they

13   started.  I believe they started in 2021.  I

14   believe the invite came from Arzu Kaner or

15   Anthony Messina and that they took place

16   regularly, I believe on Fridays.

17        Q    So -- I'm sorry, go ahead.

18        A    Sorry.  Go ahead.  It might be my

19   dog you hear in the background.  Sorry about

20   that.

21        Q    Okay.  So you would have, rather

22   than rolling out this handbook company-wide

23   and distributing to every employee, fair to

24   say -- and tell me if I'm mischaracterizing

25   your testimony -- that the handbook would have

```
 1   been distributed to the GMs, who would have
 2   distributed to the employees under their
 3   purview?
 4        A    Yes.
 5        Q    And do you know or did you do
 6   anything to ensure that that process was
 7   carried out?
 8        A    No, I did not.
 9        Q    Were the employees required to sign
10   an employee handbook acknowledgment to
11   acknowledge the policies contained in the
12   Empire handbook?
13        A    Not in Florida.
14        Q    And when you say not in Florida,
15   does that mean they were required to do it in
16   all of the other Empire locations --
17        A    They are required to in New York.
18        Q    So if an employee in Florida wasn't
19   required to sign an acknowledgment of Empire's
20   policies and procedures contained in the
21   handbook, how did you determine or ensure that
22   those employees had received those policies
23   and understood that they were subject to the
24   new policies of Empire?
25        A    I did not.
```

1      Q    So it's fair to say that it's
2  possible that some employees at least of
3  Empire did not see these policies?
4      A    It is possible.
5      Q    Ms. Molino, do you have experience
6  in evaluating requests for FMLA leave?
7      A    Experience, yes.  Not training.
8      Q    Okay.  And so what is the scope of
9  your experience with respect to requests for
10  FMLA leave?
11      A    I mean, I review the request.  I
12  don't think that there's ever been a time at
13  Empire when we've had to deny a request, and
14  if we were going to deny a request, I would
15  partner with legal counsel or if I had
16  concerns about the request, I would partner
17  with legal counsel, but any request I have
18  received has been straightforward.
19      Q    Okay.  What do you mean when you
20  say straightforward?
21      A    Mostly, actually, entirely related
22  to maternity leave or paternity leave, you
23  know, taking care of themselves or a family
24  member and requesting time for that.  And I
25  understand it's unpaid job protected leave.

1          Q     Okay.  So with respect to requests

2     for leave related to, you know, pregnancy or

3     spouse related to pregnancy, what is the

4     process that you undertook as the director of

5     human resources in order to ensure that that

6     leave was carried out?

7          A     I -- the employee who is requesting

8     the leave works directly through me.  They

9     make the request through me via e-mail to let

10    me know the approximate date that they'll be

11    going out and the length of the leave, and of

12    course the understanding that, specifically

13    with maternity leave, it could start sooner,

14    based on my own experience, can go later

15    sometimes than expected.  So, yes, that's how

16    it's done.  And then typically they

17    communicate with me -- we haven't had a ton of

18    them -- they communicate with me in terms of

19    their return to work and I relay any relevant

20    information to the supervisor.

21         Q     And what are your practices in

22    terms of ensuring that the employee has, you

23    know, the requisite forms and whatnot at the

24    time they request the leave?

25         A     We just have them submit an e-mail

```
 1   requesting it.  If we require additional
 2   documentation, I would ask for it, but we
 3   haven't had to request additional
 4   documentation.  And, again, if there was
 5   something where I was going to say, can I have
 6   additional documentation, I would partner with
 7   our attorneys for advice on that.
 8        Q    Okay.  And in your capacity as the
 9   HR director or during the time that you were
10   the HR director, did you ever encounter any
11   instances where an employee would be entitled
12   to intermittent FMLA leave?
13        A    Not that I'm aware of.  It was
14   never requested.
15        Q    Is it your understanding that the
16   employee is required to request the FMLA
17   leave?
18        A    It is my understanding that they
19   are required to request leave, any type of
20   leave.
21        Q    Even when the company is on prior
22   notice of the FMLA leave?
23        A    Well, that's them requesting leave.
24   I wouldn't require them to request leave
25   again.
```

```
1          Q    So I'm sorry.  That was a
2    poorly-worded question and I can rephrase it.
3    So what I'm trying to get at is, if an
4    employee requests FMLA leave, say for
5    instance, to go out on maternity leave.
6          A    Yes.
7          Q    And during the course of, you know,
8    the lead-up to that leave that, you know,
9    something comes up that, you know, may require
10   them to take FMLA leave before the particular
11   time period starts.
12         A    Right.
13         Q    What is your process in place to
14   make that determination as to whether or not,
15   you know, they should be entitled to that
16   intermittent leave?
17         A    I would expect them to notify me,
18   and if I have questions about it -- I would
19   either approve it -- if there were questions
20   about it or how to handle it, I would partner
21   with our attorneys and go from there.
22         Q    Okay.  How long have you known
23   Patrick Walsh?
24         A    Since about 2016.
25         Q    And how did you come to know him?
```

```
 1          A     He was the CEO of TSI.
 2          Q     And in 2016 when you met him, did
 3    you interact with him on a regular basis at
 4    work?
 5          A     I did not.
 6          Q     And did that change at any point
 7    after your initial meeting with him?
 8          A     I interacted with him slightly more
 9    as a market leader, but still not a ton.  Not
10    a ton.  Individually and, you know, regularly
11    maybe on a once-a-week call we would have with
12    the executive leadership team, that included
13    Patrick and the other market leaders, but
14    Anthony Messina was my direct supervisor.
15          Q     And do you currently interact with
16    Mr. Walsh on a regular basis?
17          A     I do.
18          Q     How often would you say you
19    interact with Mr. Walsh daily?
20          A     Definitely daily.  One time a day,
21    sometimes two times a day.  Sometimes no times
22    a day.  But I think I could definitely say I
23    interact with him daily.
24          Q     Do you ever socialize with
25    Mr. Walsh outside of work?
```

```
 1          A    I do not.
 2          Q    Have you ever gone out to dinner
 3   with Mr. Walsh?
 4          A    I have.  Business dinners.
 5          Q    Approximately how many times have
 6   you attended business dinners with Mr. Walsh?
 7          A    Maybe three to five times.
 8          Q    And did those business dinners all
 9   take place after you relocated to Florida?
10          A    No.
11          Q    Of the three to five times that
12   you've had business dinners with Mr. Walsh,
13   how many times were those business dinners in
14   Florida?
15          A    One.
16          Q    Only one?
17          A    Um-hum.
18          Q    Have you -- or strike that.
19           Would you consider Mr. Walsh a friend?
20          A    No.
21          Q    An acquaintance?
22          A    No.  He's my employer.  He's my
23   boss.
24          Q    And when did you first meet Juan
25   Carlos Marrero?
```

```
 1        A    I met J.C. -- is that okay if I
 2   call him J.C.?
 3        Q    I was going to say that.
 4        A    I met J.C. when TSI acquired TMPL,
 5   TMPL Hell's Kitchen.  It was TMPL at the time.
 6   It was rebranded to New York Sports Clubs and
 7   we made it TMPL again, but he was the general
 8   manager of that location.  Gosh, that had to
 9   be, like, 2017 I want to say.
10        Q    And did you interact with him
11   regularly?
12        A    No. I met him probably a handful of
13   times, if that.  They weren't necessarily like
14   visits where I was spending time with him or
15   just him.  I was there to support the club as
16   part of the acquisition.  The general manager
17   who joined the team there, I was formerly her
18   mentor general manager in a program that TSI
19   had, so I, you know, came to support her, but
20   I had met J.C. a handful of times, maybe less
21   than five.
22        Q    Okay.  And you mentioned that you
23   were a mentor for a general manager.  Were you
24   yourself a general manager at that time?
25        A    I was a market leader at that time.
```

```
 1        Q    Okay.  And so you estimate a
 2   handful of times that you interacted with Mr.
 3   Marrero during the acquisition of TMPL in
 4   2017, and then when was the next time you
 5   interacted with him following those handful of
 6   times?
 7        A    When he joined Empire as a business
 8   consultant.
 9        Q    And have you ever socialized with
10   Mr. Marrero outside of work?
11        A    I have not.
12        Q    Do you work remotely?
13        A    I do.
14        Q    And has that always been the case?
15        A    Yes.
16        Q    Is there ever an occasion for you
17   to visit clubs or anything like that?
18        A    Yeah, I visit clubs.  It's pretty
19   infrequent.  I went out to Florida, to the
20   Palm Beach Sports Clubs, around this time last
21   year.  I went to Christi's in November.  And I
22   was just in our New York club two weeks ago.
23        Q    Okay.  Does Empire have a corporate
24   office in Florida?
25        A    No.
```

```
 1         Q    And when was the first time that
 2    you met Anthony Messina?
 3         A    I believe it was 2016, give or
 4    take, 2015, 2016.
 5         Q    And what do you recall about that
 6    meeting?
 7         A    He was the new market leader for
 8    the New Jersey market and he was coming in to
 9    take over the New Jersey clubs.  I was a BD at
10    that time, so he was my new boss.  He was
11    replacing a gentleman by the name of Larry
12    Stepansky, and he was my new boss.
13         Q    Okay.  And so as your boss, did you
14    interact with him on a daily basis?
15         A    I would say yeah, pretty much
16    daily.
17         Q    And when did he cease to be your
18    direct supervisor?
19         A    He stopped being my direct
20    supervisor in, I want to say May 2018 when I
21    transferred to the club services department of
22    TSI, and then he was briefly my supervisor
23    again when I came back from maternity leave,
24    they had me in what they called a sales
25    support director position, and he was the VP
```

1    of sales so I reported to him in that role,

2    and then he ceased to be my supervisor again

3    at some point over the summer of 2020 when a

4    new VP named Matt Calchera was brought in

5    specific to oversee the New Jersey market.  I

6    was still in my same role supporting all of

7    the clubs, but because I officed out of New

8    Jersey, they had me report to the person

9    overseeing the New Jersey clubs.

10        Q    And since the summer of 2020, when

11   you started reporting to the person who

12   oversaw the New Jersey clubs, did you continue

13   to interact with Mr. Messina?

14        A    Yes.

15        Q    And how often would you communicate

16   with him?

17        A    Probably a few times a week.  He

18   was still -- I was still in my sales support

19   role, so I communicated with all of the VPs

20   pretty regularly to help them with various

21   projects, share feedback on their clubs, that

22   type of thing.

23        Q    Did you ever interact or socialize

24   with Mr. Messina outside of work?

25        A    Business dinners, but that's it.

```
 1          Q    And approximately, you know, how
 2   often would you go or have business dinners
 3   with Mr. Messina?
 4          A    Not regularly.  Maybe a handful of
 5   times.
 6          Q    A handful of times between 2016 and
 7   his leaving Empire in March of this year?
 8          A    Yeah.
 9          Q    Are you aware of allegations that
10   Patrick Walsh has been romantically involved
11   with Empire employees?
12          A    Yes.  I am aware of an allegation
13   that he is romantically involved with an
14   Empire employee.
15          Q    Okay.  What can you tell me about
16   what you know about the allegation?
17          A    It was -- it's not an allegation.
18   It was disclosed to me as part of our policy
19   that he is in a relationship with an employee.
20          Q    And I'm going to step back.
21          MS. RATTET:  Ranjiv, if we want to
22      designate this portion of the testimony as
23      confidential, I'm happy to do that just because
24      it involves an employee who is not directly
25      involved in this matter, but I want to know the
```

```
 1          name of the employee.
 2                MR. SONDHI:  We'll designate as
 3          confidential, yes.
 4     A    So, I mean, just, I know obviously
 5  Sara is on this call and has a right to be,
 6  but the understanding is that she won't
 7  disclose it to her boyfriend, who still works
 8  for us.
 9                MS. RATTET:  Yeah.  So what I think we
10          should do actually is I would ask Sara to jump
11          off the Zoom at this point, just to ensure that
12          all of the information is protected.  I would
13          just rather curb against that.
14                Sara, if you can hear me, if you can
15          jump off.  And I can let you know when to jump
16          back on.
17                MS. DeMARTINO:  You got it.
18     Q    What is the name of the employee?
19     A    Layton Maxwell.
20     Q    And when did Mr. Walsh disclose the
21  relationship to you?
22     A    I want to say it was about a year
23  ago, but I don't recall the exact date.
24     Q    And was that the first time that
25  you had heard about his romantic involvement?
```

```
1          A     Yes.
2          Q     And what is Ms. Maxwell's position
3   at Empire?
4          A     She's the general manager, a
5   general manager.
6          Q     And who does she report to?
7          A     She reports to me.
8          Q     Did she have any other positions at
9   Empire prior to being the general manager?
10         A     Yes.  She was hired as the
11  assistant general manager before becoming the
12  general manager.
13         Q     And, I'm sorry, I don't know if you
14  mentioned this, which club does she work at?
15         A     She is the general manager of
16  actually two locations.  So she's the general
17  manager for our Palm Beach Gardens and our
18  Jupiter location.
19         Q     Is it common for general managers
20  to oversee multiple locations?
21         A     Common, no, but she's not the only
22  one.  It's certainly not ideal, just from a
23  bandwidth perspective, because it's a lot of
24  extra work, but we do have our general manager
25  in Puerto Rico has been overseeing two
```

```
 1    locations for quite some time and it's not --
 2    it's not -- it's been considered in New York.
 3    I don't think we could do it there as much as,
 4    you know, we might like to have certain people
 5    oversee two locations because they're really
 6    good, it definitely becomes a bandwidth issue
 7    for people, but we do have it in Puerto Rico
 8    as well.  And J.C. was overseeing two
 9    locations as a general manager briefly too.
10         Q    So what locations was Mr. Marrero
11    overseeing as a general manager?
12         A    He was acting general manager for
13    Gardens and Jupiter.
14         Q    Was that at the same time or -- I'm
15    sorry -- strike that.
16          When was he the acting general manager
17    for the Palm Beach Gardens and Jupiter
18    locations?
19         A    Not from the start of his
20    employment.  He was based out of Gardens when
21    he was hired in his business director role, so
22    he was the general manager there.  He assumed
23    the general manager position when Shane Kehoe
24    resigned from his position as the general
25    manager in Jupiter.  We didn't replace that
```

```
 1   general manager role at that time.
 2        Q    When did Shane Kehoe resign?
 3        A    I believe that was January 2022.
 4        Q    So if I'm understanding you
 5   correctly, Mr. Marrero was both the business
 6   director and the general manager at Palm Beach
 7   Gardens at one point?
 8        A    Yes.
 9        Q    And when was that?
10        A    That was -- from the onset of his
11   employment he -- well, hold on.  Let me pause
12   for a second.
13        Q    Sure.  Take your time.
14        A    I don't remember whether we had a
15   general manager there.  Shortly into his
16   employment, definitely he was the general
17   manager based out of Palm Beach Gardens as
18   part of his business director role.  And that
19   was a role and function that we had seen be
20   successful at TSI previously where a lot of
21   our business directors had home clubs, and
22   they were the GM responsible for their home
23   club while supporting other locations.
24        Q    So he, Mr. Marrero, was the
25   consultant or a business consultant when he
```

```
 1    was initially hired as the 1099, correct?
 2         A    Yes.
 3         Q    Okay.  And that was for
 4    approximately one month, correct?
 5         A    Yes.  Yes.
 6         Q    And that would have been in
 7    September of 2021?
 8         A    Yes.  His business consultant --
 9    the month that he was a business consultant
10    was September 2021.
11         Q    And then shortly into his
12    employment -- apologies.  He became the
13    business director in October 2021, and then
14    shortly thereafter, he wore two hats, so to
15    speak, as both the business director and the
16    general manager of the Palm Beach Gardens
17    location?
18         A    Yes.
19         Q    And he was only the business
20    director for the Jupiter location?
21         A    No.  He was the business director
22    for the three Florida clubs.
23         Q    That's what I meant.  So he was a
24    business director overseeing all three Florida
25    clubs, but he was specifically the business
```

1  director and the GM of the Palm Beach Gardens

2  location shortly after he became the business

3  director, correct?

4      A    Yes.

5      Q    Okay.  And did he remain the GM at

6  Palm Beach Gardens for the remainder of his

7  employment with Empire?

8      A    In, I want to say May of 2022, we

9  promoted Layton to be the general manager.  I

10  promoted Layton to be the general manager,

11  along with J.C., the general manager of Palm

12  Beach Gardens.  And then shortly thereafter

13  getting Christi's staffed with a new general

14  manager in mid May, we had J.C. focus all his

15  attention on Jupiter, because that was the big

16  underperforming club where we needed his help.

17      Q    Was the Jupiter location

18  underperforming when J.C. was brought on as

19  the business director?

20      A    Yes.

21      Q    I don't believe I saw any job

22  descriptions for assistant general manager in

23  the documents that were produced.  Was that a

24  role that was later created or was it in

25  existence at the time that Mr. Marrero began

```
 1   working?
 2        A    We don't -- it kind of coincides
 3   with the customer service manager role.  We do
 4   have a couple of, I would say more tenured
 5   managers that use the assistant general
 6   manager title, but it really aligns with the
 7   customer service manager role.
 8        Q    So is it fair to say that those job
 9   titles are more or less interchangeable?
10        A    Yes.
11        Q    Are there any distinctions between
12   the job duties and responsibilities of a
13   customer service manager and an associate
14   general manager -- or assistant general
15   manager?  Apologies.
16        A    No.
17        Q    Did Ms. Maxwell work for Empire in
18   any other capacity prior to her being hired as
19   the assistant general manager?
20        A    No.
21        Q    So she never had any role working
22   at a juice bar within one of the clubs?
23        A    No. She worked at a juice bar not
24   associated with us, not in one of the clubs.
25   Her previous experience was managing juice
```

1    bars somewhere in the Palm Beach area, not

2    associated with our clubs and not in our

3    clubs.

4         Q    Okay.  When Mr. Marrero became the

5    business director for the Florida clubs, was

6    there any discussion with him about the

7    financial state of each of the clubs

8    individually?

9         A    I don't know.  Not by me.  I'm sure

10   that there was between him and Mike Montella,

11   possibly Anthony Messina, but not by me.

12        Q    And if there were discussions or

13   communications with Mr. Marrero about the

14   financial state of the clubs that he was hired

15   to oversee, would those communications be

16   documented in e-mails or, you know, meeting

17   invitations, electronic meeting invitations

18   or --

19        A    Not necessarily.

20        Q    Okay.  If he was informed about the

21   financial state of those clubs, would he have

22   been sent documents to evidence the exact, you

23   know, state of the club from a financial basis

24   like a profit and loss statement or a

25   spreadsheet about revenue-driving features and

1   the like?

2        A    Yeah.  I would imagine that he

3   would have been sent the P&Ls.  They -- he

4   most likely received them automatically

5   through our reporting processes.  It just goes

6   out automatically.  So he would have most

7   likely received those reports, either directly

8   from Mike Montella, who was our CFO at the

9   time, possibly Anthony Messina or just as part

10  of our reporting function, I believe receiving

11  reports, automated reports all day.

12       Q    Okay.  And would he have had access

13  or, you know, had access to those automated

14  functions before he became the business

15  director?

16       A    No. I don't think he would have

17  been put on reporting.  He may have been set

18  up, not to say that reporting couldn't have

19  been shared with him, but I don't think he

20  would have been put on reporting, again -- I

21  know I'm not supposed to guess -- but I don't

22  think he would have been put on reporting at

23  that time.

24       Q    Okay.  When you or when the company

25  typically hires a new GM or a business

```
 1    director, what is that -- is there an
 2    interview process that takes place?
 3         A    Yeah.  There's an interview process
 4    we have for general manager.  I mean, we don't
 5    have any business directors on our team right
 6    now.  For general managers, there is an
 7    interview process that takes place.
 8         Q    Okay.  And following the conclusion
 9    of the interview process, when Empire makes a
10    determination as to who they want to hire, do
11    they send out an offer letter?
12         A    Sometimes we do; sometimes we
13    don't.  We normally only send it out if the
14    prospective employee is asking for it.
15         Q    Okay.  And once the prospective
16    employee accepts the position, does that
17    enable their access to the financial records?
18         A    So them having e-mail access would
19    give them access.  We wouldn't share financial
20    records to somebody's personal e-mail, so they
21    would need to have their Empire e-mail set up,
22    which normally coincides with their start
23    date.
24         Q    With respect to a business
25    consultant who is brought in to, you know,
```

```
 1    assess the profitability of clubs, would
 2    financial information have been shared or does
 3    the company share financial information with a
 4    business consultant?
 5         A    I'm not sure.
 6         Q    Are there any other business
 7    consultants that work for Empire?
 8         A    No.  I mean, we have other 1099
 9    employees, but not business consultants.
10    Like, we have a guy who helps us with our --
11    it's an IT function of how our reports
12    integrate, so he's a 1099 employee.  He only
13    really works as needed if we need help with
14    something, but he's not a business consultant.
15    So J.C. was really the only external business
16    consultant that we've had.
17              MS. RATTET:  It's about 12:15 right now.
18         I just want to take a temperature check to see
19         if, you know, everyone is hungry, wants to have
20         lunch.  We can go a little bit longer.
21              MR. SONDHI:  Leah?
22              THE WITNESS:  I'm okay going a little bit
23         longer.
24              MR. SONDHI:  12:30 maybe we can break.
25              MS. RATTET:  I'm at a natural stopping
```

```
 1        point right now.  If I start this next section,

 2        it may go longer.  It's up to you.

 3             MR. SONDHI:  Why don't we break now for a

 4        lunch break about, let's say half an hour or 40

 5        minutes, whatever you guys think.

 6             MS. RATTET:  Sure.  Let's come back at

 7        12:50.

 8                  (A recess was taken.)

 9   EXAMINATION BY MS. RATTET:

10        Q    Ms. Molino, you understand that

11   you're still under oath, correct?

12        A    I understand.

13        Q    Okay.  Did you speak with anyone

14   during the break other than your attorney?

15        A    No.

16        Q    Is there any prior testimony from

17   today that you would like to change?

18        A    No.

19        Q    Who at Empire determines the rate

20   of pay for particular positions?

21        A    So for general managers, it's me.

22   For particular positions, I communicated a pay

23   scale with recommendations for each position,

24   and the GMs can choose to give more when it

25   makes sense in partnership and with approval
```

```
 1   from their supervisor or one of the other

 2   directors in the company or myself.

 3        Q    Okay.  So the pay scale for other

 4   positions, what positions does that pay scale

 5   that you're referencing cover?

 6        A    Welcome team.  Personal trainers.

 7   I believe it covered everything.  I would need

 8   to take a look at that.  I'm not sure if you

 9   have it.  I believe it covered all of our

10   front-line employees, personal trainers,

11   welcome team, babysitting team, and membership

12   consultants.

13        Q    Would it have included a customer

14   service manager position?

15        A    I don't think so.  I believe it was

16   just hourly employees.

17        Q    Okay.  So customer service manager

18   is a salary position?

19        A    It depends.  Some are; some aren't.

20   Some are hourly; some are salaried.

21        Q    Okay.  I believe you just testified

22   that you set the rate of pay for general

23   managers, correct?

24        A    Yes.

25        Q    Does that rate of pay -- does it
```

1   change based off of level of experience?

2        A    Experience, performance, the club.

3   The specific club could impact it.  I mean,

4   there's a few different things that we would

5   factor into that.

6        Q    And who ultimately approves the

7   rate of pay for a general manager?

8        A    Me.

9        Q    Do you seek input or approval from

10  anyone else?

11       A    I do not seek approval from anyone

12  else.  It's possible that I could have a

13  discussion with Anthony Messina to see what

14  his thoughts are when talking about an

15  increase or bringing someone on or even

16  Jonathan Jenkins.  So I could seek input, but

17  not approval.  It's ultimately up to me.

18       Q    Okay.  That makes sense.  Do the

19  pay ranges for general managers differ based

20  on location, for instance, Florida general

21  managers versus, like, those who are located

22  in New York?

23       A    Yes.

24       Q    So on average, and I don't need a

25  specific number, and I recognize that there

```
 1   may be distinctions based off of level of
 2   experience, performance, and specific location
 3   of the club in that locale, but on average
 4   about how much would a general manager make
 5   working at a club in New York?
 6        A    Between, I would say, 80- to
 7   100,000 for a club in New York.
 8        Q    Okay.  And how much would a general
 9   manager make on average at a club in Florida?
10        A    I would say anywhere between 60- to
11   85,000.  We may have had people closer to the
12   50-, 55,000 range at one point, but I think
13   now it's 60 to 85.
14        Q    And, again, that range of pay would
15   depend on years of experience, and locale,
16   club performance, and, you know, subjective
17   factors, correct?
18        A    Correct.
19        Q    Do the general managers receive
20   bonuses?
21        A    Yes.  They can.  They can receive
22   monthly bonuses if their club hits of $500,
23   and they can receive a discretionary annual
24   bonus.
25        Q    Discretionary annual bonus?
```

```
 1         A     Yes, end-of-the-year.
 2         Q     And do you make the decision as to
 3   whether or not a general manager will receive
 4   a discretionary bonus at the end of the year?
 5         A     I do.
 6         Q     Does anyone else put input in that
 7   decision-making process?
 8         A     Anthony Messina and Jonathan
 9   Jenkins would normally provide input.
10         Q     Remind me, do Anthony and Jonathan
11   Jenkins report to Patrick, correct?
12         A     Correct.
13         Q     I'm sorry, Mr. Walsh.  And would,
14   do you know if they run any bonuses or, you
15   know, salaries by Mr. Walsh?
16         A     They do not.
17         Q     They do not ever or you do not
18   believe that they do?
19         A     I don't believe that they do.  It's
20   a conversation between them and I that has an
21   immediate outcome in that conversation, so I
22   can't see how they would.
23         Q     But it's possible that they may
24   have a conversation with Mr. Walsh of which
25   you're unaware about a salary of an employee
```

1    or a raise that's given or a bonus?

2         A    Well, anything is possible, but I

3    would say it's extremely unlikely.

4         Q    For all intents and purposes,

5    Mr. Walsh is the boss, right, of every

6    employee.  He's the CEO?

7         A    He's the CEO of the company, but he

8    only directly supervises myself, Jonathan

9    Jenkins, as it stands now, and in the past the

10   CFO, and Anthony Messina, and any other

11   corporate team member.  So we mentioned

12   some -- actually, I don't know, they may have

13   reported directly to Anthony Messina, I don't

14   know, but Arzu Kaner, Mario Curcio, I think

15   that they reported directly to Anthony Messina

16   actually.

17        Q    Okay.  How much was Ms. DeMartino

18   making as the general manager of Christi's?

19        A    I believe she was making $80,000 a

20   year.

21        Q    And how much was the general

22   manager of Palm Beach Sports Club in the Palm

23   Beach Gardens location making at the time that

24   Ms. DeMartino was employed?

25        A    So I believe 55- or 60,000, maybe

```
 1    even 50.
 2         Q    And why the disparity in pay for
 3    that particular GM at the Palm Beach Gardens
 4    location?
 5         A    He didn't have as much experience
 6    as Sara did and he -- we did pay Sara what she
 7    was making in New York more to -- I don't want
 8    to say as a courtesy, but to kind of level set
 9    the living expenses that she was used to.
10         Q    Okay.  And when you say not as much
11    experience, how many years of experience did
12    that GM have that was making 55 or 60?  And I
13    recognize that that's an estimate, and I'm not
14    going to hold you to it.
15         A    I don't recall.  I wasn't the
16    hiring manager, so I don't recall.
17         Q    Okay.  Now, what about the GM who
18    was in place at Jupiter at the time Ms.
19    DeMartino was the GM at Christi's?
20         A    He, I believe, was making 60,000.
21         Q    And how much was Mr. Marrero making
22    in his role as the business consultant for
23    Empire?
24         A    He was paid I believe $10,000 for
25    his month as a business consultant.  I'm
```

```
 1   sorry, is that what you asked, business
 2   consultant or business director?
 3        Q    You're right.  Business consultant.
 4        A    Okay.
 5        Q    So $10,000 for the month would be
 6   $120,000 annualized?
 7        A    Yes.
 8        Q    And when he transitioned to the
 9   business director, did his salary remain at
10   $120,000 annualized?
11        A    It did.
12        Q    Was he entitled to any bonuses for
13   any of his club's performances?
14        A    No.  He would have become entitled
15   to bonuses for his clubs hitting when he
16   became the general manager.  So outside of his
17   general manager role, no.
18        Q    How much does the current GM of the
19   Palm Beach Gardens location make?
20        A    Is this something again that can be
21   confidential?  I mean, I'm just...
22        Q    I haven't named any names, so --
23   unless that's something that you're concerned
24   about, which I'm perfectly fine if we want to
25   designate confidential and ask Sara to leave
```

```
1    the call for a minute.
2         A    I don't know that I care so much
3    that Sara is on the call, but just an
4    understanding that, I just don't know that
5    it's right for Sara to potentially disclose it
6    to her boyfriend, which I understand that she
7    would want to talk about with him.
8              MR. SONDHI:  I think we can follow the
9         previous protocol, Allie, then.
10             MS. RATTET:  Sure.  That makes sense to
11        me.
12             Sara, if you can hear me, if you can
13        leave the call briefly.  And I will let you
14        know when you can return.
15        Q    I believe that she's off.
16        A    Yeah.  So the Palm Beach Gardens GM
17   right now, she makes $50,000 for her role as
18   general manager at Palm Beach Gardens.
19        Q    And how much does she make for her
20   role at the Jupiter location?
21        A    $50,000.
22        Q    So she's paid in total $100,000 per
23   year as the GM of the two locations of the
24   Palm Beach Sports Club?
25        A    Yes, and she's paid separately from
```

```
 1   each location.
 2        Q    Okay.  What other circumstances, I
 3   know that you said there's limited
 4   circumstances, I believe that's what you
 5   testified earlier where, I think it was Puerto
 6   Rico, where there was a GM who was running two
 7   locations; is that accurate?
 8        A    Yes.
 9        Q    Okay.  And how much does the GM in
10   Puerto Rico make for the first, you know, one
11   of the locations that he or she runs?
12        A    She makes -- I would have to
13   double-check -- I'm not sure.  I think
14   combined she makes $70,000.
15        Q    And do you know how many years of
16   experience that general manager has as a
17   general manager?
18        A    No, I'm not sure.
19        Q    Did Ms. Maxwell have experience
20   working as a general manager before she was
21   promoted into the role?
22        A    She had experience working as a
23   general manager outside of the fitness
24   industry.
25        Q    How many years of experience?
```

```
 1          A     I'm not sure.
 2          Q     Did the company interview any other
 3   candidates for the position at the Palm Beach
 4   Gardens location?
 5          A     I am not sure.  Not that I'm aware
 6   of, but J.C. was overseeing that club and he
 7   was the one who wanted to promote her.
 8          Q     And you're sure it was J.C. who
 9   made the decision to promote her?
10          A     Yeah.  It was in partnership with
11   me.  It was actually while I was in Palm Beach
12   Gardens, I had a chance to meet with Layton,
13   see what she was doing, what she was capable
14   of in her role as assistant general manager.
15   She really had been running the Gardens
16   location.  And so him and I together decided
17   to promote her and -- to just the general
18   manager of Palm Beach Gardens at that time,
19   and she completely turned the club around.  I
20   would say that she's our number one performing
21   general manager, number one, number two,
22   definitely number one in Florida, but, yeah,
23   she's definitely one of top performing general
24   managers.
25          Q     Did Ms. Layton -- I'm sorry, did
```

1    Ms. Maxwell receive a discretionary bonus at

2    the end of 2022?

3         A    I am not sure.  I would have to

4    double-check.  Possibly, but I'm not sure.

5         Q    Did any other GM located in Florida

6    receive a discretionary bonus at the end of

7    2022?

8         A    I'm not sure.  I know that one of

9    our personal trainers or top performing

10   personal trainers received a discretionary

11   bonus.  I believe he was the only trainer in

12   the company to receive a discretionary bonus,

13   and he received one in 2022.  And that's the

14   other Florida employee that I could recall

15   receiving that, but I would have to

16   double-check.

17        Q    Okay.  So from your recollection,

18   you can only recall one personal trainer in

19   Florida and possibly Ms. Maxwell receiving a

20   bonus at the end of '22 with respect to the

21   clubs in Florida?

22        A    Yes.

23        Q    When did Empire acquire Christi's

24   Fitness?

25        A    Empire came into existence in

1    December 2020, so I guess they acquired
2    Christi's as part of the bankruptcy from Town
3    Sports International, which I believe was
4    finalized, to my understanding, on November
5    30th, 2020.
6         Q    Okay.  And at the time of
7    acquisition, what was the financial state of
8    Christi's Fitness?
9         A    I'm not sure.
10        Q    Who would have knowledge about the
11   financial state of Christi's at the time of
12   acquisition?
13        A    Probably Patrick Walsh or Anthony
14   Messina.
15        Q    When Sara -- I'm sorry, when Ms.
16   DeMartino became the GM for Christi's Fitness,
17   did you have a better understanding of what
18   the financial state of Christi's was?
19        A    No. I don't think Christi's in
20   particular.  I mean, the fitness industry as a
21   whole was in recovery mode from COVID, so I
22   would say that was my general understanding of
23   the business as a whole.
24        Q    Were there COVID restrictions or,
25   you know, safety restrictions and measures

```
 1   still in place at the beginning of 2021 for
 2   Empire's clubs?
 3        A    In Florida, I don't believe so. In
 4   New York, we had, and Puerto Rico, we had a
 5   bit of a roller coaster of policies,
 6   vaccination requirements, that type of stuff,
 7   I think some curfews kind of going back and
 8   forth.  I don't know if it was dependent upon
 9   some sort of, you know, CDC number or,
10   whatever, but we did have some restrictions
11   outside of Florida.  I don't think we had any
12   in Florida.
13        Q    Were there any times that you can
14   recall where a Florida location had to close
15   down at any particular point given, you know,
16   a COVID outbreak or anything like that in
17   2021?
18        A    No.
19        Q    How many -- what is the total
20   member count for the Palm Beach Sports Club in
21   Jupiter?
22        A    I don't know off the top of my
23   head.  I don't know.
24        Q    Is it somewhere that's over 100,
25   less than 100?
```

```
1        A    It is definitely over 100, it's

2   probably around 2,000.

3        Q    Oh, wow.  See what I know about

4   this.  And, again, I won't hold you to that.

5   I'm just trying to get a sense of, you know,

6   how many members each one of the clubs had.

7   What about for Palm Beach Gardens?

8        A    I would guess around the same

9   amount.

10        Q    And what about for Christi's

11   Fitness?

12        A    I would guess around 1200 for

13   Christi's, and that includes all membership

14   types, so swim and gymnastics as well.

15        Q    And for the memberships that you

16   estimate in Jupiter and Palm Beach Gardens,

17   are there any memberships that you're

18   excludeing from the number that you gave?

19        A    No.  They just have general

20   memberships there.

21        Q    Okay.  What is the demographic or

22   the, you know, typical demographic for a

23   patron of the Palm Beach Sports Club in

24   Jupiter?

25        A    I think it's a pretty big mix of
```

```
 1   men, women, various ages.  All of our Florida
 2   clubs definitely have -- can have an older
 3   demographic, snowbird demographic.  We
 4   definitely experience, you know, what we call
 5   in season, which I'm sure living in Florida,
 6   everyone can appreciate, you know, that
 7   October to, I don't know, March/April where
 8   we're busier with people who come to Florida
 9   for half the year.
10        Q    I understand.  And it's always
11   counter-intuitive to me that it becomes busier
12   during the winter, so I hear you.  And would
13   you say it's the same for the Palm Beach
14   Gardens location as well?
15        A    Yes.
16        Q    What was the typical demographic
17   for a patron at Christi's?
18        A    I would guess the same.  I know
19   that -- I know that there's -- it's been said
20   that it's an older demographic, older
21   population.  Obviously we also have a
22   gymnastics program, so that leads me to
23   believe that there's families around too, but
24   I am kind of making some assumptions.  I don't
25   know that we have the data to support that,
```

```
 1    and I don't spend enough time in the clubs on
 2    a daily basis to truly grasp the demographic
 3    of each individual location.
 4         Q    That's fair.  But you visited all
 5    three of those locations?
 6         A    I have.  Yes.
 7         Q    Where is the Palm Beach Sports Club
 8    in Jupiter, where is it located?
 9         A    It is in a shopping center that
10    when I was there, which was last year, was at
11    kind of like an abandoned shopping center.
12    There wasn't -- I guess during COVID a lot of
13    stores had closed down, so it seemed to me
14    like we were one of the few tenants in that
15    shopping center.
16         Q    Was the location easy to see from,
17    you know, the main street?
18         A    Well, it was actually very hard for
19    me to find because Apple Maps didn't take you
20    to the location.  I had to call somebody else
21    and get direction and end up reporting it to
22    Apple so that they could fix it.  I think that
23    it was easy to see from the street.  I don't
24    particularly remember.  What stands out to me
25    is that I had a hard time getting there.
```

1        Q    Sure.  So was there any signage for

2   the Jupiter location in the shopping center in

3   which it's located?

4        A    I am sure there is, but I cannot

5   say and describe it to you.

6        Q    And if there is signage there, is

7   that something that would be deducted as an

8   expense from the budget of that particular

9   location?

10       A    Yes.  If there was signage put into

11  the club, yes.

12       Q    And with respect to the Palm Beach

13  Gardens location.

14       A    Yes.

15       Q    What was your perception -- strike

16  that.

17        What was your -- was it difficult to

18  see from a main thoroughfare?

19       A    Yes.

20       Q    How so?

21       A    It's kind of -- it's in the back of

22  -- it was actually one of my observations when

23  I first got to the club -- it's in the back of

24  a shopping center.  You can easily miss it.

25  And I think that -- I could be wrong about

```
 1    this -- but I think that we completely lost
 2    all signage at some point in the last year as
 3    well for that club in terms of what the
 4    shopping center provides.  So it was difficult
 5    to find and not easily visible from the rest
 6    of the shopping center.
 7         Q    But easily visible from the street?
 8         A    I don't think so.  I remember
 9    because I compared it to a club that I ran
10    that was like that, again, hidden in the back
11    of a shopping center, my first club, and I
12    spoke with the team there about how to
13    overcome that.
14         Q    You visited Christi's as well,
15    correct?
16         A    Yes.
17         Q    And what is your perception of
18    Christi's location?
19         A    It seems fine to me.  I mean, I
20    don't know the area well enough to say, like,
21    is, you know, is Dixie Highway a road people
22    travel a lot.  It seemed like there is a lot
23    of good places to partner with, local
24    businesses.  I specifically remember seeing,
25    like, a Vitamin Shoppe, made note of that, and
```

```
1    some shopping centers nearby that I thought
2    could be good places for prospecting and
3    partnering.  I wouldn't say that -- I don't
4    remember what the signage looked like, but I
5    was able to find it.  And it is in a
6    stand-alone building.
7         Q    And you don't recall whether there
8    was a sign indicating that the business was
9    Christi's Fitness?
10        A    I am 99 percent sure that all of
11   our clubs have a sign somewhere that say it's
12   Christi's Fitness.  I couldn't describe it to
13   you, but I do believe we have a sign somewhere
14   on all the buildings saying what it is.
15        Q    When you were at the Christi's
16   location, did you notice that it was next to a
17   graveyard?
18        A    I did not.
19        Q    What is the cost of a monthly
20   membership at Palm Beach Sports Club in
21   Jupiter?
22        A    I believe it's $100.
23        Q    And was that the same amount as
24   when Ms. DeMartino was employed by Empire?
25        A    No. We have done various price
```

```
 1   increases over the years.  It was definitely
 2   -- I believe it was always more than Christi's
 3   to be a member of the Palm Beach clubs, but I
 4   don't recall the specifics.
 5        Q    And would the Palm Beach Gardens
 6   location also be in the same range or the same
 7   amount as the Jupiter location?
 8        A    Yes.
 9        Q    And if it's $100 now and may have
10   been a little bit different when Ms. DeMartino
11   was employed, what is the membership, monthly
12   membership for Christi's Fitness?
13        A    The monthly membership, I'm talking
14   about per member price, I believe it's $55.
15   And I think it was the same when Sara was
16   there too.
17        Q    So $100 per month per member for
18   the Jupiter location?
19        A    Yes.  Yes.
20        Q    A hundred dollars per member per
21   month for the Palm Beach Gardens location?
22        A    Yes.
23        Q    And $55 per month per member for
24   Christi's Fitness?
25        A    I believe.  And all of that is on
```

```
 1   our website, so I could easily check.  I just
 2   don't have it memorized.
 3        Q    That's perfectly fine.  I'm just
 4   trying to get a sense of what the ranges were.
 5   And you said that you believe that that amount
 6   was around the same when Ms. DeMartino was
 7   there?
 8        A    I believe so.
 9        Q    Okay.  But that there had been a
10   membership price increase at the Palm Beach
11   Sports Club locations since she --
12        A    Yes.
13        Q    -- since she left?
14        A    Yeah.  We've increased price at,
15   yes, at the Palm Beach locations.
16        Q    Is there a reason why the
17   membership price wasn't increased at
18   Christi's?
19        A    I don't know.  I'm not sure.  I'm
20   sure there is a reason.  I don't know what it
21   is.  I know that -- yeah, I don't know what it
22   is.
23        Q    Who would have the knowledge or
24   perhaps the information about why there was no
25   increase in the membership at Christi's?
```

```
 1          A     Anthony Messina.

 2          Q     Do any of the Florida clubs offer

 3    multiuse passes?  And when I say multiuse, I

 4    mean access to multiple locations for a set

 5    price.

 6          A     Yes.  I mean, technically, all of

 7    our clubs can sell multiuse locations.  We do

 8    have multiuse for the Florida clubs for the

 9    two clubs that are closer together.

10          Q     So there's a multiuse membership

11    for Palm Beach Sports Club in Jupiter and Palm

12    Beach Gardens.  And how much does that cost

13    per month?

14          A     I'm not sure.  I know it's probably

15    not sold a ton, but I'm not sure on how much

16    it costs.

17          Q     Would it be more than the single

18    club membership of $100 per member?

19          A     Yes.

20          Q     And is there a reason why -- is

21    that the -- strike that.

22           The multiuse pass was available for all

23    Florida clubs, correct?

24          A     Yeah.  Technically, anyone could

25    sell what we call an Elite Membership, which
```

```
 1    is access to our entire network.  I would say
 2    it is very unlikely that anybody outside of
 3    New York is going to sell that membership,
 4    just because, you know, New York is just a
 5    totally different beast in that sense, and
 6    people do use different clubs depending on
 7    where they work, live, commute.  We have a
 8    couple clubs that are Elite only there, and
 9    they go for $175, $200.  So not to say it
10    can't happen or doesn't happen in Florida or
11    Puerto Rico, but it would be very unlikely for
12    those clubs to sell an Elite club and I would
13    say that the majority of their sales are
14    single club memberships at all of those
15    locations outside of New York.
16         Q    Is there an intermediary membership
17    such that the pass would permit you to access
18    state-specific locations?
19         A    There is a Florida specific, yes.
20         Q    Please let me finish the question
21    just because I want to make sure there's a
22    clean record.  I totally understand, and I'm
23    going to just put my hand up if I'm not done.
24    I'm not trying to be rude.
25         A    Okay.
```

```
 1          Q     Okay.  So I didn't hear your
 2     response.  So is there a state-specific
 3     membership such that a person may be able to
 4     access the clubs in that particular locale
 5     versus nationwide?
 6          A     Yes.
 7          Q     And is that something that is
 8     pushed, is that pass pushed in terms of sales
 9     at the Palm Beach location?
10          A     I don't know what you mean by
11     pushed.
12          Q     I should clarify.  Is that a
13     popular membership at the Palm Beach Sports
14     Clubs located in Jupiter and Palm Beach
15     Gardens?
16          A     I believe that the single club
17     membership is more popular.
18          Q     And by more popular, what
19     percentage of sales make up a single club
20     membership?
21          A     I'm not sure.
22          Q     Do you know what percentage of
23     sales make up the membership such that you can
24     access all the Florida clubs?
25          A     No.  If I knew that, I would know
```

1  the single club.

2      Q    What percentage of memberships at

3  Christi's account for the Florida multiclub

4  pass?

5      A    I'm not sure.

6      Q    What is the term or the name of the

7  pass that is specific --

8      A    I think it is multiclub Florida.

9  That's how we have it in the system, so

10  multiclub Florida.  And I would assume that it

11  is the least popular of the options at

12  Christi's too, the same way I would with the

13  other clubs.

14      Q    Why is that?

15      A    Based on my experience working in

16  the industry for a long time, I've worked at

17  clubs in the suburbs, which is what the

18  Florida clubs are, and clubs in the city,

19  which is what our New York clubs are, and we

20  very rarely sold multiclub memberships at any

21  of the suburb locations that I've worked at.

22  And, again, I've worked at many.  It's been my

23  experience over the years.

24      Q    Do either of the Palm Beach Sports

25  Club locations offer or have a swimming pool?

```
 1          A     No.
 2          Q     Do either of the Palm Beach Sports
 3   Club locations in Florida have a gymnastics
 4   program?
 5          A     No.
 6          Q     What other sales metrics account
 7   for the revenue at the Palm Beach Sports Club
 8   location in Jupiter?
 9          A     Personal training for sure would be
10   across all our clubs.  They also have
11   babysitting, so that would be a factor.  A
12   small portion would be, like, energy drinks
13   protein bar type things.  I'm trying to think
14   if there's anything else.  I don't think
15   there's anything else.  Sublease revenue at
16   Jupiter.  And I don't know if they're selling
17   these -- we did put infrared saunas in, and I
18   think that that's going to add additional
19   costs in Jupiter, but I don't recall the
20   specifics or if that's being sold regularly.
21          Q     When were the infrared saunas
22   installed at the Jupiter location?
23          A     I believe August 2022.
24          Q     And is that an amenity that is in
25   addition to the membership rate, in other
```

```
 1   words, is that something that would be like an
 2   add-on?
 3        A    I believe it's at additional cost,
 4   you can buy sessions to use it.
 5        Q    Any other facilities, like an
 6   infrared sauna, at either one of the Palm
 7   Beach Sports Club locations?
 8        A    I know for sure that Palm Beach
 9   Gardens has a dry sauna and they have the cold
10   plunge.  I don't think either location has a
11   steam room, but I could be wrong about that in
12   Jupiter, but I don't think they do.
13        Q    Do the Palm Beach Sports Club
14   location offer classes?
15        A    Yes.
16        Q    And what type of classes?
17        A    Zumba, yoga, various, like, cardio,
18   strength training, different types of classes
19   like that.
20        Q    And are those classes included in
21   the monthly membership price?
22        A    They are.
23        Q    Any classes that aren't?
24        A    Not that I know of.  They could,
25   like, for example, a personal trainer could,
```

```
 1    if they have a specialty and they wanted to
 2    offer small group training, boxing class,
 3    that's something that they could do.  I don't
 4    know that that's something that's actually
 5    happening now in any of the clubs, but it's
 6    something that can happen.
 7         Q    Okay.  What percentage of Christi's
 8    revenue was attributable to the gymnastics
 9    program?
10         A    Where it stands today, I believe it
11    is approximately -- it is approximately 30
12    percent of revenue where it stands today.  I
13    don't know where it stood during Sara's time
14    there, not to say that we couldn't figure that
15    out, but I don't know the specifics.
16         Q    Okay.  What percentage of Christi's
17    revenue is attributable to the aquatics
18    program?
19         A    I'm not sure.  I'm not sure.
20         Q    Is it less than the percentage
21    attributable to the gymnastics program?
22         A    Yes.
23         Q    And then what other services or
24    amenities make up for the remainder of the
25    revenue at Christi's?
```

```
 1        A    Obviously personal training.
 2   Babysitting.  What else, we do have...  I
 3   think we do have a sublease revenue there.
 4   Gymnastics.  Swim.  I think that that covers
 5   it.  May sell some, like, water bottles, water
 6   at the desk, like, those types of things.  Any
 7   of those clubs that do have that, it's not a
 8   huge moneymaker, but they may have that at the
 9   front there.  Not sure.
10        Q    And what percentage of Christi's
11   revenue is attributable to monthly
12   memberships?
13        A    I want to say between 60 -- I'm
14   guessing, which I know I'm not supposed to
15   do -- so over 50 percent.
16        Q    Do the Florida clubs offer any
17   promotions?
18        A    They have, I believe, a family
19   add-on membership promotion.  And I don't know
20   whether they're still offering, we had a
21   SilverSneakers promotion out of Christi's that
22   might have been offered.  I'm not sure.
23        Q    I don't mean to jump around, but I
24   want to go back quickly.  When you say that
25   there is sublease revenue, what do you mean by
```

```
1    that?
2         A     There's a massage therapist that
3    leases space from us and pays us accordingly.
4    I don't know the specifics of that agreement.
5    And then for Jupiter, it's a chiropractor.
6         Q     And when you say -- was the massage
7    therapist at Palm Beach Gardens?
8         A     No, that's Christi's.
9         Q     Okay.  And then a chiropractor at
10   Jupiter.  Do you know how much that accounts
11   for per month?
12        A     Like, approximately $1500.
13        Q     And what about for Christi's?
14        A     I want to say a couple hundred
15   dollars.
16        Q     When Sara became the GM of
17   Christi's, was the SilverSneakers program in
18   place at that time?
19        A     No, it was not.
20        Q     Why not?
21        A     We eliminated it when we became a
22   new company.  We -- well, yeah, we eliminated
23   it when we became a new company.  I would say
24   overall, it wasn't something that was bringing
25   in a lot of money.  I was very involved with
```

```
 1    SilverSneakers at the previous company, so my
 2    knowledge of the SilverSneakers program is
 3    based on that, and we did see a significant
 4    decline when we reopened the clubs in
 5    SilverSneakers as a whole because it is for
 6    senior citizens and they were using the gyms
 7    less for sure, just being more health
 8    conscious.  And then SilverSneakers was also
 9    renegotiating a lot of their contracts to be
10    less favorable.  And, again, that was based on
11    my exposure to that at TSI.
12         Q    And under the SilverSneakers
13    program, would the insured or the person who
14    was able to have a membership under that
15    program, did they pay any percentage of the
16    membership?
17         A    So I don't know what they paid to
18    their insurance company.  I assume some
19    premium is assessed on their side, but they
20    pay us based on check-ins to the club.  So the
21    member is not paying us directly anything.
22         Q    Okay.  So it's zero dollars
23    out-of-pocket under the SilverSneakers program
24    from the member, but Empire would be or the
25    company would be paid based on check-ins?
```

```
 1        A    Yes.
 2        Q    Do you recall how much based on
 3   check-ins?
 4        A    No.  I want to say, like, there was
 5   levels and everything, and I don't think we
 6   ever even had it at Empire.  I think
 7   essentially we discontinued it when we became
 8   Empire.  So I want to say it was, like, I
 9   don't know, $3 to $5 per check-in.  And there
10   was a cap of around $30.  It definitely was
11   based on different tiers, so, like, some of
12   our larger clubs when we were at TSI in Boston
13   or New York, maybe got a little bit more
14   money, but there was a cap of around $30 to
15   $40, and we got, like, I don't know, 3.50 per
16   check-in, there may have been different levels
17   where, like, if they checked in x amount of
18   times it went up a little more, like, the
19   first five were this, but there was some type
20   of cap there as well.
21        Q    And what is the Silver and Fit
22   program?
23        A    That's ASH.  American Specialty
24   Health.  It's a much, much smaller program
25   than SilverSneakers.  They have very, very few
```

```
 1   participants.  I guess they're a competitor of
 2   SilverSneakers, but they have very few
 3   participants.  I think that their compensation
 4   is a little more favorable where, if I
 5   remember correctly -- and, again, based on my
 6   dealings with them at TSI, because I oversaw
 7   this specifically at TSI -- if we got, like,
 8   one check-in, we got, like, I don't know, $40
 9   or $50.  It was just a way more favorable
10   program, but a lot less people participated,
11   so it was never a huge moneymaker in any club.
12        Q    Do you know why few people
13   participated in the Silver and Fit program?
14        A    I assume it has to do with, like,
15   insurance.  I don't know, like, what insurance
16   company they work with.  I don't know how it
17   works internally for them.  I don't know if
18   it's something -- I don't know if it's
19   something that some insurances add on, where,
20   like, I know that Optum, which is another
21   version of this, is, like, part of United
22   Healthcare.  So they have the United
23   Healthcare network, it's going to be a bigger
24   program.  SilverSneakers a lot of people are
25   eligible for.  I don't know if that's a
```

```
 1   Medicaid thing, but whatever the population is
 2   for ASH it's very -- it's a small population
 3   of people that qualify or are eligible.
 4        Q    When Sara was the -- Ms. DeMartino
 5   was the GM of Christi's, were there any
 6   conversations about bringing the
 7   SilverSneakers program back or a comparable
 8   program to accommodate the elderly population?
 9        A    No, but we offered a promotion for
10   them to join the gym at a discounted rate,
11   and, again, this happened prior to Sara
12   starting and then while she was there,
13   especially in the beginning, because that was
14   the period in which we eliminated this.  We
15   were essentially honoring the SilverSneakers
16   memberships while we transitioned these people
17   onto paying memberships.  So we gave them a
18   highly discounted rate to join the club.  And
19   I don't know the specifics of the rate.  I
20   want to say it was maybe 50 percent off, but
21   we did give them a promotion and we were able
22   to provide the club with a call list, and that
23   was something that was worked on prior to Sara
24   joining the team and then when she did join
25   the team.
```

```
1          Q     And what was the impact of the
2     club, of Christi's, transitioning away from
3     the SilverSneakers program?
4          A     I believe that the conversion was
5     pretty successful.  I mean, given the fact
6     that there weren't a ton of SilverSneakers
7     users even using the club anymore, the ones
8     that were active users, I don't remember the
9     specifics, but I do remember it was deemed a
10    success, the conversion.
11         Q     By what standards?
12         A     We were able to capture a large
13    population of the SilverSneakers members.  We
14    were able to get them onto general
15    memberships.
16         Q     When you say large, how does that
17    equate to a percentage of retention?
18         A     I don't know.  It would be based on
19    active users, so people that had been actively
20    using the club because, again, those are the
21    only people we got paid on.  I think that
22    financially we broke even, and this is based
23    on leadership calls we would have on a weekly
24    basis.  So the people that were overseeing
25    those efforts, this was information they
```

1    shared.  I wasn't directly involved, but I was

2    part of those leadership calls, which is where

3    I was made aware of it.

4         Q    Are there documents that would

5    evidence the percentage of retention following

6    conversion away from the program?

7         A    There may be.

8         Q    And you don't recall the details of

9    the promotion that was offered when you were

10   -- or when the club was transitioning out of

11   SilverSneakers?

12        A    No, I just wasn't -- that wasn't

13   directly in my wheelhouse of responsibilities

14   at the time, so it's just not something that I

15   recall the specifics of.

16        Q    Was that promotion offered for a

17   limited period of time or consistently for,

18   you know, the duration of that member's

19   membership?

20        A    It was for the duration of that

21   member's membership.

22        Q    So if that member elected to stay

23   on despite removal of the SilverSneakers

24   program, then that member would be entitled to

25   the promotional rate for as long as he or she

1    was a member at Christi's?

2         A    I mean, technically, we can could

3    raise dues.  It's in our agreement, but we

4    haven't, so, I mean, yes, we can raise dues on

5    any of our memberships, but we haven't.

6         Q    What is different about Christi's

7    when compared to, say, a Palm Beach Gardens or

8    Jupiter Palm Beach Sports Club?

9         A    They have a pool and a gymnastics

10   facility.  I think that that's the big

11   difference.

12        Q    And would you say that that impacts

13   the clientele that, and the members, at

14   Christi's?

15        A    Well, you're going to attract

16   people who are interested in gymnastics, where

17   we don't attract that at the other clubs.  And

18   the pool has always been a selling point.

19   Again, I've worked in many clubs over the

20   years, and it was, like, always a joke because

21   people, like, love to know that they have a

22   pool, whether they're going to use it or not,

23   it's always been a major selling point when

24   I've worked at clubs with pools versus clubs

25   that don't.

1          Q     And with respect to personal
2     training at Christi's, what percentage of
3     revenue was attributable to personal training?
4          A     I'm not sure.
5          Q     Was it less than 10 percent?
6          A     Possibly.  I really don't know.
7          Q     The reason I'm asking is because
8     earlier you testified that you estimated the
9     gymnastics program revenue to be 30 percent,
10    and you estimated the memberships, monthly
11    memberships, to be over 50 percent.
12         A     Yes.
13         Q     So I'm asking if, you know, if
14    there's 20 percent left to distribute among
15    the revenue-generating features, then I'm just
16    trying to get a sense -- and, again, if you
17    don't know the answer, I don't want you to
18    testify and guess.  I'm just trying to get a
19    sense of where -- how much of the --
20         A     And so I could probably make a
21    guess as to where it stands today, but that's
22    because I'm more involved in that side of the
23    business.  I was very not involved in that
24    side of the business.  I mean, we had a
25    fitness director at that time.  So, you know,

1    my numbers are based on where it stands today.

2    I don't know where it stood when Sara was

3    there.  I would say it's probably about 5 or

4    10 percent of revenue as it stands today.

5         Q    And what about personal training

6    sessions in the Palm Beach Sports Club Jupiter

7    location?

8         A    As it stands today?

9         Q    Yeah.  Sure.

10        A    I don't know percentage-wise, but

11   they're doing about -- they're doing very well

12   right now, and on an upswing $20- to $25,000 a

13   month in revenue as it stands today.

14        Q    Is there a way to determine --

15   strike that.

16         Approximately how many new, in terms of

17   the monthly memberships at Christi's, what

18   percentage of that number accounts for new

19   memberships?

20        A    Can you clarify a little bit.

21        Q    Sure.  I'm just trying to get a

22   sense of, you know, if those are long-standing

23   members or if there is a large increase in the

24   number of members or if there has been since

25   Ms. DeMartino's departure and also during the

```
1   time that she was the GM.
2        A    Yeah, I mean, the gym industry as a
3   whole probably runs, you know, 3 to 4 percent
4   attrition.  It's definitely impacted by the
5   seasons, where -- I mean, January, for
6   example, is different than, you know, July
7   when people are traveling.  So attrition
8   varies.  But we have, you know, people cancel
9   out and people sign up every month, and the
10  expectation is that the club is gaining
11  members regularly and growing EFT.  So even
12  at, like, our clubs where we've raised the
13  rates, assuming our older members that are
14  cancelling out because, I think, on average in
15  the fitness industry most members have a
16  20-month membership life.  So our members that
17  let's say on average are cancelling out that
18  joined 20 months ago may be paying a lower
19  rate than the members that are joining now.
20  Or, you know, at some locations, your members
21  stay for five to ten years and those people
22  have lower rates.  So -- I don't know if that
23  answered your question.
24       Q    How, in your experience, what is
25  the best way to increase membership sales?
```

```
 1        A    I believe in following the
 2   membership sales process, what we call morning
 3   flow or GM daily flow, that really sets the
 4   club up for success, and it's about being
 5   consistent in those processes, so they include
 6   meeting with your team to have a production
 7   meeting daily and review yesterday's
 8   performance and the plan for today, today's
 9   goals.  It includes having a team meeting to
10   goal set with your entire team.  It involves
11   call driving for the membership consultants
12   and the general manager being a part of that,
13   and it involves prospecting, whether that be
14   external or internal prospecting.  And
15   internal prospecting can be as simple as
16   setting up a table at the front desk to get
17   referrals for members that are coming in.  We
18   did offer at that time, which we don't
19   anymore, a promotion that allowed members to
20   get a credit if they referred a member who
21   joined.  So that was definitely a really easy
22   way to boost sales.  So it's a combination of
23   those sales-driving activities, and the key
24   there is being consistent with it.  Also, a
25   team training, so training your team regularly
```

```
 1    on different things that help them become
 2    better at their job.  So, for example, you
 3    would train your membership consultant on
 4    maybe overcoming objections and you would
 5    role-play with them.  So tell me what
 6    objections you're getting lately, and they may
 7    say, oh, I need to talk to my spouse.  That's
 8    a really common objection.  Okay.  So what can
 9    we say -- what question can we ask during the
10    needs analysis to better prepare for that.
11    The GM TO'ing, which is taking over the sale.
12    So if a membership consultant can't close the
13    sale, the GM is expected, as long as they're
14    in the building, to come in and try to close
15    the sales themselves.
16         Q    Who is responsible for prospecting?
17         A    The membership consultants.
18         Q    Are they the only people who are
19    responsible?
20         A    I would say it's the responsibility
21    of the general manager to prospect with them
22    on occasion, not every single time that they
23    prospect, but it's the responsibility of the
24    general manager to ensure that they're going
25    out prospecting and also review the results.
```

1   So if you're an MC and you're going out
2   prospecting, as the general manager, I'm going
3   to let you know, hey, your goal is to get five
4   contacts.  And then when you come back, I want
5   to know how many contacts did you get.  Okay,
6   you got four.  Maybe that wasn't a great area.
7   Let's try this next time.  Oh, you got six,
8   that's awesome.  So setting expectations,
9   putting a plan together, reviewing results,
10  and then an expectation that the general
11  manager does go out to prospect with her team
12  or their team at times, you know, especially
13  if it's a community event, it's really great
14  for the general manager to be there, if it's
15  something where a table is being set up at a
16  community day or a 5K, but I think that
17  especially if it's a new MC, the GM may go out
18  with them to kind of show them what
19  prospecting looks like.
20       Q    Do PTs prospect?
21       A    They prospect -- no.  They prospect
22  the floor for clients and fitness orientation,
23  so when they're working their floor shift,
24  which is like their designated hours where
25  they're just available to help people, we call

1    that prospecting the floor.  So they are

2    looking to engage people to either book a

3    fitness orientation, help them, and hopefully

4    turn that into a client.  They can go out and

5    prospect with the membership consultants.

6    We've definitely seen that be very valuable

7    whether it's an event or setting up outside

8    somewhere, if you bring a PT, and if they have

9    a boxing specialty, they'll bring a couple of,

10   like, pads and engage people with that.  I've

11   done events where the PTs, like, give people

12   challenges, push-up challenges, and spin a

13   wheel and make it fun.  So they aren't

14   required to go out and prospect for new

15   memberships, but they can definitely add value

16   to external prospecting and they are expected

17   to internally prospect for new clients.

18        Q    Can an MC or a PT or anyone in

19   another position wear multiple hats?  And if

20   you need an explanation or example, I can give

21   that to you.

22        A    Sure, an example would be great.

23        Q    So, for example, if there's, say,

24   somebody is absent from work for an extended

25   period of time and there's a gap in the number

1   of MCs, would Empire object to someone else,

2   you know, a PT perhaps, filling the role until

3   that person returned?

4        A    No.  I mean, I don't know that a PT

5   filling in the gap of a membership consultant

6   necessarily makes the most sense, just because

7   that takes away their own revenue-driving

8   activities, but, no, I don't think we would

9   object to that.  We have welcome team step in

10  to help sometimes.  So no, I don't think we

11  would object to that as long as the needs of

12  the business are being met and we weren't

13  hindering another area of the business.

14       Q    And that's probably a better

15  example than the one that I gave.  Basically,

16  just, you know, if someone is sitting at the

17  front desk and fielding calls, you know, it's

18  not as if that person would be prohibited from

19  making a sale if they could do so, correct?

20       A    No. They're actually commissioned,

21  so, I mean, front desk is more than welcome to

22  sell memberships.  They do sell membership.

23  When there's no membership consultant or

24  managers in the building, so early hours, late

25  at night, it's encouraged and they are paid

```
 1   commission.
 2        Q    Is there something about the role
 3   of a membership consultant that, and the way
 4   that they, you know, prospect or drive a sale
 5   that is different and, you know, not intuitive
 6   for a front desk person who would also do the
 7   same after hours?
 8        A    I think membership consultants are
 9   getting trained with a sale skill set, so
10   overcoming objections.  We train them on
11   conducting a needs analysis.  They go through,
12   you know, various, you know, one-on-one
13   trainings.  And not to say that a welcome team
14   couldn't naturally, you know, be able to pick
15   that up really quickly.  I think being willing
16   to go out and talk to people is a personality
17   trait too, in addition to a skill set.  So the
18   real benefit of a membership consultant is
19   somebody who is devoted to generating sales
20   and has had some additional training,
21   one-on-one attention, isn't at the front desk
22   checking people in, you know, they're devoted
23   to sitting down and making the phone calls or
24   getting out and prospecting without
25   distractions.
```

```
 1        Q    But in terms of, you know,
 2   training, in order to make a sale, you say MCs
 3   have one-on-one training and whatnot.  It's
 4   not as though making a sale is that
 5   complicated, right?  Would you agree with
 6   that?
 7        A    No, it's not that complicated.
 8        Q    So pretty much anyone could do it
 9   if they were given some guidance.  Would you
10   agree with that?
11        A    I would say anyone could sign up a
12   membership.  I don't know that anyone could
13   close a sale.  I wish it were that easy, but
14   it is a skill set to close a sale.
15        Q    And I think that's fair, and I
16   agree with you.  But what I'm asking more is
17   that if that person was given training or
18   tools to be able to, you know, effectuate that
19   sale, it's not like -- it's not like it
20   requires a special skill set that couldn't be
21   learned by any person, correct?
22        A    I believe most people can learn the
23   skill set.  I would say probably there's some
24   people that can't, but, yes, probably many
25   people could learn the skill set of selling a
```

```
1    membership and what goes into that.
2         Q    When did you first meet Ms.
3    DeMartino?
4         A    I want to say -- I honestly don't
5    know.  It was definitely at -- it was TSI.  We
6    probably met -- we use to have monthly
7    director meetings, and I would assume that we
8    met at one of those, but I can't remember the
9    specific time that I first met her.
10        Q    And were those monthly director
11   meetings in person?
12        A    Yes.  And that was at the old
13   company.  That was in New York.
14        Q    And that was when she was the
15   general manager at one of the clubs in New
16   York?
17        A    She was a business manager briefly.
18   I don't know how long, but she was a business
19   manager at one point.
20        Q    She was a business manager at the
21   time that you met her?
22        A    Yes.  That's when we would have
23   met.  We would have been at meetings together
24   then.
25        Q    And at that point, you weren't the
```

```
 1    HR director, correct?
 2         A    No.
 3         Q    Do you know -- who supervised her
 4    when she was the business manager?
 5         A    Could have been Anthony Messina,
 6    but -- or Ryan Pastore.
 7         Q    Did you ever have any conversations
 8    with Mr. Messina when Ms. DeMartino was in New
 9    York about her performance?
10         A    Not that I recall.
11         Q    Do you know anything about her
12    performance before she moved to Florida?
13         A    I believe that she was demoted at
14    some point from business manager back to
15    general manager, but that's about the extent
16    of what I know.
17         Q    Do you know the reason why that
18    occurred?
19         A    I assume it was based on
20    performance, but I'm not sure.
21         Q    And then were you involved in --
22    when did you first learn that Ms. DeMartino
23    would be moving to Florida and become the GM
24    of Christi's?
25         A    Probably at the end of January,
```

1    beginning of February of 2021.

2         Q    And how did you learn that?

3         A    From Anthony Messina.

4         Q    And was that a phone call from Mr.

5    Messina?

6         A    Yeah.  It would have had to have

7    been.  I didn't see him in person, so yes.

8         Q    Do you recall what was discussed on

9    that phone call?

10        A    No.  I mean, we knew that the

11   current GM was leaving, so we knew that club

12   was going to be gapped a GM, and he said he

13   had someone to fill the spot, and that was the

14   extent of it.  And it's Sara.

15        Q    Why was the current GM leaving

16   Christi's?

17        A    I believe he was pursuing a career

18   selling insurance or something like that.

19        Q    And was the club performing

20   adequately under his management?

21        A    I'm not sure.

22        Q    Do you know anything about the

23   discussions that were had before Ms. DeMartino

24   accepted the position as the GM for Christi's

25   as it relates to her employment with

```
 1   Empire/TSI?

 2        A    Well, Empire and TSI are two

 3   different things so...

 4        Q    I say that, let me clarify, just

 5   because I know there was -- I'm not sure the

 6   exact date that she was -- actually, strike

 7   that.

 8        So do you know anything about the

 9   reason why -- or do you know if Ms. DeMartino

10   left TSI?

11        A    I do not know for certain.  I

12   assumed that she resigned from there, but I'm

13   not sure.

14        Q    Do you know that she was -- that

15   she was moving to Florida before she was

16   offered the position as GM?

17        A    Yeah.  My understanding was that

18   she was planning to move to Florida outside of

19   being offered a position of GM.

20        Q    And what do you mean about the

21   details of her moving to Florida?

22        A    I believe that I heard she was

23   moving to Florida.  I don't know if it was

24   maybe something to do with family or not.  I

25   don't know if that -- I could have just been
```

1    making that assumption.  She was relocating to

2    Florida, and I thought that that was, like,

3    okay, well, that works out perfect.  I mean,

4    Florida is a big state and this is where we

5    have an opening, and this is the area she

6    wants to be in, and she has experience, so I

7    thought it worked out well.

8         Q    But when you heard that she was

9    moving to Florida, did you understand that she

10   was moving to Florida to work for Christi's?

11        A    No.  My understanding was that she

12   was relocating to Florida on her own and was

13   interested in the open position that we had.

14        Q    And how do you know that she was

15   interested in the open position?

16        A    Based on my conversation with

17   Anthony Messina.

18        Q    And did Anthony, during that

19   conversation with you, ever mention that Sara

20   had given her two weeks' notice?

21        A    No.

22        Q    Did he mention anything about

23   having to convince Ms. DeMartino to work for

24   Christi's?

25        A    No.

```
1          Q    Did he mention anything about who
2    might be moving to Florida with Ms. DeMartino?
3          A    No.
4          Q    When you worked as -- I'm sorry,
5    remind me of the position that you had before
6    you were hired as the HR director December
7    2020?
8          A    When I left TSI, my role was sales
9    support director was my title.
10         Q    Okay.  And as a sales support
11   director, did you -- were you working from
12   home for that role?
13         A    No.  I was working in one of our
14   New Jersey clubs.
15         Q    Have you ever heard the name David
16   Rankin?
17         A    I had not.
18         Q    When was the first time that you
19   heard the name David Rankin?
20         A    In, I don't know, May or June of
21   2021.
22         Q    And what were the circumstances
23   surrounding your learning Mr. Rankin's name?
24         A    I don't know.  Just a new employee
25   at Christi's.
```

```
1         Q    And did you hear that he was going
2    to be a new employee at Christi's for Ms.
3    DeMartino?
4         A    No, I don't think so. I knew that
5    probably from Mario Curcio or Anthony Messina
6    or Arzu Kaner that Sara had hired somebody.
7    Might have been made aware at some point that
8    he needed to update, like, information for his
9    medical benefits in June.  I feel like I
10   remember that coming up because he was hitting
11   his 30-day mark of eligibility, and that was
12   the extent of it.
13        Q    So prior to May or June of 2021,
14   there was no discussion with you as the HR
15   director about David Rankin coming in as an
16   employee at Christi's?
17        A    No.
18        Q    Did your relationship with Sara
19   change when she became the GM at Christi's?
20   And what I mean by that is, previously you
21   testified that the interactions were limited
22   to, you know, meetings and whatnot.  Did your
23   interactions or the frequency of your
24   interactions increase when she moved to
25   Florida?
```

```
 1         A    Yes.
 2         Q    How often would you communicate
 3   with Ms. DeMartino?  On a daily basis?
 4         A    Probably, I don't know about daily,
 5   but throughout the week I would say we
 6   communicated.
 7         Q    And in your role as HR director, do
 8   you regularly communicate throughout the week
 9   with most of the GMs at Empire?
10         A    Probably, like, maybe once a week.
11         Q    So fair to say that your
12   interactions with Ms. DeMartino -- there were
13   more interactions with her than maybe other
14   GMs?
15         A    That's fair to say, yeah.  She
16   definitely reached out for help more.
17         Q    In your interactions with Ms.
18   DeMartino, were they over the phone?
19         A    Yes.
20         Q    Ever in person?
21         A    I don't think so, no.  No, because
22   I hadn't been to Christi's until November, so
23   I was never there while she was there.
24         Q    How would you characterize the
25   nature of your communications with Ms.
```

1    DeMartino?

2         A     I think that they were cordial,

3    friendly, like, work friendly, not like we're

4    going to go hang out friendly, but work

5    friendly.

6         Q     Were any of your communications

7    personal in nature?

8         A     You know, we definitely had some

9    personal conversations around her pregnancy,

10   just kind of mom-to-mom conversations.  You

11   know, she had shared at some point with me a

12   concern with one of the, like, tests she got

13   back early on.  And it ended up being okay,

14   but I know she was, like, worried about that,

15   and just, like, as a mom and a woman, I

16   understand that feeling.  As a mom more than

17   anything, I know that feeling.  So we talked

18   about that and I would even say bonded over

19   some of that for sure.

20        Q     Did you consider Ms. DeMartino an

21   acquaintance?

22        A     Yeah, an acquaintance.  I mean, a

23   colleague, work acquaintance.

24        Q     Did you ever send Ms. DeMartino

25   any, you know, gifts?

```
 1        A    I don't think so, but I did mean to
 2   when she told me about her baby that she was
 3   expecting.
 4        Q    Did you send Ms. DeMartino any
 5   texts around the holidays wishing her a happy
 6   holidays?
 7        A    I wouldn't be surprised if I sent
 8   any of the GMs around the holidays wishing
 9   them happy holidays.
10        Q    When did Ms. DeMartino disclose her
11   pregnancy to you?
12        A    I believe it was October of 2021.
13        Q    And was that over the phone?
14        A    Yes.
15        Q    Not through text message?
16        A    I don't think so. I'm 99 percent
17   sure that it was a phone call.
18        Q    And when you said October 2021, was
19   it early October?
20        A    I believe it was early October.  I
21   know that -- it could have even been
22   September.  Based on what she told me, I was
23   the only one she had told at that point and
24   I -- she had asked me not to tell anyone.  She
25   wanted to inform Anthony Messina next and was
```

1  going to.

2       Q    Do you know when she ultimately

3  informed Mr. Messina about her pregnancy?

4       A    No, I don't.  I want to say it was

5  shortly thereafter, but I don't know for sure.

6       Q    And Mr. Messina, at that time that

7  she discussed her pregnancy, he was Ms.

8  DeMartino's direct supervisor?

9       A    Yeah.  I mean, we also had Arzu

10 Kaner on the operations side that supported

11 the GMs, but Anthony was her direct supervisor

12 at that time.

13      Q    And do you know if he had been her

14 direct supervisor prior to her moving to

15 Florida?

16      A    I believe he was at some point.  I

17 don't know if that changed with people moves.

18 Again, we had, you know, other VPs, market

19 leaders, all that come in, but I believe at

20 some point she reported to Anthony while she

21 was in New York.

22      Q    What was your understanding about

23 the nature of her relationship with

24 Mr. Messina?

25      A    My understanding was that they

1    worked together and he had a positive work

2    experience with her.

3         Q    Do you know how long they had

4    worked together?

5         A    No, I'm not sure.

6         Q    Did she -- did Ms. DeMartino say

7    why she chose to disclose her pregnancy to you

8    before Mr. Messina?

9         A    I assume because I was HR, but I

10   don't know that she specifically said that.

11        Q    Did she disclose any concerns about

12   disclosing her pregnancy to Mr. Messina?

13        A    No.

14        Q    When was the first time that Empire

15   identified a need for Christi's performance to

16   improve?

17        A    I think that it had been an ongoing

18   conversation on our weekly management calls

19   that Christi's was underperforming for quite

20   some time, but I don't remember the exact,

21   like, date or month that that conversation

22   started.

23        Q    Who participated in weekly

24   management calls at Empire?

25        A    Michael Montella, Jonathan Jenkins,

1   Patrick Walsh was on them, assuming he was,
2   you know, available, Anthony Messina, Arzu
3   Kaner, Mario Curcio, our marketing team, and I
4   think that was it.  Oh, and J.C. was on it
5   when he became the business director.
6        Q    And did the makeup of the weekly
7   management calls ever change, aside from
8   adding J.C. when he came on as a business
9   director?
10       A    I mean, it definitely expanded.  It
11  definitely expanded just based on different
12  things we were talking about.  Sometimes we
13  would include other people in it.  And then we
14  also had some people that were with the
15  company but had left, like Kate Wugas, and,
16  yeah, I think that that's it.
17       Q    Were the weekly management calls
18  recorded?
19       A    No.
20       Q    Was anyone designated as the
21  secretary or the person who was required to
22  take notes of the call?
23       A    No.
24       Q    Did you ever take notes during the
25  weekly management calls?

```
 1          A     I don't think so. Not that I
 2     recall.
 3          Q     So there was no meeting minutes?
 4          A     No.
 5          Q     Do you know where Mr. Marrero was
 6     living at the time he was brought on as a
 7     business consultant for Empire?
 8          A     I believe in Miami.
 9          Q     And was he commuting from Miami to
10     Palm Beach Gardens/Jupiter during that month
11     that he was working as a consultant?
12          A     I believe so.
13          Q     Was the company reimbursing him for
14     expenses incurred as a result of his commute?
15          A     I don't think so. It's possible
16     that he could have stayed.  We had, like, free
17     stays at a hotel that we had an agreement
18     with, so he could have stayed at the hotel
19     sometimes.  I have no idea.
20          Q     And we briefly went over this
21     earlier during the initial deposition that we
22     decided to postpone, but what specifically was
23     your understanding of his role as the business
24     consultant?
25          A     My understanding of his role as the
```

```
 1   business consultant was that he would just
 2   come in, work alongside the team at the two
 3   Florida locations, the two Palm Beach Sports
 4   Clubs and make assessments, observations of
 5   the team, and make assessments and
 6   recommendations based on what he saw.
 7        Q    And when you say observe the teams,
 8   does that include all positions at those
 9   locations?
10        A    Yes.
11        Q    And what assessments did he make?
12        A    I'm not sure.  I don't recall.
13        Q    Were these assessments provided in
14   a written report?
15        A    They may have been, but I'm not 100
16   percent sure.
17        Q    And at that point, he was
18   conducting observations and assessments at
19   only the Palm Beach Sports Club, Jupiter, and
20   Palm Beach Gardens location, right?
21        A    Yes.
22        Q    So Christi's at that point, there
23   was no discussion about observing Christi's or
24   making assessments?
25        A    No.
```

```
1           Q     Why not?
2           A     I don't think logistically it made
3    sense to expect him to drive the additional 90
4    minutes north to Christi's.  When he relocated
5    to Palm Beach Gardens and was joining the team
6    full time, it made more sense to have him
7    support the club at that time.
8           Q     Did you interact with Mr. Marrero
9    at any point when he was the business
10   consultant?
11          A     Not a lot, not to say that I
12   didn't, but it definitely wasn't a lot if I
13   did.
14          Q     What would be the nature of those
15   interactions that you may have had?
16          A     I don't even know.  I honestly
17   don't know.  Maybe sharing feedback about some
18   of the team members, but I don't know.
19          Q     If there was an exchange of
20   feedback about the team members, would that
21   have been documented in writing?
22          A     Not necessarily.
23          Q     Why not?
24          A     Just an exchange of information.  I
25   mean, it wasn't anything really formal.  This
```

```
 1    is what I'm seeing.  These are the areas of
 2    opportunity.  I don't know that it was about
 3    one person in particular.  I don't even recall
 4    if or when it was, but I don't think it was
 5    anything formal.
 6         Q    When he was hired as consultant,
 7    was he hired with the understanding that he
 8    would transition to a more permanent role?
 9         A    No.
10         Q    Can you hear me?
11         A    Yeah, I said no.
12         Q    No. And how do you know that?
13         A    It just, it wasn't -- how do I
14    know?  I don't know if I'm making an
15    assumption here, if we were going to hire him
16    in a more permanent role, we would have hired
17    him in a permanent role to start with.
18         Q    I mean, it's possible that maybe
19    Mr. Walsh was testing out to see what his
20    skill set was, right?
21         A    Anything is possible.
22         Q    And when did you first learn that
23    he would become the business director?
24         A    I want to say it was, like,
25    probably a week or so before, you know, it was
```

```
 1   a short -- his consultant stint was a pretty
 2   short time period in and of itself, so
 3   probably a week or so before.
 4        Q    And did you conduct onboarding with
 5   him during that week time period?
 6        A    Yeah.  I collected his onboarding
 7   documents, so I-9, W-4, all of that, and
 8   entered it into ADP.
 9        Q    Why make the change from consultant
10   to business director?
11        A    My understanding is that the
12   business consultant was meant to be temporary
13   and the business director was a permanent
14   salaried position when he expressed that, I
15   guess, he was willing to move to Palm Beach
16   Gardens.  I mean, the consultant position, if
17   he was living in Miami, that's not something
18   that would be sustainable long-term. And I
19   don't think that's a commute that anyone would
20   make every day for $120,000 a year.
21        Q    I agree with that.  And I think
22   that's why I'm having a hard time
23   understanding, you know, why someone would
24   want to do that for a month period of time
25   without the understanding that maybe their
```

```
1    role would transition into a more permanent
2    role, especially if he expressed, you know,
3    the concern about the commute like you just
4    testified to.
5         A    I feel like that's a question for
6    J.C. And he was running a consulting business,
7    I believe, so however he wanted to make money
8    for his business, I can't speak to what he
9    deems is worth his time.
10        Q    Right.  But you also have a direct
11   line to Mr. Walsh, right?
12        A    I did not have any direct
13   communication to Patrick about what J.C. was
14   thinking with his commute.
15             MS. RATTET:  It's about 2:30.  You guys
16        want to --
17             MR. SONDHI:  I was going to suggest a
18        break.  Let's take 10, 15, whatever.
19             MS. RATTET:  Sure.  Whatever works for
20        you.
21             MR. SONDHI:  All right.  We'll be back.
22             (A brief recess was taken.)
23   EXAMINATION BY MS. RATTET:
24        Q    Ms. Molino, you understand that
25   you're still under oath, correct?
```

```
1          A    I understand.
2          Q    Okay.  Is there anything that you
3     testified about today that you wish to change
4     so far?
5          A    No.
6          Q    Other than your attorney, did you
7     speak with anyone else during that brief
8     break.
9          A    No.
10         Q    When Mr. Marrero was hired or
11    started working as the business director, what
12    was your impression of him?
13         A    I thought that he -- I thought that
14    it was good that we had somebody in Florida to
15    focus on the Florida clubs, and I thought he
16    was a positive, supportive, in-the-trenches
17    leader that was going to be really good for
18    the team.
19         Q    Did your impression of him change
20    at all over the course of his employment?
21         A    I would say at a certain point I
22    didn't think he was the right person to get
23    the job done, which was when the organization
24    terminated his employment.
25         Q    And why did you think that?
```

```
 1        A     That he wasn't getting the job
 2   done?  The Jupiter club continued to
 3   underperform.  We had given him that as his
 4   sole focus towards the end of his employment,
 5   and he was unable to turn around the club.
 6   The business is a meritocracy, so we really
 7   judge people based on their performance, and
 8   the performance wasn't there.
 9        Q     And when did the performance of the
10   Jupiter club start decreasing or when did the
11   financials start to go down?
12        A     It had been suffering,
13   underperforming I should say, and I can't
14   speak to the specifics of it.  It had been
15   underperforming.  We had that manager Shane
16   Kehoe in the role.  He left in January to
17   pursue another position outside of the fitness
18   industry.  And, you know, the hope was that
19   J.C. would be the general manager there.  He
20   thought he could get the job done.  And,
21   again, we just never saw an upswing.  I don't
22   know if there was an actual decline, but we
23   didn't see performance results that met our
24   expectations.
25        Q     How does Empire determine what
```

1    performance results meet its expectations, in

2    your experience?

3         A    Profitability, hitting membership

4    sales goals, fitness revenue goals, growing

5    revenue month over month, controlling

6    expenses, again, to get to that profitability

7    standpoint.

8         Q    Right.  But is there a point at

9    which revenue drops, you know, x amount a

10   percent or so that that puts the club on

11   notice that -- or triggers a performance

12   notice to the person overseeing that

13   particular club?

14        A    There's no -- no, there's no -- I

15   would say no.  There's no specific threshold

16   that says, this is the trigger.  I would say

17   if a club is continually trending downward,

18   that becomes a reason for concern.

19        Q    And when you say continually

20   trending downward, do you mean over the course

21   of, you know, several months or two months or

22   a couple weeks, how do you kind of make that

23   determination?

24        A    I mean, we gave -- I think that the

25   determination could be made in a matter of,

1    you know, six months.  We did give J.C. a

2    year.  We gave Sara a year.  I think a year is

3    fair if you're asking someone to turn around a

4    club.  I think it's more than fair.  I think a

5    good GM can turn it around quicker.

6         Q    Even if there are circumstances

7    beyond a GM's control that would significantly

8    impact a club's ability to bring in revenue?

9              MR. SONDHI:  Object to form.

10              You can answer.

11        A    Yeah.  I think, in my experience

12   and what I have seen over the years, I've seen

13   underperforming clubs turn around very

14   quickly.  And a GM who's saying it can't be

15   done, it can't be done because of XY and Z

16   excuses, someone else comes in and turns it

17   around, they, you know, take the initiative.

18   Maybe they have more experience, a different

19   skill set, but, you know, the answer, we just

20   don't just accept it can't be done or it would

21   be letting a club go out of business and

22   putting, you know, the 90 people that work

23   there at risk of losing their job because one

24   person can't get it done.

25        Q    Which GM communicated to you that

```
1    they couldn't get it done?
2         A    I don't think any GM ever
3    specifically said to me I can't get it done,
4    that I can't recall.
5         Q    Okay.  So your prior testimony just
6    now was just a hypothetical?
7         A    Well, we were talking about J.C. so
8    I don't think that he was capable of getting
9    it done in the timeline we gave him at
10   Jupiter.
11        Q    Did you have something else to say?
12        A    No.  I would also say the same was
13   true for Sara.
14        Q    Anyone else that you can think of?
15        A    I mean, other GMs that we've
16   terminated.  I believe Anthony Testi was the
17   general manager at Jupiter previously.  I
18   don't think that he was able to get it done.
19   Jason Radford at Palm Beach Gardens was also
20   unsuccessful in his role.
21        Q    And Anthony Testi was terminated?
22        A    Yes.
23        Q    And Jason Radford was terminated?
24        A    Yes.
25        Q    Did Anthony Testi, during his
```

```
 1    employment as the GM, did any of the amenities

 2    or features of the club shut down such that it

 3    would impact his revenue-generating

 4    capability?

 5         A    I don't think so.

 6         Q    What about Jason Radford?

 7         A    No.

 8         Q    What about J.C. Marrero?

 9         A    No, not that I'm aware of.

10         Q    Did you take maternity leave for

11    the birth of your child?

12         A    At TSI, yes.

13         Q    So you were not an employee of

14    Empire when you had your child?

15         A    Correct.  I was not.

16         Q    Okay.  What was -- was the process

17    that, you know, now that you've been the HR

18    director, was the process at TSI for

19    requesting FMLA for you, did it mirror the

20    process at Empire that you implemented as HR

21    director?

22         A    No.  I mean, it was a significantly

23    larger organization, I think 200 locations

24    around 9,000 employees, so they outsourced

25    that to a company that I had to deal with
```

```
 1    directly.  And it was also slightly different
 2    because I was in New Jersey and pregnancy
 3    counts as short-term disability in New Jersey,
 4    as well as New York, so that process was a
 5    little different on my end as well.
 6         Q    Okay.  What about the process for
 7    ensuring there was coverage for your position
 8    while you were out, was that process similar
 9    to what Empire had while you were the HR
10    director?
11         A    Yeah.  I mean, I wasn't overseeing
12    a club.  I had different responsibilities and
13    those were absorbed by other people while I
14    was out.
15         Q    Did you have any responsibility to
16    ensure that your activities and assignments
17    were covered while you were out?
18         A    I was responsible for training
19    people on my job duties so that they could be
20    absorbed.
21         Q    Okay.  What was Empire's -- strike
22    that.
23         Who is responsible for making coverage
24    arrangements when an employee goes out on
25    extended leave at Empire?
```

```
 1        A     The direct supervisor of that
 2   employee.
 3        Q     So in the case of Ms. DeMartino,
 4   that individual would have been Mr. Marrero at
 5   the time that she disclosed her pregnancy?
 6        A     Yes.
 7        Q     Did you ever have any discussions
 8   with Mr. Marrero about, you know, Ms.
 9   DeMartino's eventual leave and the
10   arrangements that needed to be made to ensure
11   that there was coverage?
12        A     No.
13        Q     Is there a reason that Mr. Marrero
14   wouldn't have initiated those discussions with
15   you to ensure that there was coverage?
16        A     I mean, we had a customer service
17   manager in the club to cover the day-to-day
18   responsibilities of running the club, opening
19   the club, closing the club, and J.C. would be
20   able to fill in as needed.  You know, it's not
21   completely -- it's not -- I won't say
22   abnormal -- it does happen where a club is
23   gapped and we manage without the manager.  So,
24   you know, there was people in place.  The
25   building was going to open and close, and J.C.
```

1    would be responsible for going there

2    throughout it.  I mean, that would fall on

3    him.

4        Q    Right.  But you said that he never

5    discussed the arrangements with you at all

6    right and it was his responsibility?

7        A    Yeah, I guess because we just

8    weren't close enough to that point as we

9    understood it.

10       Q    Do you recall when Ms. DeMartino's

11   due date was?

12       A    I believe it was in early May, but

13   I do not recall the exact due date.

14       Q    Okay.  So as that time got closer,

15   after the first of the year, would that be the

16   time period within which those discussions

17   should have been had, in your opinion?

18       A    Not necessarily.

19       Q    Well, I guess then, in your

20   opinion, when would those discussions need to

21   be had before somebody is going out on

22   maternity leave?

23       A    Probably in the four to six weeks

24   prior, so March or April.

25       Q    Were you aware that Ms. DeMartino's

```
1    pregnancy was high-risk?

2         A    I was not.

3         Q    So she never told you that she was

4    experiencing complications with her pregnancy?

5         A    No. The most she disclosed to me

6    was what I shared earlier, that she had a

7    concern about a test early on, a genetic

8    screening, that I think ended up being okay,

9    and she was relieved about that.  And that was

10   really the extent of really any issues that I

11   was aware of or complications with the

12   pregnancy.

13        Q    But, as a woman, fair to say that

14   any pregnancy over the age of 35 could be

15   deemed high-risk?

16        A    Definitely, yes.

17        Q    Okay.  And were you aware of Ms.

18   DeMartino's age?

19        A    I know that she is over the age of

20   35.

21        Q    Okay.  So it would be a reasonable

22   assumption that her pregnancy was likely

23   high-risk just in and of itself and that

24   further complications might, you know,

25   increase the risk associated with the
```

1   pregnancy?

2            MR. SONDHI:  Object to form.

3                You can answer.

4        A    I mean, my understanding is

5   high-risk being over 35 more likely to have,

6   you know, down syndrome, that type of thing.

7   I don't know about complications with the

8   actual pregnancy or anything related to that,

9   but, yeah, I could assume that her pregnancy

10  had the potential to be high-risk based on the

11  fact that she was over 35, but it wasn't

12  something she communicated.

13       Q    And, you know, being a mother and

14  having carried a child, are there certain, you

15  know, things that also may increase the risk

16  of a pregnancy, for example, COVID-19?

17       A    I don't know if that's -- I don't

18  know.

19       Q    Do you recall -- you mentioned

20  earlier that you really followed closely the

21  CDC guidance, and particularly in the New York

22  and New Jersey area, right?

23       A    Yes.  I don't know if there was any

24  conclusions ever made about whether COVID-19

25  was dangerous to a child.  I know it was

```
1    dangerous to everyone.  I don't know if it
2    became particularly dangerous to someone who
3    was pregnant.
4         Q    Well, one would think that an
5    already high-risk pregnancy and, you know,
6    COVID-19 may increase the risk, correct?
7         A    You're asking me to make
8    assumptions, like, in hindsight, so I don't
9    think -- it's not something I was thinking of.
10   I don't want anyone on my team to have
11   COVID-19 or any of the complications that can
12   come from it.  I don't want any pregnant woman
13   or any woman that I know to ever have issues.
14   Beyond that, it's not something I was thinking
15   about on a regular basis.
16        Q    Did anyone ever express concern to
17   you that Ms. DeMartino may not return from
18   FMLA leave?
19        A    No.
20        Q    Were you concerned that she may not
21   return from FMLA leave?
22        A    No.
23        Q    But, yet, there was no coverage
24   plan in place to ensure that someone was
25   acting GM while she was out, right?
```

```
 1        A     Right.
 2        Q     When Mr. Marrero was the business
 3   director, he reported directly to Anthony
 4   Messina, correct?
 5        A     Yes.
 6        Q     Did you ever have any conversations
 7   with Mr. Messina about Mr. Marrero during the
 8   course of his employment with Empire?
 9        A     I'm am sure we did speak about
10   J.C., but I don't recall the specifics.
11        Q     Was it strictly about how he was
12   performing in his role as the business
13   director?
14        A     Yeah, it would have just been in
15   general about the Florida clubs as a whole.
16        Q     And what was your understanding of
17   his perception of how the Florida clubs were
18   performing as a whole?
19        A     Florida overall was an
20   underperforming market.
21        Q     How so?
22        A     Just compared to, you know,
23   membership sales getting back to where they
24   were pre-COVID numbers, revenue results, and
25   compared to New York, you know, we saw a
```

```
 1   better recovery in our New York clubs
 2   post-COVID than in Florida.
 3        Q    Why was Mr. Messina removed from
 4   being Ms. DeMartino's direct report?
 5        A    He was removed from being --
 6   overseeing the Florida clubs because he was
 7   based out of New York and he was focusing more
 8   of his attention there since he lived in New
 9   York.  He also was helping, getting ready to
10   open our brand new location and was going to
11   be spending a lot of time there, in New York.
12   So, you know, when J.C. came on as the
13   business director, the Florida clubs became
14   his responsibility to support them.
15        Q    So he was removed from overseeing
16   the Florida clubs, but yet Mr. Marrero was
17   still directly reporting to him?
18        A    Yeah, but he didn't -- none of the
19   GMs directly reported to Anthony.  There was a
20   layer added in there of J.C.
21        Q    Did, after J.C. was terminated, did
22   the -- was the layer removed, so to speak?
23        A    Yes, because it wasn't replaced,
24   yes.
25        Q    And that happened when J.C. --
```

1    strike that.

2        If Ms. DeMartino was directed to report

3    to Mr. Marrero.

4        A    Okay.

5        Q    Then why would she be required to

6    seek approval for raises given to employees at

7    Christi's from Mr. Messina?

8        A    Because he was overseeing the

9    fitness department on the fitness side, so she

10   may have been required to seek approval from

11   him.  I don't know if it was before J.C. was

12   in the role.  I'm not really sure what you're

13   referencing.

14       Q    Well, I think that at some point an

15   issue arose regarding raises that Ms.

16   DeMartino was giving to employees at

17   Christi's; is that accurate?

18       A    Yes.

19       Q    And at some point, there was

20   mention of the fact that those raises were not

21   approved by Mr. Messina.

22       A    Yes.  She went and -- she told me,

23   when I confronted her the raises in that

24   conversation, she said Anthony approved it.  I

25   called Anthony.  I said, did you approve these

```
 1   raises.  He said no.
 2        Q    Do you have documentation of that
 3   conversation with Anthony?
 4        A    No. I have documentation of the
 5   follow-up to J.C. about that conversation,
 6   which I believe is entered as evidence or was
 7   submitted as part of discovery that recaps
 8   when that happened.
 9        Q    When did Empire become aware that
10   Christi's, the gymnastic foam pit at Christi's
11   would require renovations?
12        A    I believe that was around September
13   or October 2021.
14        Q    So there was no awareness of the
15   deterioration of the foam pit prior to
16   September or October of 2021?
17        A    I'm not sure.
18        Q    Who would have information
19   relative to that inquiry?
20        A    Jonathan Jenkins.
21        Q    What was the reason for or the need
22   to renovate the foam pit?
23        A    I do not have a great understanding
24   of that, but I believe there was some sort of
25   water coming into the bottom of it.
```

```
 1          Q    Did it pose a safety concern to the
 2    persons who would have been in that foam pit?
 3          A    I'm not sure.
 4          Q    And if it had to do with, you know,
 5    water leaking from underneath, that's a
 6    structural -- you would agree that that's a
 7    structural issue?
 8          A    I believe so.
 9               MR. SONDHI:  Object to form.
10                 You can answer.
11          A    Yes.
12          Q    Who was responsible for ensuring
13    that invoices for projects, such as the
14    renovation to the foam pit, are paid?
15          A    At the time, Michael Montella, the
16    CFO.
17          Q    Were you privy to the conversations
18    surrounding the renovation of the foam pit
19    during your time as the HR director?
20          A    No.
21          Q    So you had no knowledge about what
22    was going on at Christi's with respect to the
23    renovations of the foam pit?
24          A    Not in detail.  I mean, I knew
25    there was some sort of renovations going on
```

```
 1   but, again, that wasn't my department so I
 2   really didn't know anything.  I didn't get
 3   into the nitty-gritty of it.
 4        Q    Do you recall there being any delay
 5   with the payment of the invoices with respect
 6   to the renovations?
 7        A    I do not recall.
 8        Q    And I think you mentioned earlier
 9   that the renovation cost would have come out
10   of Christi's operating budget, correct?
11        A    I believe so.
12        Q    Do you know what the operating
13   budget was for Christi's during the time that
14   Ms. DeMartino was employed?
15        A    No.
16        Q    Do you know what the operating
17   budget is for Palm Beach Sports Club in Palm
18   Beach Gardens?
19        A    When you say operating budget, what
20   do you mean, expenses that they are allowed to
21   spend?  Payroll expenses?
22        Q    Yeah.  I mean, I would think that
23   anything that would be a cost, right, to
24   operate the business in terms of payroll and
25   all of those things.
```

```
 1        A    I mean, we would say that a healthy
 2   club typically runs payroll 30 percent of
 3   revenue.  That's the gauge that we use.  It's
 4   not a hard and fast budget, and there isn't a
 5   hard and fast operating budget.  You know, if
 6   we need to spend money to make improvements,
 7   we spend the money based on the needs of the
 8   business.
 9        Q    So then it's not club-specific, it
10   really is all coming from the same source?
11        A    No.  The clubs fund their own
12   operations.
13        Q    Okay.  What I'm trying to
14   understand is, you know, what is the amount
15   that a club sees, you know, at the beginning
16   of the year with respect to how much they can
17   apply for its payroll and hiring --
18        A    We don't have it separate.
19        Q    So no separate budget for any of
20   the clubs?
21        A    No.  Again, we would say that 30
22   percent of revenue is what we consider a
23   healthy payroll budget, and we would touch
24   base with clubs who are significantly over on
25   that, but it's not a set in stone budget that
```

```
 1   you can spend XYZ.
 2        Q    Okay.  So if a renovation cost had
 3   an impact on Christi's budget, then -- strike
 4   that.
 5            So despite the fact that there was a
 6   need to renovate the foam pit, if Christi's
 7   needed to hire additional employees such that
 8   it would put them over the 30 percent of
 9   revenue, you know, gauge that you would
10   consider in terms of payroll for operations,
11   would Empire generally allow Christi's to hire
12   other people or is that something that --
13        A    Yeah.  And Christi's I think is the
14   most staffed club in Florida and has always
15   been the most staffed club.  It has the
16   highest payroll with the most employees in
17   Florida.  And, yes, we would allow adding
18   additional team members where it made sense to
19   meet the needs of the business.
20        Q    When did renovations begin on the
21   foam pit at Christi's?
22        A    I'm not sure.
23        Q    So what I was saying what --
24            MS. RATTET:  I think this will be Exhibit
25        1 to Ms. Molino's fact witness deposition.
```

```
1          Q    This is -- the document that I'm
2    showing you, have you seen this document
3    before, Ms. Molino?
4          (Molino Exhibit 1 was introduced for
5           the record.)
6          A    I've seen it as part of this whole
7    process, but it's not something that I saw
8    prior to this or in my role of HR director.
9          Q    Can you hear me?
10              MR. SONDHI:  You're breaking up, Allie.
11              MS. RATTET:  I believe that this will be
12         Exhibit 1 to Ms. Molino's deposition.
13         Q    Ms. Molino, have you seen this
14    document before?
15         A    As part of this process, but I had
16    not seen it previously or in my role as HR
17    director or at the time whenever this was
18    being done.
19         Q    Okay.  And this is a one-page
20    document Bates number Defendant 342.  Ms.
21    Molino, when I refer to Bates numbers, and I'm
22    not sure if this was discussed in your prior
23    deposition, it's going to be the small number
24    on the bottom of the screen right here.  It's
25    just a way to categorize the documents so that
```

1    we can keep track of what was produced.  So
2    what I'm showing you is a notice of
3    commencement for -- that gives a general
4    description of improvement for a reroof and
5    foam pit, and the document really speaks for
6    itself, but it shows an acknowledgment of this
7    document around November or on November 10th
8    of 2021.  Do you see that?
9         A    Yes.
10        Q    Would it be fair to say that the
11   renovations for this project occurred shortly
12   thereafter?
13        A    Most likely.
14        Q    And when the foam pit was being
15   renovated, I know that you've testified to
16   your involvement at the time, but do you
17   recall any discussions with Ms. DeMartino
18   about the time it would take to complete the
19   project?
20        A    No.
21        Q    Did you have any discussions with
22   anyone at Empire about the time it would take
23   or the expected time it would take to complete
24   the project?
25        A    I could have been privy to those

1    conversations happening between others, you
2    know, at our meetings, but I don't know that I
3    had any direct conversations about it, but it
4    just wasn't in my purview or area of
5    expertise.
6        Q    And I don't want you to put a
7    number or, you know, a specific amount of
8    months or weeks on it, but initially, would it
9    be fair to say that the foam pit renovation
10   project was expected to be temporary?
11       A    It was temporary.
12       Q    Okay.  How long would you say that
13   it took then?
14       A    I have no idea.  I don't know, but
15   it's not permanent so that makes it temporary.
16       Q    Well, a temporary closure of a foam
17   pit could have multiple interpretations,
18   right?
19            MR. SONDHI:  Object to form.
20              Go ahead.
21       A    I mean, if we're going to define
22   the word temporary as something that's not
23   permanent, so that makes it temporary.
24       Q    Okay.  Ms. Molino, I'm going to
25   share my screen with you.

```
 1                    MS. RATTET:  This will be marked as Molino
 2           Exhibit 2.
 3                       (Molino Exhibit 2 was introduced for the
 4                       record.)
 5           Q     Ms. Molino, do you recognize this
 6     document?
 7           A     Yes.
 8           Q     And what is this document?
 9           A     This is Sara's complaint against
10     Empire.
11           Q     Are you sure about that?
12           A     Let me get my glasses.
13           Q     If you need me to zoom in, please
14     let me know.  I'm happy to do that.
15           A     Okay.  So this was the questions
16     that we were sent to answer.
17           Q     Right.  Did you participate in the
18     preparation of these answers?
19           A     Yes.
20           Q     And did you review these answers to
21     ensure that they were accurate to the best of
22     your ability?
23           A     Yes.
24           Q     And did you sign this verification
25     under the penalty of perjury that the
```

```
 1   foregoing would be true and correct to the
 2   best of your knowledge and/or based on the
 3   information contained in your company records?
 4        A    Yes.
 5        Q    Did anyone else assist in the
 6   preparation of these interrogatories?
 7        A    Our attorneys.
 8        Q    I'm sorry, what was that?
 9        A    Our attorneys.
10        Q    Okay.  But anyone from Empire.  I
11   don't want to know what you discussed with
12   your attorneys and what they did.  I just want
13   to know if there was anyone besides you that
14   assisted in the preparation?
15        A    I don't think so, no.
16        Q    And you were the only person
17   gathering information in order to respond to
18   these interrogatories?
19        A    I believe so. I'm not sure, you
20   know, our attorneys met with several people on
21   our team.  I don't remember the timeline in
22   which that happened.
23        Q    Right.  And, again, I don't want to
24   stray into gray area, and I don't want to know
25   any privileged information.  I just simply
```

1  want to know if in participating in the

2  preparation of these answers to

3  interrogatories if you spoke with anyone at

4  Empire, you yourself directly, to gather facts

5  and information responsive to these requests?

6       A    It's possible that I would have

7  gathered e-mails to share with the attorneys

8  prior to this, but I don't recall speaking to

9  anybody at Empire specifically about this.

10      Q    Okay.  And I'm going to direct your

11  attention to Interrogatory No. 5, which states

12  the reasons why the gymnastic foam pit was

13  closed for construction at any time during

14  plaintiff's employment.  And the response is:

15 The gymnastics foam pit was temporarily closed

16  due to overdue renovations requiring updating

17  the foam pit.  The necessary renovations

18  included replacing existing plumbing line,

19  installing new floated macerator sump pump,

20  installing new drainage and waterproofing the

21  foam pit area.

22       Do you recall reviewing answers -- or

23  response to Interrogatory No. 5?

24      A    Yes.  And I believe this was based

25  on information I got from the vendor directly

```
 1    or Jonathan Jenkins.
 2         Q    Okay.  So you did speak with
 3    someone else at Empire?
 4         A    I did not speak with them.  I would
 5    have sent over the communication to our
 6    attorneys.
 7         Q    So when you say information
 8    provided -- so when you say information
 9    provided from Jonathan Jenkins, that wasn't
10    information provided directly to you by
11    Jonathan Jenkins?
12         A    I don't think so. I think that this
13    came from a vendor and I sent it over to our
14    attorneys.
15         Q    Okay.  Would you consider, in the
16    context of operating a fitness club that
17    generates 30 percent revenue for its
18    gymnastics program, would you consider a
19    three-month closure of that program to be
20    temporary?
21              MR. SONDHI:  Object to form.
22         A    I would consider anything that's
23    not permanent to be temporary, yes.
24         Q    Okay.  So anything that's not
25    permanent would be temporary, could be two
```

```
1   years?

2        A    Yeah.

3        Q    Okay.  And, again, you have no

4   personal knowledge as to what the estimates

5   were in terms of the time it would take to

6   begin and conclude this project?

7        A    No.  And, again, not to say that

8   that wasn't discussed in my presence, but it's

9   not something that I was closely paying

10  attention to or involved in.

11       Q    Okay.  I'm showing you

12  Interrogatory No. 2, which contains Empire's

13  response as well.  You want to take a minute

14  to review this?

15       A    Yes.  Sure.  Okay.

16       Q    Okay.  So the interrogatory asks

17  Empire to identify the legitimate

18  nondiscriminatory reasons that Empire contends

19  form the basis for plaintiff's termination.

20  For each reason, identify and describe the

21  factual basis for the reason and identify any

22  documents that support its contention.  The

23  first sentence of the response says:

24  Plaintiff was terminated from her position for

25  complete failure to achieve the objectives she
```

1    was hired to.

2         What does complete failure to achieve

3    the objectives she was hired to mean?

4         A    She was not able to turn the club

5    to profitable.  She was not able to achieve

6    profitability for the club.

7         Q    Okay.  The third sentence begins

8    with -- under plaintiff -- do you see where I

9    am?

10        A    Okay.

11        Q    Christi's monthly revenue

12   consistently fell and at one point dropped by

13   35 percent relative to the monthly revenue at

14   the outset of plaintiff's employment.

15        Where was the point at which the

16   monthly revenue dropped by 35 percent?

17        A    I believe that was January.

18        Q    So the monthly revenue, you think

19   it was January of 2022?

20        A    I believe so, but, again, I think

21   that there's P&Ls to confirm that.

22        Q    Has the company produced those P&Ls

23   for Christi's?

24        A    If we were asked to, we did, and we

25   can.

```
1          Q     So had there been other -- it says
2     monthly revenue consistently fell, do you see
3     that?
4          A     Yes.
5          Q     What do you mean by that or what
6     did the company mean by that?
7          A     Revenue decreased every month, and
8     quite honestly, I mean, it's a matter of
9     letting the club continue to fail and lose
10    money and close it and a ton of people losing
11    their jobs or letting go of Sara, bringing in
12    a general manager who is capable of turning it
13    around, and giving the club a chance to
14    survive and for all of those people who depend
15    on that club to keep their jobs.
16         Q     And so if the revenue for the
17    gymnastic program was 30 percent, right, in
18    your estimate --
19         A     As of today.  I don't know what it
20    was when Sara was there, but as of now.
21         Q     Sure.  Could it have been more than
22    it is today when Sara was there?
23         A     It's possible.  I don't know.
24         Q     Okay.  Are there documents that
25    would be able to identify what the revenue was
```

```
 1   for gymnastics during the time of her
 2   employment?
 3        A    Yes.
 4        Q    Has Empire produced those documents
 5   in the course of this litigation?
 6        A    I don't know that we've been asked
 7   to.
 8        Q    Okay.  And you were responsible for
 9   compiling the information and documents
10   responsive to plaintiff's discovery request,
11   correct?
12        A    Yes.
13        Q    Okay.  So there was no -- is
14   Christi's profit and loss statement generated
15   on a monthly basis?
16        A    Yes.
17        Q    So for all of the months during
18   which plaintiff worked, Christi's would have a
19   profit and loss statement that would itemize
20   the specific revenue streams as well?
21        A    So revenue isn't broken out
22   specifically by membership type on the profit
23   and loss, it's just membership dues, and that
24   does include gymnastics.
25        Q    Was there ever a point at which
```

```
1   gymnastics wasn't factored into membership

2   sales?

3        A    I don't think so.  I'm not sure.  I

4   don't think so during Empire.  I'm not sure

5   how it worked at TSI, but don't think so.  I'm

6   not sure.

7        Q    You don't think so why?  Would you

8   have known about that?

9        A    No.  The VP of sales would.  I'm

10  sorry, I think we're talking about two

11  different things.  So when you're saying

12  sales, I'm taking it to count as, like a

13  membership sale, we call it a tick.  So does

14  it count as a tick, I don't know whether a

15  gymnastic membership always counted as a tick.

16  It did always count as membership revenue.

17       Q    Okay.  What were the key

18  performance indicators that Empire assessed

19  when making a determination as to the

20  financial health of a sports club or one of

21  its clubs?

22       A    Revenue growth, the membership

23  sales, expense control.  Revenue growth is

24  probably our biggest indicator of success.

25       Q    So that would be things such as,
```

```
 1    you know, I mean, I guess it could include a
 2    bunch of factors, correct?
 3         A    Yes.
 4         Q    And membership sales, would that
 5    include membership sales with respect to the
 6    gymnastic programs at Christi's?
 7         A    Yes.
 8         Q    And at no point was Christi's
 9    gymnastic program sales eliminated from the
10    membership sales category?
11         A    Not that I know of.
12         Q    Plaintiff failed to recruit and
13    hire membership consultants and personal
14    trainers, both key sales-generating roles.  I
15    believe earlier you testified that -- and
16    correct me if I'm mischaracterizing -- but in
17    essence you said words to the effect of
18    Christi's was -- had the highest payroll and
19    the most employees; is that accurate?
20         A    Yes.  It does have the highest
21    payroll of the Florida clubs and the most
22    employees.  I think a lot of that comes from
23    the group exercise side of things, but again,
24    there's not a set budget.  It's allowing the
25    clubs to meet the needs of the business.
```

```
 1          Q    So do you think that hiring
 2   membership consultants and personal trainers
 3   specifically would have impacted Christi's
 4   ability to generate revenue during the time
 5   that the foam pit was closed?
 6          A    I do.
 7          Q    You do.  Why is that?
 8          A    Because their entire job is to
 9   prospect the -- or prospect outside of the
10   club to generate sales.  They are
11   revenue-driving positions that the GM
12   oversees.
13          Q    What are the job duties and
14   responsibilities of a fitness supervisor?
15          A    To support the day-to-day fitness
16   operations, so helping ensure that fitness
17   orientations are happening for new members,
18   following up with current clients to ensure
19   they're enjoying their sessions, helping to,
20   you know, tidy up the floor, do walk-throughs
21   of the club, reviewing programming to make
22   sure that, you know, the personal trainers are
23   programming in a way that meets our standards,
24   and driving revenue for the personal training
25   side of things.
```

```
1          Q     And with respect to driving revenue
2    for the personal training side of things,
3    would that include prospecting?
4          A     Prospecting the floor, yeah.
5          Q     What about prospecting outside of
6    the location?
7          A     Not necessarily.  I mean, if the
8    general manager would like them to go to an
9    event or assist a membership consultant in
10   prospecting, then there can be value to that,
11   but it's kind of up to the general manager to
12   assess what strategy makes sense.
13         Q     Right.  So if the general manager
14   directed someone to go prospecting out in the
15   community versus prospecting on the floor,
16   then would there really be a need for a
17   membership consultant?
18         A     Yes, of course.
19         Q     Is there a need for somebody to
20   drive sales?
21         A     Yes.  There is a need for somebody
22   to drive sales.  There is the need for
23   multiple people to drive sales in the club.
24         Q     How many membership consultants are
25   typically employed at an Empire property?
```

```
 1        A     Anywhere from two to four.
 2        Q     Are there any clubs where there's
 3   only one?
 4        A     Not that I can think of right now.
 5   There may be only one at Jupiter right now.
 6   There may be only one at Jupiter right now,
 7   but I know that they're looking to hire.  It's
 8   not ideal for there to be only one actually
 9   anywhere, ever.
10        Q     Even if --
11        A     We would consider the club
12   understaffed if they had just one membership
13   consultant.
14        Q     But it wasn't simply the fact that
15   there was only one membership consultant that
16   was impacting Christi's revenue during the
17   months of November through February when the
18   foam pit reopened, correct?
19        A      It was certainly a contributing
20   factor.  Sales is really simple.  More phone
21   calls, more sales.  You need people to make
22   those phone calls.
23        Q     Do you have evidence that those
24   phone calls weren't being made?
25        A     No.  But it's just a simple matter
```

```
 1   of you can only make x amount of phone calls
 2   as one person in a day.
 3         Q    Right.  But you said that Christi's
 4   had the highest payroll, right, with the most
 5   employees?
 6         A    Yes.
 7         Q    And we previously discussed that
 8   front desk people could make calls and try to
 9   make sales, correct?
10         A    They could, yeah.  But that's not a
11   focused call drive.  That's a solution, a
12   temporary solution, but that's not a focused
13   call drive.  There's a reason why we have
14   membership consultants in our clubs, and
15   that's because they lead to more sales.
16         Q    And how many membership consultants
17   are there at Christi's currently?
18         A    I believe there are two.
19         Q    Okay.  And do you know or have you
20   reviewed the change in revenue with respect to
21   membership sales as a result of hiring another
22   MC?
23         A    No.  I haven't sat there and
24   correlated the exact benefit financially of
25   having two MCs enrolled, but it's our
```

```
 1   expectation as a company that all clubs have
 2   two MCs minimum in the role.  The GM doesn't
 3   get to decide otherwise and still get terrible
 4   results.
 5        Q    You say that it's an expectation,
 6   right?
 7        A    Yes.
 8        Q    Is there a policy and a directive
 9   in writing?
10        A    Well, there was a directive to Sara
11   in writing, so yes.
12        Q    Which directive are you referring
13   to?
14        A    Her supervisor e-mailed her letting
15   her know she needed to hire somebody, another
16   membership consultant.
17        Q    Do you recall in your time as the
18   HR director there being any issue with
19   employee retention at Christi's?
20        A    Not that I recall.
21        Q    Do you recognize the name Chris
22   D'Oro?
23        A    Yes.
24        Q    And who is Chris D'Oro?
25        A    He was the lead trainer or fitness
```

```
 1   supervisor at Christi's.  Not sure which.
 2        Q    Okay.  And when was he hired?
 3        A    He was hired -- he worked
 4   previously at our Palm Beach Sports Club Port
 5   St. Lucie location, and when we closed that
 6   down in August -- we might have moved him even
 7   a little sooner because we knew it was closing
 8   down, but when we closed that location down,
 9   we moved him to Christi's.  So I don't know
10   when he was hired from the start, but he moved
11   to Christi's around July/August 2021 due to
12   the fact that the location he was at was
13   closing down.
14        Q    Did Mr. D'Oro have any performance
15   issues?
16        A    I'm not sure.
17        Q    When did Mr. D'Oro cease to be
18   employed by Empire?
19        A    I believe December 2021, but that
20   would have been communicated to Sara as his
21   direct supervisor.
22        Q    So the end of his employment would
23   have overlapped with the closure of the foam
24   pit?
25        A    If the foam pit was being worked on
```

```
 1    in December and he resigned in December, then
 2    yes.
 3         Q    Were there any other amenities or
 4    features of Christi's that were shut down
 5    during Ms. DeMartino's employment?
 6         A    Not that I am aware of.  There may
 7    have been something with the pool heater that
 8    I think has always been an ongoing issue in
 9    the winter with Christi's, but I don't know
10    the specifics of it.  It's not my area of
11    expertise and I don't believe the pool was
12    ever shut down for it.  In general, I do
13    believe that Christi's does stop swim lessons
14    in the winter anyway, just as a standard
15    operating procedure that was always in place.
16    But, again, not my area of expertise.  I don't
17    have definitive knowledge of that.
18         Q    Going back quickly to Mr. D'Oro,
19    who was moved from the Port St. Lucie
20    location, I'm sorry, so that location closed
21    down you said?
22         A    Yes.
23         Q    When was that location closed?
24         A    Well, I guess, it reopened as
25    another business not associated with us.  Our
```

1  business there closed down, I want to say
2  August 1st, 2021.  It was absorbed by new
3  owners.  I have no idea if they're still in
4  business, but it, you know, reopened as
5  another gym called Reborn Athletics, I
6  believe.
7       Q    Okay.  Were you ever informed that
8  there were issues with the air-conditioning
9  unit at Christi's?
10      A    No.
11      Q    Did you participate in the December
12  performance evaluation or notice that was
13  given to Ms. DeMartino by Mr. Marrero?
14      A    No.
15      Q    So as HR, you would not have been
16  privy to any disciplinary action taken against
17  a GM?
18      A    I knew the performance conversation
19  was happening, but I wasn't part of the
20  conversation.  I believe that Michael
21  Montella, our CFO at the time, may have been
22  part of that because there was some review of
23  financials and I was informed after that it
24  happened, but I wasn't part of the
25  conversation.

1          Q    You just said that or you just
2     testified that you learned that the notice
3     would be issued or something to that effect.
4     I don't want to mischaracterize your
5     testimony.
6          A    I knew the performance conversation
7     was happening in December.
8          Q    When did you learn?
9          A    I don't recall.  Before it
10    happened.
11         Q    Was it a week before?
12         A    I don't recall.
13         Q    Was it longer than a week before?
14         A    You're asking me to guess and I was
15    told not to guess, so...
16         Q    I'm not asking you to guess.  I'm
17    asking you if you can give me an estimate
18    about a range of time in which you would have
19    learned that the performance notice would have
20    been issued to Ms. DeMartino?
21         A    It would be entirely a guess.  I
22    really have no idea.
23         Q    But it was communicated to you that
24    it would be issued by Mr. Marrero?
25         A    Yes.

```
 1          Q     And Mr. Marrero began overseeing
 2   Christi's in October of 2021?
 3          A     Yes.
 4          Q     Do you know the first time he
 5   visited the club?
 6          A     No. I don't know a definite date.
 7   I believe it was in October 2021.
 8          Q     Okay.  And do you know if he
 9   visited the club any more times between his
10   initial visit in October and the time that he
11   issued the performance notice to Ms.
12   DeMartino?
13          A     I believe so.
14          Q     On how many occasions?
15          A     I'm not sure.
16          Q     Do you recall having a discussion
17   with Ms. DeMartino about taking time off
18   related to Mr. Rankin's treatment and also
19   related to a doctor's appointment at the end
20   of December?
21          A     I recall Sara requesting PTO, that
22   I believe was declined by J.C. Marrero, and I
23   believe she still wanted to take one day off
24   for David to receive treatment.  I don't
25   remember what the outcome of that was.
```

```
 1        Q    As the HR director, were you privy
 2   as to the reason as to why she was needing to
 3   attend the doctor's appointment that you say
 4   was ultimately declined by Mr. Marrero?
 5        A    I believe that David has cancer,
 6   but I'm not 100 percent sure on any other
 7   specifics.
 8        Q    Right.  But you just mentioned the
 9   two dates, the doctor's appointment for
10   Mr. Rankin and also the mention of the
11   doctor's appointment for Ms. DeMartino
12   herself.
13        A    I didn't mention any doctor's
14   appointment for Sara.
15        Q    Okay.  So with respect to the PTO
16   that was declined by Mr. Marrero, is that in
17   relation to what?
18        A    I believe Sara just asked for a
19   week of PTO off, if my memory serves me
20   correctly, I believe Sara just asked for a
21   week of PTO off with hardly any notice, very
22   suddenly, at the end of December that I
23   believe was declined by J.C. because it was
24   last-minute notice.  And it was just to use
25   her PTO and take vacation time, and then she,
```

```
1    I believe, still wanted to take at least one
2    of the days off to go to a doctor's
3    appointment with David.  I did not make any
4    mention of a doctor's appointment for her.
5         Q    I apologize if I misunderstood what
6    you were testifying about.  And the reason why
7    Ms. DeMartino wanted to use her PTO was
8    because Empire had implemented a policy that
9    was more or less a use-it-or-lose-it policy,
10   right?
11        A    Yes.
12        Q    So did Mr. Marrero permit her to go
13   to the doctor's appointment ultimately for
14   Mr. Rankin?
15        A    I am not sure.
16        Q    But there was an understanding that
17   there was a doctor's appointment at the end of
18   December that Ms. DeMartino had requested time
19   off to attend, right?
20        A    For David, yes.
21        Q    Right.  And Mr. Marrero told you
22   that Ms. DeMartino did not request that time
23   off, right?
24        A    I got -- I think that that was in
25   relation to -- I don't know.  I feel like --
```

```
 1   are we talking about two separate things?
 2        Q    No. I'm asking that because it is
 3   my understanding that he told you that it was
 4   an unapproved absence or something to that
 5   effect.
 6        A    I don't recall that conversation.
 7             MS. RATTET:  This is going to be marked as
 8        Exhibit No. 3 to Ms. Molino's fact deposition.
 9                  (Molino Exhibit 3 was introduced for the
10                  record.)
11        Q    Ms. Molino, do you recognize this
12   document?
13        A    Yes.
14        Q    And it's Bates numbers DEF521 to
15   522.  Do you want to take a minute to review
16   the document?
17        A    Sure.  Okay.
18        Q    So in this e-mail, J.C. claims that
19   he was never informed about a doctor's
20   appointment.  Was that the doctor's
21   appointment in relation to Mr. Rankin?
22        A    I assume that this was a doctor
23   appointment for Sara based on this.
24        Q    Okay.  Did you ask?
25        A    No.
```

```
 1        Q    Was J.C. Marrero, was it his
 2   practice to show up unannounced to clubs that
 3   he was overseeing?
 4        A    I would hope so.
 5        Q    Why is that?
 6        A    It's a general expectation that as
 7   a district manager or business director that
 8   you make unannounced visits as well as
 9   announced visits.  It's a best practice to
10   check on the club.  If the GM knows you're
11   coming, they are going to prepare, which is
12   great, but it's also important to see what's
13   happening in a club, even when a GM isn't
14   expecting you.  I personally just made
15   unannounced visits to clubs in New York last
16   week.
17        Q    Do you know if Mr. Marrero made
18   unannounced visits to Palm Beach Sports Club
19   in Jupiter?
20        A    I would assume he probably had a
21   set schedule there.  Some of his visits were
22   probably unannounced if he went in on, you
23   know, the weekends and everything.  I'm sure
24   that there were unannounced visits there.  But
25   he was the general manager of that club so a
```

1    slightly different scenario where he would

2    have a GM scheduled probably that his team was

3    familiar with.  And given that he lived close,

4    they probably expected to see him more often.

5         Q    But you don't have personal

6    knowledge as to whether or not he did make

7    unannounced visits, right?

8         A    No.  No.

9         Q    What about for Palm Beach Sports

10   Club in Palm Beach Gardens?

11        A    I don't have personal knowledge of

12   that.

13        Q    About whether or not he made

14   unannounced visits?

15        A    Yes.

16        Q    Is there any way to or is there any

17   documentation that we could review in Empire's

18   possession that would help us determine

19   whether or not he made unannounced visits at

20   Palm Beach Sports Club in Jupiter and Palm

21   Beach Gardens?

22        A    I don't think so.

23        Q    Did you find Mr. Marrero to be

24   truthful?

25        A    Yes.

```
1          Q    And why is that?
2          A    I had no indication that he was
3    being dishonest with me.
4          Q    Prior to the December write-up
5    issued by Mr. Marrero, had Sara ever or Ms.
6    DeMartino ever mentioned to you that she felt
7    as though Mr. Marrero was picking on her?
8          A    No.
9          Q    Not once?
10         A    No. The only thing that she ever
11   complained to me about was when he showed up
12   unannounced, and she was very upset about
13   that, and she sent me an e-mail about it.
14         Q    Did you ever hear from anyone
15   within the Empire organization that Ms.
16   DeMartino felt that she was being picked on by
17   Mr. Marrero?
18         A    No.
19         Q    You're positive of that?
20         A    Yes.
21         Q    And with respect to your
22   understanding of Mr. Marrero's hire, he was
23   hired and put in the role as business director
24   to oversee all of Christi's -- I'm sorry, all
25   of the Florida location for Empire's clubs?
```

```
 1          A     Yes.
 2          Q     And no one at Empire directed him
 3    to focus particularly on the club, meaning
 4    Christi's, and its general manager, Ms.
 5    DeMartino?
 6          A     I believe that there was a general
 7    consensus on our weekly management calls that
 8    Christi's needed help.  It was losing money
 9    and it couldn't continue to lose money or it
10    would go out of business, so I do believe that
11    there was a general consensus that the club
12    needed help and needed to be turned around.
13          Q     But a general consensus, would you
14    agree, is different than a directive to focus
15    particularly on one location over another?
16          A     Yeah, I don't think the directive
17    was focused on this location over another.  I
18    mean, all of the locations needed attention,
19    but there was a directive to turn around the
20    Florida clubs, Christi's being part of that.
21               MS. RATTET:  I think we're on No. 4.
22               (Molino Exhibit 4 was introduced for the
23                record.)
24          Q     I think this is Exhibit 4, and it
25    is a document that is Bates stamped SBD89
```

```
 1    through SBD98.  Ms. Molino, do you recognize
 2    this document?
 3         A     Yes.
 4         Q     And what is it?
 5         A     The complaint from Sara against
 6    Empire Holdings.
 7         Q     Are you sure about that?
 8         A     I believe so. It's the EEOC
 9    complaint.
10         Q     Why don't you take a look at the
11    document and see if you change your mind.
12         A     So this is our statement in
13    response to her complaint.
14         Q     That's what it is.  It was the
15    position statement that was submitted in
16    response to Ms. DeMartino's charge of
17    discrimination.
18         A     Okay.
19         Q     Did you participate in anything
20    that had to do with this response?  And I,
21    again, I don't want to hear any communications
22    or anything that you discussed with your
23    attorneys.  I just want to know if you
24    participated in preparing this document.
25         A     I did.
```

```
 1          Q    So you would have reviewed the
 2   document to ensure its accuracy before it was
 3   submitted to the investigator?
 4          A    Yes.
 5          Q    Okay.  I want to direct your
 6   attention, this is SBD91, under Heading B, the
 7   club's revenue suffered under charging party's
 8   management.  If you look down at the third
 9   paragraph.  Can you read the third paragraph
10   for me.
11          A    You want me to read out loud?
12          Q    Yes, please.
13          A    Where it says "in October"?
14          Q    Yes.
15          A     In October 2021, Empire assigned
16   Juan Carlos Marrero to be its business
17   director overseeing Empire's portfolio,
18   including the club.  Due to the club's
19   continued struggles, revenue numbers dipped
20   further in September and October 2021.  Empire
21   directed Marrero to focus particularly on the
22   club and its general manager, charging party.
23   Marrero promptly took steps to meet with
24   charging party, visit the club to assess the
25   club's ongoing revenue shortfalls and
```

```
 1  brainstorm solutions.
 2       Q    Okay.  So when you read the part
 3  where it starts after the end dash Empire
 4  directed Marrero to focus particularly on the
 5  club and its general manager, charging party,
 6  would you agree with that statement?
 7       A    Yes.
 8       Q    Okay.  And when did that occur?
 9       A    At some point when J.C. was brought
10  on, I guess in October 2021, when he was
11  brought on to focus on the Florida clubs,
12  including Christi's.
13       Q    Okay.  With respect to the
14  performance notice that was issued to Ms.
15  DeMartino, have you seen that document before?
16       A    Yes.
17       Q    One of the main features, I'll
18  represent to you, was a focus on the fact that
19  the notice was being issued due to November
20  financials.
21       A    Okay.
22       Q    If Mr. Marrero had been implemented
23  to oversee primarily Christi's in October of
24  2021 and the foam pit closed in mid November
25  of 2021, do you think that it's a fair
```

```
 1   assessment of Christi's profitability based on
 2   November financials if 30 percent of the
 3   revenue stream was shut down at that point?
 4        A    I think that the performance
 5   towards the end of the year, so November,
 6   December, beginning of January was the
 7   culmination of poor performance and poor
 8   results throughout the year.
 9        Q    Would Mr. Marrero have known about
10   that performance and poor results throughout
11   the year?
12        A    I believe so.
13        Q    You attended Mr. Marrero's
14   deposition, right?
15        A    Yes.
16        Q    Do you recall him testifying that
17   he never reviewed any financials as it related
18   to Christi's?
19        A    Yes.
20        Q    Okay.  So how could he have known
21   that it was a culmination of poor performance
22   over the course of a year if he never reviewed
23   any documents that would have reflected
24   Christi's financial performance during the
25   year that Ms. DeMartino was employed as the
```

```
 1   general manager?
 2           MR. SONDHI:  Object to form.
 3       A    I don't know what he reviewed or
 4   didn't review or what he recalls or doesn't
 5   recall, but at the end of the day, he was
 6   hired to turn around these clubs, so it was
 7   established that they were underperforming and
 8   need help.
 9       Q    So if he didn't review any of the
10   financials, as he testified, how would he have
11   known whether or not Christi's was improving?
12       A    You'll have to ask him that.
13       Q    No, I'm asking you.
14       A    I don't have an answer for that.
15       Q    Right, because it would require
16   some sort of documentation to support whether
17   or not he actually had a basis to make a
18   determination that Christi's was suffering,
19   right?
20           MR. SONDHI:  Object to form.
21       A    I'm not understanding the question,
22   if there even is a question.
23       Q    What I'm asking is, if Mr. Marrero
24   testified that he did not review Christi's
25   financials.  And you sat in his deposition,
```

```
 1    right?
 2         A    I was there, yeah.  I wasn't, you
 3    know, paying attention nonstop, but I was
 4    there, yes.
 5         Q    I can represent to you that that
 6    was his testimony.
 7         A    Okay.
 8         Q    How would he have known how
 9    Christi's was performing?
10         A    We had weekly management calls
11    where we talked about the underperformance of
12    Christi's.
13         Q    And who would have highlighted the
14    underperformance of Christi's to Mr. Marrero?
15         A    Most likely Anthony Messina or
16    Michael Montella.
17         Q    And Mr. Messina recently left
18    Empire, correct?
19         A    His position was eliminated.
20         Q    I thought you took over his
21    position.
22         A    I absorbed some of his roles.  I
23    didn't take over his position.
24         Q    You didn't?
25         A    He was vice president of sales.
```

```
 1          Q    He worked at Empire and previously
 2    at TSI for several years, correct?
 3          A    Correct.
 4          Q    Was his departure surprising to
 5    you?
 6               MR. SONDHI:  Object to form.
 7          A    I don't even know how to answer
 8    that.
 9          Q    I'm just asking your opinion, if it
10    was surprising that, you know, someone who had
11    been with the company for quite a while left,
12    you know, in March of 2022?
13               MR. SONDHI:  Object to form.
14          A    March of 2023.
15          Q    Apologies.
16          A    No, not particularly.
17          Q    Why not?
18          A    Just not this huge organization
19    that we were at TSI.  We don't need all these
20    levels of support, and his position was
21    something that could be absorbed by other
22    people, and was.  So for the optimization of
23    the business, we eliminated it.
24          Q    So it was Empire's decision to
25    eliminate that position and in turn no longer
```

```
1    employ Mr. Messina?
2         A    Yeah.  I guess if we could maybe,
3    like, pause for some confidentiality there.  I
4    don't know that Sara needs to get off, but I
5    would ask, the terms of his departure are
6    confidential.
7              MR. SONDHI:  We'll follow the same
8         protocol if it's confidential information
9         regarding his exit.
10             MS. RATTET:  Sure.  Sara, can you please
11        leave for a minute.
12        A    It was Empire's decision to
13   eliminate Anthony's role within the
14   organization.
15        Q    Why?
16        A    His role didn't make sense.  It was
17   something that could, like I said, be absorbed
18   by other people.  We have -- it was something
19   that could be absorbed by other people.
20        Q    Who made the decision to eliminate
21   his position?
22        A    Patrick Walsh.
23        Q    How would you describe Anthony
24   Messina's personality in your interactions
25   with him?
```

```
 1        A     Upbeat.  Very knowledgeable about
 2   the business.  I don't really know what else
 3   to say.  Good leader.  Good mentor.
 4        Q     And he mentored you?
 5        A     He definitely was somebody I would
 6   consider a mentor when he was my direct
 7   supervisor.
 8        Q     Would you say that Mr. Messina is
 9   somewhat nonconfrontational?
10              MR. SONDHI:  Object to form.
11        Q     Your interactions with him, you
12   know, as a mentor/mentee relationship?
13        A     Not necessarily.  I mean, I have
14   seen, you know, Anthony have tough
15   conversations with people over the years.
16        Q     Was there a personality clash
17   between Mr. Walsh and Mr. Messina such that
18   that contributed to the elimination of Mr.
19   Messina's position?
20              MR. SONDHI:  Object to form.
21        A     No.
22        Q     When was the decision made to
23   eliminate his position?
24        A     At the end of March.
25        Q     So at the time that he was let go?
```

```
 1        A     Um-hum.
 2        Q     Were there any discussions prior to
 3   that about eliminating his position?
 4        A     No.
 5        Q     So the decision was made relatively
 6   quickly?
 7        A     I mean, I don't know how much
 8   thought went into it.  It definitely, I think,
 9   was something that it was just apparent.  He
10   relocated to Florida last year, he left New
11   York.  So that definitely impacted the
12   viability of his role, and yeah.
13        Q     But you relocated from New York to
14   Florida and it doesn't seem to have impacted
15   the viability of your role?
16        A     I was hired as a remote employee.
17   And I asked permission to move to Florida
18   before I moved.
19        Q     I can't hear you.
20              THE WITNESS:  Okay.  Can anybody else hear
21      me?
22              MR. SONDHI:  I hear you.
23              MS. RATTET:  You may have just cut out for
24      me for a second.
25                 Ms. Stella, would you mind reading that
```

```
 1        back to me.
 2              (The answer was read by the
 3              stenographer.)
 4        Q     Were you aware that Ms. DeMartino
 5   tested positive for COVID in January 2022?
 6        A     Yes.
 7        Q     Did she notify you?
 8        A     I don't think so. I think it was
 9   all secondhand through J.C. that I received
10   the information.
11        Q     And what specifically did J.C. tell
12   you?
13        A     Again, based on my recollection, I
14   think -- I remember that Sara hadn't tested
15   positive yet, but I believe David had, and he
16   was asking how long she would be out.  And I
17   believe I said it depended on when she tested
18   positive, and I believe he communicated that
19   to her.  And I don't remember what the
20   specific COVID protocols were or CDC
21   recommendations were at that time.  I believe
22   it might have been, I don't know if it was,
23   like, five days out with day zero being the
24   day you test positive, but I would have
25   probably asked him when she tested positive to
```

```
 1   help him figure out how long she needed to be

 2   out for.

 3        Q    Okay.  When an employee tests

 4   positive for COVID-19 -- and I recognize that

 5   you don't know the specifics with respect to

 6   days staying out and how long they're

 7   contagious and, you know, if they are no

 8   longer contagious if they are allowed to

 9   return to the workplace, I don't want to know

10   or need to know specifics about that.  But

11   were employees able to work from home if they

12   were contagious and positive for COVID-19?

13        A    Typically we would never have a

14   general manager work from home outside of

15   possibly doing payroll if it was, you know, a

16   necessity, a payroll Monday where it would

17   make sense, but for the most part, their job

18   duties can't be completed from home, so we

19   would of course allow them to take the days

20   off they need to recover, but wouldn't count

21   that as days at work.

22        Q    And that was consistent across the

23   board for all general managers?

24        A    Yes.

25        Q    Did Mr. Marrero ever come down with
```

```
 1   COVID-19?

 2        A    I'm not sure.  Probably.

 3        Q    And as the HR director at Empire,

 4   would he have made you aware that he was

 5   positive for COVID?

 6        A    I don't know that he would have

 7   made me aware that he was positive, but,

 8   because of me being an HR director, but he may

 9   have let me know when he had COVID.  I don't

10   know.

11        Q    And if he was in a business

12   director hybrid role at the time that he was

13   diagnosed with COVID or tested positive for

14   COVID, then he would be in a GM role that that

15   wouldn't really permit to work from home

16   unless it was payroll on a Monday?

17        A    He was a corporate employee, so he

18   would have the ability to work from home if

19   needed.

20        Q    Does Empire have a telework policy?

21        A    We have a remote work policy.

22        Q    And what does that policy cover?

23        A    It says that we can allow -- we may

24   allow employees to work from home.  I don't

25   know -- I don't know if you want to pull it
```

```
 1   up.
 2          Q    No, I'm just asking you.
 3          A    We may allow employees to work from
 4   home if it makes sense for their position.  It
 5   does not make sense for a general manager to
 6   work from home.
 7          Q    But is it evaluated, whether or not
 8   the company is willing to permit someone to
 9   work from home, is it evaluated on a
10   case-by-case basis?
11          A    Yeah.  It can be.  The job of a
12   general manager is in the club, doing work in
13   the club.  Outside of payroll, there's very
14   little that they can do from home.
15          Q    Right.  So if a general manager is
16   experiencing a high-risk pregnancy and
17   diagnosed or tests positive for COVID-19,
18   would that be the type of circumstance that
19   Empire may permit the general manager to work
20   from home?
21          A    No. We would have her take her time
22   off to recover.
23          Q    Even if she was under a performance
24   notice and feeling pressure to perform in
25   order to remain employed?
```

```
 1        A     Yes.  We would expect her to take
 2   her time off to recover.
 3        Q     And not count that against her for
 4   missed time in the overall consideration of
 5   her ability to increase performance of the
 6   club during that time off?
 7        A     Correct.
 8        Q     Were you responsible for posting
 9   Indeed ads for the position of general manager
10   in Florida?
11        A     Yes.
12        Q     And how many times did you post an
13   Indeed ad for the position of general manager
14   for one of the Florida clubs?
15        A     I'm not sure.
16        Q     Was it more than ten?
17        A     I'm not sure.
18        Q     Is there a way -- strike that.
19         Do you have documents to show the dates
20   on which the Indeed ads were posted while you
21   were the HR director?
22        A     Yes.  I submitted all of that as
23   part of discovery.
24        Q     Okay.  Did you know that Empire
25   placed an Indeed ad for the GM position in
```

```
 1   south Florida in late January?
 2        A    I think that was for a manager
 3   position.
 4        Q    It was just for a manager position?
 5        A    Yes.
 6        Q    And how is a manager position
 7   different from a general manager position?
 8        A    We were just hoping to see if we
 9   could get a fitness manager, any type of sales
10   manager, any kind of fitness expert manager to
11   have any interest in working in the club.  I
12   spoke to Sara about it and let her know it was
13   meant to be a support person for her if we
14   found the right person.
15        Q    So just straight manager position
16   that was posted to Indeed would not encompass
17   a general manager?
18        A    Correct.
19        Q    If you received responses to that
20   posting from people seeking to be a general
21   manager, would you have considered those
22   applications?
23        A    I would have considered them to
24   start in our clubs in a different position and
25   see if they, you know, developed into a
```

```
 1  manager in the future, general manager, in the
 2  future.  I would consider anybody that we're
 3  hiring a potential general manager.
 4      Q   Was it the job of the general
 5  manager to post positions on Indeed?
 6      A   It was part of their job, yes, when
 7  they were doing their job.
 8      Q   Right.  So my question for you is,
 9  if it's not really your job to post on Indeed,
10  then why did you post the ad on Indeed in
11  January of 2022?
12      A   Because the club required
13  additional help and support.  Sara wasn't get
14  the job done on her own.
15      Q   Which club?
16      A   Christi's.
17      Q   So the ad was specific to
18  Christi's?
19      A   I believe so.  And, again, it was
20  submitted as discovery.
21      Q   Right.  I believe that you just
22  testified that it was for managers applicable
23  to all Florida clubs.  Correct me if I'm
24  wrong.
25      A   Yeah, you are wrong.  Correct it.
```

```
 1          Q    Okay.  Specific to Christi's?
 2          A    Yes.
 3          Q    So why wouldn't you ask Sara to do
 4     that?
 5          A    Because Sara had proven herself
 6     incapable of hiring anyone over the course of
 7     however many months it had been.  I'm not
 8     going to let a club go out of business or fail
 9     because one person cannot get the job done.
10          Q    Did you forward candidate
11     submissions to Ms. DeMartino?
12          A    No, I don't think so. I think -- I
13     believe I sent it to J.C.
14              MS. RATTET:  This is going to be Exhibit
15          5, Bates number Defendant 372, a one-page
16          document.  It's an e-mail, subject line, raises
17          at Christi's.  Sara DeMartino coaching
18          conversation.
19                  (Molino Exhibit 5 was introduced for the
20                  record.)
21          Q    Ms. Molino, do you recognize this
22     document?
23          A    I do.
24          Q    And what is it?
25          A    It's a recap of a conversation I
```

1    had with Sara regarding raises at Christi's.

2         Q    Okay.  What prompted that

3    conversation with Ms. DeMartino?

4         A    I forget how I discovered it, but I

5    was in ADP doing something standard, and it

6    caught my eye that David was being paid more

7    than what was typically in that pay range.

8    And I looked at the history of it, and I could

9    see that it was a recent increase, so I asked

10   Sara about it.  She said that Anthony Messina

11   had approved it.  I reached out to Anthony to

12   ask him about it, if he approved it.  He said

13   no. I let Sara know my concerns around that

14   and just reiterated the expectations for MC

15   and PT pay going forward.

16        Q    So the e-mail says:  Sara has given

17   David multiple raises over the last six

18   months.  What is multiple raises?

19        A    I believe there was one in

20   September and one in February.  The February

21   one was the one that caught my attention.

22        Q    And so the two raises, you consider

23   that to be multiple raises?

24        A    Yes.

25        Q    Okay.  And it says:  I confirmed

```
1   with Anthony that this was not approved by
2   him.  Did you ask Sara if she sought --
3        A    She vol -- okay.
4        Q    Strike that.  Anthony in this
5   e-mail is referring to Anthony Messina,
6   correct?
7        A    Yes.
8        Q    Okay.  So it says:  I confirmed
9   with Anthony that this was not approved by
10  him.  Did you ask Sara if she sought Mr.
11  Messina's approval?
12       A    She volunteered that she had sought
13  his approval, which then prompted me to ask
14  Anthony if this was true.
15       Q    Okay.  Is there any documentation
16  to show that she had volunteered that
17  information to you?
18       A    No.  This was a phone conversation
19  that her and I had.
20       Q    And it says:  I confirmed with
21  Anthony that this was not approved by him.  So
22  after Ms. DeMartino allegedly volunteered that
23  she had cleared this raise with Mr. Messina,
24  that's when you went and called him to
25  confirm?
```

```
 1        A     Yes.  And I believe Anthony told me
 2   at that time that Sara had then texted him to
 3   say, what is the pay range for PT or MC.  So
 4   it was kind of like she was trying to cover
 5   herself there.  That's what Anthony told me.
 6        Q     So he suggested to you that Sara
 7   was doing something nefarious?
 8        A     He suggested to me that she reached
 9   out to him right after this happened to say,
10   oh -- to try to cover her bases, cover
11   herself.  She reached out to him and said, oh,
12   what's the typical pay range for this role.
13   And I don't know if either of them have that
14   text message.  Definitely worth asking them,
15   but I was told that there was a text message
16   exchanged and he let her know what it was and
17   that was that.
18        Q     So would it surprise you to know
19   that there were multiple pay raises over the
20   recommended pay range for employees at
21   Christi's?
22        A     I don't know that it would
23   necessarily surprise me.  I would hope that
24   they were approved.  I had encouraged Sara to
25   speak to J.C. about getting approval.  I
```

```
 1   believe there's an e-mail record of it,
 2   getting approval to pay a welcome team person
 3   more if she felt it would help her hiring.
 4   And I thought that he would say yes to that,
 5   but I did encourage her to ask him.
 6       Q    Would Ms. DeMartino need to seek
 7   approval to give a raise within the
 8   recommended pay range for a position?
 9       A    No.
10       Q    It's only when the pay exceeded the
11   recommended range?
12       A    Yes.
13       Q    And what specifically -- was it
14   just David Rankin, the fact that he was given
15   a raise or --
16       A    It definitely concerned me that it
17   was David given their relationship for sure.
18       Q    Okay.  But you knew that or I'm
19   sorry -- did you know that they were in a
20   relationship at that point?
21       A    In February 2022 I did, yes.
22       Q    So February of 2022 was the first
23   time that you learned about the nature of
24   their relationship?
25       A    No, I learned about it in July of
```

```
 1   2021.
 2        Q    And you knew that she was the GM of
 3   Christi's, right?
 4        A    I did.
 5        Q    And you knew that any position
 6   under her at Christi's would necessarily be a
 7   subordinate position to her as the GM, right?
 8        A    Right.
 9        Q    So I guess I'm having a hard time
10   understanding why the issue, you know, it was
11   such a big deal at this point knowing, you
12   know, having known that for such a long time?
13        A    It was unapproved.  She tried to
14   lie about it.  She was deceitful about it.
15   And then when I let her know I could see it,
16   then she admitted it.  And then she went in
17   and reversed it and tried to reach out to
18   Anthony to seek approval after the fact.  The
19   whole thing just gave me a sense of
20   deceitfulness.  And I gave her a coaching
21   conversation on MC and PT pay going forward.
22   It's exactly what it says it was.  I'm going
23   to coach people and let them know this is
24   something we could have handled better and
25   these are my expectations going forward.  And
```

```
 1   I'm going to make her supervisor aware of it.
 2        Q    And you're what?
 3        A    And I'm going to make her
 4   supervisor aware of it, which was why the
 5   e-mail was sent to J.C.
 6        Q    Okay.  What did J.C. do in response
 7   to this e-mail?
 8        A    I don't think he did anything in
 9   response to this e-mail.
10        Q    And this e-mail was sent on
11   February 16, and I assume -- and I don't want
12   to assume -- but if you recall the
13   conversation with Sara and, you know, the
14   chain of events that you just described with
15   respect to calling Anthony and whatnot, that
16   occurred on this date, correct?
17        A    I believe so.
18        Q    Okay.  Do you recall having a
19   conversation with Mr. Marrero after you sent
20   this e-mail on the phone?
21        A    I don't recall.  Based on this
22   e-mail, it looks like I had spoke to him
23   before I sent this e-mail.  I said I just
24   wanted to recap our conversation, but I don't
25   particularly recall one way or another.
```

1       Q    Okay.  Do you know or -- do you

2  know if Mr. Marrero counseled Ms. DeMartino

3  about MC and PT pay going forward after you

4  had the discussion with her?

5       A    I am not sure.

6       Q    Were you aware that -- strike that.

7     Was Mr. Marrero -- did he seek your

8  advice before he prepared any performance

9  notice for an employee under his control?

10      A    Not necessarily.

11      Q    Okay.  Would he have sought your

12  input though given your HR expertise?

13      A    Would he have sought my input on

14  what?

15      Q    On preparing a performance notice?

16      A    He might have.  He's also a

17  seasoned manager and capable of preparing a

18  performance management, performance notice on

19  his own.

20      Q    If you recall from Mr. Marrero's

21  deposition that you attended, he, you know,

22  testified essentially, and, again, I don't

23  want to mischaracterizing his testimony, but

24  it's my recollection that he testified that

25  anything related to performance management,

1    HR-related leave would have gone through you

2    and he would have discussed with you before he

3    took any action.  Do you recall that?

4        A    Yes.  And he would have discussed,

5    I'm going to issue a performance notice for

6    somebody, and I would have said okay.  I don't

7    know that I would have necessarily reviewed

8    the performance notice or been part of that

9    conversation.

10       Q    But it was his practice to put you

11   on notice of the fact that he would be issuing

12   a performance notice?

13       A    I don't think it was all the time,

14   but with Sara, I was aware he was issuing a

15   performance notice.

16       Q    On what date?  Are you talking

17   about the December notice?

18       A    The December, and I believe he

19   issued another one in February.

20       Q    Okay.  And do you know the

21   substance of the performance notice that was

22   issued in February?

23       A    I believe that I've seen it as part

24   of this process, but I did not see it before

25   he issued it to her.

```
 1        Q    Aside from the MC and PT pay issue
 2   that you had discussed with Sara on February
 3   16, was there anything that was mentioned
 4   about her performance that would be the
 5   subject of a performance notice aside from
 6   those particular things that you discussed in
 7   this e-mail?
 8        A    I don't know if she was meeting the
 9   staffing goals that had been set, the club's
10   overall performance, I mean, I'm not sure.
11        Q    So it's just a coincidence that
12   there was a performance notice issued or a
13   performance notice alledgedly issued on
14   February 16, the same day that you sent this
15   e-mail about the pay issue?
16        A    Yeah.  I don't know -- I don't know
17   the specifics of what that performance notice
18   was for, but I don't know that it was for
19   this.  I don't believe it was for this,
20   although it could have been.  Again, he's her
21   direct supervisor.  He can issue performance
22   notices without me.
23        Q    And he would have likely at least
24   told you the fact that he was going to be
25   issuing that notice, correct?
```

```
 1        A    Yes.  He would have let me know
 2   that he's performance managing Sara, sure.
 3   Yes.
 4        Q    And did he?
 5        A    I believe so.
 6        Q    But you don't actually know?
 7        A    I don't.
 8        Q    In your experience working with Mr.
 9   Marrero, was it customary for him to send
10   e-mails detailing, you know, the contents of
11   and memorializing the contents of important
12   conversations or at least clueing you in to
13   conversations he had had with certain people
14   who had been issued performance notices and
15   such?
16        A    I don't recall.  I don't think that
17   he would have looped me in on performance
18   notices he was having with his front-line
19   team, but with a general manager, yes.
20        Q    Right.  So what I'm asking you is
21   maybe a little bit different.  In reviewing
22   the documents that were produced in this case,
23   it seems as though Mr. Marrero is relatively
24   detail-oriented and good at memorializing the
25   contents of discussions that are had and, you
```

```
 1   know, outlining or bolding and italicizing to
 2   ensure that there's distinctions made between
 3   different points that he wants to make,
 4   especially with respect to, you know, action
 5   plans for, you know, increasing revenue in a
 6   club or detailing the contents of the
 7   discussion that is discussed with respect to a
 8   performance notice that's issued.  And so I
 9   just want to know if that was your general
10   understanding as well.  Was it typical of him
11   to send these types of e-mails detailing the
12   meetings that he had had with people he was
13   performance managing?
14        A    I would say it's typical of a BD to
15   send a recap to a GM that they are supporting.
16   Sara was really the only GM he was supporting
17   from a distance, and I think that was his way
18   of being a supportive manager by working with
19   her on action plans, recapping those action
20   plans, so that was his way of supporting her,
21   and I think that he would have taken that same
22   step if his scope was wider and there was
23   other GMs he was supporting as well, but,
24   again, he was the GM for the other two clubs.
25        Q    Okay.  So would it have been odd
```

1    if -- strike that.

2         Does Empire have any record of the

3    alleged performance notice that was allegedly

4    issued by Mr. Marrero to Ms. DeMartino

5    February 16th of 2022?

6         A    I believe that only J.C. had record

7    of that.

8         Q    And so he would not have sent you

9    as the HR director a copy of that performance

10   notice to include in Ms. DeMartino's personnel

11   file?

12        A    Ideally, he would have, but not

13   necessarily.

14        Q    So prior to this litigation, had

15   you ever seen the February performance notice

16   that was alledgedly issued to Ms. DeMartino?

17        A    I don't recall.

18        Q    You don't recall if you had ever

19   seen it?

20        A    I don't recall.  I know that

21   obviously I've definitely seen it as part of

22   the litigation and that's clouding my memory a

23   little bit.

24        Q    Was it common practice for GMs or

25   for people who are, you know, performance

1   managing people at Empire or subordinates at

2   Empire to document the steps that they have

3   taken to performance manage a particular

4   employee?

5        A    I don't understand the question.

6        Q    In your experience as an HR

7   director, is it best practice to document

8   specific instances where a supervisor is

9   performance managing an employee?

10       A    Yes, in a perfect world.

11       Q    What do you mean by that?

12       A    In a perfect world, we would

13  document every single performance conversation

14  we have.  We definitely are always providing

15  feedback.  And so, you know, whether that is

16  recapped in a coaching log every single time

17  or sent over an e-mail every single time, I

18  mean, probably not, but in an ideal world,

19  yeah, we would.

20       Q    Right.  And I'm talking more about

21  these big ticket items that would require, you

22  know, the issuing of a performance notice,

23  like completing a form like that, right, that

24  would be something that best practice would

25  ensure that that, you know, ends up in an

1    employee's personnel file, right?

2          A    Yes.  Best practice.

3          Q    Does Empire or at the time of Ms.

4    DeMartino's employment, did Empire maintain a

5    personnel file for Ms. DeMartino?

6          A    No, not outside of what was in ADP

7    or information that was in ADP.

8          Q    What information was contained in

9    ADP?

10         A    Just her personal information.

11   Pay.  Payroll record.

12         Q    And the performance notice that was

13   issued in December is not contained in ADP?

14         A    No.

15         Q    Where would Empire store that

16   document?

17         A    In my e-mail.

18         Q    Do you store all employee

19   performance notices in your e-mail?

20         A    All employee records, yes.

21         Q    In your e-mail?

22         A    Yes.

23         Q    In the same folder?

24         A    Yes.

25         Q    When did you first consider

```
 1   terminating Ms. DeMartino?
 2        A    I don't recall.
 3        Q    But you participated in the
 4   decision to terminate Ms. DeMartino, correct?
 5        A    J.C. made the decision to terminate
 6   her and I supported his decision.
 7        Q    When did he know notify you of his
 8   decision to terminate her?
 9        A    I believe at the end of February,
10   maybe the last day of February, not sure.
11        Q    And what was the reason or what
12   were the reasons given to support his
13   recommendation to terminate Ms. DeMartino?
14        A    The overall performance of the
15   club.  She had been given a year to turn the
16   club around and hadn't been able to.
17        Q    Anything else?
18        A    No.
19        Q    Did you discuss Ms. DeMartino's
20   termination with anyone aside from Mr.
21   Marrero?
22        A    I don't think so.
23        Q    Is it possible that you did?
24        A    It's possible I could have
25   discussed it with Anthony Messina, but I don't
```

1    think that I did.

2         Q    If you had discussed it with Mr.

3    Messina, would that have been before or after

4    Ms. DeMartino's termination?

5         A    It could have been either.

6         Q    Did you review any documents to

7    support Ms. DeMartino's termination before she

8    was terminated?

9         A    I don't know that I reviewed any

10   documents.  I reviewed J.C.'s performance

11   concerns.

12        Q    And where were J.C.'s performance

13   concerns?

14        A    Essentially with the club

15   continuing to lose money.  And again if a club

16   continues to lose money, we go out of

17   business, a lot of other people lose their

18   jobs.

19        Q    Did you consider Ms. DeMartino's

20   performance during the month of February 2022

21   before the decision to terminate her was made?

22        A    No.  It was more about her

23   cumulative performance, that the club was just

24   on this downward trend, and it was going to go

25   out of business if we didn't get someone in

1   there that could turn it around.

2         Q    When did the foam pit reopen at

3   Christi's?

4         A    Not sure.

5         Q    When did the pool heater -- when

6   was the pool heater fixed?

7         A    Not sure.

8         Q    Would it surprise you to know that

9   the month following the opening of the foam

10  pit and the fixing of the pool heater that Ms.

11  DeMartino's performance improved?

12        A    It wouldn't -- I don't understand

13  the question.  Would it surprise me?  Would it

14  surprise me that her performance improved when

15  she was being performance managed?  I mean,

16  there's lots of things that can correlate to

17  performance for one month out of the entire

18  year.

19        Q    She had been performance managed

20  since December, right?

21        A    Yeah.

22        Q    And did Christi's financials

23  improve in January?

24        A    No.

25        Q    And then the foam pit reopened in

```
 1   February, correct?
 2        A    I don't know.
 3        Q    I know that I asked you that.  I
 4   apologize.  It's the end of the day and I'm
 5   talking over my own questions.  So once the
 6   foam pit reopened, again, would it surprise
 7   you to know that Christi's financials were
 8   improving?
 9        A    No.
10        Q    Then why was the decision made to
11   terminate her if she was showing improvement?
12        A    It wasn't enough.  The club was
13   going to go out of business.  Can't let the
14   club go out of business because of one person.
15        Q    So that decision was made at the
16   end of February you said?
17        A    Yes.
18        Q    How would you know if the club was
19   going to go out of business if it was on an
20   upward trajectory?
21        A    One month is not an upward
22   trajectory.  I'm sorry, but if you ran a
23   business personally and your family was
24   dependent upon the club being profitable,
25   like, you wouldn't tolerate months and months
```

1    and months of downward poor performance.  One

2    month does not make that okay.

3         Q    How was Christi's performance in

4    March of 2022?

5         A    I don't recall.

6         Q    Do you know if it was better than

7    February 2022?

8         A    I don't recall.  I don't know.

9         Q    Are there documents to support and

10   to show Christi's financial performance in

11   March of 2022?

12        A    Yes.

13        Q    And if Christi's financial

14   performance in March of 2022 was worse than

15   the performance in February 2022, why didn't

16   you close down Christi's if it was not

17   sustainable?

18        A    Because we still had a window of

19   time to find a general manager who can

20   successfully run the club, which, fortunately,

21   we did, and turn it to profitability.  We're

22   not going to wait for it to close down.

23   That's what we were preventing.

24        Q    So it wouldn't have immediately

25   closed down then if you --

```
 1        A     If it continued under Sarabeth's
 2   oversight -- I don't believe Sara was capable
 3   of turning the club around entirely and that
 4   the eventual outcome would have been a
 5   business that's not viable.
 6        Q     But you didn't really give her the
 7   opportunity to do that, right?
 8        A     She had 12 months to do it, the
 9   same opportunity J.C. was given, 12 months.
10        Q     When J.C. was terminated for
11   largely the same reasons as Ms. DeMartino, did
12   he have to deal with the closure of a
13   revenue-generating stream that accounted for
14   more or less 30 percent -- could have been
15   more, could have been less -- of the club's
16   revenue stream?
17        A     No, but he had -- every club had
18   its own difficulties.
19        Q     What was the difficulties with Mr.
20   Marrero's club?
21        A     Like I said, the strip mall he was
22   in was largely vacant.  That was a major
23   issue.  He could have pointed to that.  I
24   mean, people make excuses for their poor
25   performance all the time.
```

```
 1          Q     I'm getting close to being done.  I
 2    --
 3          A     I do need to try and be done by
 4    5:00.  I have to get my daughter from school.
 5                MR. SONDHI:  How many more minutes do you
 6          need, Allie?
 7                MS. RATTET:  I probably need 15 to 20 more
 8          minutes.
 9                THE WITNESS:  Well, I can't be late for
10          picking my kid up from school.
11                MR. SONDHI:  All right.  So 5:00 is our
12          hard, I guess our hard stopping point.  This is
13          going to be continued, in any event, so you can
14          finish.
15                MS. RATTET:  That's fine.  If you want to
16          stop where we are and cut it off now then we'll
17          reserve the right to bring her back as a fact
18          witness to finish it up.
19                MR. SONDHI:  Yeah, for the remainder of
20          it.  Sure.
21                MS. RATTET:  Ms. Molino, thank you so much
22          for your time.  I hope that, you know, you
23          didn't take things too personally.  It's not
24          fun to do this and I really appreciate you
25          being here and taking the time to respond to my
```

1    questions.

2         THE WITNESS:  Likewise.  Thank you.

3            (The deposition of Leah Molino adjourned

4            for the day at 4:47 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                  C E R T I F I C A T E
 3    STATE OF NEW YORK )
 4                     ) ss.
 5    COUNTY OF NEW YORK)
 6              I, ELIZABETH A. STELLA, a Stenographic
 7    Reporter and Notary Public within and for the
 8    State of New York, do hereby certify:
 9              That LEAH MOLINO, the witness whose
10    deposition is hereinbefore set forth, was duly
11    sworn by me and that such deposition is a true
12    record of the testimony given by such witness.
13              I further certify that I am not related
14    to any of the parties to this action by blood or
15    marriage and that I am in no way interested in the
16    outcome of this matter.
17              IN WITNESS WHEREOF, I have hereunto set
18    my hand this 24th day of May 2023.
19              _____
20              ELIZABETH A. STELLA, STENOGRAPHER
21              My Commission Expires:  May 31, 2024
22
23
24
25
```

```
1

2                          INDEX

3    WITNESS          EXAMINATION BY          PAGE
     Leah Molino      Ms. Rattet                4
4
     Reporter's certificate                   242
5

6            (Exhibits attached to transcript.)

7
     (Corporate representative deposition portion.)
8
                     E X H I B I T S
9
     EXHIBIT          DESCRIPTION              PAGE
10
     Exhibit 1        30(b)(6) Notice of        20
11                    Deposition

12
              (Fact witness deposition.)
13
                   E X H I B I T S
14
     EXHIBIT          DESCRIPTION              PAGE
15
     Exhibit 1     Notice of Commencement      172
16
     Exhibit 2     Empire responses to         175
17                 interrogatories.

18   Exhibit 3     E-mail dated 12/28/21       197

19   Exhibit 4     Position statement          201

20   Exhibit 5     E-mail dated 2/16/22        219

21

22

23

24

25
```

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION
CASE NO: 22-cv-14301-CANNON

SARABETH DEMARTINO,

     Plaintiff,

Vs.

EMPIRE HOLDINGS AND INVESTMENTS, LLC; AND JUAN CARLOS MARRERO,

      Defendants.

_____/

CONTINUED REMOTE DEPOSITION OF LEAH MOLINO

Pages 1 through 57

Via Zoom Videoconference

August 1, 2023
2:08 p.m. to 3:41 p.m.

Stenographically Reported By:

AMY T. DESCHENES, FPR
Florida Professional Reporter
Appearing Remotely From Broward County, Florida

```
 1                    REMOTE APPEARANCES

 2

 3    On Behalf of the Plaintiff:

 4         Morgan & Morgan
           8151 Peters Road
 5         Suite 4000
           Plantation, Florida 33324
 6         954.694.9610
           arattet@forthepeople.com
 7         BY:  ALLISON M. RATTET, ESQUIRE
                BRYAN ARBEIT, ESQUIRE
 8

 9    On Behalf of the Defendants:

10         Jackson Lewis, PC
           2 South Biscayne Boulevard
11         Miami, Florida 33131
           305.577.7600
12         ranjiv.sondhi@jacksonlewis.com
           BY:  RANJIV SONDHI, ESQUIRE
13

14    Also Present:  Sarabeth DeMartino, Plaintiff

15

16

17                   INDEX OF PROCEEDINGS

18    Continued Deposition of Leah Molino          Page
```

```
19    Direct Examination by Ms. Rattet....................4
      Certificate of Oath...............................56
20    Certificate of Reporter...........................57
```

```
21

22

23

24

25
```

```
 1                        EXHIBITS
 2    Number           Description              Page
 3    6                Performance Notice         21
 4    7                Job Posting                28
 5    8                3/11/22 E-mail             33
 6    9                8/15/22 DEO E-mail         38
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1        Deposition taken before Amy DesChenes, Florida
 2   Professional Reporter and Notary Public in and for the State of
 3   Florida at Large in the above cause.
 4                         - - - - - -
 5        THE COURT REPORTER:  Will you raise your right hand,
 6        please.  Do you swear or affirm the testimony you give
 7        will be the truth, the whole truth, and nothing but the
 8        truth?
 9        THE WITNESS:  I do.
10   THEREUPON,
11                         LEAH MOLINO,
12   having been first duly sworn, was examined and testified as
13   follows:
14                    DIRECT EXAMINATION
15   BY MS. RATTET:
16        Q    Hi, Ms. Molino.  Welcome back.
17        A    Thank you.  Hello.
18        Q    Hi.  Good to see you.  Where we left last off -- and
19   just to preface today, I don't expect that we need to go over
20   the ground rules for depositions again.  And I -- I think this
21   should go relatively quickly.
22        A    Okay.
23        Q    So good -- good news for all ends.
24             But last -- where we left off, we were discussing the
25   circumstances surrounding Ms. DeMartino's termination.  And I'm
```

1    sure counsel will stop me if I'm asking the same questions.

2    But I don't believe that I asked you if -- because you

3    mentioned that it was JC's decision to terminate Ms. DeMartino?

4         A    Yes.

5         Q    And how did you -- or how did he notify you of his

6    decision?

7         A    I -- I believe it would have been over the phone.  A

8    phone conversation to let me know that he felt that it was time

9    to terminate Sara.  I would have asked her -- or asked him --

10   I'm sorry -- you know, tell me why.  Has there been performance

11   management?  And given my thoughts on it, if I had any.

12            I definitely offered to be part of it.  I do try to

13   be present when we are terminating employees, more for like a

14   support perspective to the employee, to answer any questions

15   they have around benefits and that type of thing.

16        Q    Okay.  Do you remember specifically what was

17   discussed on -- on this phone call with Mr. Marrero when he

18   notified you that he intended on terminating Ms. DeMartino?

19        A    I don't recall the specifics.

20        Q    But you were aware -- and you had actually had

21   conversations with Ms. DeMartino a couple weeks prior about

22   David Renkin, correct?

23        A    Correct.

24        Q    Okay.  And were there any other items that had

25   recently occurred that -- that supported the decision?

1    A    I think just the continue -- non-performance of the

2    club.  And by non-performance, I mean the club continuing to

3    lose money.

4    Q    Did you ultimately approve the decision to terminate

5    Ms. DeMartino?

6    A    Yes.  Not that it was -- it didn't require my

7    approval.  But I approved of the decision, if that makes sense.

8    Q    It does.  And so -- and the decision to terminate

9    her, from your understanding, and based off of what Mr. Marrero

10   communicated to you, it was -- it was all performance based?

11   A    Yes.

12   Q    And it had nothing to do with what David Renkin?

13   A    No.

14   Q    Okay.  What -- you participated in the termination

15   meeting, correct?

16   A    I did.

17   Q    And where did that take place?

18   A    It was -- I believe I was on the phone.  And I -- I

19   don't know if JC was there in person.  I think, yes, with Sara.

20   I'm pretty sure that he was there in person.  I was on the

21   phone.

22   Q    Okay.  Were you on a video conference, or was it just

23   on the phone?

24   A    I don't know.  I may have been.  If they were sitting

25   in the office together, he may have just called me and put me

1    on speakerphone.

2       Q    Okay.  Do you recall how long that meeting -- like,

3    how long that meeting was?

4       A    I don't think it was very long.  Maybe less than 30

5    minutes.

6       Q    And what do you remember about, kind of, what

7    transpired over that less than 30 minutes?

8       A    So I don't remember tons of details.  I do remember

9    there being a sense of JC kind of struggling to articulate what

10   was happening, and me jumping in to -- to clarify a bit,

11   because he seemed to be struggling to articulate what was

12   actually happening.

13      Q    Can you give me an example, just about --

14      A    Yeah.  I felt like -- I felt like he was kind of,

15   like, dancing around the subject.  Like, it's never fun or

16   enjoyable to say, you're being terminated.  And I felt like he

17   was, like, having a hard time getting to that point.  And I did

18   jump in, because I felt like it was unfair to Sara to not be

19   clear about what was happening.

20           And that's kind of the -- that's my memory of it.

21      Q    So how long had the meeting been going before you had

22   to jump in and actually tell her that the decision was made?

23      A    I -- I don't know.  I mean, it could have been 10

24   minutes.  It could have been less.  In my mind, like, these

25   things are, you know, factual, and we should be straightforward

1    and to the point.  I don't think it's something that needs to

2    be drawn out for anybody.

3             And so he may have been, like, kind of -- I don't

4    know if rambling is the right word, but struggling to get to

5    the point for the first five-ish minutes.  And I jumped in and

6    kind of got that conversation on track.

7        Q    Okay.  And when you jumped in, what -- do you -- what

8    specifically did you say?

9        A    I don't recall specifically.

10       Q    Okay.  Generally?

11       A    Probably something along the lines of, we are

12   terminating, or we're ending your employment, or we have made

13   the decision to separate, this is what that looks like.  And I

14   could have jumped into giving her information about her

15   benefits and, you know, kind of what would transpire there.

16       Q    When you say that you gave her information about her

17   benefits, what specific information did you provide to her

18   during that meeting?

19       A    So because we were terminating her on the 1st of the

20   month, she would have had benefits until the end of that month,

21   covered by us.  And then from there, she would have been -- she

22   would have been eligible for COBRA.  We use a third-party COBRA

23   administrator.  So I let her know that they would be sending

24   information on COBRA benefits.

25       Q    Was there anything else discussed related to benefits

1    during that meeting?

2         A    I don't think so.  Not that I recall.

3         Q    Do you remember what time the meeting took place?

4         A    I would guess it was earlier in the day, but I am

5    guessing.  I don't think we would have had her at work all day

6    to terminate her.  But again, I'm guessing.  I don't know.

7         Q    Okay.  And so following Ms. DeMartino's termination,

8    did you have any conversations with JC, just about next steps

9    or what had transpired?

10        A    Not about what had transpired.  I mean, we definitely

11   talked about finding a new GM.  Not -- not necessarily

12   immediately, like, that day.  But over the coming weeks and

13   months, we did talk about finding a new GM.

14             And at a certain point, I would have decided and

15   relayed to him that we were going to reach out to a recruiter

16   to help us fill the role, which is what we did do.

17        Q    Did the company post a job position or a job opening

18   for -- for a GM in the Vero Beach location?

19        A    I believe -- yes.  And I believe that it was

20   unsuccessful, which is probably the point where we decided to,

21   you know, work with an outside recruiter.

22        Q    How soon after Ms. DeMartino was terminated did the

23   company post that job position online?

24        A    I don't recall.  It would have been on Indeed.  And I

25   was asked to submit those records, which I did submit.  So that

1    would have the dates on it.  And hence, submit them again, if

2    necessary.  But it would have been through Indeed.

3        Q    Okay.  And I think -- I think from my recollection --

4    and I don't want to say anything that is inaccurate -- and I

5    don't have the document in front of me.  But I believe it was

6    the day that she was actually terminated.

7            Does that ring a bell to you?

8        A    It very well may have been.  I mean, you know,

9    finding someone as quickly as possible is always our goal.  And

10   it's not always easy to find the right people.  You know, we do

11   have clubs that go gapped for months sometimes while we're

12   looking for the right person.

13           But I probably would have, you know, take -- it takes

14   me all of five minutes to -- to post a job.  So I probably

15   would have done it that day, to get the ball rolling.

16       Q    And you would have been the person to post it, right?

17       A    I would have.  Yes.  So the -- the resumés would come

18   to me, and I would pass them along to JC to do initial phone

19   screens, interviews, and go from there.

20       Q    And did you, in fact, post prospects, or potential

21   applicants on to JC that you received from -- from the Indeed

22   posting?

23       A    I believe -- yeah.  I believe we got a few.  I -- I

24   don't screen them.  Like, if they come in, I send them to him

25   to look at.  Like, I'm not looking at each one saying, okay,

1    this one is good, let me send it, or this one is not good, I'm
2    not going to send it.
3           So they come in, I forward it over, let him kind of
4    make the assessment.  And I don't think that he was finding
5    anybody.  And that was the point where -- I knew a recruiter
6    that works just with the fitness industry.  And I -- I reached
7    out to them to find out how it would work to use them; what
8    that would look like.  And we ended up using them.
9    Q    So during the time period between March 1st and --
10   and the time that the new GM was hired -- and we'll get to that
11   in a minute -- who was responsible for overseeing Christi's,
12   you know, operations, just filling the role of GM?
13   A    So JC was really responsible for that.  I know he --
14   he still had additional responsibilities with the other clubs.
15   But -- so on a day-to-day basis, he would work through
16   Jose Rotto, who was the customer service manager at the time.
17   And probably, you know, on the gymnastics side, would have
18   worked with Britney, whose last name is escaping me right now,
19   but she's the program manager for gymnastics.  So we have a
20   couple of department heads.  I guess Linda is in charge of the
21   swim.
22          So he probably worked through the individual people.
23   But he -- he would have been going there probably once a week
24   as well to be, you know, a more senior manager presence in the
25   club.

1      Q     And did he, in fact, visit the club once a week

2   during that time period?

3      A     I believe so.  But I can't 100 percent say yes or no

4   to that because I wasn't there.

5      Q     So there was an expectation that he would at least be

6   there at one point during the week?

7      A     Yeah.

8      Q     And was -- with respect to the recruitment and hiring

9   the recruiter, was JC involved in that hiring process once the

10  recruiter kind of generated these potential applicants or

11  candidates?

12     A     So I did -- once we started working with the

13  recruiter, I did the initial interviews.  And JC -- I had a

14  couple of people I liked.  And then I moved those people along

15  to be interviewed by Anthony Messina and JC.

16     Q     And for all of the candidates that were considered,

17  was it -- did it kind of fall in line with that three-step

18  process?  You conduct the initial interview, then Anthony

19  conducting the interview?  Or did Anthony and JC kind of do it

20  in tandem?

21     A     I don't think that they would have done it in tandem.

22  Because I believe that Anthony would have done a phone

23  interview.  He was a -- I'm pretty sure he was still living in

24  New York at the time, and would have done a phone interview,

25  where I believe -- and I -- I could be wrong about this -- oh,

1  no.  Well, okay.  Because the person we hired, he did relocate.

2  So I guess we must have all did phone interviews.  But I don't

3  think Anthony and JC would have done it together.

4       Q    Okay.

5       A    I think it would have been two separate interviews.

6       Q    And was the decision to go with the candidate who was

7  ultimately hired, was that a decision made by committee?  in

8  other words, by -- by all three?  You -- all three of you being

9  you, Anthony, and JC?

10      A    Yes.

11      Q    And so who ended up being hired?

12      A    Ron Gochee, G-o-c-h-e-e.

13      Q    And how did you and the group of people who

14 interviewed Mr. Gochee arrive at the decision to hire him?

15      A    I mean, you -- in terms of -- are you asking, like,

16 what qualities he had that made us want to hire him, or how did

17 we, like, sit down that decision?  What -- I'm sorry.  If you

18 can --

19      Q    No.  No.  You're fine.  I'm glad that you asked.  And

20 please, don't hesitate to ask for clarification.

21           So really, I want to know just, like, the criteria

22 that was considered, and ultimately, you know, was it

23 personality based?  Was it, obviously, experiential --

24 qualifications?  Anything -- anything like that?

25      A    Yeah.  So Ron did have a lot of great experience.  I

1    mean, he had been in the industry for a long time.  I felt like

2    on the sales side, he really understood the importance of needs

3    analysis, getting involved in the community.  He also had

4    experience running larger multi-rec facilities that I think

5    would be valuable.  And that was kind of the -- some of the

6    qualities we found of value to him.

7            I mean, Anthony Messina probably could say more about

8    what he found valuable on, you know, the sales side of things.

9    And JC perhaps -- there may have been other qualities JC liked

10   there.  But it was definitely a lot of good experience that was

11   relative to the club -- or relevant to the club.

12       Q    And when did Mr. Gochee start working at Christi's?

13       A    I am 99 percent sure that his hire date was

14   May 9, 2021.  And I think that he trained for a week, if I

15   remember correctly, in Palm Beach Gardens, and then went live

16   in Christi's on May 17, 2021, I believe, give or take maybe a

17   couple days in there.

18       Q    Sure.  And that's fair.  Do you mean 2022?

19       A    2022.  Yes.  Sorry.  Yes.  2022.

20       Q    No.  You're fine.

21       A    Yes.

22       Q    I just want to make sure the record is accurate.

23       A    Yes.  Sorry about that.

24       Q    No problem.  How -- do you know if Christi's revenue

25   improved with Mr. Gochee at the helm?

1       A    Yes.  It has improved.

2       Q    And what -- you know, how has it improved?

3       A    I don't know the exact numbers.  I know that there's

4   been improvement on the revenue side, also improvement on the

5   expense side, and overall improvement in achieving

6   profitability.

7       Q    And when you say that there's an improvement on the

8   expense side, what would you attribute that to?

9       A    So a couple things.  One being that we did reduce the

10  number of classes on the schedule which -- yeah.  We reduced

11  the number of classes on the schedule, which is a payroll

12  expense.  And then we also brought cleaning in house, so --

13  that was Ron's idea.  We were paying, I think, $9,000 for

14  off-site cleaning.  And he brought that in house.

15          So those were some expense savings that definitely

16  contributed.

17      Q    So with respect to the number of classes and -- and

18  that being payroll, is that -- does that mean that you -- you

19  eliminated certain instructors, or a number of instructors?

20      A    Who -- I -- we wouldn't -- well, wouldn't

21  eliminate -- I just thought of something else.  But -- which I

22  will add in a second.

23          But, like -- so we wouldn't necessarily eliminate or

24  fire the instructors.  Most of them would experience a reduced

25  schedule.  And typically when we do that, we look at attendance

1    records, if there's classes that can be consolidated.  So let's

2    say, like, we have a Zumba class -- and this is just an

3    example -- a Latin dance class back to back, or on the same day

4    or, you know, maybe we can consolidate those, so the members

5    aren't completely losing, like, one type of class.

6            One of the things that also helped -- like, another

7    example of expense reduction is we had Les Mills classes, which

8    is a type of class that we license.  So we pay for that license

9    per club.  It's not -- it's not a ton of money.  But the small

10   things do add up.

11           And so when the instructor resigned from that class,

12   Ron decided to not bring in anymore Les Mills classes.  And we

13   were able to eliminate that expense.  So, you know, there's

14   definitely an element of management that needs to happen there.

15   Because you are going to get push-back from members.  Like, you

16   are going to -- no matter how much it makes sense, you are

17   going to have some really vocal members unhappy about the

18   change.  But, you know, it was something that needed to be

19   done.

20       Q    Is it -- were you referring to a Les Mills class?

21       A    Yes.  So Les Mills is a brand of classes.  Do you

22   know what that is?

23       Q    I don't.  Please educate me.

24       A    Okay.  So Les Mills is a brand of classes.  You would

25   hear it called, like, Body Pump.  We have, like, The Trip,

1    which is like their brand of spin.  And so instructors have to

2    be certified.  Just like an instructor has to have a Zumba

3    cert.  Like, you can teach Latin dance and Zumba, and they can

4    be almost the same.  But you can't call Zumba Zumba unless the

5    instructor has that cert and that licensing.

6          So Les Mills is a style of classes that is -- it's a

7    brand style of classes.  And you pay for the licensing.  And

8    there are people within the fitness community that are, like,

9    Les Mills, like, die hard.  They only want to take Body Pump.

10   And I want to say one of the others is maybe Body Combat.

11   So, like, you can have a class that's very similar, but you are

12   not allowed to call it Body Pump.  And some people only want

13   the Les Mills brand of classes in our membership base.  So we

14   pay to, essentially, use their instructors and that licensing

15   per location.

16        Q    Who makes the decision whether or not to have the

17   Les Mills classes in a particular location?

18        A    So it was Ron's decision to eliminate it.  I mean, in

19   reality, any of the GMs can make the decision to have it or not

20   have it.  In reality, I can maybe come in and say, I need to

21   cut whatever money from each club.  So we're getting rid of Les

22   Mills entirely across all our locations.  But for the most

23   part, that's a GM decision.  That's something within the GM's

24   power to make a decision on.

25        Q    So if Ms. DeMartino -- and I recognize this is a

1    hypothetical -- had she come to you and expressed a desire to

2    get rid of the Les Mills classes, would she -- you know, would

3    the company have supported that suggestion?

4              MR. SONDHI:  Object to the form.

5        A    Yes.  Absolutely.

6        Q    And with respect to the outsourcing of -- of the

7    cleaning services that you mentioned, is that a decision that

8    is -- also falls within the purview of the GM?

9        A    Yes.

10       Q    So when did Mr. Gochee decide to get rid of the --

11   the Les Mills class, or come to -- to you?

12       A    That was recent.  That was in the spring of this

13   year.  So that was a recent change.  And again, that was

14   something where the instructor who was teaching resigned, so

15   the opportunity to remove those classes was there.

16            We had an instructor in New York who resigned that

17   teaches.  And we're replacing that instructor, because the GM

18   finds value in -- in the class, the -- whatever -- that's what

19   the GM wants.  So -- so yeah.  That was Ron's decision.  That

20   was in the spring.

21       Q    And then with respect to the in-house cleaning

22   services, was that also in the spring?

23       A    No.  That would have been in -- I want to say

24   September 2022.  And I don't remember whether the changes went

25   into effect on September 1, 2022, or if we had -- like, we

1    notified them then, and had a month left.  But that was -- I'm

2    99 percent sure in September of 2022 is when that change was

3    made.

4         Q    So Mr. Gochee started some time, we'll say -- fair to

5    say mid-May of 2022?

6         A    Uh-huh.

7         Q    Once he was on location at Christi's, what was JC's

8    involvement with Christi's?

9         A    So once we had Christi's covered by Ron, and didn't

10   need JC going there, you know, throughout the week, we moved JC

11   to just Jupiter.  Jupiter was grossly underperforming.

12            I had a conversation with -- I want to say JC and

13   Anthony together.  And kind of just, like, listen, you were

14   given three clubs that are tough.  Like, you're not getting it

15   done.  We really need you to go focus on Jupiter, and turn that

16   around and get the results there.

17            So once Christi's was covered -- and we may have

18   known that Anthony Messina was moving to Florida then.  I -- I

19   don't know 100 percent on that.  But he did move to Florida in,

20   I believe, June 2022.  So there was an added layer of Florida

21   support coming that we didn't have previously.

22            So, yeah.  The conversation was like, listen, like,

23   you know, you haven't been getting the results, we need the

24   results, and we think that the best chance of you being

25   successful getting results is overseeing one club, and that one

1    club is Jupiter where we need the attention.

2        Q    And at that point, around May of 2022, was -- did

3    Jupiter have a GM at that point?

4        A    So JC was -- he was GM'ing that club.  So from my

5    recollection -- and again, like, don't hold me to the dates.  I

6    will, like, get them from ADP for you if you want.  But my

7    recollection is that Shane Kehough was the general manager of

8    Jupiter up until January when he resigned.  He got a job doing

9    something -- I don't know -- I don't know what he got -- he got

10   a job doing something else.  Maybe sales or something.  He

11   resigned.

12        And at that point we made a decision -- or I should

13   say, I guess, JC made the decision that he could handle being

14   the GM for Gardens, and Jupiter -- for Palm Beach Gardens and

15   Jupiter.  So I guess he was acting general manager for both of

16   those clubs.

17        We did -- we did promote Layton Maxwell to be the

18   general manager of Palm Beach Gardens.  I -- I want to say at

19   the end of April 2022, I went on a visit to the club, and spent

20   a few days there, and made the recommendation to promote her to

21   the general manager of the club.

22        So JC still was overseeing that club as business

23   director.  So then he was really just the GM of Jupiter.  And

24   then we took him off all the clubs and said, just get Jupiter

25   done.  Like, you know, gotta find a way to get it done.

1    Q    Okay.  And when you say that you went to Palm Beach

2    Gardens at the end of -- some time in April of 2022 for some

3    time, and you made the recommendation to promoting Layton, --

4    A    Uh-huh.

5    Q    -- who did you make that recommendation to?

6    A    To JC.  He was overseeing that club.  He was her

7    supervisor.  I said, you know, she should really -- you should

8    really make her the general manager.  He was in agreement.  And

9    I believe we promoted her while I was there.

10   Q    Okay.  And JC, ultimately, was not successful in his

11   role at Palm Beach -- I'm sorry -- Palm Beach Sports Club in

12   Jupiter, right?

13   A    Correct.

14   Q    And shortly before his termination, he was issued the

15   performance notice, correct?

16   A    Yes.

17   Q    Ms. Molino, I want to ask you just a couple questions

18   about the performance notice.  This is going to be marked as

19   Exhibit 6.  And the Bates numbers will be Defendant 389 to 41.

20        (Exhibit Number 6 marked for identification.)

21   Q    And let me know if you can see that okay.

22   A    Yes.

23   Q    Is the size good?  The font?

24   A    Fine.

25   Q    Do you need me to zoom in at all?

1        A    Yeah.  No.  It's fine.

2        Q    So it says -- you know, this was a performance

3   notice.  Do -- do you want to review this before -- before I

4   ask you questions?

5        A    Yeah.  I'll just look at it really quickly, if you

6   don't mind.

7        Q    Sure.

8        A    Would you mind scrolling down a little bit, please.

9        Q    Not at all.

10       A    Yes.  Okay.  Okay.  Yes.

11       Q    I think that's just the last witness signature, if

12  any.  I think that's the last page.

13            Okay.  So Ms. Molino, did you prepare this

14  performance notice that was issued to Mr. Marrero?

15       A    I did.

16       Q    Okay.  Did you consult with anyone in preparing this

17  performance notice?

18       A    Anthony Messina.

19       Q    Was there anyone else who gave you input into what

20  should be included in this performance notice?

21       A    No.

22       Q    And when you consulted with Mr. Messina, did he

23  review a draft of this performance notice?

24       A    I don't recall.  It's possible I read it to him over

25  the phone.  It's possible I e-mailed it to him.  But I don't

1    recall.

2        Q    And it says, date of incident, August 31, 2022.  Was

3    there any particular reason that date was included?  Did

4    something happen?

5        A    So that was just the conclusion of the month that

6    we're writing the performance notice about.  So in August, we

7    had a few clubs that were part of our focus clubs that were

8    underperforming and needed to turn things around.  And they

9    were given that expectation in the beginning of August.

10       And so date of incident was just, like, the closure

11   of the month that we --

12       Q    Okay.

13       A    -- that is being referenced.

14       Q    Okay.  And where it says date written,

15   September 6, 2022, what date is that in reference to?

16       A    So that's the date that I wrote this.  And

17   probably -- I don't know -- maybe the date we delivered it to

18   him.  I don't know.  But that was the date that I wrote this.

19       Q    And you would have delivered this via e-mail?

20       A    We delivered it over the phone.  And then I would

21   have -- I sent him a copy over e-mail, I believe, because we

22   weren't in person.  So I couldn't, you know, get him to sign it

23   or anything, but I wanted record of it being delivered.

24       And I believe that I sent him an e-mail saying, you

25   know, as a follow-up to our call, here is the performance

1    notice.  But we did originally deliver it over the phone.

2         Q    Okay.  With respect to the part where it says, you

3    know -- this is the first written warning that Mr. Marrero

4    received, correct?

5         A    Yes.

6         Q    It says, check off the core competency or

7    competencies not being met by the team member.  Achieve

8    measurable results.  What does that mean to you?

9         A    So that means achieving measurable results.

10   Achieving quantifiable measure -- measurable -- quantifiable

11   results.

12        I mean, he was -- it says here that he was tasked

13   with increasing revenue by $5,000 month over month.  And he

14   lost money month over month.

15        Q    So when it says tasked with increasing revenue by

16   $5,000 month over month, is that, you know -- what time period

17   does that encapsulate?

18        A    So that was July to August.  So our expect -- well,

19   hold on.  Let me just think for a second.

20        Yeah.  So we expected them to grow EFT revenue -- EFT

21   is, like, membership revenue; monthly dues.  So the expectation

22   was that they were going to increase that revenue by $5,000

23   from the previous month.  So July results are $100,000 in

24   revenue.  We expect you to get to $105,000 in revenue.

25        Q    Okay.  And that amount, or the amount of revenue

1    generated for -- for, say, the month of August, that would have

2    been released at the beginning of September?

3         A    Yes.  The -- you -- so you're asking when the results

4    from August would have come out?

5         Q    Yeah.

6         A    Yes.  They would have -- the -- the results from

7    August would have come out in the beginning of September in

8    terms of, like, not the -- not the P&L necessarily.  Probably

9    not the P&L that early, ever.  But in terms of, like, just our

10   reports which I think we have shared that show, like -- E --

11   there's a line that shows EFT gain.  There's a line -- there's

12   a report that shows revenue for personal training.  So it would

13   have been month-end reports like that.

14        Q    Do you know how much Palm Beach Sports Club Jupiter

15   generated, or if it increased revenue at all during the month

16   of August 2022?

17        A    I don't think so.  Because I'm saying that they went

18   backwards.  So they -- this is saying that -- this is saying to

19   lose money -- losing a total of 18 -- and continuing down

20   trend, was the only club to lose month over month.  So to me,

21   that sentence means that they were the only club in the focus

22   group that went backwards.  So, like, they were on a decline.

23        Q    During the month of July?

24        A    During the month of August, based on July's

25   results --

1      Q     Apologies.

2      A     Yes.  So they were going this way.

3      Q     Okay.  And then for performance expectations, same

4  expectation was set for August of 2022?

5      A     Yes.

6      Q     Okay.  And did Mr. Marrero meet that expectation?

7      A     No.

8      Q     Do you know how much revenue was generated from gym

9  membership dues during the month of September?

10     A     I don't.  I don't know.  And I -- I -- I don't know

11  how much was generated.  I don't think that we even let him

12  finish out the month.  Like, we knew he wasn't going to be able

13  to get this done.

14     Q     Okay.  So -- so you didn't let him finish out the

15  month of September?

16     A     He may have -- I don't -- I really -- I don't want to

17  contradict the -- the facts that we can easily look at.  But

18  what I believe -- my recollection of what happened is that some

19  point maybe mid-month, not -- maybe, like, later towards the

20  end of the month, I think that, like, we knew.  Like, Jupiter

21  was doing so bad.  There was, like, no way that he was going to

22  turn this around.

23           And we let him know, like, after this month, like,

24  we're -- we're ending it.  You know, finish -- finish out the

25  month, you know, do what you need to do, but we cannot continue

1    this.  We're separating.  And so we did know that it was not

2    turning around.

3         Q    Did you continue to pay Mr. Marrero for his services

4    after he stopped working for the company?

5         A    So we did pay him out, I believe, some type of

6    severance.  I would need to look at the specifics.  It may have

7    been, like, you know, two weeks.  But, yes.

8         Q    Okay.  So then the -- the date in ADP, the -- that

9    October date, that would just be related to whatever the

10   severance payout would have been?

11        A    Yes.

12        Q    Do you know -- do you know how much severance he was

13   paid?

14        A    I want to say that it was two weeks.  But again,

15   like, I would rather not guess, and would rather just give you

16   his pay stubs.

17        Q    Sure.  That -- that would work for us.  Can you

18   produce that?

19        A    Yes.  That's fine.

20        Q    Thanks.  Last -- last session, we discussed the

21   Indeed posting --

22        A    Yes.

23        Q    -- in -- from January.  And we talked about -- and

24   I -- again, I don't want to misrepresent your testimony, but I

25   think a fair summary would be that you were looking for any

1   manager to fill the role for Christi's.  The role was -- you

2   know, the posting was specific to Christi's.  Is that accurate?

3       A    Yes.

4       Q    Okay.  And I don't believe that I brought up the job

5   posting just to confirm, so I wanted to do that.

6       A    Okay.

7       Q    Just give me one minute.  That's going to be -- this

8   will be -- I think it's going to be Exhibit 7.

9            (Exhibit Number 7 marked for identification.)

10      Q    And it's Exhibit 7.  And it's Defendant -- I think

11  it's 185 to 186.  Yeah.

12           Is this the job posting that you were referring to

13  that was specific to Christi's for a manager?

14      A    Yes.

15      Q    Okay.  You said that it was for any manager.  Could

16  have been a fitness manager as well?

17      A    Fitness manager, sales manager.  I believe Sara had

18  indicated some dissatisfaction with her CDM at the time.  So

19  you know, customer service manager, just any management

20  solution for Christi's.

21      Q    Do customer service managers possess a deep

22  understanding for -- of P&L management?

23      A    I mean, it -- it's great if they do.  I would say

24  some of ours do.

25      Q    So would you say that these areas that are the

```
 1   bulletpoints at the top, are those just, you know, we hope that
 2   we find a candidate like this; not qualifications for the job?
 3       A    Yeah.  I mean, you know, we were definitely looking
 4   for solutions for Christi's.  You know, we have had this
 5   conversation around other positions.  When we're really
 6   struggling to fill roles like a membership consultant, let's
 7   say, you know, do we make the posting for a sales manager
 8   because that sometimes attracts a higher caliber candidate.
 9   So, you know, we -- we definitely needed support at Christi's,
10   without a doubt.
11       Q    Did you model this job posting off of -- or I'm
12   sorry -- this job description and -- and eventually the job
13   posting -- off of any particular job description or job
14   posting?
15       A    Yes.  So I do think that I based this off of a
16   general manager job posting.  And I probably just selected a GM
17   job posting from Indeed and moved it over to Christi's, made it
18   for managers in general, and posted it.
19       Q    Any reason why you chose to use the GM job posting
20   template versus, say, a fitness manager?
21       A    Well, we weren't -- a fitness manager is such a
22   specific skill set.  I mean, we were -- we were open to
23   solutions.  And Sara and I talked about this.  I -- I think she
24   asked me about it.  And I was, like, we need help.  Like, this
25   is meant to help you, if we can find somebody good.
```

```
1          Q    Are you familiar with the name -- is it Beth Sebert?

2          A    Yes.

3          Q    Did -- has Ms. Sebert ever contacted you or made a

4     complaint to you as the HR director?

5          A    Yes.

6          Q    What was that complaint regarding?

7          A    If my memory serves me correctly, it was specifically

8     about the customer service manager, Jose Rotto.  She had a lot

9     of issues with him that she spoke up about.  And then she had

10    concerns about retaliation after she spoke up.

11         Q    Did you bring any documents to this deposition today?

12         A    I did not.  I did not.

13         Q    Okay.  And so she was -- she was concerned with

14    Jose Rotto, you said?

15         A    Yes.

16         Q    And so what did you do when you received the

17    complaint from Ms. Sebert?

18         A    I partnered with JC, since he was the manager

19    overseeing the club, to help me investigate what was going on.

20    I did speak to Beth at length as well about her concerns.  And

21    I -- you know, I worked with JC to -- to look into them.

22         Q    What specifically did you do to look into her

23    concerns?

24         A    I don't recall whether -- I know that we spoke with

25    Jose directly.  I don't know whether I spoke with him, or if JC
```

1    did.  As the business director of the club, you know, it's

2    something -- he was on site, and I believe met with her

3    probably in person, and Jose in person as well.  So I don't

4    recall the specifics.

5         Q    Did you -- did you have an active role, though, as

6    the HR director?

7         A    A supporting role.  You know, a supporting role.

8    Ultimately, the people decisions are, you know -- were JC's to

9    make.  So I had a supporting role.

10        Q    Did you investigate each one, or did -- I'm sorry.  I

11   apologize.

12             Do you know if JC investigated each one of the

13   allegations made in Ms. Sebert's complaint to you?

14        A    I would believe so.  I would think so.

15        Q    Did he document the results of his investigation?

16        A    I'm not sure off the top of my head, but I would

17   think most likely.

18        Q    Would he have sent you the documentation supporting

19   the results or showing the results of his investigation?

20        A    I -- I'm not sure.  He may have.

21        Q    Is that something, if the company has in their

22   possession, they would be willing to produce?

23        A    Of course.

24        Q    Was Mr. Rotto disciplined or counseled in any way

25   following Ms. Sebert's complaint?

1      A    I believe that he was coached and counseled.

2      Q    Were you a participant in that coaching and

3  counseling?

4      A    I believe -- I'm really going off of memory here.  So

5  I believe that I did have a conversation with him to reiterate

6  our policy against retaliation.

7      Q    Was this the first complaint made against Mr. Rotto?

8      A    I believe the only one that I'm aware of -- not to

9  say that other complaints maybe weren't made -- against him to

10  Sara while she was there.  I don't know.  I do know that she

11  had some concerns about him.  And I can't remember the

12  specifics.  But I think that towards the end she wasn't

13  thrilled with him as her CSM.

14      Q    You mentioned earlier when we were talking about the

15  termination meeting with Ms. DeMartino that there were, you

16  know -- I think you mentioned that you provided benefits

17  information.

18          Did you discuss any information related to

19  unemployment at that time?

20      A    I don't think so.  I don't know whether -- I don't --

21  I don't think so.  I probably would have told her she can file

22  for unemployment.  I mean, that's -- you know, anyone can file

23  for unemployment.  It's not, you know, a -- I'm not the

24  decision maker on who gets it.  But I could have -- I don't

25  know.  It's possible.  I told her she could file for

1    unemployment.

2         Q    This will be Exhibit 8.  It's going to be Bates

3    numbers SBD 186 to 189.  I'm going to share my seen,

4    Ms. Molino.

5         Q    Can you see everything okay?

6         A    Yes.

7              (Exhibit Number 8 marked for identification.)

8         Q    I can make it a little bit bigger if that's helpful.

9         A    I -- I -- I know what this is.  I'm pretty sure.

10   But, yes.  I can see it.

11        Q    Okay.  Do you want to take a minute to -- to review

12   it, or -- before?

13        A    No.  I'm pretty sure that I know what this -- yeah.

14   I mean, no.  I feel fine about it.  I mean, you can show it to

15   me, but I'm, like, 99 percent sure I know what it is.

16        Q    Okay.  It's just a -- a verification of

17   employment/loss income.  Was this prepared by you?

18        A    It was.

19        Q    Okay.  And you submitted this on March 11th?

20        A    Yes.  Sara indicated to me that she needed this for

21   benefits -- health benefits.

22        Q    Okay.  And everything contained in this document is

23   true and accurate to the best of your ability?

24        A    Yeah.  I don't see anything.

25        Q    Let me scroll.

1      A     Yeah.  I mean -- yeah.  No.  This -- this all looks
2   correct to me.
3      Q     And it says, date employee received final check here.
4   Is that severance related?
5      A     No.  I don't think that she was given severance.  I
6   think that's just when, like, the pay period ended.  So that
7   was, like, the date the employee received the final check.
8   That was probably the Friday of her last paycheck.  I don't
9   think we gave her any severance.  So the employment ended on
10  the 1st.  That fell within a pay period.  Could have been the
11  first day of the pay period.  I don't know.  The pay periods at
12  the time were two weeks long.  And we were paid every other
13  Friday, bi-weekly.
14         So 3/18/2022 was the last day she would have gotten
15  her check that contained the 3/1/22 pay date.
16     Q     Okay.  And then under Number 2 here, Section 2, loss
17  of income, reason for termination, performance.
18     A     Uh-huh.
19     Q     And all of this you prepared, correct?
20     A     Correct.
21     Q     And that's your electronic signature right there?
22     A     Correct.  Yep.
23     Q     Okay.  When did you find out that Ms. DeMartino had
24  submitted or filed a charge of discrimination with the
25  Equal Employment Opportunity Commission?

1      A    I don't recall the exact date.

2      Q    Okay.  Can you give me an estimate?

3      A    I don't -- when did -- I don't know.  You served us,

4  right?  I don't know.  Probably the day that you served us.  I

5  have no idea.  I would have immediately reached out to our

6  insurance carrier that we had at the time, which is Access.

7  Access gave me the names of lawyers we could use.  I identified

8  Jackson Lewis as the firm we wanted to use.  I think I went to

9  their website, filled out a form for, I guess, the Florida

10  Miami location, and got in touch with the team that we're with

11  now.  So, yeah.

12      Q    Okay.  So that would have been documented in the

13  e-mails and -- and the documents that you produced -- I'm

14  sorry -- that Empire produced, correct?

15      A    Yeah.  I'm sure it would.  I mean, --

16      Q    And did you -- do you recall how you learned that the

17  charge had been filed?  And I want to make sure that you're

18  clear on distinction.  I'm not talking about the complaint that

19  initiated the lawsuit.  I'm talking about the charge of

20  discrimination that was filed with the EEOC as the

21  administrative agency earlier on in this -- in this process.

22      A    I'm so sorry.  What is your question about that?

23      Q    So -- so my question is, is do you recall how -- how

24  you found out about the charge?

25      A    I don't remember.  I don't know if it was mailed to

1   us and then sent to me when it was, you know, picked up from

2   our mailbox.  I don't -- I don't remember.  I know that there

3   was -- we involved Jackson Lewis very early on.  And they took

4   care of the communication with the investigator assigned to the

5   EEOC case.  Like, they set up the portal log-in and everything.

6   So I don't -- I just -- I don't know.

7        Q    Did you ever speak directly with the investigator who

8   was assigned to the matter?

9        A    I think that I spoke to her once to maybe let her

10  know that Jackson Lewis was going to be representing us and

11  they would be in touch.

12       Q    So at that point when you spoke with her, you would

13  have received notice before that date?

14       A    I would have received notice.  Yeah.  I don't know.

15  Like, she might have, like, left me a voicemail or something.

16  I really -- I don't know.  I mean, the -- the details of it are

17  fuzzy.  I do believe that I called and spoke to her to -- I

18  don't know -- let her know we were in receipt of it, and we

19  were retaining -- you know, we were getting attorneys, and they

20  would be in touch.  I don't totally remember all the specifics

21  of it.

22       Q    That's -- that's okay.  I don't want you to testify

23  about anything that you're --

24       A    Okay.

25       Q    -- you're unsure of.  And I just want to know,

1   generally, your recollection.  If you can give me, kind of, a

2   range, or a month, or anything like that.  But to the extent

3   that you're going to be guessing, I -- I really don't want you

4   to do that.

5           So following -- after you found out that she had

6   filed a charge, did you have subsequent communications with the

7   Florida Department of Unemployment?

8       A   They reached out to me and I sent it to our

9   attorneys, who prepared a response.

10      Q   And the response that was prepared by the attorneys,

11  was that generated, or -- do they come up with that based off

12  of information that you had provided?

13      A   Yes.  I believe so.  I mean, the attorney at the

14  time, it was still Jackson Lewis, but I believe it was

15  David Finegold that we were working with at that time.

16          And I said, like, hey, I got this.  And I think it

17  said, like, this person hasn't necessarily done anything wrong.

18  This is part of just, like, a standard, you know, check-in that

19  we do.  Please answer these questions.

20          And I may have replied and said, like, we're

21  undergoing litigation.  Like, let me get with my attorneys to

22  get this to you.  And I sent to it the attorneys, and they

23  crafted the reply, which I then sent to the unemployment

24  office.

25      Q   And did you review that reply before it was sent to

1    the unemployment office?

2         A    I'm -- I mean, I don't recall reviewing it.  But

3    that's not to say that I didn't.  I mean, I don't recall.

4         Q    Okay.  So this is going to be Exhibit 9.  And the

5    Bates numbers will be SBD 283 to SBD 290.

6              (Exhibit Number 9 marked for identification.)

7         Q    I want to start at the bottom, because that's the --

8    that's the order that the dates are in.  Is this kind of

9    generally what you were describing, Ms. DeMartino, with respect

10   to -- to the communication you received from the unemployment

11   department?

12        A    Yes.  Yes.

13        Q    Okay.

14        A    And it specifically said, like, it's random.

15   There's, like, no suspicion of wrong doing.  It's just a

16   randomized check.

17        Q    Okay.  Then if you go up, the e-mail -- the heading

18   starts on SBD 287, and the content goes on to SBD 288.

19             Have you ever seen questions like this before,

20   Ms. Molino?

21        A    I don't know that I have seen these particular

22   questions, but the questions I received may have been in a

23   similar format.

24        Q    Okay.  Can you read question 1 for me, please?

25        A    Were you advised that you were being terminated due

1   to a policy violation regarding personal relationships with

2   staff whom you directly managed?

3       Q    Did you -- was Ms. DeMartino terminated due to a

4   policy violation regarding personal relationships with staff

5   with whom she directly managed?

6       A    No.

7       Q    Is there a reason why the company would have supplied

8   this information to the unemployment department --

9       A    I mean, it's overall part of her employee record and

10  performance management she received up to her termination.  I

11  think that it speaks to her character as an employee.  And

12  that's why it's come up as part of this litigation as well.

13      Q    And so despite the fact that the company's position

14  is that Ms. DeMartino was terminated because of performance,

15  were there any other reasons as to why she was terminated

16  with -- and -- that had to do with Mr. Renkin?

17      A    No.  I mean, it was part of, like I said, her overall

18  employee management, and her character as an employee at

19  Empire.  But ultimately, she was terminated due to her

20  performance.

21      Q    Is there a reason why the company felt as though it

22  needed to -- to focus on Mr. Renkin when it had told

23  Ms. DeMartino that her termination was performance based?

24      A    I don't -- I don't know.  I mean, again, that was

25  something our attorneys prepared based on the information they

1    had been given.  I think we were fairly early on in -- in the

2    discovery process.  And, you know, part of that discovery

3    process was performance management leading up to the

4    termination.  So I don't know what, you know, David Finegold's

5    thought process was at the time of preparing this.

6         Q    But you would have reviewed and signed off on -- on

7    providing this information to a government agency, correct, to

8    ensure its accuracy?

9         A    I -- I honestly -- I don't know.  I think I already

10   said that.  I don't recall.

11        Q    Would someone at the company have been responsible

12   for approving information that went to a government agency to

13   ensure its accuracy?

14        A    Nobody besides me.  But again, I would have counted

15   on our attorneys to represent the matters on our behalf based

16   on investigation they had done on our behalf into this matter.

17        Q    Were there any discussions of -- subsequent to

18   Ms. DeMartino's termination that you were involved in about

19   contesting her application for unemployment?

20        A    No.

21        Q    So no one at the company intended to contest her

22   application for employment?

23        A    You know, I don't think that we -- I don't think I

24   received documentation or notice that she had filed for

25   unemployment.  I mean, I don't -- I don't know whether I would

1    have contested it or not.  I don't know whether I would have

2    contested it or not.  Because I -- I didn't get it.  I don't

3    think that we ever -- you know, whether it was sent or not,

4    whether it was sent to the club and overlooked, whether it was

5    sent to our corporate office, I don't know.  I didn't see it.

6    So that wasn't a decision that was made or discussed.

7         Q    By you?

8         A    What do you mean?

9         Q    You said it's not a decision that was made or

10   discussed.  What do you mean by that?

11        A    It -- it wasn't a decision to be made or that was

12   discussed because we didn't -- this was the only notification I

13   received regarding her unemployment.  I don't know that we

14   would have con -- I don't know that I would have contested it.

15   It would have been my job to contest it.  And I don't know that

16   I would have.

17             But I did not receive the opportunity to do so either

18   way, besides receiving this, which I passed on to our attorneys

19   as soon as I got it.

20        Q    With respect to the termination of Mr. Testai -- is

21   that -- am I butchering his name?

22        A    No.  Anthony Testai.

23        Q    What were the circumstances surrounding Mr. Testai's

24   termination?

25        A    I mean, Jupiter had been underperforming.  He was

```
 1   well aware of that.  Anthony Messina and I had a conference
 2   call with him to let him go, again, with me being there as a
 3   support person to answer questions.
 4          I believe that, if my memory serve me correctly, he
 5   may have had PTO that he was going on that we allowed him to
 6   still take.  We might have, like, terminated him the day before
 7   he went on PTO.  I don't know.  That's -- that's familiar to
 8   me.  Something along those lines.
 9          And we did have a conversation with him, which -- I
10   don't know if this is why this has become, like, a point of
11   conversation, which is fine.  But we did have a conversation
12   with him that, you know, he could leave on good terms and save
13   face with the rest of the team.
14          So he could say bye to the GMs.  He could say he
15   resigned.  We didn't -- we didn't care.  That was fine.  You
16   know, he was like, yeah, I understand.  I knew this was coming.
17   My sales suck.  Like, it is what it is.  And that was that.  I
18   think he had a new job, you know, a month later.  I still
19   chatted with him a couple times after that.  And -- because I
20   think he needed some documentation for remortgaging his house,
21   or something that I helped him get out of ADP.  And that was
22   that.
23          So he may have told people he resigned.  And quite
24   honestly, like, that's fine.  But he didn't resign.  He was
25   terminated.
```

1    Q    Okay.  Prior to his termination, had he received any

2    performance counseling or -- or management, or a performance

3    notice?

4    A    I don't think so.  But maybe.  I mean, he was

5    directly reporting -- at that time, we had Arzu Kaner,

6    Anthony Messina -- you know, I think that my HR function was

7    really just, you know, support and administrative.  But I

8    wasn't the day-to-day decision maker on operations.

9          And you know, it was up to Anthony Messina, Arzu

10   Kaner, Mario Curcio while he was here on the fitness side,

11   to -- to make those decisions.  And my job was to provide the

12   support they needed to execute on those decisions.

13   Q    With respect to Jason Bradford, --

14   A    Yes.

15   Q    -- was he -- did he receive any performance

16   counseling or performance notice prior to his termination?

17   A    I think he may have received a performance notice.

18   It may have been not been super formal.  It may have been,

19   like, you know, an e-mail.  I don't know.  That was in -- early

20   on in, you know, the company getting started and set up.

21          I believe that Anthony Messina terminated him in

22   person.  I -- my recollection is that -- hold on.  Sorry.  My

23   recollection is that Anthony went to stay in Florida for a

24   month to work in the club.  This was when he lived in New York.

25   And I believe it was April 2021.  He went to -- he stayed in

```
 1    Florida for a month to work in the clubs and help those clubs.

 2              And he terminated Jason while he was there.  And I

 3    believe he did at the beginning of him getting there.  So then

 4    he could, like, spend the month, you know, working on fixing

 5    things in the club, because Jason had been underperforming as

 6    well.

 7         Q    Okay.  Aside from Mr. Testai, Mr. Bradford,

 8    Mr. Marrero, and Ms. DeMartino, were there any other GMs who

 9    were terminated by Empire, or have there been?

10         A    Yep.  We terminated Rolando Garcia in -- this year,

11    in 2023.  I want to say March 2023.  He was the general manager

12    of Astor Place.  He began, I believe, his -- started in October

13    2022.  We weren't seeing the results there.  He was terminated

14    based on performance.

15              And, you know, similarly, he had a -- his men's

16    locker room was shut down for -- for a couple months there, and

17    ran into hiccups there for renovations.  So, you know, just

18    pointing out, those things do happen.  And he was terminated --

19    I want to say he was given six months.  I believe he was

20    terminated -- hired October -- beginning of October 2022, and

21    terminated in March 2023.

22         Q    Are there any documents to support Mr. Garcia's

23    termination?

24         A    In what sense?  Like, --

25         Q    So --
```

```
1         A    -- ADP?

2         Q    Yeah.  I mean, well, you know, we have a continuing

3    obligation to update discovery responses as new information

4    comes to light.

5              And so one of the -- the requests in the

6    interrogatories is, basically, has there been anyone who has

7    been terminated -- you know, a GM.  I believe that's what it

8    is.  I'm paraphrasing.  So I'm wondering if -- you know, if

9    there's any additional information and documents to support

10   that.

11        A    Yeah.  I mean, --

12        Q    And if you can provide that.

13        A    -- I'm happy to provide anything I have in relation

14   to that.  That's fine.  Yeah.  I don't know what we have.  I

15   mean, there's definitely ADP, 100 percent.  I don't know, you

16   know, if there's e-mail exchanges about it or anything like

17   that.  But, yeah.  I can provide that.

18        Q    Sure.  That works.  So I -- I am pretty close to

19   being done here.  But I do want to ask you a question about,

20   kind of, the inner workings, and your understanding of MOSO.

21        A    Okay.

22        Q    And that is the fitness software used by the club,

23   you know, in the day-to-day operations, correct?

24        A    Yep.  Yes.

25        Q    Okay.  What is your -- I mean, do you -- are you
```

1    proficient in MOSO?

2         A    Yes.

3         Q    Okay.  Are there different levels of accessibility

4    depending on -- you know, is it, like, admin level versus what

5    a GM can access versus what a CSM could access, and -- you

6    know, basically depending on the type of employee?

7         A    Yes.

8         Q    Okay.

9              (Off-the-record discussion.)

10   BY MS. RATTET:

11        Q    Were you -- who had access to, kind of, the highest

12   levels in MOSO within the Empire -- within the company?

13        A    So I think that -- well, I mean, that's changed over

14   time.  So, you know -- because we used to have a bigger team.

15   I definitely have the highest level.  And that may be system

16   admin.  There may be a slightly less level that's still high

17   called -- I want to say member services/configuration.  And

18   then there is manager work role, and then there is club level

19   access.

20        Q    So with respect to the admin level, are you the only

21   person in the company that has that level of access with

22   respect to MOSO?

23        A    I don't know.  Probab- -- go ahead.

24        Q    Let me clarify.

25        A    Okay.

1      Q    I want to make sure that we are clear on time period.

2    Do this is going to be during the time of Sara's employment.

3    So February 2021 through the end of her employment.  I -- I'm

4    really just concerned right now with that time period.

5      A    Okay.  I'm not sure.  I know -- I'm not the only one.

6    Because people like Kate Wogas, Arzu Kaner, to this day,

7    Mike Colinari, who is not an employee, but a -- but a -- a

8    vendor for us, but he does stuff with that.  Like, he has that

9    high level.

10         I don't know whether Anthony Messina, like, had the

11   highest level, or just slightly below.  There's not a huge

12   difference.  There's just, like, a couple of things that, like,

13   you could really mess up that just don't give people access to.

14   But -- so I don't -- I don't know.  And there may be a work

15   role report in MOSO.  I -- I'm definitely pretty MOSO

16   proficient, but I'm not, like, the be-all-end-all MOSO whiz.

17         I could e-mail MOSO and ask if that's a report

18   that -- I'm sorry -- that exists, where you can see, like,

19   backwards.

20     Q    Okay.  So I'm primarily concerned with, you know,

21   access to -- to client -- or -- yeah.  Client information on

22   MOSO, and being able to remove people from registers in kind of

23   a bulk basis, or freeze accounts, or thing of that nature.

24         Is that something that only the admin or someone with

25   a higher level access would be able to -- to handle, or to take

```
1    care of?

2        A    Yeah.  Yeah.  So people can't be deleted from MOSO.

3    I -- I can't do that.  And I don't think MOSO can even

4    remove -- I mean, I guess if we said, like, do a mass wipe of

5    our system, they could.  But we -- and this may be, like -- I

6    don't know if this is helpful to you, where you're going, or

7    whatever, but I'll share anyway.  So when we -- okay.

8            So when we moved over to the new company, we did --

9    we brought over information.  So MOSO assisted with taking some

10   information from the old company and bringing it over to the

11   new company.  So member records, we weren't allowed to take

12   everything.  But, like, you know, records so you could see,

13   okay, this person was a member five years ago.

14           I don't know that we had that data from, like,

15   Christi's time period.  But it probably carried over to TSI.

16   So there was that process of bringing information over.  And

17   that was done by MOSO; not by us.

18           And then in terms of bulk actions, so there's only a

19   couple of us who have access to the bulk utilities function.

20   And in the bulk utilities function, you could mass freeze

21   people.  You can -- I believe.  I could be wrong.  You might

22   have to e-mail MOOS for that.  But you can process mass bulk

23   cancellations.  That's something I do every month for all the

24   clubs.  So if people are three months' past due, we cancel them

25   out.  That's, like, standard operating procedure.  And then --
```

1    they are called past due cancels.  So there's about 150 of

2    those every month across all the clubs.  So that's a bulk

3    utility.

4            There's the ability to bulk upload notes.  There is a

5    bulk option for credits and refunds.  I have never personally

6    used it.  I probably would be scared to, and would ask MOSO to

7    help with that, just because there's, like, a lot that can go

8    wrong, and it's not something we use regularly.

9            So there's people that have access to it.  I would

10   say probably the only people that regularly have touched this

11   bulk utilities function would be myself, Kate Wogas, and

12   possibly EJ when he was here.  And EJ was a MOSO support

13   person, operation manager that worked for us briefly.  I -- I

14   couldn't tell you his full name right now, but could get it for

15   you.

16       And so, yeah.  Like, Anthony Messina probably would have

17   access to the bulk utility function, but he probably has never

18   used it.  And there's a history of it, like, when you do use

19   it.  So you could see.  I don't know if that -- I don't know

20   where you're going with this, or if that's helpful.  But --

21       Q    It -- it is helpful.  Where I'm going with this, and

22   what I want to know, is during the time that the renovations

23   were being done on the foam pit --

24       A    Yes.

25       Q    -- did -- were you responsible for, you know, a mass

```
 1    freeze of certain accounts?

 2         A    No.  I was --

 3         Q    So there were no --

 4         A    -- not responsible.  I believe EJ was in MOSO support

 5    at that time.  And I don't know whether he could have done it

 6    himself, or if he had to e-mail MOSO.  You know, there's some

 7    things that, like -- there's some things we just can't do

 8    ourselves.

 9              They have to do it.  And we -- we typically pay them

10    extra to do it.  Like, a dues increase or something.  And then

11    there's some things that if we just don't do regularly -- and

12    especially if it's something that could impact billing -- we

13    would potentially ask for help.

14              Like -- I'm sorry -- I meet with our MOSO rep every,

15    like, two weeks.  And like, I save stuff that, like, if there's

16    something, like, I don't do regularly, or I haven't done

17    before, I might ask him to, like, walk through it with me.

18    So I don't know how that process went down.  I was not involved

19    in it at the time.

20         Q    Is there a way to identify the account user who

21    ultimately enacted a freeze on particular accounts during a

22    period of time?

23         A    So -- I would think so.  I think that if it was done

24    as a bulk, it would probably be noted as admin on the account.

25    And so if it's in the bulk utilities section, if I were to log
```

1    in under EJ's MOSO and he did it through there, I believe I

2    would be able to see the history.

3          Alternatively, if they did it through MOSO, I believe

4    that MOSO would have a pretty solid record of that

5    communication.  Like, when I ask them for something, I get --

6    they are a big company.  I get issued, like, a ticket number.

7    So I -- I think that there's -- I don't know where the answer

8    is, but I'm sure that it's findable if you need it.

9          Q    That is definitely something that we would want if

10   you -- if you could get that to us --

11         A    Can you guys -- can someone, like, e-mail me?

12   Because I feel like I have committed to getting you guys a

13   couple things today, and I don't want to forget what they are.

14         Q    Sure.  I -- I will e-mail your counsel.

15         A    Okay.  Okay.  Okay.

16         Q    Okay.  And so during that time period, there was, in

17   fact, a freeze of certain memberships, right?

18         A    Yeah.  Again, I was not super involved in that side

19   of the business during that time.  Like, I was very much in my

20   own little, like, HR bubble.  Payroll, admin, that type of

21   thing.

22         But from what I understood, we froze members, yes,

23   while the -- I think a no-fee freeze while the gym was closed

24   down.

25         Q    And with a no-fee freeze, would that impact revenue

1    generated by the club?

2        A    Yes.  Yes.

3        Q    Do you know -- and again, I -- I know that you

4    weren't particularly involved with this.  But do you have any

5    understanding of how long that freeze would have been in

6    effect?

7        A    I don't.  I feel like -- I really don't know.  I feel

8    like they might have done it for a month.  And maybe it had to

9    be extended.  I feel like there was an -- a communication -- I

10   don't know if I saw it, or heard a part of it, but I feel like

11   I remember something about -- maybe they were billed what they

12   weren't supposed to be.  So the freeze had to extend to make up

13   for billing that wasn't supposed to happen when we reopened.

14            I -- honestly -- I don't know the specifics.  If I

15   was like -- if it was talked about in front of me, I probably,

16   like, would have tuned it out, or like -- not tuned it out, but

17   like, not paid as much attention, because it didn't have impact

18   on what I was doing.

19       Q    Would there be any documentation of communications

20   related to, perhaps, a -- a failure to freeze early on, and --

21   and maybe an extension of a freeze as a result of that?

22       A    I think that it would depend on a couple things.  So

23   I think it would depend on, one, what -- how we did the freeze.

24   So if there was a commun -- if it was done by MOSO, then

25   yes -- I don't know that it would acknowledge, hey, we made a

1    mistake, but it probably would say, we need to do this, or

2    extend.

3            And I don't know.  Like, could there have been a

4    communication between Sara and EJ?  Like, possibly.  But I

5    don't know.  I could look in the MOSO support mailbox and see

6    if we e-mailed them.  I don't know.  I have a feeling that we

7    may have had to contact MOSO to do it.  And that may just

8    answer this question entirely, if they have the records.

9        Q    Sure.  If there's any documents related to -- to a

10   freeze during the relevant time period, obviously, when the

11   foam pit was closed, if you could look for those and --

12       A    Okay.

13       Q    -- and submit them as well, that would be great.

14           MS. RATTET:  I need probably two more minutes.  I --

15       I don't think I have anything else.  I just want to double

16       check.

17           Can we go off the record until 3:37?

18           MR. SONDHI:  Yep.

19           (Recess taken from 3:35 p.m. to 3:38 p.m.)

20   BY MS. RATTET:

21       Q    I just have a couple more questions for you,

22   Ms. Molino.

23       A    Okay.

24       Q    So earlier we spoke about the EEOC charge, and -- and

25   you speaking with the investigator at some point.  Now I want

```
 1    to turn to the -- the federal complaint that was filed against
 2    Empire.
 3         A    Okay.
 4         Q    Were you -- were you the one who authorized counsel
 5    to accept service on behalf of the company?
 6         A    I think so.  I don't know.  I think so.  I mean, if
 7    someone authorized them, it would have had to be me.
 8         Q    Do you know a date on which that authorization would
 9    have been made?
10         A    No.
11         Q    JC's performance warning that -- that we went over
12    earlier was written after Ms. DeMartino filed her complaint in
13    court, right?
14         A    Yes.
15         Q    Was that prepared with JC?
16         A    What do you mean?
17         Q    Did JC participate in the preparation of the
18    performance notice?
19         A    Of his performance notice?
20         Q    Uh-huh.
21         A    No.
22         Q    Do you remember if you gave authorization, or -- or
23    the company to give authorization to accept service the same
24    day as the performance notice was written?
25         A    I have no idea.
```

```
1              MS. RATTET:  I think that's all I have.  I pass the
2       witness.
3              MR. SONDHI:  No questions.
4              THE COURT REPORTER:  All right.  Would you like to
5       order this witness, too, Ms. Rattet?
6              MS. RATTET:  Oh, I'm sorry.  What was that?
7              THE COURT REPORTER:  Would you like to order this
8       witness, too?
9              MS. RATTET:  Yes, please.
10             MR. SONDHI:  And a copy.
11             (Whereupon, at 3:41 p.m., no further questions were
12       propounded to this witness.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                        CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF MANATEE

5

6         I, Amy T. DesChenes, Florida Professional Reporter,

7    Notary Public, State of Florida, certify that Leah Molino

8    remotely appeared before me on the 1st day of August, 2023 and

9    was duly sworn.

10        Signed this 12th day of August, 2023.

11

12                         *Amy T. DesChenes*

13                         _____

14                         AMY T. DESCHENES, FPR

15                         Notary Public, State of Florida

16                         My Commission Number: HH196573

17                         Expires December 15, 2025

18

19

20

21

22

23

24

25

```
 1                  CERTIFICATE OF REPORTER

 2

 3    STATE OF FLORIDA

 4    COUNTY OF BROWARD

 5

 6         I, Amy T. DesChenes, Florida Professional Reporter,

 7    certify that I was authorized to and did stenographically

 8    report the deposition of Leah Molino, Pages 1 through

 9    57; that a review of the transcript was not requested; and that

10    the transcript is a true record of my stenographic notes.

11

12         I further certify that I am not a relative, employee,

13    attorney, or counsel of any of the parties, nor am I a relative

14    or employee of any of the parties' attorneys or counsel

15    connected with the action, nor am I financially interested in

16    the action.

17         Dated this 12th day of August, 2023.

18                          Amy T. DesChenes

19                          _____

20                          AMY T. DESCHENES, FPR

21                          Florida Professional Reporter

22

23

24

25
```



# Performance Notice

This Performance Notice is to document and communicate that job/company standards are not being met. Ongoing failure to meeting job/company standards can result in further discipline or termination.

Team Member's Name: JC Marrero

Manager's Name: Leah Molino and Anthony Messina

Club Location: PBSC Jupiter

| Dates | |
|---|---|
| Date of Incident: | **August 31, 2022** |
| Date Written: | **September 6, 2022** |

| Type of Warning (mark X below) | |
|---|---|
| ☒ | First Written Warning |
| ☐ | Final Written Warning |

Note dates of prior warnings here, if applicable:

| Check off the core competency(ies) not being met by the team member: | | |
|---|---|---|
| ☐ Create Empire culture | ☐ Build a high performing Team | ☒ Achieve measurable results |

**Job/Company Standards Not Being Met:** (What has led to this performance notice: substandard job performance, violation of company policies, etc. Be specific, cite examples.)

JC was part of the focus club group for August 2022. This consisted of the bottom performing clubs in the organization that met weekly to focus on activity in the clubs that drive sales. The PBSC Jupiter club, and other focus clubs, were tasked with increasing revenue by $5000 month over month. PBSC Jupiter was the only club to lose money month over month, losing a total of $1800 in revenue and continuing a downward trend for the business.

**EXHIBIT  7**
Witness: Molino
Date: 8.1.23
Court Reporter: Amy DesChenes, FPR

**EMPIRE** HOLDINGS

| Performance Expectations: (List specific and clear expectations; what does success looks like.) |
|---|
| JC is expected to gain $5000 in gym memberships dues in the month of September. This will be achieved by hitting membership sales goals and managing retention. JC will also focus on developing his team, holding all departments acocuntable to their goals, and driving sales through daily outreach, call drives, and community partnerships. JC will continue to attend weekly calls to discuss the club's progress and review best practices for driving sales. Failure to meet this goal will result in additional performance management. |

| Employee Section: If employee wishes to add a statement listing facts or their point of view, note that here. Add more pages if necessary. A separate statement may be submitted to HR. |
|---|
| |

**Employee Instructions:** Sign and date below. Your signature is meant to acknowledge that you have received and read this Performance Notice. Failure to sign does not negate the notice.

**Manager Instructions:** Sign and date below. Ask the employee to do the same. Note below if the employee refuses to sign. Give one signed copy of the Performance Notice to the employee and put the original in the employee's file. Attach related documentation, if applicable.

| Team Member Signature: | Manager Signature: |
|---|---|
| Date: | Date: |

| Note here if employee refuses to sign: |
|---|

DEF 000040

**EMPIRE** HOLDINGS

Witness Signature (if any):

# EXHIBIT E

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
                  FORT PIERCE DIVISION

           Case No.  22-CV-14301-CANNON
                     JUDGE AILEEN M. CANNON


_____

SARABETH DEMARTINO,

                Plaintiff,

vs.

EMPIRE HOLDINGS AND INVESTMENTS, LLC;
and JUAN CARLOS MARRERO,

                Defendants.
_____




              VIDEOCONFERENCE DEPOSITION
                          OF
                    LEAH MOLINO

              Pages 1 through 87




              Wednesday, September 13, 2023
                10:00 a.m. - 12:40 p.m.




              Stenographically Reported By:
          Andrea Mazor-Stabb, R.P.R., F.P.R.-C
                Registered Professional Reporter
                 Florida Professional Reporter

          REMOTELY LOCATED IN BREVARD COUNTY, FLORIDA
```

REMOTE APPEARANCES:


ON BEHALF OF THE PLAINTIFF:

    MORGAN & MORGAN, P.A.
    8151 Peters Road
    Suite 4000
    Plantation, Florida 33324
    Barbeit@forthepeople.com
    Arattat@forthepeople.com
    BY: BRYAN ARBEIT, ESQ.
        ALLISON M. RATTET, ESQ.


ON BEHALF OF THE DEFENDANTS:

    JACKSON LEWIS, P.C.
    Two South Biscayne Boulevard
    Suite 3500
    Miami, Florida 33131
    Ranjiv.sondhi@jacksonlewis.com
    BY: RANJIV SONDHI, ESQ.


ALSO PRESENT:  SARABETH DEMARTINO

```
                     INDEX OF PROCEEDINGS



Deposition of LEAH MOLINO


Direct Examination By MS. RATTET                5




Certificate of Oath                           86

Certificate of Reporter                       87



                       EXHIBITS


Number                Description            Page


Plaintiff's 1     Defendant's 3317 - 3318      6

Plaintiff's 2     Defendant's 3319 - 3322      9

Plaintiff's 3     Defendant's 2126 - 2129     13

Plaintiff's 4     Defendant's 3286, 3218-3220 23

Plaintiff's 5     Defendant's 3239 - 3241     24

Plaintiff's 6     Defendant's 3345 - 3348     28

Plaintiff's 7     Defendant's 3281 - 3282     32

Plaintiff's 8     Defendant's 2987            39

Plaintiff's 9     Defendant's 3336 - 3341     68
```

1           Videoconference deposition taken before

2    ANDREA MAZOR-STABB, Registered Professional

3    Reporter, Florida Professional Reporter and Notary

4    Public in and for the State of Florida at Large in

5    the above cause.

6                        ********

7           THE COURT REPORTER:  Can you hold your

8        driver's license or photo I.D. up to the

9        camera, please?

10           Thank you.

11           (Whereupon, the witness presented a

12        Florida driver's license and identity was

13        verified.)

14           THE COURT REPORTER:  Raise your right

15        hand, please.

16           Do you solemnly swear or affirm under the

17        penalty of perjury that the testimony you are

18        about to give will be the truth, the whole

19        truth and nothing but the truth?

20           THE WITNESS:  I do.

21           THE COURT REPORTER:  Thank you.

22           Counsel, you may proceed.

23    THEREUPON:

24

25

```
 1                      LEAH MOLINO
 2           having been first duly sworn or affirmed,
 3  was examined and testified as follows:
 4                    DIRECT EXAMINATION
 5  BY MS. RATTET:
 6       Q.  Good morning, Miss Molino.  How are you
 7  today?
 8       A.  I'm good.  How are you?
 9       Q.  Good.  Thank you so much for coming back.
10  I thought the last deposition would be the final
11  setting but I appreciate you being here today.
12           I know we've gone through this a couple of
13  times so just to go over some of the ground rules
14  briefly, it's important that we try not to speak
15  over one another.  If you could let me finish my
16  question before you start your answer, it will make
17  Andrea's job a lot easier here.
18           And also if you don't understand a
19  question that I'm asking, please let me know.  I'm
20  bound to ask terrible questions at some point today
21  and I'm happy to rephrase.  I just want to make
22  sure that you understand exactly what I'm asking
23  before you pose a response; otherwise, I will
24  assume that you have understood my question.  Does
25  that make sense?
```

```
 1        A.  Yes.

 2        Q.  Okay.  Great.

 3            So today we're here for kind of a limited

 4   purpose going over some of the documents that were

 5   recently produced.  So I want to start with the

 6   documents that relate to Empire's response to the

 7   Department of Economic Opportunity with respect to

 8   Miss DeMartino.

 9            MS. RATTET:  So I'm going to share my

10        screen here and we'll mark this as Exhibit 1.

11            (Whereupon, the above-referenced item was

12        electronically identified as Plaintiff's

13        Exhibit Number 1 for Identification.)

14   BY MS. RATTET:

15        Q.  And, Miss Molino, can you see that okay?

16        A.  I can.

17        Q.  Okay.  Great.

18            So this is going to be Exhibit 1.  It's

19   Defendant 3317 to 3318 and this is an e-mail from

20   Joel Baez to you.  Mr. Baez is with the Department

21   of Economic Opportunity.

22            So let me ask you this, have you seen this

23   document before?

24        A.  Yes.

25        Q.  Okay.  And what did you do when you
```

1   received this e-mail?

2        A.  I think that with this one -- I think that

3   with the first e-mail, if I remember correctly, it

4   was just like a form to fill out asking for like

5   how much she had made during certain periods which

6   I included.  I believe it asked -- I don't know if

7   this is the exact one where they asked for like any

8   performance notices on her or performance

9   communications or whatever.  I may have called the

10  attorneys in between this because there's a couple

11  day lag there.  I know that there was a point where

12  he asked me more detailed questions and then I know

13  for a fact I reached out to our attorneys and they

14  prepared the response.

15       Q.  Okay.  So and, again, I don't want to hear

16  about any conversation you had with your attorneys.

17  I'm sure that Mr. Sondhi will step in and remind

18  you of that as well.

19            So let's talk about that.  Again, this is

20  the e-mail from Joel Baez to you on Wednesday the

21  27th at 10:18 a.m. and initially you said that you

22  believe that it was just kind of a form that you

23  had to fill out.  So let me actually scroll down.

24            Let's see.  Is this the form that you were

25  referring to?

1        A.   Yes.

2        Q.   Okay.  I just wanted to make sure that we

3    were on the same page.

4             And so going back to Exhibit 1 -- and

5    again this is Defendant 3317 to 3318 -- you

6    respond, Hi Joel, please see attached, thank you.

7             And that was two days later.  Is that the

8    date on which you sent the completed form to Mr.

9    Baez?

10       A.   Yeah, I believe that that's what was

11   attached and I filled out.

12       Q.   Okay.  Yes, because I don't see an

13   attachment here so I just want to make sure that

14   we're on the same page to the extent that you, you

15   know, can recall.

16       A.   Yeah, I'm pretty sure that that was my --

17   the form was all -- I don't remember.  I just know

18   I sent it to -- I sent what I had to Ranjiv for

19   discovery.  I don't know why it wouldn't show as an

20   attachment on your end but you have the form so

21   clearly it was attached somewhere.

22       Q.   Right.  And that makes sense and I

23   understand that sometimes with, you know,

24   extracting these documents perhaps, you know, for

25   some reason the attachment didn't show.  I just

1    want to make sure to your recollection if the first

2    communication or response you had with Mr. Baez was

3    that you just sent the completed form?

4         A.  Yes, I know that I sent a completed form

5    and then there was follow-up questions, I believe.

6         Q.  Okay.  So let's get to that.

7              MS. RATTET:  And so we can mark this as

8    Exhibit 2.  It's going to be Defendant 3319 through

9    3322.

10             (Whereupon, the above-referenced item was

11        electronically identified as Plaintiff's

12        Exhibit Number 2 for Identification.)

13   BY MS. RATTET:

14        Q.  And so when you say that he asked you

15   follow-up questions, are these the questions that

16   you were referring to?

17        A.  Yes.

18        Q.  And then a couple of days later if you

19   look at your e-mail response to him on August 3rd

20   it says, Hi Joel, please find the information

21   requested attached here.  What was attached to this

22   particular e-mail?

23        A.  I think that was what the attorneys had

24   prepared for us.

25        Q.  Okay.  And did you participate in the

1   preparation of the whatever was sent to Mr. Baez,

2   and we'll get to that?

3       A.  No.

4       Q.  So you didn't draft anything at all by

5   yourself?

6       A.  No.

7       Q.  And, Miss Molino, does this document

8   beginning on Defendant 3326, does this look like

9   the response that was prepared on behalf of Empire

10  that was submitted to Mr. Baez?

11      A.  Yes.

12      Q.  And I want to direct your attention to

13  just this last paragraph here.  Or second to last

14  paragraph.  If you can see the last paragraph where

15  it starts on February 16th, 2022?

16      A.  Uh-huh.

17      Q.  And it says -- you can just read it to me

18  into the record, if you could do that.

19      A.  On February 16th, 2022, as a result of the

20  club's ongoing revenue deficiencies and claimant's

21  blatant disregard for company policy, the company

22  issued claimant a final written warning.  During

23  the meeting which claimant received the final

24  written warning, claimant ask if their employment

25  was in jeopardy, was told honestly that it was.

```
 1    Two weeks later Empire terminated claimant's
 2    employment.
 3         Q.  Okay.  And so when it says the company
 4    issued claimant a final written warning, who on
 5    behalf of the company issued that warning?
 6         A.  J.C.
 7         Q.  Okay.  And that is the February 16th
 8    notice that we've discussed previously in other
 9    depositions?
10         A.  Yes.
11         Q.  Okay.  And when it says claimant asked if
12    her employment was in jeopardy and was told
13    honestly that it was, who told Miss DeMartino that
14    her employment was in jeopardy?
15         A.  I don't know if J.C. told her that.  I
16    know that he asked me at some point if, you know,
17    she was -- she did ask me at some point like was
18    she going to be fired.  I said, you know, things
19    cannot continue this way with the underperforming.
20    I did have that conversation with her at some
21    point.  I know I had the conversation with her.  I
22    don't know if J.C. had that conversation with her
23    as well that day.
24         Q.  And this document is dated April 3rd of
25    2022; correct?
```

1    A.   What document?   I think it's August 3rd.

2    Q.   I'm sorry, I apologize, you're correct.

3  August 3rd of 2022.

4    A.   Yes.

5    Q.   Thank you.

6         Okay.   And so between the time that Mr.

7  Baez requested additional information with respect

8  to the questions that he sent you and the time that

9  this document was submitted to him, were there any

10  other iterations of this response prepared?

11    A.   Not that I'm aware of.   I think that this

12  was the only response sent to me, I am pretty sure,

13  and I don't know if there was, you know, internal

14  variations with Jackson Lewis but I believe this

15  was the only one sent to me.

16    Q.   And when you say it was sent to you, did

17  you review it before it was submitted to Mr. Baez?

18    A.   I don't recall.   I don't think so.   I

19  mean, I don't know if I'm allowed to say what the

20  e-mail --

21    Q.   I take don't want to know anything you

22  discussed with your attorney.   I just want to

23  know --

24    A.   I don't think I was asked to review it.   I

25  was asked to pass it along and I did.

```
 1        Q.  Okay.

 2            MS. RATTET:  So let's mark this as

 3   Exhibit 3.  This is a document, it's Defendant 2126

 4   and that's the starting page to Defendant to 2129.

 5            (Whereupon, the above-referenced item was

 6        electronically identified as Plaintiff's

 7        Exhibit Number 3 for Identification.)

 8   BY MS. RATTET:

 9        Q.  And, Miss Molino, I notice that the date

10   of this document is August 11th of this year.  Do

11   you know why that is?

12        A.  I don't know where that came from.  I

13   don't know.

14        Q.  Okay.  Is it possible that this was just,

15   you know, an auto update date in Word?

16        A.  I have no idea.  I mean, I don't know if

17   that has anything to do with what was -- I don't

18   know how it was transmitted to you guys.  I don't

19   know how any of that works.  Is it something that

20   happened on the Jackson Lewis side, I don't know.

21            MR. SONDHI:  I think it was on our end and

22        it's an auto date.

23            MS. RATTET:  Okay.  Can we get the correct

24        date of this version of the document, Ranjiv?

25            MR. SONDHI:  I'm not sure.
```

```
 1          MS. RATTET:  You don't have that
 2     available?
 3          MR. SONDHI:  Well, it's an auto date.  So
 4     when you open it, it just gives you the date
 5     that you open it.
 6          MS. RATTET:  I understand that but we can
 7     at least go into like the properties of the
 8     original document to find when it was, you
 9     know, created and whatnot; correct?
10          MR. SONDHI:  I'm not sure.  You have this
11     in Word format?
12          MS. RATTET:  It was produced to me as a
13     pdf so I'm not sure.  I just want to make sure
14     that we have the date when it was, you know,
15     this document was created.
16          MR. SONDHI:  I can check but I can't
17     guarantee that I can find that out but I'll
18     check to see what I can do with the original
19     Word document.
20   BY MS. RATTET:
21     Q.  So, Miss Molino, going back to the last
22   paragraph on Page 4, and I can flip back to the
23   prior document that was the document submitted to
24   Mr. Baez, but it says on February 16th that you
25   had, in fact, issued the final written warning to
```

```
1    Miss DeMartino.  Do you know why that was -- did
2    you make that change?
3         A.   I did not make that change.  I don't know
4    if there was a change made by Jackson Lewis, again,
5    like it was prepared by them.  I did not make a
6    change.  But I don't recall ever making a change
7    and I don't think I would make a change to
8    something attorneys prepared for us.  And I don't
9    know like, you know, if they -- you know, Jackson
10   Lewis was collecting the information from us,
11   having meetings with, you know, J.C., so I don't
12   know.  I don't know.  I have no idea where the
13   change came from, what made the change.  I don't
14   know.
15        Q.   That's okay.  Just wanted to ask.
16             So after you submitted the response to Mr.
17   Baez's questions were there any further
18   communications with the Department of Economic
19   Opportunity?
20        A.   I don't remember.  I mean, you would
21   probably know better than they but I don't
22   remember.
23        Q.   Were all e-mails produced?
24        A.   Yes, everything has been produced so if
25   there's something in there after, then the answer
```

1  is yes.  If there's not something in there after,

2  then the appears is no.

3       Q.  Miss Molino, over the course of, you know,

4  the deposition sittings that we've had previous to

5  today, we discussed kind of the Indeed postings for

6  jobs at Christi's and in the Vero Beach location.

7  With respect to fielding applications were all

8  applications submitted to the positions posted for

9  Vero Beach forwarded or passed along to Miss

10 DeMartino?

11      A.  I had sent all of the manager positions to

12 J.C. by the time we put that up.

13      Q.  Okay.  And we're talking about the

14 postings from January of 2022?

15      A.  Yes, I believe it was January, around

16 there, yeah.

17      Q.  For the general, like the manager

18 position?

19      A.  Manager, yes.

20      Q.  Right, okay.  And was it your process to

21 just forward him all positions related to

22 management level positions?

23      A.  Yeah.  I mean for the most part I didn't

24 look at every single one.  Once in a while I would

25 take a peek, you know, if time allowed but for the

1    most part I forwarded everything off.

2        Q.  Okay.  And for management positions I

3    think you previously testified that would include a

4    fitness manager or a customer service manager or a

5    sales manager; correct?

6        A.  Yes.

7        Q.  Okay.  And so when you forwarded the

8    management level position to J.C., did you make any

9    distinction between the type of management position

10   the candidate would be a good candidate for?

11       A.  Perhaps, if I happened to look at their

12   resume if something jumped out at me but it depends

13   on whether I looked at the resume or not and not

14   necessarily.

15       Q.  Okay.  And so in the case that, you know,

16   where you would look at their resume, would you

17   note the specific managerial position in an e-mail

18   to J.C.?

19       A.  Not necessarily, I don't think I would

20   have.

21       Q.  Okay.  So was there a reason that these

22   management level positions were forwarded to J.C.

23   instead of Miss DeMartino?

24       A.  Yeah, I mean at that point, you know, the

25   club had been underperforming, I didn't have a --

1    you know, Sara had been struggling to hire any

2    position so I didn't have a lot of faith in her to

3    necessarily vet these people.  She had been

4    complaining that she was having a hard time with --

5    she didn't know how to interview people or make

6    them want to take the job, make the job sound more

7    appealing.  People that would come in interviews

8    didn't have the ton of confidence in the person she

9    had, you know, interviewed and hired to be her

10   customer service manager, you know, just my

11   professional opinion but my opinion from afar.  And

12   -- and, yeah, I felt like J.C. was a better person

13   to do interviews and like get people in there and

14   get Sara some help at the club.

15        Q.  And did you forward the personal trainer

16   candidates to Miss DeMartino?

17        A.  I believe I was forwarding personal

18   trainers candidates to her.

19        Q.  So if you didn't have much faith in Miss

20   DeMartino to, you know, hire generally, why was

21   there a distinction between forwarding management

22   level versus, you know, a personal trainer or

23   another position?

24        A.  I mean, a management level is definitely a

25   much -- a different level of employment and I

```
 1   think, you know, could use a little bit more
 2   oversight there and ultimately like we couldn't do
 3   every aspect of Sara's job for her.  Like she
 4   needed to be responsible and accountable to
 5   something which was, you know, she had been tasked
 6   with hiring PTs and MCs and, you know, it was the
 7   least she could do.
 8        Q.  When the company made postings, or you on
 9   behalf of the company posted job positions to
10   Indeed, were those separate based off of the club
11   for which the position was sought?  So, for
12   example, a position in Vero Beach would be specific
13   to Christi's versus a position in Palm Beach or in
14   Jupiter specific to the Palm Beach Sports Club in
15   Jupiter?
16        A.  Yeah, I mean, you know, we do -- you have
17   to -- well, you don't have to but.  We do specify a
18   location.  I would say, you know, for like a
19   welcome team person, like we're not going to expect
20   a welcome team person to commute really far.  A
21   manager level person could commute to one of the
22   other clubs, you know, they're full-time, typically
23   salaried -- yeah, a salaried position.  So, you
24   know, that's where, you know, we may see somebody
25   make an hour or so commute.
```

```
 1                  You know, in New York I would say like I
 2     posted to kind of just various clubs because the
 3     commute is just such a different thing there and
 4     they can share postings in Florida.  And even
 5     Jupiter Gardens can share postings a bit because
 6     they are close for the frontline employees in terms
 7     of a management position.  I would say that that's
 8     the only position that could really be shared
 9     across the Florida clubs because it's a full-time
10     position with a salary where you do see people
11     commute anywhere from one to two hours a day for a
12     job that's not, you know, an entry level, minimum
13     wage job.
14          Q.  So I'm going to share my screen again.
15     Can you see this document, Miss Molino?
16          A.  Yes.
17          Q.  Okay.  And do you recognize this document?
18          A.  Yes.
19          Q.  And what is this?
20          A.  This is an application for personal
21     trainer that looked promising so I passed it along
22     to J.C.
23          Q.  And just for the record, the Bates numbers
24     on this document are 3286 to -- it's 3286 and then
25     3218 to 3220.  So I want to direct your attention
```

1  to this first e-mail that you sent on Monday,

2  December 20th to J.C.  Can you read that for me?

3      A.  This candidate applied for PT at

4  Christi's, they have a lot of experience, might be

5  worth interviewing for a management position.  Let

6  me know your thoughts.  If you're not interested in

7  interviewing, then I can pass it along to Sara for

8  PT or lead trainer.

9      Q.  And so was there a reason why Sara wasn't

10  included or why this wasn't passed along to Sara in

11  December of 2021?  I'm sorry, February of 2021.

12      A.  Yes, I was saying that -- sorry, my dog is

13  distracting me.  I would say that so they could

14  have been a manager or they were posting for a

15  management position, I mean, that could have been a

16  number of things.  We interview people fairly

17  regularly that have what I would say is just that

18  manager level experience and don't necessarily have

19  openings but just to be always recruiting.

20  Sometimes like if we found somebody really good we

21  might create a position for them, you know, talent

22  is definitely really valuable.  Like we've said I

23  think multiple times, the managers really make or

24  break the success of the clubs and like we're

25  always interviewing.  But this one in particular,

1   you know, management position, it would have been

2   at any of the clubs, could have been -- I think we

3   had just had our FM a Jupiter, he had just

4   resigned, his last day was coming up at the end of

5   December, he was relocating out of state, so we had

6   that opening at that time.  Christi D'Orro who was

7   the fitness supervisor at Christi's had left so I

8   just thought he looked promising and was worth

9   having a conversation with.

10      Q.  And you knew that at that point Christi's

11  was in dire need for personal trainers; correct?

12      A.  Yes, but this was somebody who, I think,

13  had the skill set to be much more than a personal

14  trainer based on the resume.  I mean, like I said,

15  it was worth a conversation.  If I was wrong about

16  that, you know, he could be passed along to Sara

17  for PT or lead trainer which lead trainer is

18  part-time position so, yes.

19      Q.  Okay.  Then Mr. Marrero -- I'm sorry, yes

20  Mr. Marrero responds, that's great.  Thank you.

21         What happened after he responded that's

22  great, thank you?  Did Mr. Marrero do anything?

23      A.  I have no idea.  But I would hope so but I

24  have no idea.

25      Q.  And this is an e-mail from J.C. Marrero

1   also included in Exhibit 4 Defendant 3218 and you

2   can see the e-mail from Mr. Marrero on Tuesday,

3   December 21st at 10:56 a.m.  Do you see where I

4   am --

5       A.  Yes.

6           (Whereupon, the above-referenced item was

7       electronically identified as Plaintiff's

8       Exhibit Number 4 for Identification.)

9   BY MS. RATTET:

10      Q.  And he says that he spoke to him and he's

11  going to meet the first week of January in Vero

12  Beach.  Do you know if that meeting ever took

13  place?

14      A.  I'm not sure.  I mean, I don't know if

15  there's any updates from him.  I don't recall

16  anything specific or stand out about it.

17      Q.  And did Mr. Marrero tell you or discuss

18  with you why he believed that this candidate was a

19  strong candidate for management?

20      A.  No.

21      Q.  So this is the extent of the follow-up and

22  your understanding of what happened?

23      A.  Yes.

24      Q.  With respect to Mr. Lawson?

25      A.  Yes.

```
 1              MS. RATTET:  Okay.  I'm going to share my
 2         screen and this is going to be marked as
 3         Exhibit 5.  And this document, it's going to
 4         be Defendant 3239 to 3241.
 5              (Whereupon, the above-referenced item was
 6         electronically identified as Plaintiff's
 7         Exhibit Number 5 for Identification.)
 8    BY MS. RATTET:
 9         Q.  Can you see that okay on your end?
10         A.  Yes.
11         Q.  So do you recognize this document,
12    Miss Molino?
13         A.  Yes.
14         Q.  And what is it?
15         A.  It is an application for somebody who
16    applied for manager and MC, both positions were
17    posted.
18         Q.  Okay.  Is there a separate e-mail that
19    comes through to you with respect to the management
20    position this applicant applied for?
21         A.  I think that there should have been.  I
22    don't know if I maybe, you know, deleted it as a
23    duplicate because they're literally the same
24    resume.  Like when it came through if I just, you
25    know, moved it over because they're the same one
```

1   but I knew he applied for both so there must have

2   been two.

3       Q.  And did you search for any e-mail showing

4   that he had applied to the manager position over

5   the course of this litigation?

6       A.  I don't know.  I know that I provided a

7   list like, first of all, very early on from Indeed

8   of the people that applied for various positions.

9   I don't know.  I think the manager was part of

10  that.  I think that was part of like the original

11  request for discovery before Ranjiv was even

12  involved like, you know, we had a couple of

13  attorneys here.  So I don't -- I don't know.  I

14  mean, I can look and see if I have Perry Antrilli

15  applied for manager in my e-mail.

16      Q.  Okay.  Can you do that for me?

17      A.  Yes.

18      Q.  Okay.  Thanks.

19          So going to the top of this e-mail that

20  was forwarded from you to J.C., can you read what

21  the body of the e-mail says to J.C.?

22      A.  He applied for MC-2.  Not sending to Sara

23  since he also applied for manager.

24      Q.  What do you mean by not sending to Sara

25  since he also applied for manager?

1     A.  Well, I don't think there's a point in two

2  people reaching out to the same applicant.  So I

3  was sending to J.C., he's a call for manager and if

4  he's manager material, he's also interested in MC.

5     Q.  Do you know how may applicants applied to

6  positions for MC or membership consultant?

7     A.  I don't recall.

8     Q.  Was it more than ten?

9     A.  I don't -- I think so.  I honestly don't

10  recall and I think that that's like -- I'm pretty

11  sure in Indeed that's a definitive number that I'm

12  sure we could just get you the information for so

13  why guess.

14     Q.  I mean, if you can get us that information

15  for the specific breakdown.

16     A.  If it's in Indeed, you can definitely have

17  it.  I'm pretty sure it is like for -- you know,

18  unless for some reason it's not there because it's

19  an older one but I'm like 99 percent sure that that

20  information would just be there.  You can see how

21  many applicants there were for every position that

22  was listed.

23     Q.  Is a membership consultant, is that a

24  management level position?

25     A.  No.

1      Q.  Is there a reason why you didn't send this

2  applicant both to Sara and J.C.?

3      A.  Yes, I just said that, because I don't

4  think that there was -- think there's any point in

5  two separate people reaching out to the same

6  applicant.

7      Q.  Do you know if Mr. Marrero ever reached

8  out to this applicant?

9      A.  I have no idea.  I mean, I have no idea.

10     Q.  Did you ever follow-up with him to see

11 whether or not he reached out to this applicant?

12     A.  No.  I didn't follow-up with him on that,

13 no.

14     Q.  Did he ever follow-up with you to provide

15 a status update?

16     A.  Not on -- I don't think he did on this

17 specific applicant which, you know, I would assume

18 to mean that he was no good.

19     Q.  When you forwarded this document or this

20 application to Mr. Marrero, did you have a

21 particular management position in mind with respect

22 to this candidate?

23     A.  No.

24         MS. RATTET:  Okay.  So this is going to be

25     marked Exhibit 6.  It's Defendant 3345 to

```
1        3348.

2            (Whereupon, the above-referenced item was

3        electronically identified as Plaintiff's

4        Exhibit Number 6 for Identification.)

5   BY MS. RATTET:

6        Q.  Miss Molino, have you seen this document

7   before?

8        A.  Yes.

9        Q.  And what is this document?  And if you

10  need me to scroll down and you want to see the full

11  document --

12       A.  I believe that it's one of the many

13  resumes I sent to J.C. and he's replying to it

14  saying that he likes this one.

15       Q.  Do you know if Mr. Marrero actually met

16  with Mr. Burney that Friday?

17       A.  I have no idea.

18       Q.  Did you follow-up to ask him if he did?

19       A.  I did not.

20       Q.  Do you know what he meant when he said the

21  rest of the candidates have not responded or done

22  poorly on a phone interview?

23       A.  I would assume he meant they did not

24  return his call or e-mail, however he reached out

25  to them, or whatever phone interview questions he
```

1  asked they weren't worth bringing in for an in

2  person interview.

3      Q.  Do you know how many candidates would fall

4  into, you know, this category of the rest of the

5  candidates?

6      A.  No.

7      Q.  Do you know how many candidates Mr.

8  Marrero interviewed over the phone?

9      A.  I have no idea.

10     Q.  Why did Mr. Marrero say, if you can please

11 make a note in his e-mail?

12     A.  I don't know.

13        MR. SONDHI:  Object to form.

14        THE WITNESS:  That's a question for J.C.

15     I don't know.

16 BY MS. RATTET:

17     Q.  Did you ask him what he meant by that?

18     A.  No.

19     Q.  Would there be any reason to note a file

20 or anything like that with respect to --

21     A.  No.  I mean, in ADP you can like mark

22 like, you know, passing on this person.  I don't

23 think I ever did that but ADP does give you the

24 option to like say like, whatever, like click not

25 interested in this candidate.  And I think that

1    they may ask you for feedback for more of like an

2    algorithm standpoint in terms of like, you know,

3    should we send you candidates like this in the

4    future.  You know, ADP is like an advertising

5    platform practically so I think he was just

6    referencing that like note it in ADP which I don't

7    typically do that so I don't think I would have.

8         Q.  And then he said I would also like to

9    discuss my plan for Vero Beach when you have some

10   time this week.  What was the plan for Vero Beach?

11        A.  I have no idea.

12        Q.  Did you ever speak with him this week

13   about what his plan would be for Vero Beach?

14        A.  I don't recall.

15        Q.  Did you ever have any conversations with

16   Mr. Marrero about what, you know, his plan would be

17   for Vero Beach?

18        A.  I mean, I don't remember the timelines.

19   We obviously talked about Christi's, you know, him

20   going there.  I don't know that there was ever

21   like, here is my laid out plan for Vero.  Like I

22   have no idea.

23        Q.  Did he ever submit anything to you in

24   writing detailing his plan for Vero Beach in, you

25   know, around this time in February of 2022?

```
1          A.   Not that I recall.  I mean, if you have an
2     e-mail then, yes, but if you don't then, no.  I
3     don't recall ever seeing like a laid out plan for
4     Vero Beach besides -- I think e-mails that have
5     come up in this -- in these depositions which I've
6     been on.  I don't know if I was copied on them
7     originally but just, you know, plans for Christi's
8     with Sara, action plans type things.  I don't
9     recall me ever being sent or discussed like a
10    specific plan for Vero Beach.
11         Q.  Do you know if Mr. Marrero's plans for
12    Vero Beach in your conversations with him or --
13    strike that.
14              In your conversations with Mr. Marrero
15    about Christi's, did his plan for Christi's ever
16    evolve or change over the time that he was the
17    business director?
18         A.   I don't -- I don't want to say I don't
19    understand that question.  I guess I don't
20    understand how to answer that question.  Like I
21    don't -- did his plans change like month to month?
22    This is what we're going to do to be success this
23    month versus the last month?  Possibly, probably.
24    I mean, I don't know.  There was no time where him
25    and I had a conversation that this is my plan for
```

```
 1   Christi's, you know, on December 1st, 2021, and now
 2   come January, whatever, 2022, this is my new plan.
 3   Like we weren't having meetings where J.C. was
 4   sharing these like well thought out, you know,
 5   plans with me.  Not to say that they didn't exist
 6   or he wasn't having those conversations with
 7   someone, I don't know, but there was like no like
 8   specific meetings regularly where J.C. was, you
 9   know, putting together plans with me and then
10   changing them or updating them.
11         MS. RATTET:  Okay.  I'm going to share my
12      screen again.  This will be marked as
13      Exhibit 7.  And it is an e-mail chain, Bates
14      numbers Defendant 3281 to 3282.
15         (Whereupon, the above-referenced item was
16      electronically identified as Plaintiff's
17      Exhibit Number 7 for Identification.)
18   BY MS. RATTET:
19      Q.  Miss Molino, do you need me to scroll so
20   you can take a look at this entire document?  Do
21   you recognize this document?
22      A.  I don't particularly recognize it.  I
23   don't know that I've reviewed it recently.  So if
24   we could look at it, that would be good.
25      Q.  Sure.  Can you see it okay right now?
```

```
1          A.   I can, yes.

2          Q.   Let me know if you need me to scroll.

3          A.   Okay.  Can you scroll?

4          Q.   Sure.

5          A.   Okay.  I'm good.

6          Q.   Okay.  So I want to focus your attention

7     to Miss DeMartino's e-mail to you on Thursday,

8     March 4th at the top.  Do you see that?

9          A.   Yes.

10         Q.   And actually let's start with the e-mail

11    right below that.  I think that this was your

12    response to a forwarded e-mail from Miss DeMartino;

13    correct?

14         A.   Right.  Yes.

15         Q.   And then you say not sure what this is?

16         A.   Because there was body or context to the

17    e-mail.

18         Q.   Okay.  Was Miss Milliman's e-mail included

19    in the forward?

20         A.   Yes, but I don't know why Sara is sending

21    this to me.  Like there's no action, there's no

22    request for help, there's other people that this

23    probably should have gone to.  Like this was -- I

24    don't know why she's sending this to me.

25         Q.   Okay.  Who else would she have gone to --
```

1  well, let's start here.

2         What exactly is the issue that she's

3  forwarding to you?

4      A.  It seems like somebody wants a refund.

5      Q.  And who would that typically go to?

6      A.  Well, typically the GM would handle these

7  things but Sara very much liked to deflect her

8  work.  But if she needed support, whatever, the

9  level above her I would expect it to go to Arzu

10 Kaner or Anthony Messina in March 2021.

11     Q.  And in March 2021 this was relatively soon

12 after she was on boarded; correct?

13     A.  Yes.

14     Q.  And then if you go to the March 4th e-mail

15 from Miss DeMartino, what is the member issue that

16 you were discussing with her?

17     A.  I have no idea.  I mean, she's saying it's

18 this.  I don't recall having a conversation with

19 her about it.

20     Q.  So you have no idea what this member issue

21 is even if you read Miss Milliman's e-mail?

22     A.  I mean, I can read the e-mail verbatim and

23 that's the member issue, but I don't recall ever

24 having a conversation with Sara about it.  I'm not

25 saying it didn't happen but I just don't recall,

1    this doesn't stick out in my mind as memorable.

2         Q.  I'm not, you know, really concerned about

3    specifically your memory of any conversation, just

4    if you have an understanding about the member issue

5    or the issue with respect to the member at issue in

6    this e-mail.

7         A.  Okay.  I mean, can you scroll down again

8    to Kayla's e-mail?  This member has not been here

9    in over a year.  For some reason she was billed

10   11/21/2021, please refund back to mother's card.

11   She's not an active member nor should she even have

12   an active account.  There's been an issue with

13   conversion member.  Thank you for your help.

14         So, I mean, this is like something that I

15   would say the gym industry and probably

16   subscription businesses deal with, you know, often

17   enough that like, you know, people say, oh, no, I

18   swear I cancelled because they forgot they're

19   paying for something that they haven't used.  Like,

20   you know, I'm paying for HBO for the last year, I

21   haven't used it.  I call Amazon and say, no, no, I

22   cancelled it, I tried to cancel it hoping they'll

23   give me a refund.  So like, you know, people say,

24   no, I cancelled it.  No, I never whatever, I tried

25   to cancel it, I didn't know I signed up, you know,

1    to get out of paying for something that really the

2    onus is on them to monitor their bank accounts

3    regularly.  So this is something that we encounter

4    in the gym industry and I would guess most

5    subscription based businesses.

6         Q.  Was there an influx of this type of issue

7    during the COVID pandemic such that there were

8    freezes placed on accounts that, you know, were

9    placed for a certain amount of time and then once

10   the freeze was lifted people were beginning to be

11   charged again?

12        A.  Yeah.  I mean, definitely we had more

13   people freeze across all the clubs and then people

14   forget; right?  So, typically when we have people

15   on freeze they're still billed $15 which, you know,

16   kind of helps people remember that they have a gym

17   membership; right?  Although, we do still have

18   plenty of people that forget they were on freeze

19   until they come off and get charged more or

20   whatever, finally noticed.

21            But with the COVID freezes -- during COVID

22   we did no fee freezes across all the clubs.  So I

23   would say that, you know, probably like remembering

24   your gym membership was on a freeze like was it,

25   you know, at the top of people's mind coming back

1    from COVID.  So, yeah, I would say that that not

2    charging people caused people to forget that their

3    account was on freeze.

4        Q.  During that time period was there a set

5    number of months that member accounts were placed

6    on freeze?

7        A.  I don't recall what we did specifically

8    during COVID just because policies and procedures,

9    I would say, changed a bit due to something, you

10   know, unprecedented.  But our typical policy is

11   that freezes can last 12 months.  And I don't think

12   most, though, even like to like freeze typically

13   beyond that.  But, yeah, our policy is freezes can

14   last 12 months.

15       Q.  And under circumstances where -- strike

16   that.

17           Were there any instances in which members

18   or member accounts were placed on freeze rather

19   than been cancelled when they should have been?

20       A.  Not that I'm aware of.

21       Q.  And when a member comes off of freeze,

22   were there any complaints about a misunderstanding

23   about whether or not they were actually cancelling

24   a membership versus placed on freeze?

25       A.  Well, it sounds like from this e-mail Sara

1   is saying, yes.  I wasn't in the club or talking to

2   the members so I don't know that I would have the

3   most knowledge about that.  But based on Sara's

4   e-mail it sounds like she was encountering, you

5   know, this person and possibly someone else.  Other

6   people, too, based on Sara's e-mail.

7        Q.  And what is Empire's process with respect

8   to, you know, membership reimbursements if, you

9   know, there is such a misunderstanding between what

10  was actually done or supposed to be done?

11       A.  What's the question?  What's our process

12  or policy, what was that?

13       Q.  Yeah.  So it was a poorly worded question.

14  Let me try to rephrase.

15           Basically what I want to know is what

16  happens when a member comes to you and complains

17  about charges that they never authorized and maybe

18  it was because the freeze was lifted, is it the

19  company's policy to refund that money or is it, you

20  know --

21       A.  Yeah, I mean, if we -- if we need to,

22  yeah.  I mean, the goal is obviously, you know, we

23  go through and try to evaluate, you know,

24  signatures, signed documents, any receipts that

25  were sent, any usage, those types of things; right?

1  And then, you know, you're ideally having -- the

2  general manager is ideally having a conversation

3  with the member to see like what we can do besides

4  a refund.  So, you know, maybe we give them a

5  credit for future months, that's preferable to us

6  over a refund.

7        Maybe they get a complimentary personal

8  training session or a complimentary 30-day pass to

9  bring in a friend or family member with them.  So,

10  you know, we see if there's anything we can do to

11  add value to their membership as opposed to a

12  refund and, you know, if they're truly owed a

13  refund, right, like it seems like it's the right

14  thing to do for the member and we can't find

15  another solution then we would refund the member.

16        MS. RATTET:  Okay.  I'm going to mark this

17     as Exhibit 8 and share my screen again.  And

18     this is going to be Defendant 2987.

19        (Whereupon, the above-referenced item was

20     electronically identified as Plaintiff's

21     Exhibit Number 8 for Identification.)

22  BY MS. RATTET:

23     Q.  Miss Molino, do you recognize this

24  document?

25     A.  Yes.  I haven't reviewed it recently but I

1    do recognize it.

2        Q.  Okay.  Do you want to take a look at it

3    and then let me know when you're ready?

4        A.  Okay.

5        Q.  Did you respond to Miss DeMartino?

6        A.  I don't remember.

7        Q.  Did you have any conversation with her or

8    discussion with her about her request to forego

9    using PTO when she was COVID positive?

10       A.  I don't recall.

11       Q.  And is there a reason why you wouldn't

12   have responded to this particular e-mail?

13       A.  I don't -- I don't think so.  I don't know

14   if I would have -- you know, if J.C. had reached

15   out to me about it, too and I talked to him about

16   it and he relayed the information to her, I don't

17   know.

18       Q.  Do you typically not respond to e-mails

19   from employees when they come in?

20       A.  No, but, I mean, if the resolution is

21   being taken care by the direct supervisor then, you

22   know, it's being taken care of by their direct

23   supervisor.

24       Q.  So you wouldn't have sent just an e-mail

25   confirming that, you could have delegated or J.C.

1   would be able to respond?

2       A.  I mean, I don't know.

3       Q.  Do you know what she means, what Miss

4   DeMartino means when she says I was able to do this

5   in the past and it was approved by Anthony and HR?

6       A.  Yes, at the previous company that we all

7   worked at together that isn't this company anymore.

8   So I have no idea, you know, if that's true.  I

9   have no idea what that situation was but it's a

10  different company.

11      Q.  Okay.  So you know that she was referring

12  to her time at TSI rather than Empire?

13      A.  Yes, because there's nobody approved by

14  Anthony in HR, wasn't approved by me who's HR so it

15  had to have been that, I mean, and I never approved

16  it in the past.  So I'm pretty sure she's talking

17  about Empire -- or not Empire at TSI unless her and

18  Anthony worked someplace else together that I'm not

19  aware of.

20      Q.  Did you consider her request to work from

21  home?

22      A.  I mean, we don't allow anyone to work from

23  home.  Like we don't allow any general managers to

24  work from home.  You know, do some of them work

25  from home like do they respond to e-mails from

1  home, probably, but they're not working their, you
2  know, days at home.  It's just not a position, you
3  don't run a club from home.  So, yeah, we don't
4  have people work from home.  I don't know whether I
5  considered it or didn't consider it.  I don't know.
6  I don't know.  Yeah, I don't know.  I don't know if
7  she had actually -- if she had tested for PTO at
8  this -- for COVID at this point.  I don't recall
9  but, you know, it's not really productive for a GM
10  to work from home and, you know, probably be, you
11  know, sitting there doing nothing most of the day
12  and calling it a workday.
13      Q.  So with respect to specific tasks, is it
14  possible that, you know, a GM could handle payroll
15  at home?
16      A.  Yeah, they could but it's not like a full
17  day's worth of work and I also could handle payroll
18  for them.  I mean, you know, we don't have a GM in
19  the club, I do the payroll for the club.  So when I
20  have a new GM starting and they haven't learned
21  payroll yet, I'll do payroll for them.  So it's
22  definitely something that, you know, payroll could
23  have been taken care of without her, she didn't
24  have to do it.  And so, yeah, it's not a full day's
25  worth of work anyway.

1      Q.   Was that communicated to Miss DeMartino

2   that payroll -- that someone else could take on the

3   responsibility of payroll while she was out?

4      A.   I don't know if that ever came up during

5   her employment.  I mean, I don't know.

6      Q.   So I'm talking about with respect to, you

7   know, the COVID, her being out for COVID and

8   specifically she said, you know, they can't do

9   things including payroll and phone interviews.  So

10   what I'm asking is if you offered in response to

11   this e-mail to handle her payroll so that she

12   didn't have to feel the need to even work from

13   home?

14      A.   I don't know.  I didn't reply to this.  I

15   don't know if J.C. related to her.  I have no idea.

16      Q.   Could J.C. have handled the payroll on her

17   behalf?

18      A.   He could have, yeah.  I mean, it probably

19   would have been me that would do it just because,

20   you know, I think I'm probably quicker at it than

21   he is.  But, yeah, he could have.  It probably

22   would have been a partnership of him, you know,

23   contacting the club, getting any, you know -- if I

24   went through the payroll and saw I had to uses

25   punches, I probably would have reached out to J.C.

1   and probably who's they and say like, hey, these

2   are the employees that have in or out punch, like

3   find out for me, can you get a manual time card

4   over to me so I can make those adjustments.  You

5   know, if you have any manual time cards in the club

6   send them over to me.  So he would have been

7   involved in some way.  I would have needed his help

8   in some way for sure.

9        Q.  Okay.  But you don't know if that

10   assistance was ever offered to Miss DeMartino;

11   right?

12        A.  No, I'm not sure.

13        Q.  And what about with respect to conducting

14   phone interviews, was -- was there someone who

15   would have been able to conduct phone interviews

16   while she was out?

17        A.  I mean, she could have delegated that to

18   someone on her team.  She could have asked J.C. to

19   do it.  I have no idea what phone interviews she's

20   referencing, did she actually have any scheduled.

21   I think, you know, from my perspective Sara wanted

22   to have a day off at home and not have to use her

23   PTO.

24        Q.  But you didn't offer to assist her with

25   these two specific items while she was COVID

1   positive; right?

2      A.  I don't recall personally offering to

3   assist her but, again, that's something I would

4   expect her direct supervisor to be the one to

5   offer.

6      Q.  And do you know if Mr. Marrero ever

7   offered to assist her with these particular --

8      A.  I do not know.

9      Q.  Did you ask Mr. Marrero to assist Miss

10  DeMartino with payroll while she was COVID

11  positive?

12     A.  I'm not sure.  I also saw that that was

13  sent on a Thursday.  I don't know how time

14  sensitive payroll was when she was returning, that

15  type of thing.  I mean, if we're on a Thursday and

16  payroll closes on Sunday and then doesn't have to

17  be signed off on until the following Thursday, like

18  I don't know where we were in her COVID recovery at

19  that point but it wasn't like all payroll has to be

20  done today, Thursday.  Like most GMs probably don't

21  even look at it until the Monday after payroll

22  closes on Sunday and then we have a due date of,

23  you know, it having to be signed off by Thursday to

24  get people paid on time.  So, you know, it wasn't

25  something like, you know, super urgent.

1      Q.  Was that communicated to Miss DeMartino

2   that it wasn't super urgent?

3      A.  I don't know but I would expect her to

4   know that if payroll doesn't close until Sunday and

5   she doesn't typically do payroll until Monday or

6   Tuesday, it's not super urgent on a Thursday, I

7   mean, at that point.

8      Q.  How long does it typically take to

9   complete payroll?

10      A.  A couple hours max.  It depends how, you

11   know, hopefully you have your team clocking in and

12   out and that's pretty minimal.  I mean, you know, I

13   could probably sit here and do payroll for a club

14   in less than 30 minutes.  It would take a couple

15   hours max if you have a bunch of people with manual

16   time cards for some reason.  If you're not holding

17   people accountable to, you know, clocking in and

18   out appropriately and there's miss punches in

19   there.  I'm, you know, in the club getting

20   interrupted that type of thing but, yeah, I would

21   say two hours max.

22      Q.  What is the current status of Anthony

23   Messina's employment relationship with Empire?

24      A.  He is, I guess, you know, still available

25   in a consulting capacity to answer questions on

1   different things he handled while he was here and,

2   you know, advise the business on business

3   decisions.

4       Q.  And when did -- when was the decision made

5   to retain him as an employee after March of this

6   year?

7       A.  I think that decision was made pretty

8   quickly.  I don't know that we knew what the exact

9   timeline would look like right away but we knew

10  that there would be some sort of, you know,

11  transition period on -- and severance given his

12  position with the company so and having to

13  transition his tasks and everything.  So it was

14  made pretty quickly I think.

15      Q.  You assumed a lot of his day-to-day tasks;

16  correct?

17      A.  No, not too many.  We had other people

18  assume his day-to-day tasks.

19      Q.  Okay.  What percentage of his tasks were

20  kind of assumed by you in your new role?

21      A.  I don't think many.  My position didn't

22  change much since Anthony left.  You know, I had

23  already been becoming more involved on the

24  operation side of things.  He was really sales and

25  fitness.  I don't think many, maybe like five

1   percent, if that.

2       Q.  Which other employees assumed job duties

3   and responsibilities that previously had fallen

4   under Mr. Messina's purview?

5       A.  Samantha Granoli, I don't know if I'm

6   saying her last name correctly, she took on the

7   majority of his day-to-day responsibilities in

8   terms of processing refunds on credits, helping

9   enroll sales, his admin tasks I would say.  And

10  then we also had Chris Piazza jump in on the

11  fitness side of things and take over some of the

12  fitness related tasks that he had been working on.

13      Q.  So when you say that Miss Granoli assumed

14  the majority of his day-to-day tasks, you know,

15  with respect to admin types of things, what

16  percentage would that be?

17      A.  I don't know.  I mean, maybe 60 percent.

18      Q.  And then Mr. Piazza would have assumed 35

19  percent?

20      A.  Yeah, I mean, I think like some things

21  just aren't happening anymore because the position

22  was eliminated.  So, you know, some of it kind of

23  -- I don't think I would say that like Chris took

24  on 35 percent, I would say some of the things just

25  aren't probably happening at all anymore, so I

1   don't know.

2       Q.  Okay.  So what percentage would you

3   estimate that Chris Piazza took on?

4       A.  I feel like this is kind of like very

5   arbitrary numbers for me to be guessing at so I'm a

6   little bit uncomfortable.  I just want to be clear

7   that this is very much a guess, I mean, I don't

8   know if that's the right thing to do here.

9           MR. SONDHI:  I'll object to form on it,

10      too.

11          MS. RATTET:  Yeah, I don't want you to

12      guess.

13  BY MS. RATTET:

14      Q.  I'm just wondering if you can give me an

15  estimate of, you know, even assuming that some of

16  the responsibilities were -- you know, were no

17  longer applicable?

18      A.  Yeah, I mean, maybe like 10 to 20 percent,

19  somewhere in there.

20      Q.  And what was Miss Granoli's job title?

21      A.  We brought her in as an operations manager

22  and she was kind of like, you know, brought in as

23  someone with potential, has a lot of experience.

24  She's very, very organized, had a lot of

25  experience, you know, writing SOPs, that type of

1    thing.

2         So she was brought in -- she's filling the

3    role and some of the duties as like an AGM for the

4    Florida clubs, so like matching accounts receivable

5    but she's also working on special projects like she

6    -- you know, her and I put together like a robust,

7    you know, welcome team training program when she

8    first started.  She just helped organize and

9    planned a huge event we had for fashion week.  So

10   she kind of was brought as like this, you know, to

11   fill in some of the AGM role and CSM role at the

12   Florida clubs but also take on special projects.

13        Q.  Okay.  And so is her focus specifically on

14   the Florida clubs or does she also work on --

15        A.  No, she works in New York, too.

16        Q.  And what percentage is her work focused on

17   the Florida clubs?

18        A.  She works out of the Florida clubs.  I

19   mean, it's probably somewhat 50/50 because she, you

20   know, remotely supports the Florida clubs with all

21   their, you know, member issues, refund requests,

22   all of that.  And there's more of them so I think

23   that that would, you know, definitely take up more

24   of her time and just hire volume of membership, all

25   of that there.  But, I mean, probably 50/50 but she

1    is based out of the Florida clubs.  I mean, she

2    works from a Florida club every day so, you know, I

3    don't know if that equates to them getting, you

4    know, a little bit more of her time and attention.

5    It's hard to say.

6         Q.  And is Mr. Piazza based out of Florida as

7    well?

8         A.  No, he's based out of New York.

9         Q.  When did the subject of severance first

10   come up in relation to Mr. Messina's separation

11   from Empire?

12        A.  Pretty much immediately.  I think that's

13   that initial conversation that we were eliminating

14   his position.  I believe that happened with Patrick

15   and him on a Friday and I believe, you know, that

16   weekend it came up, you know, over the course of

17   Saturday and Sunday, like what the transition would

18   look like, how long would he be available to us,

19   you know, a hundred percent that he obviously had

20   to go, have his own job search, all of that.  And

21   then, you know, being available to us on an ongoing

22   basis from there, so, but it came up, I think, that

23   weekend, over the course of that weekend.

24        Q.  And when you say that it came up over the

25   course of the weekend, who initiated that

1    discussion?

2         A.  I want to say that, you know, I think that

3    -- I think it probably came up initially with

4    Patrick and Anthony on the phone, which I was not

5    part of that conversation so I'm not a hundred

6    percent sure but that's the impression I have and

7    then it evolved over that weekend.  I don't know if

8    it started with, you know, Anthony asking or, you

9    know, Patrick asking me what I thought or what, I'm

10   not really totally sure what came first there.

11        Q.  And when you say Anthony asking, do you

12   mean Anthony asking for severance?

13        A.  Yeah, I mean, I don't know that he said --

14   I think that there was some understanding that

15   there would some severance paid on their initial

16   call, you know, let me know like what we need to do

17   to transition here and as we thought about it, like

18   who do we need to get trained, you know, how much

19   support, ongoing support after they're trained will

20   they require from Anthony and things like that, I

21   don't know.  And then, you know, opening new clubs,

22   that type of thing, like what does it make sense to

23   keep Anthony on and available to us during that

24   time.

25        Q.  Are there any documents to show the

1    initial -- or when the initial discussions with Mr.

2    Messina about severance took place?

3         A.  I don't think so.

4         Q.  And you weren't on that initial phone call

5    with Mr. Walsh and Mr, Messina; correct?

6         A.  No.

7         Q.  And so how did you learn or how do you,

8    you know, come to assume that those discussions and

9    the things that you just mentioned were actually

10   discussed on that call?

11        A.  I don't know.  I feel like there was an

12   indication from one of them that I spoke to after

13   of like, you know, we'll figure out what this looks

14   like to move forward but like, you know, this

15   position is being eliminated and we need to figure

16   out what that looks like in terms of a transition

17   and moving forward.  I don't know who brought it up

18   first or what.

19        Q.  Okay.  What was Mr. Walsh's position with

20   respect to paying Mr. Messina severance and

21   retaining him?

22        A.  I think that he was open to it.  I don't

23   know what his -- I don't know that there's any like

24   thing that sticks out to me of him being like all

25   for it, gung ho or totally against it.  I think he

1  was okay with it.

2      Q.  So is it fair to say that Mr. Messina was

3  the person who first brought up the issue of the

4  severance if Mr. Walsh wasn't really taking a

5  proactive stance in that regard?

6      A.  No, I don't think necessarily.  I think

7  Patrick would know that there needs to be a

8  transition, I mean, and we're laying someone off

9  which, you know, we take seriously of course and,

10  you know, optimizing their position.  So, you know,

11  I don't think -- I think if Patrick was open to a

12  new, there would be some sort of transition period

13  there where Anthony would continue to, you know, be

14  paid and support us through the transition.

15      Q.  So when did you first learn that Mr.

16  Messina had either requested or was going to be

17  offered severance?

18      A.  I don't recall.

19      Q.  Was it shortly after his last -- or his

20  technically last day with the company or, you know,

21  close to that?

22      A.  Yeah.  I mean, it was shortly after the

23  conversation continued to happen occurred.  So I

24  think the initial conversation occurred, I want to

25  say, March 24th and that's just based on -- I'm

1    pretty sure that's what it was, March 24th based on

2    the files they sent over recently refreshing my

3    memory there.  So I think the initial conversation

4    happened on March 24th and then I want to say that

5    it was brought up, you know, at some point that

6    weekend and, you know, the conversation of how

7    we're going to communicate it to the clubs because

8    obviously for the clubs to hear his position is

9    being eliminated would be alarming for them.

10          So I think we informed them on Monday or

11   Tuesday I want to say.  I don't remember.  I think

12   maybe it was Monday like during -- at that time we

13   had the gym closed on Mondays and then I think the

14   severance thing was decided over the course of that

15   weekend.  So he was informed on a Friday and the

16   severance decision was, you know, finalized at some

17   point Saturday or Sunday and we were informing the

18   club on Monday.

19          But Anthony was still continuing to work

20   as normal up until a certain point which I don't

21   know if that point was pre-established or -- I

22   don't know if we knew what it was then or it was

23   defined but he was going to continue to work at a

24   certain point like up until a certain point

25   regularly and, of course, training, whatever,

1   supporting.  And then we knew that like he would

2   need to make himself more available to looking for

3   jobs so he would continue to support and advise as

4   needed.  If we had any questions, if the people

5   taking over his roles needed help, he would

6   continue to be available for that.

7        Q.  Did you participate in the conversation

8   telling Mr. Messina that his position had been

9   eliminated?

10       A.  I did not.

11       Q.  Who participated in that conversation?

12       A.  It was just Patrick and Anthony.

13       Q.  Did you speak with Mr. Walsh after he had

14   the conversation with Mr. Messina?

15       A.  I'm pretty sure I spoke to both of them

16   separately and I don't remember in which order.

17       Q.  And was that the same that day that he

18   learned that the position was eliminated, that Mr.

19   Messina did?

20       A.  Yes.  I believe so, yes.

21       Q.  Okay.  What do you remember from your

22   conversation with Mr. Messina that day?

23       A.  I remember personally feeling like

24   surprised and bummed.  I worked with Anthony a long

25   time and, you know, I hated to see him and his

1   family, you know, impacted by that.  I don't think

2   he was overly surprised.  You know, I mean, he's

3   been doing this a lot longer, so, you know, maybe

4   for him to some extent like he knew that.  You

5   know, we had these big plans to grow this company,

6   originally that evolved over time.  You know, when

7   he was brought on in his role, you know, he was

8   brought on to run, you know, we're saying like 30

9   clubs within the first year and that changed.  So,

10  I don't know, maybe he kind of wasn't as surprised

11  but, I mean, I was surprised and disappointed and

12  felt bad for him and his family.

13      Q.  Did Mr. Messina mention anything about

14  severance during your conversation with him?

15      A.  I don't think so.  I mean, quite honestly

16  it was like Friday night and I was like in the

17  grocery store with my daughter like walking around

18  having this conversation and I remember just kind

19  of like being mind blown and it sticks out to me

20  because my daughter asked me what happened and

21  she's four and I said oh, you know, whatever.  It

22  was a funny conversation her and I had together so

23  it stuck out to me but, yeah, I don't know that it

24  was a super in depth conversation or what

25  specifically I asked.  I was doing something else

1    and had my child with me, so.

2        Q.  Do you -- you also spoke with Mr. Walsh

3    that day; correct?

4        A.  Yes.  Briefly.

5        Q.  And what do you remember about the

6    conversation with Mr. Walsh after he spoke with Mr.

7    Messina about the elimination of his position?

8        A.  Again, it was like Friday evening and he

9    called me and said like, hey, just wanted to make

10   you aware.  I think that he was, you know, possibly

11   on his way to, I don't know, out or to go do

12   something with his kids.  I remember it being a

13   short conversation and like, you know, we'll catch

14   up over the weekend to discuss further but FYI I

15   just wanted to make you aware.  So that may have

16   happened and then I might have called Anthony,

17   Anthony might have called me.  I don't remember

18   exactly how those events transpired but my initial

19   conversation with Patrick around it was pretty

20   quick.

21       Q.  And during that conversation did the idea

22   of settlement come up?

23       A.  Severance.

24       Q.  Severance, thank you for that.

25       A.  No, I don't think so.  I think there was

1    some acknowledgement, it wasn't like immediate,

2    there was going to be transition period and, you

3    know, I didn't really know what that looked like

4    yet.

5         Q.   Earlier you testified that you knew that

6    the initial conversations regarding severance

7    occurred on March 24th because there were files

8    that you sent over that refreshed your recollection

9    as to that particular date?

10        A.   That I know that the initial conversation

11   about Anthony's position being eliminated, I

12   believe that -- I believe the severance agreement

13   that we had with him was six months to that date.

14   And if I remember correctly what refreshed my

15   memory was that ends on September 24th which is

16   important for me to know so I know when Anthony's,

17   you know, time with us ends.  But I think that it

18   was -- so I think that was the six months which

19   made we say March 24th which, again, I believe that

20   was a Friday.  I definitely remember it being a

21   Friday because, again, these are conversations that

22   kind of happened over the weekend type thing.

23        Q.   After the determination was made to offer

24   some sort of severance to Mr. Messina what happened

25   next?

1     A.  I don't know in terms of what.  I mean, I
2  don't know.  Can you be more specific?
3     Q.  Sure.
4        Were there any conversations about, you
5  know, the terms of a potential severance agreement
6  or, you know, were those discussions simply verbal?
7  I just kind of want to know how that transpired and
8  how it resulted in some form of agreement reduced
9  to writing.
10     A.  Yeah, I mean, there were definitely verbal
11  conversations on talking through, and I don't know
12  that, you know, what other conversations other
13  people had but like, you know, talking through
14  like, okay, what needs to be transitioned, who is
15  it being transitioned to, on getting Anthony's
16  insight on who we're thinking of transitioning it
17  to because he does know the team.
18     Q.  I'm asking particularly about the
19  severance agreement and whether there were
20  conversations and, you know, discussions about
21  potential terms to that agreement leading up to the
22  point at which it was reduced to writing, the
23  agreement?
24     A.  I don't recall.  I mean, I feel like that
25  was all looped in with the transition, like what

1   support are we going to need on an ongoing basis as
2   part of the transition and what makes sense for the
3   business.
4       Q.  Were Mr. Messina's duties and
5   responsibilities with respect to the transition
6   like put in writing anywhere?
7       A.  I don't think so, no.
8       Q.  Did you participate in those discussions
9   about what he would be required to do as he was
10  transitioning out?
11      A.  Yes, I think that I arranged, I mean, like
12  I said, some of the transitions in terms of the
13  trainings with those people, getting them the
14  access that they needed.  I helped facilitate some
15  of that.
16      Q.  Are there any e-mails to document kind of
17  what you did in terms of helping to facilitate the
18  transition?
19      A.  I don't think so.  Perhaps like asking to
20  grant access, you know, through more so for Chris
21  to be able to help some of the reinstate stuff, the
22  PT side of things but that would be the extent of
23  it.  I don't think there was any other e-mails.
24      Q.  Can you agree to produce that document?
25      A.  Sure.

1           MR. SONDHI:  Can we take a break?

2           MS. RATTET:  Sure.  How long do you need?

3           MR. SONDHI:  Five minutes.

4           THE WITNESS:  Okay.

5           MR. SONDHI:  Thank you.

6           (Whereupon, a brief recess was had, after

7      which time the following proceedings were

8      had:)

9           MS. RATTET:  Okay.  Let's go back on.

10  BY MS. RATTET:

11      Q.  Very quickly, Miss Molino, before I go

12  back to kind of conversations or discussions about

13  the severance agreement, with respect to the job

14  duties Miss Granoli assumed when Mr. Messina's

15  position was eliminated, and I won't hold to you

16  numbers because I know that you gave me a rough

17  estimate about 50/50 between New York and Florida,

18  but, you know, in that realm with respect to the

19  New York matters that he was kind of overseeing or

20  the job duties related to the New York market, did

21  any of these responsibilities or duties require her

22  to travel to New York?

23      A.  No.

24      Q.  So all of those duties could have been

25  performed remotely?

1      A.  Yes.

2          And just to clarify, she did travel to New

3   York recently but that's for something unrelated to

4   the duties she assumed from Anthony.

5      Q.  Yeah, and I just want to know with respect

6   to the duties that she assumed with respect to Mr.

7   Messina's role before it was eliminated.

8          So when was Mr. Messina first presented

9   with a written severance agreement?

10     A.  I don't think I got that to him until

11  maybe the beginning of May type of thing.  I don't

12  know.

13     Q.  And when you say that you got that to him

14  at the beginning of May, was that the first

15  iteration of that document?

16     A.  I believe so, yes.

17     Q.  And at the time that he was presented with

18  that document, was he still receiving payments?

19     A.  Yeah, I mean, we had already established

20  that he would be paid for six months and make

21  himself available to us for those six months.

22     Q.  So he was still employed by Empire at the

23  time that he received the agreement in the

24  beginning of May; correct?

25     A.  Yes.

1        Q.   And what happened after you sent Mr.

2   Messina the agreement in early May?

3        A.   He signed it and sent it back to me.

4        Q.   And how soon after you sent the agreement

5   did he sign it and return it to you?

6        A.   I think pretty quickly but I don't recall.

7        Q.   And you said he sent it back to you.  Was

8   that through e-mail?

9        A.   Yeah.

10        Q.   Do you have a copy of that e-mail?

11        A.   I've already sent it.

12        Q.   Okay.  Do you have a copy of the signed

13   agreement?

14        A.   I sent what I have.

15        Q.   Okay.  So is there a signed agreement?

16        A.   I mean, he signed it.  I guess Ranjiv said

17   it's like a picture of a signature which I didn't

18   notice at the time, I just like -- was like okay,

19   here it is.  So I guess not.

20        Q.   You guess not what?

21        A.   I mean he signed it but I guess Ranjiv

22   told me it was just like a picture of a signature.

23        Q.   I don't want to hear about any

24   conversations.

25        A.   How about this, I sent you everything I

1    have.

2        Q.   Okay.  So the reason that I'm asking, and

3    just to clarify because I'm not saying that you

4    didn't do that, but the people that received the

5    e-mail transmitting the severance agreement to Mr.

6    Messina and an agreement that was unsigned; okay?

7        A.   Okay.

8        Q.   So what I'm asking you is if there's a

9    fully executed or signed agreement between the

10   parties?

11       A.   There is an agreement with his signature

12   on it that I sent.  I mean, I'm kind of talking to

13   Ranjiv right now but I sent everything I have.

14           MR. SONDHI:  We can maybe discuss off the

15       record about if you want to clear this issue

16       up.

17           MS. RATTET:  Yes, I mean, I certainly want

18       to.

19   BY MS. RATTET:

20       Q.   So you said that there's an agreement that

21   Mr. Messina signed.  Is there an agreement where

22   Empire and Mr. Messina both signed the document?

23       A.   I don't think so.  I don't think that I

24   added my signature to it.

25       Q.   Is there a reason why you didn't add your

1  signature to it?

2      A.  No, no reason.

3      Q.  And you said that there's e-mails

4  transmitting the signed document back to you from

5  Mr. Messina?

6      A.  Yes.

7      Q.  And before Mr. Messina sent the signed

8  document or returned the signed document back to

9  you, did he propose any changes to the agreement as

10  drafted?

11      A.  No.

12      Q.  Who prepared the agreement that Mr.

13  Messina reviewed and ultimately signed?

14      A.  I think it was one of our other attorneys.

15      Q.  Okay.  And was the agreement prepared

16  specifically for Mr. Messina or is that a standard

17  form agreement that Empire typically uses in the

18  event that they offer an employee a severance?

19      A.  It is a standard form -- well, it had been

20  used previously for Michael Montella.  He never

21  signed it.  I don't think he ever signed it but it

22  was sent to him.  So it was originally prepared for

23  him.

24      Q.  Okay.  Were there any changes to the

25  agreement sent to Mr. Messina -- or were there any

1   changes to the agreement originally offered to Mr.

2   Montella that were included in the agreement sent

3   to Mr. Messina.

4       A.  Not that I recall besides obviously the

5   timeline, the time frame of the extended, you know,

6   support and then, I guess, like the financial piece

7   of it would have been updated.  I don't know that

8   there was anything else particular.  I'm not sure.

9       Q.  Does Empire have a copy of the original

10  agreement sent to Mr. Montella?

11      A.  Yes.

12      Q.  Can Empire produce a copy of that

13  agreement?

14      A.  Sure.

15      Q.  Did you review the severance agreement or

16  proposed agreement before you sent it to Mr.

17  Messina?

18      A.  I mean, I probably briefly.  I don't know.

19      Q.  Did anyone else review it before it was

20  sent to Mr. Messina?

21      A.  I don't think so.

22      Q.  Did Mr. Walsh have any input into the

23  terms that were included in the agreement that was

24  sent to Mr. Messina?

25      A.  I mean, input, he agreed -- I mean, he

1   ultimately is the one who green lighted, you know,

2   keeping Anthony on for the six months.

3        Q.   Right.  But did he, to your knowledge,

4   give any input into the actual terms of the

5   severance agreement?

6        A.   No.

7        Q.   Was he copied -- was Mr. Walsh copied on

8   any e-mails related to the severance agreement?

9        A.   I don't think so.

10       Q.   Is there a reason why he wasn't copied on

11  e-mails related to the severance agreement?

12       A.   No, I mean, I don't know any reason why he

13  would be or wouldn't be.

14            MS. RATTET:  I'm going to pull up

15  Exhibit 9.

16            (Whereupon, the above-referenced item was

17       electronically identified as Plaintiff's

18       Exhibit Number 9 for Identification.)

19  BY MS. RATTET:

20       Q.   Miss Molino, can you see my screen okay?

21       A.   Yes.

22       Q.   This is Exhibit 9, Defendant 3336 to

23  Defendant 3341.  It's an e-mail dated May 3rd,

24  2023, sent by you to Anthony Messina and also the

25  severance agreement.  We can just enter it as a

1   composite exhibit.

2         Miss Molino, was this the first time that

3   you sent Mr. Messina the severance agreement?

4         A.  Yeah, I believe so.  I don't think I would

5   have ever sent it to him another time, yeah.

6         Q.  And is there a reason why there was a gap

7   between, you know, the initial elimination of his

8   position on March 24th and this May 3rd date on

9   which he received the severance agreement?

10        A.  Yeah, I mean, I don't think like -- I

11  don't know if it was that he kind of like

12  officially, you know -- I don't remember if there

13  was a significance around April 30th being like his

14  last day of, you know, complete availability to us.

15  I don't recall if that was what it was, you know,

16  it could have just been me juggling a million

17  things and not getting it to him quickly.  You

18  know, it didn't feel like something super pressing.

19  We had reached an agreement.  It wasn't something

20  -- I don't think either party was particularly

21  worried about, you know, following through on.  I

22  believe Anthony would continue to support us.  I

23  think he believed that, you know, we would continue

24  to honor the agreement we had with him and it may

25  have been just when I got to it.  I don't really

1   know why there was a big time gap.

2        Q.  When you say that April 30th was the last

3   day of Mr. Messina's complete availability, what do

4   you mean by that?

5        A.  And I don't know.  I don't know that

6   that's definitive.  That's one possibility.  I

7   don't remember if he had agreed to, you know, to

8   be, you know, completely available to us before

9   starting another job through April 30th and

10  available to the clubs.  I mean, he continues to be

11  available to myself, Patrick and people who assumed

12  his roles but I don't know if he was still, you

13  know, available to some extent through April 30th.

14  I don't recall the specifics of that.  That's just

15  one thing that popped into my head as a

16  possibility.  I don't have a definitive answer for

17  you on that either way.

18       Q.  So between the time he was informed that

19  his position had been eliminated and the date on

20  which the agreement was sent, which is May 3rd, did

21  Mr. Messina continue operating in the same role

22  that he had before he was notified of the

23  elimination of his position?

24       A.  Not fully.  There was definitely a time

25  period and, again, I don't know exactly what that

1  was.  It wasn't like, you know, Anthony your

2  position's being eliminated, today's your last day.

3  It was like, hey, your position's being eliminated,

4  like we need to figure out what this looks like in

5  terms of, you know, transitioning things over,

6  getting any additional support we need before doing

7  that, whatever.  So there definitely was like a

8  time period where people had been trained and the

9  work had started transitioning to them but maybe

10 Anthony -- they were reaching out to Anthony for

11 help more regularly, that type of thing.  I don't

12 really recall the specifics of it.

13      Q.  But for all intents and purposes Mr.

14 Messina was still an employee of Empire during this

15 transition phase; correct?

16          MR. SONDHI:  Object to the form.

17          THE WITNESS:  Yes.

18 BY MS. RATTET:

19      Q.  And he understood that he was still

20 employed -- or that was your understanding is that

21 he understood that he was still an employee?

22      A.  Yeah.

23      Q.  And you recognize the agreement and

24 release; correct?

25      A.  Yes.

1        Q.   Let me know if you want to take a minute

2    to review it.  I'm going to ask you some questions

3    about it.

4        A.   Okay.

5        Q.   So did you enter in the second day of May,

6    that date in the first paragraph?

7        A.   Yes.

8        Q.   And was that date entered into on May 2nd?

9        A.   That was -- yes, I was writing, I guess,

10   today's date or whatever it was at the time, yeah.

11       Q.   It was your understanding that his

12   employment was continuing with the company after

13   the termination date indicated in this agreement

14   that we have up on the screen.  Do you know why

15   there's a provision stating that his termination

16   had, in fact, ended?

17       A.   I mean, where does it say that?  It says

18   with six months notice like.  I mean, so that means

19   six months.

20       Q.   So I'm looking at paragraph one,

21   termination of employment where it says the parties

22   acknowledge and agree that employee's employment

23   with the company terminated as of the termination

24   date?

25       A.   Can you like point to it?

1    Q.   Sure.   Sorry, it's paragraph one.

2    A.   Terminated as of the termination date.

3  Yeah, I mean, this is like, I guess my -- I mean,

4  it was prepared by an attorney.   I don't know.   I'm

5  not an attorney.   Maybe I should have had an

6  attorney read it before I sent it to Anthony.

7    Q.   But it was prepared by an attorney; right?

8    A.   For Michael Montella, then I just reused

9  it and entered in information as it relates to

10  Anthony.   So, I mean, maybe I should have had an

11  attorney review it.

12    Q.   Okay.   So you did not, in fact, have --

13  you used purely the agreement prepared for Michael

14  Montella and did not have an attorney review this

15  agreement before it was sent to Anthony?

16    A.   I did not have an attorney review this

17  agreement before sending it to Anthony.

18    Q.   In paragraph two, the second clause where

19  it begins and contingent upon employee's

20  cooperation, was that sentence included in Mr.

21  Montella's agreement?

22    A.   I believe so.   I mean, that's something I

23  feel like can just be easily answered.   So I don't

24  think that's something that I would have added but

25  I could be wrong.   I mean, it just seems like

1    something that can be easily answered with the

2    actual document.

3         Q.   Okay.  And you agreed it's in the Montella

4    agreement?

5         A.   Right.

6         Q.   Okay.  And I'm looking at paragraph four

7    now on Page 2 of the agreement, Defendant 3338

8    return of proprietary information.  Did Mr. Messina

9    return all proprietary information before signing

10   this agreement?

11        A.   I don't think that he has any proprietary

12   information to return so there was no return of

13   information.

14        Q.   Did you ask him?

15        A.   No, I didn't.

16        Q.   And if I can direct your attention to

17   paragraph six, the non-disparagement clause,

18   Defendant 3339.  Did you make any changes to this

19   paragraph before sending it to Mr. Messina?

20        A.   I don't think so.  I mean, I would be

21   shocked if I did.  But, again, that seems like

22   something that can be easily answered.

23        Q.   Would you consider a deposition notice a

24   court order, Miss Molino?

25             MR. SONDHI:  Object to form.

```
 1              THE WITNESS:  I don't know.  I guess, I
 2         don't know.  I don't know.  I'm not an
 3         attorney.
 4    BY MS. RATTET:
 5         Q.  Prior to Mr. Messina's deposition did you
 6    have any discussions with him about the deposition
 7    as it relates to the confidentiality provision in
 8    this agreement?  And I can tell you it's paragraph
 9    7C.
10         A.  No.
11         Q.  And I know that you don't know the exact
12    date when Mr. Messina signed and returned and if
13    there are documents, like you said, that would
14    support that date and indicate that date and that's
15    perfectly fine, you can just let me know.  But do
16    you know approximately how long he took to review
17    and return the signed agreement back to you?
18         A.  I believe it was the same day or within a
19    day.  It wasn't long.
20         Q.  And do you see where it says receipt -- I
21    acknowledge receipt of a copy of this agreement as
22    of the blank date of blank 2023?
23         A.  Yes.
24         Q.  Did Mr. Messina acknowledge receipt when
25    he returned the agreement to you?
```

```
 1        A.   I don't know.  I mean, I'm assuming yes
 2   but I don't know.
 3        Q.   How many signatures were included on the
 4   agreement that he returned to you?
 5        A.   I think -- I don't know.
 6        Q.   But there's a document that would show
 7   that?
 8        A.   Yes, I mean, he sent something signed back
 9   to me.  I didn't examine it super closely so I
10   honestly just don't know.
11        Q.   What did you do after you received the
12   signed agreement from Mr. Messina?
13             MR. SONDHI:  Object to form.
14             THE WITNESS:  Nothing.
15   BY MS. RATTET:
16        Q.   Did you put the agreement into a file?
17        A.   No.
18        Q.   So where is the agreement currently
19   housed?
20        A.   In my e-mail.
21        Q.   When did you learn that Mr. Messina would
22   be designated as the corporate representative, or
23   when did you designate him as the corporate
24   representative?
25        A.   I don't recall.
```

1        Q.  Do you know if it was before he signed and
2    returned the agreement?
3        A.  Was it before he signed and returned this
4    agreement?
5        Q.  Uh-huh.
6        A.  No.
7        Q.  So earlier you testified that Mr. Messina
8    would still make himself available, you know, kind
9    of on a continuing basis and I recognize that you
10   have a relationship with him in terms of, you know,
11   a mentor/mentee relationship and you've worked
12   together for a long time.  So is it your
13   understanding that you'll still be able to discuss
14   things related to Empire with him after the
15   separation is finalized on September 24th?
16       A.  It's not something I've given a ton
17   thought to.  I would think that there's still a
18   chance that he may continue to consult for us as a
19   needed if we're, you know, opening new clubs, that
20   type of thing if Patrick, you know, thinks there's
21   value there.  You know, would we still maybe have
22   conversations around like how's work going type of
23   thing, yeah, but would I disclose, you know, what I
24   would consider to be like confidential employee
25   matters with him, no, he's not an employee but, you

1    know, the same way I would talk about, you know,

2    work with a friend like.  I don't know.  Like if I

3    talk to people that still work at the other

4    company, at New York new sports clubs or whatever,

5    they've moved on to other places, how's it going

6    there.

7          I talked to one of my old bosses, you

8    know, who's at Crunch now and we'll catch up

9    sometimes, you know, how are you guys doing with

10   the business, how we're doing, whatever, just in

11   general terms, but I wouldn't share anything

12   confidential with him.  Beyond that date I

13   wouldn't.  I haven't thought about it but I

14   wouldn't share anything confidential with him or

15   specific beyond that date.

16       Q.  When you say that he'll be available or

17   you think he'll be available to consult with

18   as-needed, would that mean that he would continue

19   to be paid as a consultant?

20       A.  Yeah, I mean we would probably need to,

21   you know, that would probably depend what that

22   looked like and us reaching some sort of agreement.

23   I don't know if it would be probably like an hourly

24   rate of some sort type thing.  Again, I think that

25   it would really be up to Patrick if he sees the

1    value there.  But I could see, I think Anthony has

2    a lot of experience and could be valuable as we're

3    opening up new clubs, those type things especially

4    New York.  He's worked in New York so long he knows

5    that market very well.  And his current company

6    doesn't do business there so I don't think that's a

7    conflict of interest although, you know, that's

8    really for him to figure out.  But, yeah, I could

9    see there being some sort of agreement to use him

10   on, you know, an hourly type consulting basis if it

11   made sense in the future.

12        Q.  Is there a conflict of interest currently

13   because his current company has a location or

14   operates out of Orlando?

15             MR. SONDHI:  Object to form.

16             THE WITNESS:  No, I don't think so.  I

17        mean, those are very, very, very far apart.

18        It's not a direct competitor at all and, you

19        know, Florida is a pretty big state and

20        Orlando is pretty far from our clubs that we

21        have.

22   BY MS. RATTET:

23        Q.  Have there been any discussions about

24   retaining Mr. Messina on a consultant basis, you

25   know, with anyone at Empire?

1        A.   I don't know about any specific.  I don't

2    know.  I don't know.  I mean, I feel like it may

3    have come up, you know, in relation to us -- like I

4    said, we are opening a new gym in New York and

5    there could be some value there in the future but I

6    don't know.  I don't even know if Anthony would be

7    open to it but, you know, I don't know.

8        Q.   But have you had any specific discussions

9    with anyone at Empire about the possibility of

10   retaining Mr. Messina after the conclusion of -- or

11   the September 24th date?

12       A.   Patrick and I may have discussed, you

13   know, whether we're like a hundred percent, you

14   know, good with, you know, we've gotten everything

15   we need from him in terms of like, you know,

16   information he has, insight, the trainings, you

17   know, the people that took over his role are good

18   to go, you know, are we good for that and that type

19   of thing but nothing definitive.

20       Q.   When did those conversations or

21   conversation take place between you Patrick?

22       A.   Probably sometime over the summer I would

23   guess.  Maybe in August just knowing that Anthony's

24   time is winding down.

25       Q.   And were -- was that possibility of

```
 1   retaining Mr. Messina as a consultant ever
 2   communicated to Mr. Messina?
 3        A.  I don't think so.
 4        Q.  Did you ever discuss that possibility with
 5   Mr. Messina?
 6        A.  I don't recall it.  I mean, I don't know
 7   if he's ever said like, you know, I would be
 8   available if you guys need help or whatever.  I
 9   don't recall that specifically.  I could see him
10   saying something like that but I don't recall a
11   very specific conversation around it.
12            MS. RATTET:  I'm pretty close to wrapping
13        up.  If I can just take five minutes to go
14        back and check my notes, it shouldn't be much
15        longer.
16            MR. SONDHI:  Great.  Thank you.
17            (Whereupon, a brief recess was had, after
18        which time the following proceedings were
19        had:)
20            MS. RATTET:  I just have a couple more
21        questions for you, Miss Molino.
22   BY MS. RATTET:
23        Q.  Going back to the discussion that we had
24   about the company's response to the Department of
25   Economic Opportunity, again, I don't want to know
```

1    anything that you discussed with your attorneys,

2    but were you the person who provided information to

3    the attorneys in order to prepare the response?

4        A.   I don't think I provided any specific

5    information for the response.  They had information

6    already in relation to the claim and that

7    information had been provided from various

8    resources myself.  I'm assuming at that point they

9    had met with J.C.  I don't know if they had met

10   with anybody else at that point, so, yeah.

11       Q.   Okay.  What was your involvement or did

12   you have any involvement in relation to the

13   pregnancy discrimination EEOC charge that was

14   brought by Daniella Rosato?

15       A.   No, I didn't.

16       Q.   Did you know that she had brought a

17   charge?

18       A.   After the charge was brought I was made

19   aware of it but I had no involvement in it because

20   it's in Puerto Rico.  We rely heavily on our

21   attorneys there.  I don't speak Spanish so that

22   definitely does limit me there but I had no

23   involvement.

24       Q.   Okay.  Is there an HR function for Empire

25   present in Puerto Rico?

1        A.   No.   We communicate pretty regularly with

2   our attorneys there.   We communicate regularly with

3   them, yeah.

4        Q.   Okay.   And in March of 2022 you were still

5   the HR director; correct?

6        A.   Yep.

7        Q.   And so the extent of your involvement was

8   simply that you were notified that a charge had

9   been filed?

10       A.   Yeah, I was notified a charge had been

11  filed.   I think that, you know, I said to the

12  general manager who was Amaryllis at the time like,

13  hey, if you guys are terminating someone you should

14  loop me in.   But I do intend to involve normally --

15  I think I always involve any time we have an HR

16  issue come up in Puerto Rico we involve our

17  attorneys there that are employment law attorneys

18  because I just get concerned about like things

19  getting lost in translation like, you know, if I'm

20  interviewing somebody and the person translates

21  something wrong I just don't think that that's

22  right for the business.   So we do rely heavily on

23  our attorneys there.

24       Q.   In relying heavily on the attorneys there,

25  do the attorneys still kind of keep you informed as

1    to what's going on?

2         A.  Yeah, too some extent.  I mean, we had

3    a -- for example, we had a call with them yesterday

4    about --

5         Q.  I don't want to hear --

6         A.  I know, I know.

7              MR. SONDHI:  I think you've answered it.

8              THE WITNESS:  Okay.  Yes, they normally

9         loop me in on, you know, what the outcome or

10        the recommendation was to some extent, yes.

11   BY MS. RATTET:

12        Q.  Okay.  And is it your understanding that

13   that charge and that issue had resolved?

14        A.  Yes.

15        Q.  And the matter was settled and, again, if

16   the terms of the settlement are confidential and I

17   recognize that so I don't want to know but I just

18   want to confirm that it was settled?

19        A.  Yes.  It was settled.

20             MS. RATTET:  I think that's it for me.

21             MR. SONDHI:  Nothing for me.

22             MS. RATTET:  Okay.  Thank you.

23             Again, Miss Molino, hopefully this is the

24        last time.  I really appreciate your time and

25        being here today.  So, thank you, again, I

```
1        appreciate it.
2            THE WITNESS:  Thank you.  Have a good day.
3        Bye everyone.
4            MR. SONDHI:  Are you ordering?
5            MS. RATTET:  Yeah.
6            MR. SONDHI:  Okay.  We'll take a copy.
7            (The deposition was concluded at 12:40
8        p.m.)
9            (Reading and signing of the deposition was
10       waived by the witness and all parties.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    CERTIFICATE OF OATH

 2    STATE OF FLORIDA

 3    COUNTY OF BREVARD

 4

 5            I, Andrea Mazor-Stabb, Registered Professional

 6    Reporter, Florida Professional Reporter, Notary Public,

 7    State of Florida, certify that LEAH MOLINO remotely

 8    appeared before me on September 13, 2023 and was duly

 9    sworn.

10            Signed this 18th day of September, 2023.

11

12

13            _____
              Andrea Mazor-Stabb, R.P.R., F.P.R.-C
              Registered Professional Reporter
14            Florida Professional Reporter-C
              Notary Public, State of Florida
15            Commission No.:  HH 154451
              Expires:  October 23rd, 2025
16

17

18

19

20

21

22

23

24

25
```

```
 1              CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA

 3   COUNTY OF BREVARD

 4

 5          I, Andrea Mazor-Stabb, Registered Professional

 6   Reporter, Florida Professional Reporter certify that I

 7   was authorized to and did stenographically remotely

 8   report the deposition of LEAH MOLINO, Pages 1 through

 9   87 that a review of the transcript was not requested;

10   and that the transcript is a true record of my

11   stenographic notes.

12          I further certify that I am not a relative,

13   employee, attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorneys or counsel connected with the action, nor am

16   I financially interested in the action.

17          Dated this 18th day of September, 2023.

18

19

20

21

22

23   _____
     Andrea Mazor-Stabb, R.P.R., F.P.R.-C
24   Registered Professional Reporter
     Florida Professional Reporter-C
25
```

# EXHIBIT F

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
 3   FORT PIERCE DIVISION
     - - - - - - - - - - - - - - - - - x
 4   SARABETH DEMARTINO,
 5
                         Plaintiff,
 6
              vs.
 7                           Case No.
                              22-cv-14301-CANNON
 8
 9   EMPIRE HOLDINGS AND INVESTMENTS, LLC;
     and JUAN CARLOS MARRERO,
10
                         Defendants.
11   - - - - - - - - - - - - - - - - - x
             DATE:  Thursday, May 18, 2023
12           TIME:  10:00 a.m.
13           Volume I
14           Deposition of JUAN CARLOS MARRERO,
15   Defendant, taken by Plaintiff, in the
16   above-entitled action, held via Zoom, pursuant
17   to notice, taken before Elizabeth A. Stella, a
18   Stenographer and Notary Public within and for
19   the State of New York.
20
21
22
23
24
25
```

```
 1

 2    R E M O T E   A P P E A R A N C E S:

 3          MORGAN & MORGAN, PA
                  Attorneys for Plaintiff
 4                8151 Peters Road, 4th Floor
                  Plantation, Florida 33324
 5                (954)807-7774

 6          BY:  ALLISON M. RATTET, ESQ.
                   arattet@forthepeople.com
 7
            BY:  BRYAN ARBEIT, ESQ.
 8                 barbeit@forthepeople.com

 9
            JACKSON LEWIS, P.C.
10                  Attorneys for Defendant
                    One Biscayne Tower, Suite 3500
11                  2 South Biscayne Boulevard
                    Miami, Florida 105581
12                  (305)577-7600

13          BY:   RANJIV SONDHI, ESQ.
                    ranjiv.sondhi@jacksonlewis.com
14
            BY:  PEDRO TORRES-DIAZ, ESQ.
15          Pedro.torres-diaz@jacksonlewis.com

16

17

18    ALSO PRESENT:  Sarabeth DeMartino, Plaintiff

19                   Leah Molino

20

21

22

23

24

25
```

```
 1
 2                    STIPULATIONS
 3              It is hereby stipulated and
 4    agreed by counsel and among counsel for the
 5    respective parties hereto, that the filing,
 6    sealing, and certification of the witness'
 7    deposition shall be and the same are hereby
 8    waived; it is further stipulated and agreed
 9    that all objections, except as to the form of
10    the question, shall be reserved to the time of
11    trial; it is further stipulated and agreed
12    that the within deposition may be signed
13    before any notary public with the same force
14    and effect as if signed and sworn to before
15    the Court.
16
17
18
19
20
21
22
23
24
25
```

1   J U A N   C A R L O S   M A R R E R O, the

2   witness herein, having been sworn, remotely,

3   upon being examined testified as follows:

4   EXAMINATION BY MS. RATTET:

5        Q    Hi.  Good morning, Mr. Marrero.

6        A    Good morning.

7        Q    My name is Allie Rattet, and I'm an

8   attorney with Morgan and Morgan, and I

9   represent Sara DeMartino in her lawsuit

10  against Empire and you as an individual.

11  Would you please state and spell your name for

12  the record for me.

13       A    Sure.  My full name is Juan Carlos

14  Marrero.  First name J-U-A-N.  Middle name

15  C-A-R-L-O-S.  Last name M-A-R-R-E-R-O.

16       Q    Thank you.  Do you go by any other

17  names?

18       A    J.C.

19       Q    Okay.  Any other names besides

20  J.C.?

21       A    No.  Just in case, at work,

22  sometimes it will be Juan or Juan Carlos, but

23  it's always usually J.C.

24       Q    Okay.  Thank you.  Have you ever

25  been deposed before?

```
 1        A    I'm sorry?

 2        Q    Have you ever been deposed before?

 3        A    A very long time ago when I worked

 4   for Equinox Fitness.

 5        Q    Okay.  Approximately how long ago

 6   was that?

 7        A    Probably, like, 13, 15 years ago.

 8        Q    Okay.  And what was the reason for

 9   the deposition?

10        A    I was just involved in the club

11   level.  They said prejudism [sic], so they

12   brought me in, and I just remember going into

13   Miami, kind of like a video room.  They asked

14   my name and that was it.  It was, like, ten

15   minutes of questions they had for me and that

16   was it.  From my understanding, everything was

17   dismissed.

18        Q    Okay.  And when you say prejudism,

19   what do you mean by that?

20        A    I don't recall because I don't

21   remember.  They just called me in and they

22   just asked me a couple questions.  And I just

23   remember it was stated something about

24   prejudism, you know, black, toward black.

25   That's what I remember.
```

```
 1        Q    Okay.  And were you the person who
 2   was involved in this matter?
 3        A    No, not at all.  I was just in the
 4   gym, in the gym.  Yeah, yeah, not at all.  I
 5   think they asked me for proof.  I wasn't
 6   involved at all.  It wasn't against me or
 7   anything like that, no.
 8        Q    Okay.  Okay.  So since it's been
 9   several years since you've been in a situation
10   like this, I think probably, to refresh your
11   memory, let's go over some just ground rules
12   about what the deposition is like.  It's
13   really important, and I know that in everyday
14   vernacular, we tend to talk over one another
15   because it's just natural and organic to have
16   a conversation, but for purposes of the
17   deposition today, to make sure we try our best
18   not to speak over one another.  It's bound to
19   happen, but to the extent that we can avoid
20   it, it will make it much easier on Ms. Stella
21   if we can try to avoid talking over one
22   another.
23        Do you understand that?
24        A    Yes.
25        Q    Okay.  And you're doing a great job
```

```
 1    already today with verbal responses.
 2    Obviously, a court reporter in a transcript
 3    can't take down nonverbal responses.  So
 4    shakes of the head or, you know, nods or hand
 5    gestures, none of that will come out in the
 6    transcript, so it's important that you give a
 7    verbal response.
 8         A    Okay.
 9         Q    Okay.  And so I'm going to be
10    asking you a series of questions today from
11    your independent recollection.  I tend, of
12    course, over the course of a day to ask a
13    terrible question here or there.  I try to
14    avoid it to the extent possible, but if you
15    don't understand a question, please let me
16    know.  I'm happy to rephrase it.  If you do
17    answer the question though, I will have
18    assumed that you understand it, and so the
19    testimony will be what it is based off of the
20    question that I asked.
21         Does that make sense?
22         A    Yes.
23         Q    Okay.  If you need a break today,
24    that's perfectly fine.  Just let me know when
25    you need a break.  The only thing that I ask
```

```
 1    is that you don't leave a question pending.
 2    So if there's a question that I'm asking, if
 3    you can provide a response before you go on
 4    the break, then we can take a break shortly
 5    thereafter.
 6         A    Okay.
 7         Q    Your attorney may object to some of
 8    my questions today.  And the objection is, you
 9    know, it's just a formality, and so he'll need
10    to do that, but unless he tells you not to
11    respond, then I'm going to be entitled to your
12    response, and so he'll let you know if there's
13    some grounds on which you're not permitted to
14    respond or he doesn't want you to, but
15    otherwise, I'm still entitled to hear what
16    your response is to my question.
17          Does that make sense?
18         A    Yes.
19         Q    Okay.  Very good.  Is there any
20    reason today that you would not be able to
21    testify truthfully?
22         A    No.
23         Q    Okay.  Any reason the deposition
24    should not move forward today?
25         A    No reason.
```

```
 1          Q    Okay.  And are you taking any
 2    medications that would interfere with your
 3    ability to recall certain events or testify
 4    truthfully?
 5          A    No medication.
 6          Q    Okay.  So I think that pretty much
 7    covers it in terms of the ground rules.  So
 8    what did you do today to prepare for this
 9    deposition?
10          A    What did I do?  I went over all my
11    notes and some self-care early in the morning.
12          Q    Okay.  And when you say you went
13    over all of your notes, what notes are those?
14    What do you mean by notes?
15          A    Oh, my personal notes.
16          Q    Okay.  Personal notes.  When were
17    those personal notes taken?
18          A    So your question is what, like, how
19    did I prepare this morning?  So self-care,
20    like, I went to work out, not to get so into
21    it.  And then I just prepared my day with my
22    personal notes.
23          MR. SONDHI:  I think I can help you,
24       Allie.  Maybe you can ask him if he reviewed
25       anything.
```

```
1              MS. RATTET:  That was going to be my next
2         question.
3         Q     So did you review any documents in
4    preparation for today's deposition?
5         A     Yes, I did.
6         Q     Okay.  And which documents did you
7    review?
8         A     I reviewed -- actually, I have them
9    in front of me.  So I have reviewed the
10   Complaint.
11        Q     Okay.  Did you review anything
12   else, any other documents?
13        A     No. It was just the Complaint that
14   I really reviewed, yes.
15        Q     Okay.  So when you testified a
16   couple minutes ago to personal notes, what
17   notes were you referring to?
18        A     My personal notes on the actual --
19   on my report that I printed.
20             MR. SONDHI:  You don't have to show those,
21        J.C. Just answer the question.
22        A     Just my personal notes on top of
23   the documents that I had printed.
24        Q     Okay.  And those personal notes,
25   when were those taken?
```

```
1          A     This morning.
2          Q     Okay.  Did you review any other
3    documents, aside from the Complaint and the
4    personal notes?
5          A     No. That's it.
6          Q     Okay.
7              MS. RATTET:  I would ask that the personal
8          notes are entered as Exhibit 1.
9                  (Exhibit 1 was introduced for the
10                 record.)
11             MR. SONDHI:  Is that something you're
12         producing?
13             MS. RATTET:  Well, I would hope that he
14         was producing it because he brought it to the
15         deposition.
16             MR. SONDHI:  Okay.
17             MS. RATTET:  I mean, unless it was -- I
18         think these are personal notes, not at your
19         instruction.
20             MR. SONDHI:  So that's what I wanted to
21         clarify actually.
22                 So if these are any notes, J.C., that
23         are, just for the record, that is anything from
24         my instruction, then I'm going to object to
25         that for attorney-client privilege and it would
```

```
 1        not be admissible as an exhibit.  So I don't

 2        know what the notes are, but if it's anything

 3        related to instruction, I'll need to review it

 4        first.

 5             MS. RATTET:  That's perfectly fine with

 6        me, but, you know, he did bring it to the

 7        deposition and he said that it was his personal

 8        notes, so...

 9             MR. SONDHI:  We'll review it first, and of

10        course anything not part of my instruction,

11        then we'll provide.

12             MS. RATTET:  Sure.  We can agree in theory

13        on that right now.

14             MR. SONDHI:  Okay.

15        Q    Okay.  So you reviewed the

16   Complaint.  You took personal notes and

17   reviewed personal notes.  Did you speak with

18   anyone other than your attorneys about this

19   deposition today?

20        A    No.

21        Q    Have you ever been convicted of a

22   crime, Mr. Marrero?

23        A    No.

24        Q    Have you ever been charged with a

25   crime of dishonesty?
```

```
1         A     No.
2         Q     And when I say a crime of
3    dishonesty, I mean fraud or crimes that would
4    involve your ability to tell the truth.
5         A     No.
6         Q     Okay.  Have you ever been a party
7    to a lawsuit?
8         A     Can you repeat the question.
9         Q     Sure.  So have you ever been a
10   party to a lawsuit?  And I'll qualify that by
11   saying prior to this case.
12        A     No.
13        Q     Have you ever filed for bankruptcy?
14        A     No.
15        Q     Have you ever filed for divorce?
16        A     I'm divorced and remarried.
17        Q     Okay.  And when did you file for
18   divorce or when did you get divorced?
19        A     Hold on.  I'm remarried for a
20   couple years.  I don't remember.  I really --
21   probably 2009, somewhere in that, 2009, 2011.
22   That's when I believe everything was
23   finalized.
24        Q     Okay.  And did that occur in the
25   State of Florida?
```

```
 1          A    Yes.
 2          Q    Okay.  Did you attend high school,
 3   Mr. Marrero?
 4          A    Yes.
 5          Q    And what high school did you
 6   attend?
 7          A    Newtown High School.
 8          Q    N-E-W-T-O-W-N?
 9          A    N-E-W-T-O-N -- O-W-N -- yes,
10   Newtown.  Yes.  N-E-W-T-O-W-N.
11          Q    Okay.  So Newtown High School.  And
12   where was Newtown High School located?
13          A    Queens, New York.
14          Q    And are you from Queens?
15          A    Yes.
16          Q    Okay.  And did you graduate from
17   Newtown High School?
18          A    No, I did not.
19          Q    And what years did you attend?
20          A    I don't recall.  '90s.  In the '90s.
21          Q    Okay.  Was it early '90s?
22          A    I believe so.
23          Q    So '90 to '93?
24          A    Could be, yeah.
25          Q    Okay.  And did you get a GED?
```

```
 1          A     Yes, I did.

 2          Q     And when did you get the GED?

 3          A     I'd like to say 1991.

 4          Q     Okay.  So how many years of high

 5     school did you attend?

 6          A     I believe two.

 7          Q     So fair to say that you would have

 8     attended high school in 1989/1990?

 9          A     I don't recall.  I really don't.

10          Q     Okay.  Did you attend college?

11          A     Yes.

12          Q     And where did you attend college?

13          A     Queensborough Community College.

14          Q     And where is Queensborough

15     Community College located?

16          A     Bayside Queens, New York.

17          Q     And did you obtain a degree?

18          A     I never finished.

19          Q     So no associate's degree?

20          A     That's correct.

21          Q     And what years did you attend

22     Queensborough Bayside?

23          A     Once again, in the early '90s.

24     Right after the GED.  Like, right after that.

25     So I would say the early '90s.
```

```
 1          Q    Okay.  Do you have any other
 2   degrees beyond the GED?
 3          A    Just certifications, but no
 4   degrees, no.
 5          Q    Okay.  What certifications do you
 6   have?
 7          A    Certified holistic health coach.
 8          Q    Any other certifications?
 9          A    More on the training side, the
10   personal training.  So 200 hours of yoga
11   certification.  Thai massage.
12          Q    And are these -- I'm sorry, I
13   didn't mean to cut you off.
14          A    One more.  Reiki specialist, but,
15   like, Level 4.
16          Q    Okay.  And with respect to the
17   certified holistic health coach, what did that
18   certification entail?
19          A    So it was about a year's work, of
20   hard work.  Online courses, and then also
21   going to courses as well.
22          Q    And what type of online courses
23   were those?
24          A    From the school.  So it's Institute
25   of Integrative Nutrition.  That was provided
```

```
 1   from the school.
 2        Q    And so was there a, like, clinical
 3   component to that with, like, in person versus
 4   online?
 5        A    Yeah.  There were.  And you had to
 6   complete a certain amount of hours that I do
 7   not recollect the amount of hours at this
 8   time.
 9        Q    Do you know generally about how
10   many hours?
11        A    It was about a year's work.  That's
12   what I remember.  It was a year's work, and
13   then you could also fast-track, but it was the
14   whole length of the year, if I remember.
15        Q    And a year's work.  Would you say
16   40 hours a week, like a full workweek?
17        A    I don't recollect, but, yeah, a
18   full workweek I would like to say.  Also
19   Co-Active courses for life coaching as well
20   you can add.
21        Q    You said Co-Active courses?
22        A    Yeah.  That's the name of the
23   company.
24        Q    And so let's go back to the
25   certified health coach.  When you become a
```

```
 1    certified health coach, what does that enable
 2    you to do beyond, you know, what you would be
 3    able to do without that certification?
 4         A     Yeah.  So you're able to coach
 5    people one-on-one, and you're able to identify
 6    their lifestyle behaviors and give
 7    suggestions.
 8         Q     Okay.  And then you mentioned that
 9    you also have 200 hours of yoga certification.
10         A     Yes.  That is correct.
11         Q     And is that a specialized type of
12    yoga?
13         A     No. No. Vinyasa.  Vinyasa yoga.
14         Q     And then you said also Thai
15    massage, correct?
16         A     That is correct.  Yeah.
17         Q     And what did that certification
18    entail?
19         A     Hands-on with the master, and
20    hands-on for -- it was two weekend courses.
21         Q     And then with respect to Level 4
22    Reiki specialist, what did that certification
23    entail?
24         A     Hands-on, and also studying, but
25    mostly hands-on one-on-one with your
```

1    instructor.

2         Q    And when you say hands-on

3    one-on-one, can you kind of describe what that

4    would be?

5         A    It's the way a session is done.  So

6    that's what I mean by being hands-on.  So a

7    session is being done.  You have to do a

8    certain amount of things to the body,

9    physically and nonphysical.  So the master or

10   the instructor will give you instructions on

11   how to do it and how to position yourself.  So

12   that's what I mean by hands-on.

13        Q    And this is just for my edification

14   because I'm not aware of these specialized

15   techniques, but it's basically just a session

16   where you're learning the specialized

17   techniques in order to perform on someone

18   else, correct?

19        A    That is correct.  Or yourself.

20        Q    Okay.  And then you said Co-Active

21   courses to be a life coach.

22        A    That's correct.

23        Q    What exactly -- what is the

24   Co-Active program that you're involved in?

25        A    Co-Active is a preparation course

```
 1   to get you ready to become a life coach.  So
 2   I, combined, I did a little bit over 600 hours
 3   and basically completed 85 percent of the
 4   curriculum.
 5         Q    You said 600 hours?
 6         A    I'm sorry?
 7         Q    I'm sorry.  You said 600 hours?
 8         A    Over.  Yeah, over 600 hours.  And
 9   that's something ongoing with me right now
10   that I take it from time to time, yeah, when
11   I'm prepared.
12         Q    Okay.  Is there -- so at 85
13   percent, I mean, that's about -- I don't know,
14   my math is terrible -- probably 800 hours,
15   around there?
16         A    Yeah.  It's basically complete.  I
17   just need to take about two more courses.
18         Q    Okay.  And when did you start the
19   life coach courses?
20         A    I'd like to say probably -- I don't
21   recall.  I don't.  Recent, but I don't know.
22   2020 you can put.
23         Q    Like during COVID?
24         A    Prior to that.  Prior to COVID.
25   Yeah, prior.
```

```
 1          Q    Okay.  And I don't believe that I
 2    asked you when you became a certified holistic
 3    health coach.
 4          A    2013.
 5          Q    And the yoga certification has been
 6    ongoing?
 7          A    Yeah, but that's for myself.  I
 8    don't teach it.
 9          Q    Okay.  And when did you start
10    working with a Reiki specialist to achieve
11    Level 4?
12          A    2011.
13          Q    Okay.  And the Thai massage
14    courses, the two weekend courses?
15          A    2013 as well.
16          Q    Any other classes or certifications
17    that we haven't already discussed?
18          A    Not -- no.  That would be it that I
19    recall.
20          Q    Okay.  Have you ever filed a charge
21    of discrimination with an administrative
22    agency?
23          A    No.
24          Q    Have you ever requested a leave of
25    absence from an employer?
```

```
 1          A     No.  Not that I recall.
 2          Q     Okay.  Have you ever requested,
 3   specifically, FMLA leave?
 4          A     I don't recall.
 5          Q     Is there something that you're
 6   thinking of, a health-related condition, that
 7   you may or may not have requested some sort of
 8   leave?
 9          A     Yeah, I don't remember.
10          Q     Okay.  So when you say you don't
11   remember, there may have been a circumstance
12   in which you requested some sort of leave?
13          A     Yeah, I just don't recall.
14          Q     Okay.  And are you currently
15   employed, Mr. Marrero?
16          A     I'm not.
17          Q     And when was the last time that you
18   were employed?
19          A     October of 2022.
20          Q     But you are the owner/president of
21   Flow Lifestyles, Inc., correct?
22          A     Yeah.  That's how I operate.
23   That's my business.
24          Q     And when you say that's how you
25   operate, what do you mean by that?
```

```
 1          A    So I do consulting, fitness
 2   consulting.
 3          Q    Do you do anything else under the
 4   purview of Flow Lifestyles, Inc.?
 5          A    Health coaching.
 6          Q    Anything else?
 7          A    Anything with health, body, and
 8   mind.
 9          Q    And do you have private clients?
10          A    Yes, I do.
11          Q    Okay.  What is your degree of
12   management experience within the workplace?
13          A    I like to say experience.
14          Q    Okay.  And when you say experience,
15   what do you mean by that?
16          A    Being in the industry for about two
17   decades in management.  So I believe that that
18   has a lot to do with experience.
19          Q    And have you regularly supervised
20   employees over those two decades?
21          A    Yes.
22          Q    Okay.  And on average, how many
23   employees would you say that you have
24   supervised at a time?
25          A    So I would supervise managers and
```

```
 1    the managers would supervise their employees,
 2    so depending on the size of the club or the
 3    position that I held.
 4         Q    Okay.  So I want to table your
 5    employment with Empire, but just to confirm,
 6    you worked for Empire -- what were your years
 7    of service with Empire?
 8         A    Yeah.  So this time around, I
 9    started on October 2021 and ended October of
10    2022.
11         Q    Okay.  And you said this time
12    around.  Does that mean that you previously
13    worked for Empire in some capacity?
14         A    Yes, I did.
15         Q    Okay.  And what capacity was that?
16         A    As a general manager.
17         Q    Okay.  And did you work as a
18    general manager in Florida?
19         A    No.  In New York City.  So they had
20    taken over a facility that I was working under
21    and it was -- go ahead.  You were going to
22    say?
23         Q    Please continue.  I didn't mean to
24    cut you off.
25         A    No worries.  So it was in New York
```

```
 1    City where I was working as a general manager,
 2    and they had taken over afterwards.  But once
 3    again, it's probably not Empire, but some of
 4    the same staff was there.
 5         Q    Okay.  Was that --
 6         A    I left.  And then I went to Florida
 7    with my consultant company.  In October 2021,
 8    I started with Empire again in Florida.
 9         Q    Okay.  So when you were the GM in
10    New York City, what club was that for?
11         A    It was TMPL Gym.
12         Q    And is there only one TMPL location
13    in New York City?
14         A    At the time, there was one, and I
15    worked there.  And then I worked at the West
16    Village location for their pre-sale.
17         Q    Okay.  I'm sorry, I think I missed
18    that.  So the first TMPL Gym that you worked
19    at, what location was that at?
20         A    Hell's Kitchen.
21         Q    Hell's Kitchen.  And then
22    subsequent to working at the Hell's Kitchen
23    location, you worked at the location in the
24    West Village?
25         A    Yeah, their new location that they
```

```
 1   were opening up.  I did their pre-sale.

 2        Q    And when you say pre-sale, what do

 3   you mean by that?

 4        A    Before the gym opened, months

 5   before, you're showcasing the gym through

 6   blueprints and selling the memberships as

 7   well.

 8        Q    Are you showcasing to investors?

 9        A    Prospects.  Membership sales.

10        Q    And what years did you work at TMPL

11   in Hell's Kitchen?

12        A    I'd like to say probably 2016, and

13   then I believe to 2018 or '19.  And then I

14   came to Florida.

15        Q    And when did you move to Florida?

16   What month?

17        A    May.

18        Q    Of 2019?

19        A    I believe so.

20        Q    And so during that time, the 2016

21   to 2019 period, did that also encompass your

22   time doing the pre-sale for the West Village

23   location?

24        A    Repeat the question.  I'm sorry.

25        Q    Sure, no problem.  So you testified
```

1    that you worked for TMPL at the Hell's Kitchen

2    location, and correct me if I'm wrong, from

3    2016 to 2019.

4         A    Um-hum.

5         Q    So during that time period, was

6    there also, you know, did you also work at the

7    West Village location or were you doing

8    pre-sale for the West Village location during

9    that time period?

10        A    It was at the very end when I did

11   the West Village, at the very end.  So it

12   could have been the two months of that year,

13   yeah.  A majority of the time, it was Hell's

14   Kitchen.

15        Q    Okay.  And then prior to working

16   for TMPL in Hell's Kitchen, where did you

17   work?

18        A    I don't remember right now because

19   I moved, so give me a second.

20        Q    Sure.

21        A    Prior to that, I believe I worked

22   for a year doing consulting at a holistic

23   pharmacy in New York City.

24        Q    So that would have been 2015 to

25   2016, approximately?

```
 1        A    Yeah, it could have been somewhere
 2   around there.
 3        Q    And you said it was a holistic
 4   market?
 5        A    No, no, pharmacy.  Holistic
 6   pharmacy.
 7        Q    I'm sorry.  And you said you did
 8   consulting work for them?
 9        A    That's correct.
10        Q    And what did that work entail?
11        A    Set up their juice bars and a lot
12   of operations with vendors and holistic
13   doctors.
14        Q    And what were the operations with
15   vendors?
16        A    Putting them in contact together,
17   and also tracking their invoices.
18        Q    And what type of vendors did you
19   work with?
20        A    Anything in the health-related
21   field.
22        Q    So I'm not completely familiar with
23   the health-related field, though I love Whole
24   Foods.  What, you know, is it those types of
25   companies?
```

```
 1          A     Yeah.  Think of Whole Foods in the
 2     supplement side, so the vitamins and
 3     supplements, anything with vitamins and
 4     supplements.
 5          Q     Okay.  And then prior to consulting
 6     with the -- I'm sorry, strike that.
 7           What was the name of the holistic
 8     pharmacy?
 9          A     Vitahealth.
10          Q     Okay.  And prior to working for
11     Vitahealth, where were you employed?
12          A     I worked briefly in David Barton
13     Gym.  That was the name of the company, David
14     Barton Gym.
15          Q     David, D-A-V-I-D?
16          A     Uh-huh.  Space B-A-R-T-O-N, space
17     Gym.
18          Q     B-A-R-T-O-N?
19          A     That's correct.
20          Q     And how long did you work for David
21     Barton Gym?
22          A     I don't remember.
23          Q     Can you give me an estimate?
24          A     I believe I started 2015.
25          Q     Okay.  So did your work for David
```

```
1    Barton Gym overlap with your consulting work
2    for the holistic pharmacy?
3         A    No.
4         Q    Okay.  So, but you worked at David
5    Barton prior to Vitahealth, correct?
6         A    That is correct.  Yeah, that is
7    correct.
8         Q    Okay.  Approximately how long did
9    you work at David Barton?
10        A    I don't remember.  It was before
11   Vitahealth.
12        Q    Was it, like, a year?  Two years?
13        A    Don't remember.  It's not two
14   years.
15        Q    Okay.  So less than two years?
16        A    Yeah.
17        Q    Okay.  And before you worked at
18   David Barton, where did you work?
19        A    I was traveling.  I opened up two
20   fitness centers in Puerto Rico.  They're
21   called LIV Fitness, L-I-V, Fitness Clubs.
22        Q    And did you reside in Puerto Rico
23   during the time that you were working for LIV?
24        A    Yeah.  They relocated me as well.
25   Yes.
```

```
 1          Q    And how long did -- were you
 2   relocated to Puerto Rico and working for LIV?
 3          A    It was on and off.  I would like to
 4   say two years plus, on and off.
 5          Q    So would it be fair to estimate
 6   from 2012 to 2014?
 7          A    That's a good estimate.  Yeah.
 8          Q    And was LIV affiliated with any
 9   other fitness clubs?
10          A    Not at the time.  At the time, it
11   was owned -- I worked with the owners at the
12   time.
13          Q    And were the locations limited to
14   Puerto Rico?
15          A    Yeah.  There was just one location
16   and then they opened up a second location.
17   That's where the time went.
18          Q    Okay.  And then prior to your time
19   in Puerto Rico, where you estimate it was
20   probably around 2012, 2014, did you work at
21   any other fitness clubs?
22          A    That's when I started my own
23   company in 2009, December of 2009.
24          Q    Okay.  And is that the Flow
25   Lifestyles?
```

```
 1          A     Yeah.  That is correct.  Yeah.
 2          Q     Okay.  Was it the same Flow
 3   Lifestyles or was it a different company?
 4          A     It was a different identity, but it
 5   was still the same name of the company.
 6          Q     Okay.  Was it an LLC?
 7          A     Yes, it was.
 8          Q     And so from December of 2009 to
 9   2012, that's when you were working under Flow
10   Lifestyles, LLC?
11          A     That is correct, yeah.
12          Q     Okay.  And did you ever work for
13   Equinox?
14          A     Yeah.  So prior to that -- I'd like
15   to say November 2001 through December 2009.
16          Q     Okay.  And what was your role at
17   Equinox?
18          A     Area general manager.
19          Q     And what were your job duties and
20   responsibilities as the general manager of
21   Equinox?
22          A     My role as the general manager or
23   as the area general manager?  Because I had
24   general managers under me at Equinox that I
25   had to manage.
```

```
 1          Q    Okay.  Let's start there.  As the
 2     area general manager of Equinox, what was the
 3     area that you oversaw?
 4          A    Sure.  It was Miami Beach,
 5     Aventura, and Coral Gables.
 6          Q    And what were your day-to-day job
 7     duties as the area manager?
 8          A    Okay.  Sales performance.  Hire.
 9     Develop the team.  Brand awareness.  And
10     support each club on their needs.
11          Q    And was that the time period within
12     which Equinox was kind of entering the Florida
13     market?
14          A    Yeah.  So I was in charge of -- my
15     promotion -- I received a promotion to get
16     that title, area general manager.  So I was
17     promoted from New York City to bring Equinox,
18     the brand, to the South Beach location, so
19     that's what I did.  Soon after I did that, I
20     opened up the Coral Gables location as well.
21          Q    So for the list of gyms and
22     facilities that we've just discussed, were
23     those roles typically general manager roles
24     or, you know, management level roles?
25          A    Yeah.  Especially, very executive,
```

```
 1    like high-end roles, like area general
 2    manager.  So we had a lot of training as well.
 3    Any time you were promoted, you also had
 4    training.  So they were all, yeah, manager
 5    roles.
 6         Q     And what type of training were you
 7    required to have when you received a
 8    promotion?
 9         A     Customer service.
10         Q     Anything else?
11         A     That's what I remember at this
12    time.
13         Q     Were you required to have any
14    training with respect to equal employment,
15    antidiscrimination?
16         A     Yes.
17         Q     Antiharassment?
18         A     Yes.
19         Q     Do you -- can you give me an
20    estimate of, you know, the frequency or
21    approximately how many trainings you attended
22    with respect to those types of...
23         A     Yeah, I would like to say frequent.
24         Q     And what do you mean by frequent?
25         A     Once a year frequent.
```

```
 1          Q    Did you -- were you required to
 2    take additional courses throughout the year or
 3    was it just a, you know, one training without
 4    any supplemental courses?
 5          A    I don't understand the question.
 6    Sorry.
 7          Q    It was a poorly-worded question.
 8    So what I want to know is, you said that these
 9    trainings were frequent, but they happened
10    once a year.  Was there, you know, were you
11    required to do more than just a once-a-year
12    type of a course?
13          A    Yes.  You would be required to take
14    those courses.
15          Q    Okay.  It's a little different the
16    question that I'm asking.  It's more of, like,
17    a maintenance type of a question.  And here is
18    how I can better word it for you, and I
19    apologize:  So every time you were promoted,
20    were you required to take a course, a training
21    course, related to antidiscrimination,
22    antiharassment, and the like?
23          A    Yes.
24          Q    So if you were promoted twice
25    within one year, then that would necessarily
```

1    mean that you would take two trainings during
2    that one-year period?
3         A    You would do refreshers at least
4    once a year.
5         Q    That's a good word.  That was the
6    word I was looking for.  So over the course of
7    your -- and I'm just going to date back to
8    November of '01 -- so from November of '01,
9    generally speaking, to the present time, which
10   is 2023, if you're taking at least one course
11   a year, that would mean that you've attended
12   probably right around 23 trainings with
13   respect to sexual -- or harassment,
14   antidiscrimination, equal employment?
15        A    Yeah.  I guess.  I'm not sure how
16   many.
17        Q    Well, is that a fair estimate?  I
18   don't want to mischaracterize your testimony.
19        A    Yeah.  I would say I've taken many
20   refreshers and many courses in the amount of
21   time that I've worked as a manager.
22        Q    Would you consider yourself
23   familiar with, you know, federal employment
24   laws?
25             MR. SONDHI:  Object to form.

```
 1           Q    You can answer.  You can answer.
 2                MR. SONDHI:  You can answer, J.C.
 3           A    Oh, okay.  Yes.
 4           Q    And which federal employment laws
 5      are you familiar with?
 6           A    From Florida.
 7           Q    What do you mean when you say from
 8      Florida?
 9           A    Florida is what I would know, like,
10      any of the laws from Florida.
11           Q    Okay.  So you would be more
12      familiar with the Florida employment laws than
13      you would be federal employment laws?
14           A    Depending on what state I'm
15      working, based off my refreshers, you know, I
16      would have to go take a course, and based off
17      of that, depending on what state or country
18      I'm working at, yes.
19           Q    Okay.  And all I'm really trying to
20      find out here is, you know, are you familiar
21      with, you know, the FMLA or Title VII or those
22      types of statutory laws and acts?
23                MR. SONDHI:  Object to form again.
24                   You can answer.
25           A    Yes.
```

```
1           Q    And what is the degree of your
2     familiarity with, let's say, the FMLA?
3           A    So I would go back to my guide and
4     would talk to my HR person before, you know,
5     if I had any questions.
6           Q    Right.  But my question was a
7     little bit different.  You know, you testified
8     that you had taken all these courses and you
9     were familiar, and I specifically asked you if
10    you were familiar with the FMLA.  So based off
11    of your personal knowledge and the courses
12    that you've taken, what is your degree of
13    familiarity?  What do you know about the FMLA?
14          A    I would say yes, I'm familiar with
15    it.
16          Q    And what is your understanding of
17    what the FMLA is?
18          A    Yeah, they would have to -- whoever
19    wants to take time off, they would be required
20    to go through our HR department.
21          Q    Okay.  And do you know the reasons
22    why an employee might request FMLA leave?
23          A    Yes.  Medical.
24          Q    And you also mentioned that you
25    were familiar with, you know, state laws with
```

```
 1   respect to -- and correct me if I'm wrong --
 2   antidiscrimination, antiharassment, and the
 3   like.  What is your understanding of Florida's
 4   laws with respect to antidiscrimination?
 5        A    I'm familiar with it.
 6        Q    And what do you know about
 7   Florida's antidiscrimination laws?
 8        A    That I'm familiar with it.  That's
 9   my best answer at this time.
10        Q    Okay.  So nothing specific about,
11   you know, what the laws protect?  Based on
12   your understanding.
13        A    Yeah.  I would just check with my
14   HR person at any time if I had more detailed
15   questions.
16        Q    Okay.  So when you were the GM at
17   TMPL in Hell's Kitchen --
18        A    Um-hum.
19        Q    -- how many employees did you
20   supervise?
21        A    That was a large club, so you have
22   to give me some time, because we had different
23   departments.  We had a minimum of four
24   departments, four managers, and then, you
25   know, a nice large staff of personal trainers.
```

```
 1            Q    And I'm not asking you to give --
 2            A    It's the club itself, and just the
 3       best answer I could say is I managed the
 4       managers under me, which we had different
 5       departments, and it was a very large club.
 6            Q    And so was there a reporting
 7       structure such that you were at the top of
 8       that structure when you were the general
 9       manager at TMPL?
10            A    Yes, like, I reported to somebody.
11       That is correct, yes.
12            Q    But everyone who fell under your
13       purview, did they all report to you?
14            A    They reported to the managers, and
15       the managers reported to me.
16            Q    Okay.  And were you the person who
17       ultimately made decisions related to their
18       employment?
19            A    No.  No.  I would have to get that
20       approved.
21            Q    Okay.  Could you make
22       recommendations?
23            A    Oh, absolutely.  Yes.
24            Q    And what was that process like?
25            A    So this is before Empire.  So the
```

```
 1   process was there was an owner there, so any
 2   time the recommendations, you felt that you
 3   wanted to hire somebody, the owner had to meet
 4   the person.  That's the only thing, yeah.
 5        Q    Okay.  So it was just basically
 6   that you needed to get a stamp of approval
 7   from the higher-up before you made any
 8   decision, but you could make a recommendation
 9   based off of what you believe?
10        A    Yes.
11        Q    Okay.  Did Town Sports
12   International purchase the LIV Fitness clubs
13   in Puerto Rico?
14        A    Yes.
15        Q    And when did that happen?
16        A    I don't know.  I don't recall.
17        Q    Was it while you were present on
18   the island?
19        A    Not when I with Puerto Rico.  I was
20   with the owners, the original owners.  So it
21   was after.
22        Q    Okay.  So you weren't there when
23   LIV was purchased by Town Sports
24   International?
25        A    I was not in Puerto Rico clubs, was
```

```
 1  not managing the Puerto Rico clubs.  That is
 2  correct.
 3       Q    Okay.  Fair to say that the fitness
 4  world is relatively small?
 5       A    Very.  Yeah.
 6       Q    Was that a yes?
 7       A    Yes.
 8       Q    So, and why I'm asking you is the
 9  legal world is small, right, lawyers, you get
10  to know faces.  Is that kind of a similar
11  understanding within the fitness world for
12  you?
13       A    I don't understand.  I kind of
14  don't understand the question.  Sorry.
15       Q    No. That's perfectly fine.  I'm
16  glad that you asked me to rephrase.  It was a
17  poorly-worded question.
18        So is it fair to say that, you know,
19  for how long you have worked in the fitness
20  world, you're familiar with certain faces and
21  owners and, you know, it's kind of a small,
22  tight-knit community?
23       A    Yeah, I would say so.
24       Q    Okay.  So you said that you moved
25  to Florida in May, around May of 2019.
```

```
 1          A     Um-hum.
 2          Q     What prompted your move to Florida?
 3          A     To work with the original owners
 4   from the Puerto Rico clubs.  And I did
 5   consulting for their new boutique clubs that
 6   they were bringing to Florida.
 7          Q     And what were the name of those
 8   clubs?
 9          A     Antidote Wellness Labs.
10          Q     Was it A-N-T-I-D-O-T-E Wellness
11   Labs?
12          A     That is correct.  Yes.
13          Q     Okay.  And were there multiple
14   locations?
15          A     No.  It was just one.
16          Q     And where was that location in
17   Florida?
18          A     Pinecrest, Florida.  Pinecrest,
19   Florida.
20          Q     And so you left Empire to move to
21   Florida to start working with LIV again or the
22   original owners of LIV?
23          A     First, I moved to Florida for a
24   better lifestyle for myself and this
25   opportunity arose, yes, that is correct.
```

```
 1          Q    Okay.  So you made a choice to move
 2    to Florida.  It wasn't a job that pulled you
 3    or brought you down here?
 4          A    No.  It was just, you know, the
 5    opportunity I had.
 6          Q    And when you say the opportunity
 7    you had, you mean related to employment or...
 8          A    Yes.
 9          Q    Yes, as opportunities related to
10    employment?
11          A    Um-hum.  Yeah.  I had an
12    opportunity when I lived in Miami, which was
13    Antidote Wellness Labs.
14          Q    Okay.  So I just want to make sure
15    I'm understanding clearly.  You made the
16    decision to move to Florida.  Once you were
17    down here, you got in contact with the people
18    at LIV?
19          A    Yeah.
20          Q    And then jump-started that
21    relationship again?
22          A    Yeah.
23          Q    Okay.  And so then, what did you do
24    when you were working for Antidote Wellness
25    Labs?
```

```
 1        A     Many roles, but let's just keep it
 2   as a manager, which under there is hiring,
 3   developing, and launching programs that drive
 4   revenue.
 5        Q     And what type of programs would
 6   those be?
 7        A     Metabolic programs.
 8        Q     And what do you mean by a metabolic
 9   program?
10        A     So to simplify it, an added
11   ancillary service for the business that
12   relates to fitness, that relates to fitness is
13   the best way I can explain it.
14        Q     Perhaps, can you give me an example
15   just so that I can conceptualize it.
16        A     Yeah, no problem.  It was a fitness
17   studio where we did classes.  We added a
18   recovery component to give it more value.  We
19   added a metabolic component, where somebody
20   would walk in and not only take classes, but
21   now they're meeting with a metabolic coach.
22   And through science and through assessments
23   and tests, the prospect of the member would
24   receive a printout exactly what's happening
25   with their metabolism.  So that's another
```

```
1    value that the company had.  Those are the
2    things that I helped create with the owners,
3    those things.  So when I said an added
4    ancillary service, not only is it added
5    ancillary, but it's also a lot of value.  And
6    not only putting it together, marketing it,
7    teaching the staff how to speak about it, and
8    really putting it into play and so forth.
9    Does that answer your question?
10        Q    Yeah, it does.  It actually makes a
11   lot more sense now when you put it in those
12   types of terms and in a way that's easier for
13   me to understand.  So in terms of these, you
14   know, ancillary services, fair to say that the
15   club became kind of like a one-stop-shop for
16   health, wellness, fitness?
17        A    That's a perfect marketing slogan.
18   Yes.  That's where we were going, a
19   one-stop-shop, yeah, where you get everything.
20        Q    And did that also involve, you
21   know, dietitians?
22        A    Yeah.  Hiring nutritionists.
23        Q    And was Antidote the first club to
24   kind of take this model and put it into
25   existence?
```

1      A     Yeah.  Their goal was to franchise.
2  Unfortunately, COVID happened, and they did
3  not survive, unfortunately.
4      Q     Okay.  So with all of this
5  knowledge and development that you had from
6  working at Antidote, the company doesn't
7  survive, and then you cut to, what, October
8  2021, and was that your next position?
9      A     Yeah.  That's my next position.
10  And I started off for one month as a business
11  consultant.
12      Q     And we're talking about Empire,
13  correct?
14      A     That is correct, yes.
15      Q     Okay.  So you started working at
16  Empire, not in October but in September?
17      A     So I started with them October as a
18  business consultant.  One month after, I was
19  made an employee.
20      Q     So you became an employee in
21  November 2021?
22      A     I believe so.
23      Q     And in your role as a business
24  consultant, what were your responsibilities?
25      A     So business consultant was only for

```
1    four weeks.  So that was just basically

2    working alongside the CEO and just assessing

3    everything and explaining what his needs were.

4         Q    And who was the CEO?

5         A    Patrick Walsh.

6         Q    And had you had previous

7    interactions with Patrick Walsh prior to your

8    hiring at Empire as the business consultant?

9         A    Yeah.  We had brief conversations,

10   more text messages, how are you, how is your

11   project going on in Florida, which was his,

12   and that's about it.  That's how I found out

13   about the place, and he invited me and I went

14   to see the place, and that's when we started

15   talking about the consulting for me to him.

16        Q    Okay.  And so let's start here,

17   when was the first time that you met Patrick

18   Walsh?

19        A    Prior to October 2021.  And it's

20   within those weeks prior to that.

21        Q    So you had never interacted with

22   him prior to the time that you were in

23   Florida?

24        A    Yeah.  Through text messages, like

25   I mentioned, yes.
```

```
 1        Q    Right.  So I want to know your
 2   initial meeting with Patrick Walsh.  When was
 3   the first time you knew who he was or
 4   established that contact?
 5        A    I always knew Patrick from New York
 6   City because, again, for many years, so I've
 7   known him from TMPL Gyms.
 8        Q    Okay.  So fair to say at least
 9   since 2016?
10        A    Since he acquired the clubs in
11   TMPL.
12        Q    Okay.  And he was the CEO of TSI?
13        A    From what I remember.
14        Q    And so you maintained a
15   relationship with Patrick Walsh from, you
16   know, your time at TMPL.  And would you -- is
17   it fair to characterize that relationship as,
18   you know, a friendship?
19        A    A working relationship.
20        Q    Did you ever socialize with Patrick
21   outside of work?
22        A    In Florida, yes.
23        Q    What about in New York?
24        A    In New York, no.
25        Q    So no happy hours or business
```

```
 1    dinners or anything like that in New York?
 2         A     Not in New York, no.
 3         Q     Okay.  So acquaintances in New York
 4    through the fitness world?
 5         A     Yeah.  I just -- the executive guy.
 6         Q     Okay.  Did you know anyone else
 7    affiliated with TSI?  When I say TSI, you
 8    understand that to be Town Sports
 9    International, right?
10         A     Yeah.  Yes.
11         Q     Did you know anyone else at TSI
12    over the years that you worked at TMPL?
13         A     Did I know anybody else in TSI,
14    from where?
15         Q     So what I'm really asking is, you
16    know, based on your understanding and
17    knowledge and interactions with Patrick Walsh,
18    did you know anyone else who was kind of on a
19    higher level who worked regularly with Patrick
20    Walsh?
21         A     No.  The only time is when I came
22    to Florida and he explained the clubs.  He
23    also told me that he was working with -- he
24    had -- he was working with Leah Molino and
25    Anthony Messina.  Those two names, I worked
```

```
 1   with them in TMPL in New York City.
 2        Q    Okay.  So you worked with Leah and
 3   Anthony.  Anyone else who was affiliated in
 4   some way with the clubs in Florida?
 5        A    I don't remember, no. Not that I
 6   recall, no.
 7        Q    Okay.  So what about -- give me
 8   just a second.  Was Michael -- is it Montella?
 9   -- affiliated with TSI or TMPL when you were
10   working in New York?
11        A    I don't remember.
12        Q    Okay.  What about Jonathan Jenkins?
13        A    Yes.
14        Q    Okay.  So did you just know of
15   Jonathan Jenkins, Leah Molino, and Anthony
16   Messina or did you interact with them
17   regularly when you were up in New York?
18        A    I would interact the most with
19   Anthony Messina.
20        Q    And how often were your
21   interactions with Anthony Messina?
22        A    I'd like to say once a week.
23        Q    And was he -- did he supervise you?
24        A    Yes.  That's -- yes.
25        Q    And what was his role?
```

```
 1            A     I don't remember.
 2            Q     But it was something above your
 3    role as the GM.  Fair to say?
 4            A     That's correct.
 5            Q     And did you report directly to him
 6    the entire time that you were working at TMPL?
 7            A     No.  I would report to a BD.  Once
 8    again, the company was taken over, so there
 9    was a lot of, you know, switches, so I don't
10    remember the names, but I remember reporting
11    to another gentleman.  His name was Ryan
12    Pastore.  And he was somebody that I would
13    report to weekly as well.
14            Q     Can you spell that last name for
15    me.
16            A     I would say P-A-S-T-O-R-E.
17            Q     Okay.  And so you reported to Ryan
18    Pastore and Anthony Messina, both on a weekly
19    basis?
20            A     From what I remember.
21            Q     Okay.  And was that -- strike that.
22             Okay.  And how often did you interact
23    with Leah Molino?
24            A     Not much at TMPL.  From what I
25    remember, she was helpful with the transition
```

```
 1   of everything operationally.
 2        Q    And when you say transition, are
 3   you referring to the acquisition or the change
 4   in ownership?
 5        A    The change in ownership, that is
 6   correct.  Yes.
 7        Q    And did she, to your knowledge,
 8   have any other role besides being an HR
 9   director?
10        A    I don't remember.
11        Q    Did you ever socialize with Anthony
12   Messina outside of the workplace?
13        A    No.
14        Q    Never?
15        A    Correct.
16        Q    So no happy hour with Anthony
17   Messina?
18        A    Correct.
19        Q    Okay.  No business dinners?
20        A    No.
21        Q    How often did you interact with
22   Jonathan Jenkins --
23        A    I don't remember.
24        Q    -- up in New York?
25        A    Don't remember.
```

```
 1          Q    So let's talk about when you were
 2    hired on as a business consultant.
 3          A    Um-hum.
 4          Q    What was your understanding of that
 5    role?
 6          A    As a business consultant is to give
 7    all the information and support to the CEO.
 8          Q    And were you a 1099 contractor?
 9          A    Yes.  For that one month, yes.
10          Q    During that one-month period, was
11    there discussion about you becoming an
12    employee?
13          A    That was at the end.  By the third
14    week.  By the third week of me being there,
15    um-hum.
16          Q    Okay.  So when you started as the
17    business consultant, there was no intention of
18    you remaining as an employee on either a
19    temporary or permanent basis?
20          A    No.
21          Q    When did that change?
22          A    By the third week of discussing
23    with Patrick.
24          Q    And what was the cause for that
25    change?
```

```
 1        A    Well, I was living in Miami.  I was
 2   very far away.  I had to relocate.  That was
 3   the big factor.  So, you know, and speak to my
 4   wife.  Those were the factors.  I was able to
 5   find a place, and we moved, my wife and I.  If
 6   we didn't move, it would have not worked.  So
 7   those were the factors, me relocating.
 8        Q    So that means that you were
 9   relocating from Miami to Palm Beach Gardens
10   area or, you know, Central Coastal Florida?
11        A    Yes.  That is correct.
12        Q    What were you told -- I'm sorry,
13   strike that.
14         Were you told or given a title when you
15   were considering moving up to Palm Beach
16   Gardens?  Did Patrick Walsh, you know, give
17   you a specific title?
18        A    When I was hired as an employee, my
19   title was business director.
20        Q    Right.
21        A    Um-hum.
22        Q    Did you sign an employment
23   agreement?
24        A    I believe so, yes.
25        Q    Do you have a copy of that
```

```
 1   agreement?
 2         A    HR does.
 3         Q    And do you remember the terms of
 4   that agreement?
 5         A    I don't recall.
 6         Q    Was it, to your recollection, was
 7   it for a defined period of time, the contract?
 8         A    No. It was not, no.
 9         Q    Was your employment at will?
10         A    Yes.
11         Q    Did you receive any equity in the
12   company?
13         A    No.
14         Q    Was it common for someone in a
15   business director role or even a GM role to
16   sign an employment contract --
17         A    Yes.
18         Q    -- in the fitness industry?
19         A    Yeah.
20         Q    So what were you told when you were
21   offered the position as business director?
22         A    So basically to oversee all three
23   clubs.  Okay.  I was also announced as a
24   business director to all the employees to make
25   them understand that I would be managing the
```

```
 1   three clubs.  So at the time, we did not have
 2   a -- no, we had managers in all three clubs,
 3   so basically, I would be overseeing the clubs
 4   and there to support them and --
 5        Q    And when you --
 6        A    I'll just finish.  And my duties
 7   just really falls back on, again, sales
 8   performance, the cleanliness, customer
 9   service, but also hiring, training, and
10   developing the staff.  That was a big factor
11   for us in Florida.
12        Q    And when you say that you oversaw
13   all three clubs, and each of the clubs had
14   their own managers, were those -- are those
15   general manager positions?  Is that what
16   you're referring to?
17        A    Yes.  Yes.
18        Q    What -- the clubs were two Palm
19   Beach Sports Clubs, correct, and then
20   Christi's?
21        A    Christi's Fitness.
22        Q    And the Palm Beach Sports Clubs
23   were located in Palm -- Jupiter and Palm Beach
24   Gardens?
25        A    Yes.
```

```
 1          Q    At the time you were hired as the
 2   business director for the three clubs, the
 3   Palm Beach Sports Clubs, and Christi's
 4   Fitness, were there any other business
 5   directors, to your knowledge, at TSI?
 6          A    No.
 7          Q    Or I'm sorry, Empire.
 8          A    No.
 9          Q    So was that role created
10   specifically for you?
11          A    I don't know.
12          Q    Did you ask?
13          A    No.  But in TSI, there was a role
14   called business director.  Not Empire.
15          Q    Okay.  And did you interact with
16   any business directors when you were working
17   at TMPL?
18          A    Yes.
19          Q    And what was your understanding of
20   their function within the club?
21          A    Yeah, once again, like I mentioned,
22   sales performance, but one of the big things
23   about business directors was support.  So any
24   time a general manager needed something, in
25   any aspect of the gym, operationally or
```

```
 1    anything, I would see the business directors
 2    immediately support their managers.
 3         Q    When you say support, because that
 4    term has come up a couple of times already
 5    today, and you said support operations and,
 6    you know, support different functions within
 7    the club, what does that term support mean to
 8    you?
 9         A    Yeah, so it changes for almost like
10    every description.  So support can mean
11    hands-on, somebody teaching you instead of
12    telling you how it's done and explaining it,
13    especially in the fitness role with sales, so
14    a lot of role-playing.  That's one way of
15    support.  Another way of support is also doing
16    things to help your team win.  So if you need
17    to hire somebody, you would see the business
18    director really helping you by putting ads out
19    and trying to identify what the holes might
20    be.  And based off of that holes individualize
21    it and then support and give a solution in a
22    very positive way.  And that's always been my
23    interaction and it was very motivating.  So
24    when I got that role, that's the same feeling
25    that I just wanted to provide as well.
```

```
 1        Q    Okay.  So you said, you know, doing
 2   things on a hands-on -- in a hands-on way,
 3   doing things to help your team win.  Can you
 4   give me some examples of what you mean by
 5   doing things to make your team win?
 6        A    Yeah.  So if you need to hit a
 7   sales number, which is a goal, right, you're
 8   going to need to bring in a certain amount of
 9   prospects into your gym to show them, and so
10   one of the things to help is the manager and
11   myself would go out with the team and really
12   work on bringing people in.  So that's one of
13   the things that we would do together.  So, for
14   example, let's go jogging where there's a lot
15   of people and give out guest passes.  But
16   seeing myself doing it with my team instead of
17   saying to do it is the supporting aspect of
18   things.  And the fact that I'm doing it with
19   them has always helped me a lot as well.  Does
20   that answer your question as one of the
21   examples?
22        Q    I think that's a good example.  Are
23   there any other examples you can give me?
24        A    Sure.  If somebody doesn't know the
25   system, let 's say on a new CRM system or a
```

1  new software, explaining to them how to do it,

2  showing them reports on how to view certain

3  things and analytics of your club.  So doing

4  things like that as well.

5       Q    And you -- you're a certified

6  personal trainer, correct?

7       A    Um-hum.  Correct.  Yeah.

8       Q    Were your support roles and

9  techniques geared toward those types of

10 employees versus perhaps, you know, an

11 administrative employee?

12      A    I don't understand the question.

13 Sorry.

14      Q    I get it.  It was not a great

15 question.  I think what I'm trying to say is,

16 did your approach change in terms of the ways

17 in which you supported employees based off of

18 whether, you know, they were more on the

19 administrative side versus the, you know,

20 physical trainer side?

21      A    I haven't practiced personal

22 training or managed personal training in a

23 while.  It's been more of the general manager

24 roles that I've held.  So I, you know, like, I

25 kind of don't understand.  If you're saying do

```
 1    I behave differently?  You know, I have
 2    managed as a general manager and as an area
 3    general manager for a long time and not really
 4    managed personal training per se.  I would
 5    have personal training managers, for example.
 6    If anything, that's just been for myself more
 7    of the personal training, the yoga, but more
 8    of the management has been on the general
 9    manager, area general manager level.
10         Q    Right.  That makes sense.  So, you
11    know, as a general manager overseeing things,
12    you would delegate then or it sounds -- again,
13    correct me if I'm mischaracterizing your
14    testimony -- but it seems as though there's
15    specific departmental managers, right, a
16    personal trainer manager or some other
17    department, you would almost delegate the
18    responsibilities because you were overseeing
19    the whole versus the part?
20         A    Yeah, the whole, correct, and
21    seeing what each one would need in each
22    department, yeah, the whole.  And everybody
23    would be treated the same way as well, you
24    know.
25         Q    Right.  So when -- because you were
```

1  more -- you've been a general manager for so

2  long, did you delegate responsibilities, like

3  hiring, to say, a PT manager?

4       A    Yeah.  It's their duties.  So

5  whatever falls under their duties, yeah, I

6  would hold them accountable and also support

7  them if they needed help.

8            MS. RATTET:  We've been going for probably

9        an hour and a half now, do you want to take a

10       -- I don't know if anyone is hungry or...

11           MR. SONDHI:  I was going to suggest a

12       break.  I'm guessing you have a lot more, based

13       on where we're at right now, so maybe a lunch

14       break and then we'll come back.

15           MS. RATTET:  Sure.  That works for me.

16       How long do you need, Mr. Messina?

17           MR. SONDHI:  Mr. Marrero.

18           MS. RATTET:  I apologize.  So sorry.

19           THE WITNESS:  Whatever is fair.  We can

20       keep moving, whatever is fair for everybody.

21       You guys tell me.

22           MR. SONDHI:  It's 12:05.  How about 12:40

23       we come back.

24           MS. RATTET:  That works for me.

25           THE WITNESS:  Okay, guys.  See you soon.

```
 1              (A recess was taken.)
 2    EXAMINATION BY MS. RATTET:
 3         Q    So Mr. Marrero, other than your
 4    attorney, did you speak with anyone else over
 5    the break that we just had?
 6         A    No.
 7         Q    And is there anything about your
 8    testimony up until this point today that you
 9    wanted to change?
10         A    No.
11         Q    And you understand that you're
12    still under oath, correct?
13         A    Yes.
14         Q    Okay.  So I think where we left
15    off, we were talking about kind of the
16    overarching management role and, you know, you
17    having so much experience about that.  And I
18    want to talk more specifically about,
19    specifically, why you were told you were hired
20    to be the business director overseeing the two
21    Palm Beach Sports Club and Christi's Fitness.
22    What specifically were you told?
23         A    Why I was hired?  I don't
24    understand.
25              MR. SONDHI:  Object to form.  I'm just not
```

```
 1          understanding it myself.
 2          Q    Sure.  Let me rephrase the
 3    question.  What were you told when you were
 4    hired -- strike that.
 5               MS. RATTET:  So I don't know how you want
 6          to do this, Ranjiv.  Should I just mark as
 7          Exhibit 2 the next exhibit?  I know we have the
 8          discussion about the personal notes and
 9          everything, the composite exhibit.  We'll just
10          mark it as 2?
11               MR. SONDHI:  Yeah.  Sure.
12               MS. RATTET:  Okay.
13                   (Exhibit 2 was introduced for the
14                   record.)
15          Q    So this is going to be Exhibit 2,
16    and I'm going to give you a minute,
17    Mr. Marrero, to take a look.  The Bates number
18    on this document is Defendant's 38.  And at
19    this point, when I refer to the Bates number
20    on the document moving forward, if you can see
21    in the lower right-hand corner, there's some
22    numbers and letters.  And that's just
23    basically going to identify the document
24    within the case.  So that's what I mean when I
25    say Bates numbers.
```

1          Have you seen this document before?

2      A    Yes.

3      Q    And what is this document?

4      A    Announcing to the staff that I will

5  be coming onboard.

6      Q    Okay.  And do you know when this

7  document was prepared?

8      A    Yes.  I believe right when I was

9  entering as an employee.

10     Q    Okay.  And so that would have been

11 in October 2021.  No, apologies, November

12 2021.  Did you participate in the preparation

13 of this document?

14     A    No. I'm sure somebody asked me or

15 Leah to say a little bit about my background.

16     Q    Okay.  So if we look at the first

17 paragraph, that's not something that you would

18 have participated in preparing or drafting?

19     A    No. Absolutely not.

20     Q    Okay.  And if you look at it, it

21 says -- I can just read it into the record.

22 J.C. will be based -- second sentence -- J.C.

23 will be based out of the Palm Beach Gardens

24 location and will work closely with the

25 Florida market to increase brand awareness,

```
 1   boost sales and revenue, and bolster our
 2   reputation in the community as a provider of
 3   luxury fitness.
 4        A    Um-hum.
 5        Q    What does that sentence mean to
 6   you?
 7        A    Exactly what it says.  Sales, okay.
 8   So performance, okay.  Brand awareness.  So
 9   making sure everything is up to par with the
10   brand.  Customer service.  Okay.  Bolster the
11   reputation, yeah.  And then just, you know,
12   having our gyms be part of the community as
13   well.
14        Q    Okay.  Was there an understanding
15   that those three gyms that you oversaw were
16   not a part of the community?
17        A    No.  Not at all.
18        Q    It was just that the company placed
19   importance on ensuring that, you know, it was
20   community-driven?
21        A    Yeah.  That goes for any kind of
22   fitness center, from my experience.
23        Q    Okay.  And so, is it fair to say
24   that, you know, maybe the processes and
25   approaches may change depending on the locale
```

```
 1   of a particular fitness center with respect to
 2   the type of clientele or the type of programs
 3   or, you know, generally, who is going to
 4   inhabit those clubs?
 5        A    I don't understand the question.
 6   When you say change, I don't understand that
 7   part.
 8        Q    Right.  So, for example, a fitness
 9   club that's located say in, you know, I don't
10   know, the Midwest, in a small town in the
11   Midwest, the approach and community outreach
12   may be different than, say, a club that is
13   located in Brickell and Miami?
14        A    Yes.
15        Q    And how would that differ?  Can you
16   give me an example of, you know, why an
17   approach may be different or what approach you
18   might take in maybe a smaller locale than a
19   larger one or a big city locale?
20        A    Yeah.  It all has to do with the
21   community.  So, just briefly, I would look at
22   my manager and I would ask them to tell me a
23   little bit about the demographic.  And what I
24   mean about that is just, you know, tell me a
25   little bit more, more details, what kind of
```

```
1  people are living here and so forth, get me up
2  to speed, educate me a little bit more, and
3  then I do my due diligence as well.
4       Q    Okay.  And when you say the --
5  would you say that you always do that when you
6  start overseeing a fitness club?
7       A    Yeah.  Yes.
8       Q    Is that one of the first things
9  that you do?
10      A    Absolutely.  Yeah.  To give us
11 direction, all of us, not me, just for all of
12 us.
13      Q    Sure.  And you said that you also
14 conduct your own due diligence.  What do you
15 mean when you say that?
16      A    So scouting the area myself within
17 five miles, looking at the competitors, what
18 other gyms are in the area.  That's what I
19 mean.
20      Q    Okay.  So when did you move from
21 Miami up to Palm Beach County?
22      A    Started somewhere around mid
23 October.
24      Q    Okay.  And so if we look at the
25 second paragraph here, it kind of gives the
```

1    background.  J.C. brings over two decades of

2    experience in the fitness industry, both in

3    the U.S. and Latin America, which we covered

4    extensively earlier today.  He has created a

5    strategy for new clubs that drove sales and

6    profits through excellence and operating

7    standards, brand awareness, cross promotion,

8    co-branding, community relationship building,

9    and creative outreach plans.  Does that cover

10   the, you know, the bases of the strategy and

11   the things that you implemented in the past

12   with respect to your responsibilities in a

13   management role or a director role?

14        A    Yes.

15        Q    Okay.  Is there anything else that

16   you would include here that's not included

17   here?

18             MR. SONDHI:  I'm going to object to form

19        on that.

20                But you can answer, J.C.

21        A    I'm good with that.

22        Q    What do you mean you're good with

23   that?

24        A    I'm fine.  You said if I wanted to

25   add.  No, I'm fine with this, yeah.

1       Q    So this would be a fair

2   characterization of the things that you've

3   done, the ways that you've created strategies

4   to promote clubs and gain this experience and

5   expertise?

6       A    Yes.

7       Q    Okay.  And then if you go to

8   Paragraph 3, it says:  Most recently, J.C. has

9   helped launch the Equinox brand in the Florida

10  market, worked with the original owners at

11  LIV, developed boutique fitness brands.  And

12  then it says, J.C. has spent the last month

13  working at both Jupiter and Palm Beach Gardens

14  getting to know the club teams and the brand.

15  So when it says the past month, what month did

16  you spend getting to know the club teams and

17  brands at the Jupiter and Palm Beach Gardens

18  locations?

19      A    October, the month of October, when

20  I started.

21      Q    And forgive me if you've already

22  testified to this, but did you start in early

23  October?

24      A    October.  October 2021.  I would

25  probably say the first week of October.

```
1            Q     Okay.  So for the entire month of
2     October of 2021, you -- did you just go back
3     and forth between the Palm Beach Sports Club
4     locations of Jupiter and Palm Beach Gardens?
5            A     Yes.
6            Q     Okay.  And at that point in time,
7     you knew that you were going to be overseeing
8     all three of the clubs, including Christi's
9     Fitness?
10           A     No, not yet.
11           Q     Oh, okay.  So when did you learn
12    that --
13           A     Like I mentioned, around the third
14    week of October.  And it was because I was,
15    you know, going to relocate.
16           Q     Okay.  So in reference to this
17    month here, right, the month that you spent
18    getting to know the teams, you had not already
19    relocated to --
20           A     Not yet.
21           Q     -- to Palm Beach County?
22           A     I was still traveling from Miami.
23    So my goal was -- yeah, um-hum.  I was just
24    still traveling.
25           Q     But at that point -- so then you
```

1    were still just the business consultant?

2         A    Yeah.  Like I mentioned before,

3    October, I was hired as a business consultant

4    and that's what I did.  As of November 1st,

5    that's when I was hired as an employee.  And

6    by that time, I was already living there.

7         Q    Okay.

8         A    This e-mail or this note, this memo

9    that you're showing me, that went out to the

10   staff for November.

11        Q    Okay.  And you're certain of that

12   date?

13        A    Yeah, because that's when I started

14   as an employee.

15        Q    Okay.  And so, you had no

16   operational control over Christi's until

17   November of 2021?

18        A    That is correct.

19        Q    Okay.

20             MS. RATTET:  This will be marked as

21        Exhibit 3.  I'm going to share my screen.

22                 (Exhibit 3 was introduced for the

23                 record.)

24        Q    And it is a one-page document.  Do

25   you recognize this document, Mr. Marrero?

```
 1        A    Yes.
 2        Q    Okay.  And what is this document?
 3        A    This is an e-mail sending out to
 4   the managers.  So I'm just reading it quickly.
 5   Uh-huh.  Yeah.  So this is discussing that I
 6   will be overseeing the Florida market.  And as
 7   you can see there in the e-mail, my whole
 8   thing is, like, what are the needs?  We're
 9   going to discuss what the needs are right now.
10   And this is at any time, me not managing
11   overseeing Christi's Fitness.  This is just me
12   saying I'm going to be overseeing the Florida
13   market, and I want to discuss what your needs
14   are, marketing and everything like that so I
15   can assess the Florida market.  So that's what
16   that e-mail is.
17        Q    Okay.  So as of Tuesday, October
18   12, 2021, you were not overseeing Christi's?
19        A    I was the business consultant
20   overseeing the Florida market, you know, and
21   based out of Palm Beach and Jupiter, but not
22   overseeing it officially, just overseeing the
23   Florida market, to be clear, but never
24   announced that I'm your director or anything
25   like that.
```

```
 1          Q     Okay.  Does the signature block
 2     give you a title?
 3          A     Yeah, it does.
 4          Q     Okay.  So if you're sending that
 5     e-mail with a signature block that, you know,
 6     refers to you as business director, I'm having
 7     a difficult time reconciling how you were not
 8     actually in that role at that point in time.
 9     And maybe you can care to explain that to me.
10          A     Sure.  So once I was in, officially
11     in that role, by law, I have to put that
12     title.  So it could be on me that I might be
13     saying October 1st, where I should have been
14     hired as a business director.  Maybe as of
15     September is when I did the consulting.  So
16     that's something that I'd like to rephrase now
17     looking at this e-mail.  So starting off as
18     October is when I was hired as a business
19     director instead of a business consultant.
20     And I started as a business consultant in
21     September.  So sorry about that.  So just
22     looking at that, because I didn't have access
23     to e-mail when I was a consultant.
24          Q     Okay.  So just for purposes of
25     clarifying the timeline.  So previously --
```

```
1          A     Yeah.  So October.
2          Q     Okay.  So previously you testified
3    -- and, again, correct me if I'm
4    mischaracterizing anything -- but previously
5    you testified that you were the business
6    consultant for a one-month period of time when
7    you were transitioning from Miami to Palm
8    Beach, in October of 2021, and you became the
9    business director in November of 2021.  And
10   now, this has refreshed your recollection and
11   you believe you became the business consultant
12   in September of 2021 and the business director
13   in October of 2021?
14         A     Yeah.  And I know that's what I'd
15   like to state.  That is correct, yes.
16         Q     Okay.
17         A     Thank you.
18         Q     Sure.  Okay.  So if we go back to
19   Exhibit 2.  So J.C. has spent the last
20   month -- I'm sorry, I'm looking at Exhibit 2
21   Paragraph 3, sentence two.  J.C. has spent the
22   last month working at both the Jupiter and
23   Palm Beach Gardens getting to know the club
24   teams and the brands.  So at this point, you
25   were not overseeing Christi's, and now this
```

```
 1   document you believe is not dated in October?
 2        A    Yes.  As a regular employee.
 3   That's me being welcomed as an employee with
 4   an e-mail and everything.  That is correct, as
 5   of October.
 6        Q    How many fitness clubs does Empire
 7   have in the State of Florida?
 8        A    Three.  Palm Beach Sports Clubs,
 9   Jupiter, and Christi's Fitness, when I was
10   working with them.
11        Q    Okay.  So Jupiter.  Palm Beach
12   Sports Club Jupiter?
13        A    Gardens.
14        Q    Gardens.  And Christi's Fitness?
15        A    Um-hum.
16        Q    So you previously testified that at
17   this point, you were not overseeing Christi's
18   specifically, but you were overseeing the
19   Florida market, correct?
20        A    That is correct, when I started as
21   a business consultant.  And as a business
22   director, okay, that's when I oversaw all
23   three clubs, to be clear.  As a business
24   consultant, I just saw the Florida market, and
25   I never even went to Christi's.  When I became
```

1    a business director, yes.  And that's after

2    October 1st, 2021, all three clubs.

3         Q    Okay.  Do you -- would you not

4    consider Christi's Fitness to be a part of the

5    Florida market?

6         A    Yes.  But, once again, as of

7    October 1st, 2021, is when I started

8    overseeing it, including it into my portfolio.

9    Prior to that, no.

10        Q    But, again, correct me if I'm

11   misunderstanding you, but I believe that you

12   testified that you were overseeing the Florida

13   market when you were the business consultant,

14   correct?

15        A    Um-hum.

16        Q    And that did not include Christi's?

17        A    Um-hum.

18        Q    And then when you became a business

19   director, you began overseeing Christi's,

20   right?

21        A    That is correct, yeah.

22        Q    So why, if Christi's is -- is

23   Christi's not technically a part of the

24   Florida market?

25        A    It is, but even if you can see in

1  the e-mail, it states on this memo that I have

2  been spending my time at Jupiter and Gardens,

3  okay.  So, once again, there was conversation

4  of me going and moving forward with them.  And

5  at the very end, you know, once I relocated,

6  that's how come I didn't know the dates too

7  well.  Once I relocated, they said, okay, it's

8  official, you're going to be overseeing three

9  clubs as a business director.  Just to clarify

10 all of that.  Is that -- do you understand

11 that part?

12      Q    Sure.  I'm just still confused as

13 to why -- let's strike that.

14      A    Yeah.

15      Q    Did anyone specifically tell you

16 the clubs that fell under the purview of the

17 Florida market?

18      A    As of October 2021, I was informed

19 that I would be overseeing all three

20 locations.  Prior to that, I was not informed

21 that.

22      Q    What specifically were you informed

23 prior to that?

24      A    Can you please assess my clubs here

25 in Florida, the Jupiter and the Gardens.  Can

1    you please let me know how things are running
2    here between management and sales, and if
3    there are any missed opportunities.  And
4    there's a lot more detail, but that's the main
5    thing that I was there for.
6         Q    Okay.  So it was --
7         A    As a business consultant, you know.
8         Q    Well, I don't.  And that's why I'm
9    asking these questions.
10        A    Sure.
11        Q    So is there any documentation as to
12   what specifically your responsibilities were
13   as the business consultant?
14        A    As a business consultant, I had
15   conversations only with the CEO.  And him and
16   I are the ones that spoke.  After that one
17   month, okay, and by the third week is when I
18   started telling you that I started looking for
19   places, and that's when I relocated, and he's
20   like, okay, I want to make you an employee.
21   I'm going to have you speak to the team, and
22   this is the way it works.  And that's when
23   everything went out.  And then they gave me
24   the responsibility of a business director and
25   to oversee all three clubs.  Prior to that, he

```
1    never mentioned three clubs.  He mentioned
2    these two clubs.
3         Q    Okay.  When you said that you only
4    had conversations with the CEO, that would be
5    Patrick Walsh, correct?
6         A    That is correct, yes.
7         Q    Okay.  And were those conversations
8    over the phone?
9         A    Over the phone and in person.  It
10   was mostly in person, especially when I was at
11   the Gardens location and the Jupiter location.
12   One thing to add -- sorry -- one thing to add.
13   Now, the recollection here, there was a new
14   general manager at the Jupiter location, so
15   that was also one thing.  He said, hey, can
16   you please oversee the Jupiter location and
17   give the new general manager support.
18        Q    And that's what Patrick Walsh told
19   you?
20        A    That is correct, yeah.  Uh-huh.
21        Q    When you were the business
22   consultant in September --
23        A    Yes.
24        Q    -- of 2021?
25        A    Yes.
```

```
 1        Q    Okay.  Who was the general manager
 2   at the Jupiter location in September of 2021?
 3        A    Shane.  Do you need the last name?
 4        Q    Yes, please.
 5        A    K-E-H-O-E, I believe that's how you
 6   spell it.
 7        Q    Kehoe?
 8        A    I believe so, yeah.
 9        Q    Is Shane a male or a female?
10        A    It's a male.  I'm going to look at
11   my phone one second please.  Yeah.  Uh-huh.
12        Q    And how long had Shane been in the
13   role as the general manager at the Jupiter
14   location?
15        A    He was new.  I don't remember.  He
16   was brand new.  That's all I can remember.
17        Q    Did Shane have prior general
18   manager experience?
19        A    He was with the company back in New
20   York City as a manager.  That's all I
21   remember.
22        Q    Do you know what his role was?
23        A    I don't recall.
24        Q    Okay.  And during that month, in
25   September 2021, when you were in the
```

```
 1   consulting role, approximately how much time
 2   did you spend between the Jupiter and Palm
 3   Beach Gardens locations getting to know the
 4   club teams and the brand?
 5        A    I spent a lot.  I spent a minimum
 6   of six days a week, eight to ten hours a day,
 7   really long, long hours.  Yeah, just a lot, a
 8   lot of hours.
 9        Q    And what did you learn about the
10   brand?
11        A    I knew about the brand already.  So
12   it's really to enhance it and to give you
13   better customer service.  So one of the things
14   was a lot of training and development needed
15   to take place immediately.
16        Q    And training and development with
17   respect to what exactly?
18        A    To all departments.  So if you
19   have, for example, the sales department,
20   teaching them how to, from the very beginning,
21   from the greeting to the facility, to exactly
22   -- touring somebody and explaining to them
23   what amenities we have and everything like
24   that.  So that took some time.  And I put all
25   the scripts together for the teams, for the
```

```
1   sales team, and for different departments.  So
2   that was for one department.  A lot of
3   role-playing as well.  And then for different
4   departments too, how to answer the phones, you
5   know, in the certain way that we look for it.
6   And that's how I spent most of my days.  And
7   it would be at both clubs.
8        Q    And so both clubs in the same day?
9        A    Yeah, sometimes, or sometimes I
10  would spend one full day.  That's why it was
11  very important for me to live in the area.
12  The clubs were about 20 minutes apart, 25
13  minutes apart.
14       Q    And with respect to the Palm Beach
15  Sports Club, the Jupiter location, how would
16  you describe the, you know, the locale in
17  which the club sits?  Give me some examples.
18       A    What do you mean by locale?
19       Q    I was going to say that's a pretty
20  general question.  What I'm looking for is,
21  you know, was it in a high traffic area?  Was
22  it, you know, near a shopping center?  Was it
23  visible from a main thoroughfare street?
24  Those types of things.  What was your kind of
25  perception about the Jupiter location?
```

```
1        A    It was in the shopping center.  It
2   was all positive.  There was not many
3   concerns.
4        Q    Did the Jupiter location have
5   difficulty, you know, driving member sales?
6        A    It was different.  It was different
7   than Gardens.  I don't want to say yes.  The
8   best thing I can say is the challenge that I
9   saw was it was adopted by -- it was another
10  gym -- so we took over.  Palm Beach Sports
11  Clubs took over this other gym.  I don't know
12  how much time in when I came in. So it was a
13  bit of that.  So that's why it was more of,
14  like, the brand awareness, who we are now.
15  We're not at $29, $39 a month; we're at 89, 99
16  a month.  So how do we bring that brand
17  awareness and the customer service up to par.
18  So those are one of the main challenges.  So
19  to answer your question, when you're like,
20  does Jupiter suffer or does Gardens suffer, I
21  mean, it's not that they were suffering.  It
22  was more of, like, how do we clean this up and
23  how do we keep the value high to make sure
24  that people would spend $89- or $99, opposed
25  to the 29 or 39.  So those are the factors.
```

1    And then you also had people that are, you
2    know, snowbirds that would go away and so
3    forth.  But you always implement many things
4    when that happens.  So, you know, you just
5    work internally on bringing programs when that
6    happens.  Those are the things that were kind
7    of like a challenge from the dues.  So those
8    were the big factors too.
9         Q    Sure.  Okay.  So with respect to
10   the Palm Beach Gardens location, where was
11   that located?
12        A    Palm Beach Gardens, in a shopping
13   center by Donald Ross.  I don't remember the
14   address, but, you know, Palm Beach Gardens.
15        Q    In your opinion, was it a similar
16   type of location as the Jupiter location but
17   just in different cities or were there
18   distinguishing factors?
19        A    No, they were different, but you
20   can't compare that because it's a different
21   type of traffic, you know.  And Jupiter had
22   things that Gardens didn't have.  Gardens had
23   a cold plunge.
24        Q    Okay.
25        A    Okay.  Things of that nature.  So

```
 1    there was some small amenities that Gardens
 2    had that Jupiter didn't have.
 3         Q    Okay.  What were those amenities,
 4    aside from the cold plunge?
 5         A    From what I remember, it's the cold
 6    plunge and a dry sauna.
 7         Q    And were those, in your opinion,
 8    revenue-driving amenities, the cold plunge?
 9         A    It drives revenue.  At the end,
10    it's all about the customer, you know, having
11    the right things in your club to make sure
12    that members become -- that a prospect turns
13    into a sale by having these amenities.
14         Q    Okay.
15         A    It's a draw.  It's a draw for a
16    member.
17         Q    What was the clientele like in the
18    Jupiter location?
19         A    How would you like me to answer?  I
20    don't understand.
21         Q    Well, I mean, I wasn't there.  So
22    as the business director, I assume that you
23    interacted with the, you know, the members or
24    saw the type of members that were coming
25    through the door.
```

```
 1        A     Many people that love taking
 2   classes.
 3        Q     Okay.
 4        A     The snowbirds.  And what I mean by
 5   snowbirds, people that would come up north and
 6   still live in Jupiter and come back.
 7        Q     Would you say that there was any
 8   particular demographic with respect to, you
 9   know, age or, you know, race or anything like
10   that?
11        A     No. It varied.  I mean, early in
12   the mornings, you would have an older
13   population.  Throughout the day, you would
14   have a young population.  And it varied, you
15   know, it's back and forth.  The best thing is
16   just during the times.  That's when you would
17   see the change.
18        Q     Sure.  When you became the business
19   director, did you have any control over the
20   Florida clubs -- and when I say Florida clubs,
21   I mean all three of the clubs that were under
22   your purview at that point -- did you have any
23   control over their operating budget?
24        A     No.
25        Q     Was the operating budget the same
```

```
 1   across the board for all three clubs?
 2        A    No. Different.
 3        Q    Was there one particular club that
 4   had a higher budget than another?
 5        A    I would assume so, yes.
 6        Q    As the business director, were you
 7   privy to that information?
 8        A    Yes.
 9        Q    So which club had the highest
10   operating budget?
11        A    I don't remember.  And if I was to
12   guess, I would say Gardens.
13        Q    Okay.  And if you -- which club
14   would have had the second highest operating
15   budget?
16        A    I don't remember.
17        Q    So Palm Beach Gardens had the
18   highest.  Were there any factors that went
19   into considering what the budget would be for
20   the particular club?
21        A    I don't remember.  I didn't create
22   the budgets.  They came from corporate.
23        Q    Did you give input into what the
24   budget might be?
25        A    No.
```

```
 1        Q     Zero input through your entire time
 2   there?
 3        A     Yes.  From what I recall, yes.
 4        Q     Okay.  Would you, when you were
 5   placed in the role as the business director,
 6   would you consider the Florida clubs, again,
 7   all three, to be underperforming?
 8        A     Maybe.
 9        Q     How so?
10        A     It all changes.  You could have one
11   month that you're underperforming and the
12   following month that you bounce back.  So at
13   the time, it was about hitting our goals.  So
14   it all varied, that's why.
15        Q     Okay.  So when you were hired, were
16   you ever told that you were hired to, like,
17   address Empire's underperforming clubs?
18        A     No.  But as a manager, we all, you
19   know, this, even taking a business director
20   away, like as a general manager, our job was
21   to perform and hit goal.  We were
22   underperforming.  It's a performance-based
23   job.  That was always informed to us through
24   weekly calls through my directors, and
25   through -- it was always a performance-based
```

```
 1    job.  So it was always about performing and
 2    ensuring we hit goal.  And if we didn't, what
 3    can we do?  What did we miss?  So it doesn't
 4    happen the following month.
 5         Q    Okay.  I'm going to strike that as
 6    nonresponsive.
 7          I want to know if you were told when
 8    you were hired that you were hired
 9    specifically to address defendant's
10    underperforming clubs?
11         A    I don't recall that.
12         Q    Well, you just testified that --
13         A    We're performing, but this is also
14    -- but for somebody to say -- what you're
15    saying is that somebody addressed me that I
16    had to address the unperforming clubs.  And
17    what I'm telling you right now is we always
18    have to address any unperforming month or club
19    that you're operating in as the general
20    manager.  And if not, what are you going to do
21    about it.  So for somebody to say to me, I
22    want you to address these unperforming clubs.
23    Okay.  What are we going to do, you know,
24    okay, what are we going to do to perform?
25         Q    Well, did somebody actually say
```

```
 1   that to you though?
 2        A    No, not that I recollect.
 3   Absolutely, no.  I don't remember that.
 4        Q    Okay.  Were you required to
 5   complete or -- strike that.
 6         Were you required to participate in any
 7   onboarding procedures when you became the
 8   business director?
 9        A    It was through Leah.  I would send
10   her the paperwork in the beginning, and then
11   she took it off of my hands, which was very
12   good for me.
13        Q    So did Leah complete the onboarding
14   paperwork --
15        A    Yes, she did.  Um-hum.  She did.
16        Q    Do you recall what was included in
17   the onboarding paperwork?
18        A    Yeah.  Yeah.  Employee handbook.
19   Your job description.  And then your I-9s,
20   W-4, direct deposit.
21        Q    So did Leah physically complete
22   those documents for you or did you complete
23   them on your own behalf?
24        A    No.  Everything would get forwarded
25   to HR.  So everything that I just said to you
```

```
 1    would be forwarded to HR.  As I got busy, she
 2    would just, you know, do it for me instead of
 3    getting all the documents.  That's it.  And it
 4    probably happened to two employees that I
 5    recall, but, yeah.
 6         Q    Do you recall receiving a copy of
 7    an employee handbook when you were hired?
 8         A    Yes.  Yes.  We all did, yes.
 9         Q    Were you required to --
10              MR. SONDHI:  Allie, I'm sorry.  I'm
11         confused.  Were you talking about J.C.'s
12         onboarding or the hiring of other employees
13         when you're talking about...
14              MS. RATTET:  I'm talking about J.C.'s
15         onboarding.
16              MR. SONDHI:  Okay.  I think his response,
17         I believe, and he'll clarify, but I think he
18         was discussing other employees that are being
19         hired, the onboarding of those, not J.C.
20         himself.
21              THE WITNESS:  Yeah.  I'm a little
22         confused.  Thank you for clarifying that,
23         Ranjiv.
24              MR. SONDHI:  Go ahead, Allie.  I just
25         wanted to clarify that's what he was talking
```

```
 1        about.
 2              MS. RATTET:  Right.
 3        Q    So Mr. Marrero, if you're confused
 4   as to a question that I'm asking, and you've
 5   been doing a pretty good job of that, please
 6   let me know.  I know that this can get taxing,
 7   especially later in the day, but it's really
 8   important for you to let me know so that I can
 9   rephrase and, you know, we have a clean
10   record.  So, did you, when you were hired,
11   were you required to complete onboarding
12   paperwork?
13        A    Yes.
14        Q    Which documents were you required
15   to complete?
16        A    Employee handbook, I-9, W-4, direct
17   deposit.
18        Q    Any other documents?
19        A    That's what I remember at this
20   time.
21        Q    Okay.  Did you retain copies of
22   those documents?
23        A    Yes.
24        Q    Okay.  Were you required to
25   acknowledge receipt of the employee handbook
```

```
 1   that you received?
 2         A    Yes.
 3         Q    And did you retain a copy of that
 4   acknowledgment?
 5         A    Yes.
 6         Q    Will you produce those onboarding
 7   documents to us now that we know that they're
 8   in your possession?
 9         A    It would be through my e-mail that
10   Ranjiv will get from me.  Absolutely.
11         Q    Were you required to complete any
12   training as part of your onboarding?
13         A    What kind of training?
14         Q    Well, I'm asking you.  Any training
15   at all?
16         A    I've done in the past, but what
17   kind of training...  The only training I
18   received was from Leah, just getting me on
19   board with the club managers and explaining to
20   me the staff a little bit, but it was more on
21   me to get out to the clubs.
22         Q    Okay.  So as the business director,
23   you were not required to complete any, you
24   know, antidiscrimination, antiharassment
25   training like we had previously discussed
```

```
 1   earlier?
 2        A    Those are the things that we had in
 3   Town Sports International.  So the fact that I
 4   learned that Leah was our head of HR, it felt
 5   very relieving.  And she knew I had taken
 6   those courses already in Town Sports
 7   International.  So it was pretty much, kind of
 8   just refreshing to see those same faces.
 9        Q    Okay.  So the last time that you
10   had worked at Town Sports International was in
11   2016, correct?
12        A    Um-hum.  Yes.
13        Q    Okay.  So it had been some time
14   since the prior training, correct?
15        A    From that time, yeah.
16             MR. SONDHI:  Object to form.
17        Q    So you were not required to
18   complete any of that training as part of your
19   onboarding with Empire in your role as the
20   business director?
21        A    I don't recall.
22        Q    Who did you directly report to?
23        A    As a business director, in the
24   first few months, it was mostly Patrick, and
25   then Anthony Messina.  And Leah mostly always
```

1    for support, if I had any kind of questions,

2    anything that pertained to anything, from the

3    club level to an HR level.  So those were my

4    two.  But Anthony Messina was kind of the one

5    that I would report to, and Leah Molino was

6    more of, like, a support.

7         Q    Okay.  And I'm not sure if you may

8    have misspoken, but you said Patrick for the

9    first couple of months, did you mean for the

10   first month when you were the membership

11   consultant or did that carry over into the

12   director role?

13        A    That carried over, because he would

14   visit frequently the club.  That's the reason

15   I'm mentioning that.

16        Q    How frequently would Patrick visit

17   the Florida clubs?

18        A    Pretty frequent, like, almost daily

19   unless he was away.  You know, he would work

20   out and just check in in a very friendly

21   manner.

22        Q    And did he frequent the Jupiter

23   club more than the Palm Beach or was it equal?

24        A    It was equal from what I remember.

25        Q    And how many days a week did you

```
 1   typically work?
 2        A    Minimum of five to six days easily.
 3        Q    So you, on average, would see
 4   Patrick five to six times per week?
 5        A    Yeah.  And seeing him is a hi and
 6   bye.  And sometimes, you know, probably once a
 7   week, hey, how are things going, you know, and
 8   so forth.
 9        Q    So during those once-a-week
10   conversations where it was more than just a hi
11   and bye, were those lengthy conversations or
12   about how long were those conversations
13   typically?
14        A    It was probably typically a few
15   minutes.  And it was on the supporting aspects
16   of things, like, how are things going, how are
17   you doing.  So it always felt very supporting.
18        Q    So fair to say that you got a lot
19   of face time with Patrick Walsh, the CEO, when
20   you were in your business director role?
21        A    Yeah.  But very professional, you
22   know, always checking in, hi, how are you, how
23   are things going, in that nature.
24        Q    Did you -- I know earlier you
25   mentioned that you didn't really, you know,
```

```
1    you didn't have a personal relationship with
2    him when you were at TMPL.  Did that change
3    when you moved to Florida?
4         A    It changed a little bit, because he
5    knew the area.
6         Q    Okay.  So what, you know, how would
7    you describe the change?
8         A    Accommodating.
9         Q    Okay.  And what do you mean by
10   that?
11        A    Accommodating, so, in other words,
12   he would ask me, did you get yourself a place
13   yet, things in that nature.  And I would ask
14   him, hey, is Jupiter better to live or
15   Gardens, you know, things like that since he
16   lived in the area.  It felt very helpful.
17        Q    Did you ever go out to dinner with
18   Patrick?
19        A    Yeah, for business.
20        Q    How often would you go out to
21   dinner with him?
22        A    Once a month probably in the
23   beginning, and then he got very busy.
24        Q    And was anyone else present at
25   those once-a-month dinners?
```

```
 1        A    I would just touch base with him,
 2   dinner.  It would be a quick thing, how am I
 3   doing, and how are his clubs performing, and
 4   then he would ask me things about New York.
 5   That's what I recall about him and I.
 6        Q    Do you recall any of the names of
 7   the restaurants that you guys went to?
 8        A    Ready?  Lucky Shack.  And Lenora's.
 9   It's those two that I remember.
10        Q    And was anyone else present during
11   those dinners?
12        A    I would bring my wife sometimes.
13        Q    So you said you reported to Patrick
14   for the first couple of months, so would that
15   be from, you know, would that consider both
16   the consultant role and the director role
17   or...
18        A    Yes.
19        Q    Approximately when did you stop
20   reporting to him directly?
21        A    Probably three months out, after.
22   Three months out probably.
23        Q    So that would be somewhere around
24   December, end of the year?  Is that fair?
25        A    Yeah, could be.
```

```
1            Q    Could be or it is a fair
2    assessment?
3            A    I really don't recall.  I could
4    just tell you the first couple months, and
5    then he was traveling a lot after.
6            Q    Okay.  And when you stopped
7    reporting, you know, more directly to Patrick,
8    did Anthony step in or was there a dual role?
9            A    No.  Anthony always oversaw his
10   clubs, all of his clubs.  So I kind of, like,
11   went under, making sure that I was always on
12   the calls.  So he oversaw the whole -- I don't
13   know what his title is -- but he oversaw all
14   the managers, and then I fit right in there.
15   So I would report my numbers to him, weekly
16   calls, and so forth.  Um-hum.
17           Q    Did you have a primary office in
18   your role as the business director?
19           A    Did I have a primary office?  I
20   floated around.
21           Q    Around to the clubs?
22           A    Yeah.  And I would find an empty
23   office and I would use one.
24           Q    Did you have a designated office in
25   any of the locations?
```

```
 1        A    No, I didn't.  Gardens probably
 2   for, like, one month and that was it, but,
 3   yeah, no.
 4        Q    What percentage of your time was
 5   spent, you know, in the office at one of these
 6   clubs versus maybe prospecting or out in the
 7   field, for lack of a better term?
 8        A    I would probably say 50/50.
 9        Q    Okay.  And when you were at the
10   office, were you fulfilling your typical
11   administrative roles and overseeing those
12   things that were happening at the clubs?
13        A    Yeah, day-to-day, and a lot of the
14   reporting as well.
15        Q    And what do you mean by reporting?
16        A    So, for example, you know, how each
17   club is performing, okay, their day-to-day
18   performance.
19        Q    Okay.  And you kept pretty close
20   tabs on that?
21        A    Yeah.
22        Q    And what job responsibilities would
23   take you out of the office and kind of into
24   the community?
25        A    I don't understand.  What job
```

```
 1   responsibilities would take me out of the
 2   office?  So that would be prospecting.  That
 3   would be meeting other managers outside,
 4   finding out the community events in the area.
 5        Q    Sure.  So I'm not familiar...
 6        A    So that's why I answered it that
 7   way.
 8        Q    That makes sense.  So prospecting
 9   would be, you would be out in the field
10   visiting the other clubs and --
11        A    No.  So prospecting would be trying
12   to get new members.  So maybe going to a
13   Starbucks.
14        Q    Okay.
15        A    And, you know, striking a
16   conversation with people there.  That's
17   prospecting.
18        Q    Okay.  Were there specific modes of
19   prospecting in your experience that were more
20   successful than others?
21        A    Yes.  And to add, prospecting, you
22   always want to do it with a team member.  So
23   if I'm doing it, it's the role of a general
24   manager to do it with their sales team or to
25   do with a front desk associate.  So I would
```

1    always have fun and do it with somebody, you

2    know, and teach them by getting their names

3    and so forth.

4         Q    But you also participated in the

5    prospecting, correct?

6         A    By teaching, yes.  Absolutely, 100

7    percent, yes.

8         Q    So just to make sure that I'm

9    clear.  When you said that you spent 50

10   percent of your time in the office, right,

11   doing all the things that you already

12   testified to, and then you spent 50 percent of

13   your time in the field prospecting, was it

14   only prospecting that you were doing?  I just

15   want to make sure I'm clear.

16        A    Sure.  Sure.  So it's building

17   relationships, okay.  So you have to choose

18   who's your demographic, who's the right

19   restaurant that you're going to target.  So

20   you have a plan of action prior to doing all

21   of these things, and you're working off of

22   that plan of action.  And you're basically

23   checking things off.  So when you're going

24   back to your day-to-day, whether it's 50

25   percent less or more, you want to check off

1   making sure that you are meeting these people.

2   So like I mentioned, prospecting, going out,

3   finding out the charities, the community, and

4   so forth.  Those are the things that I felt

5   myself doing, especially with the new general

6   manager at Jupiter.

7        Q    Okay.

8        A    On the weekend a lot.

9        Q    So you worked with the general

10  manager at Jupiter to do these, you know, out

11  in the field activities, like prospecting,

12  building relationships, you know, selecting

13  the most ripe areas to build a customer base?

14       A    That is correct.

15       Q    Okay.  And was it only you two who

16  were prospecting?

17       A    No. Every general manager does this

18  to begin with.

19       Q    Okay.

20       A    I'm there to support them, to help

21  them, you know.  So everybody does this.  It's

22  just not my job duty.  This is the general

23  managers.  I'm there to -- when I'm at the

24  club, what are their needs.  And they might

25  say, well, I need more sales.  Okay.  Did we

1    target -- let's take a look at your action
2    plan.  Did we hit these places?  Let's go
3    together.  Let's go to the dealership
4    together.  Let's do these things together.
5    And those are the things that I would see
6    sometimes spending a little bit more than 50
7    percent, or less, but it's usually about that
8    time.  And that's how we would expect for our
9    general managers as well too, that this is
10   their job.
11        Q    Okay.  So, but, if it's their job,
12   then, I guess, what was the need to have the
13   business director out there prospecting as
14   well?
15        A    Good question.  So to give you that
16   answer, if you had a brand new general manager
17   at Jupiter that didn't understand how
18   prospecting works, so that's where I step in.
19   So going back to the word that I used support,
20   and doing things hand-on-hand.  These are the
21   things that were my job.  So that's why, to
22   answer your question, 50 percent or 60
23   percent, it's a good answer, but sometimes you
24   spend the whole day there reviewing certain
25   things for the following day to get out to the

1    community and so forth.  So it is their job.

2    And it's to make them understand.  So somebody

3    being brand new, they needed that extra

4    support and extra help.  And that's what I,

5    you know, I had no problem doing and I loved

6    it.

7         Q    Okay.  And so for someone who may

8    not have, you know, the support to prospect

9    or, you know, the employee numbers to be able

10   to do that, would it be your obligation to

11   support that person as well with respect to

12   prospecting and the like?

13        A    It was my job to support what the

14   needs were.  So we're kind of getting stuck on

15   the word prospecting.  So whatever the needs

16   were, I took it upon my responsibility, you

17   know, to make sure that I helped the

18   individual, whatever their needs were.  So if

19   somebody says, I can't get sales because I

20   can't get people in the door.  Okay, did we

21   prospect?  Or, again, it's the needs is the

22   best thing I can answer.

23        Q    Okay.  So just to make sure I'm

24   clear.  You said -- and I know that this is an

25   approximation, the numbers can't be exact --

```
 1    but 50 percent of the time in the office and
 2    50 percent of the time either prospecting,
 3    building relationships, community development
 4    outside of the fitness location, correct?
 5         A    Yeah.  But, you know, again, the
 6    percentages sound good, but it all goes back
 7    to the goal.  What are we doing to get to the
 8    goal?  So based off of the needs, that's how
 9    we would plan it.  So it could be 50 percent,
10    60 percent and so forth.  But the main thing
11    is, how do we get to that goal and to their
12    needs.
13         Q    Okay.  How would you describe your
14    management style?
15         A    Very friendly.
16              MR. SONDHI:  Object to form.
17                You can answer.
18         A    Very friendly.  Very easygoing.
19    Extremely supportive.
20         Q    Would you say that you're hands-on?
21         A    To some extent, yes.
22         Q    Do you tend to manage on a more
23    macro level versus micro level or the
24    opposite?
25         A    I manage off of an action plan, and
```

```
 1   wherever that action plan falls, we all work
 2   as a team.
 3          Q    And who develops that action plan?
 4          A    The general managers do.  And if
 5   they don't have one, I will send them
 6   something to add.
 7          Q    To add to?
 8          A    To add.  So to add to see what
 9   their needs are, how we can help, how we can
10   all work together.  Yeah.
11          Q    Okay.  And has there ever been
12   occasion where you've needed to adjust the
13   proposed plan or the management plan?
14          A    So those plans are usually changed
15   a lot, sometimes, and it's because of the
16   manager.  You know, an event could be coming
17   up so they might change things.  And they
18   said, you know, we have to do this event this
19   weekend, so I'm going to have to bring three
20   more employees because of this change.  So
21   things change, but for the positive.
22          Q    How many employees did you have at
23   the Palm Beach Gardens location?
24          A    I don't remember.  I'll say more
25   than 20.
```

```
 1           Q     More than 20?
 2           A     Yeah.  That's including, you know,
 3    personal trainers and front desk.  And I had a
 4    very, very good assistant general manager who
 5    was promoted afterwards, but she was very,
 6    very good.
 7           Q     And who was that person?
 8           A     Her name is Layton.
 9           Q     And she was the assistant general
10    manager you said?
11           A     At the time when I was the business
12    director, at that time, that is correct.
13           Q     And so there were more than 20.
14    Were there less than 30 employees?
15           A     Probably.  I can't remember, but
16    probably.  So she helped me out a lot where
17    she took a lot of the club responsibilities.
18           Q     Okay.  What about at the Jupiter
19    location?
20           A     Under 20.  And I'm just guessing.
21    Under 20 though.
22           Q     And how many employees were there
23    at Christi's Fitness?
24           A     Again, probably under 20, under 15.
25    Not including gymnastics.
```

```
 1        Q    Okay.  Were you excludeing any
 2   other, you know, facilities or employees from
 3   the other clubs?
 4        A    No.
 5        Q    So with Christi's, you're saying
 6   that there were under 15 employees if you
 7   don't include gymnastics.  How many if you
 8   include gymnastics?
 9        A    I really don't recall.  I really
10   don't know.
11        Q    As the business director, were you
12   the person to whom requests for time off were
13   directed?
14        A    Any new employee, yes, but they
15   would go through Leah.
16        Q    Were they required to notify you of
17   their request?
18        A    Yes, but I had adopted everybody
19   when I came in, so if anybody had any request,
20   that was already existing.  Nobody ever asked
21   me for, you know, time off or anything like
22   that that I recall.
23        Q    So no one asked you -- I'm not
24   talking about an extended period of time.
25   Just, you know, what if somebody has a
```

```
1    doctor's appointment?
2         A    They would contact me.  Yes, they
3    would contact me.  And the reason they would
4    contact me, they would tell me, I'm not going
5    to come in today, but I have x -- somebody
6    else -- taking care of this for me.
7         Q    Okay.  Were general managers
8    required to contact you to tell you if they
9    were going to attend a doctor's appointment?
10        A    I didn't require anybody to do
11   that, no.
12        Q    Okay.  Were general managers
13   permitted to give raises at their discretion?
14        A    No.
15        Q    No?
16        A    That would go through our HR
17   department.  Not even myself as a business
18   director.  I would go through my HR
19   department.
20        Q    Was that a company policy?
21        A    It has been, yes.  And even at my
22   level, like, I would need to receive approval
23   if somebody was doing it, but I would go to my
24   HR department to give somebody a raise.  Yeah,
25   I wouldn't do it on my own.
```

```
 1        Q    Right.  But I'm not asking you what
 2   you would do.  I'm asking if there was a
 3   policy in place that required all raises to go
 4   through you.
 5        A    I would say yes, not through me,
 6   but through our HR department, yes.
 7        Q    Okay.
 8        A    Yes.
 9        Q    Did you have authority to hire and
10   fire employees in your role as a business
11   director?
12        A    I did, but I would always check
13   with my HR upon letting somebody go if I did
14   do that.
15        Q    Why would you check with HR if you
16   had the authority?
17        A    To make sure that we're applying to
18   the policies.
19        Q    What policies?
20        A    Our company's policy, the ones that
21   we find in the handbook.
22        Q    Well, what specifically do you have
23   in mind?
24        A    I don't recall, but that's what I
25   would do.  These are the steps that I would
```

```
 1    do.  If I were to think of terminating
 2    somebody, I wouldn't do this on my own.  I
 3    would speak to my HR department.
 4         Q    Did anyone else besides you have
 5    authority to hire and fire?  And let me
 6    clarify, anyone under your purview.
 7         A    Um-hum.
 8         Q    Have authority to hire and fire?
 9         A    All general managers do, yes.
10         Q    What was Empire's disciplinary
11    policy when you were the business director?
12         A    So you would always do a verbal, a
13    write-up, and then the third would be a
14    termination.
15         Q    And you always did that, that was
16    your understanding?
17         A    If I ever let go of somebody, those
18    are the steps that I would do, yeah.
19         Q    Okay.  So we've talked about the
20    company handbook before.  Actually -- strike
21    that.
22         We talked a little bit about the
23    branding for the Palm Beach Sports Club.
24         And I apologize.  I should be taking
25    this down.
```

```
 1            We previously discussed the branding
 2    for the Palm Beach Sports Club.  What was your
 3    perception of the brand when you became the
 4    business director?
 5         A    I don't understand.  What were my
 6    feelings on the brand?  What do you mean?
 7         Q    Yeah.
 8         A    A nice gym.  Exclusive.  Clean gym.
 9         Q    Any room for improvement?
10         A    There's always room for
11    improvement.
12         Q    Specific to the Palm Beach Sports
13    Club, what improvements would you have made if
14    you were, you know, had unlimited control?
15         A    Well, the operations, you know, a
16    lot of things, like, in the bathrooms, you
17    know, we had to get a lot of things cleaned
18    up.  New flooring, because the flooring would
19    always get black no matter how much we would
20    pay or do something.  So new flooring.  Small
21    things like that.  More on the aesthetics.
22    That's really nobody's fault.  They're
23    beautiful clubs.
24         Q    While you were there, were there
25    any renovations done to the Jupiter location?
```

```
1           A    Yes.  We, to add value to the

2    Jupiter location, since we didn't have a cold

3    plunge, we purchased two infrared saunas, and

4    we designated a nice room called recovery

5    where we incorporated the infrared saunas,

6    compression boots, Theraguns, things so a

7    member could just be on their own.

8           Q    So similar to your principles when

9    you were working with Antidote Wellness Labs?

10          A    Exactly.  Yeah, similar.  You see

11   the trend there.

12          Q    So you added a cold plunge?

13          A    No.  No.  No.  We did not add a

14   cold plunge.  Gardens had a cold plunge.  But

15   for us, Jupiter, what we did was we added two

16   infrared saunas.

17          Q    Okay.

18          A    Yeah.  And we incorporated a

19   recovery room.

20          Q    Thank you for clarifying.

21          A    No. Thank you.

22          Q    Were there any renovations made to

23   Gardens?

24          A    Not that I recall.

25          Q    And the cold plunge at Gardens.
```

```
 1    I'm sorry.
 2         A    No worries.  You got it right, cold
 3    plunge at Gardens.  Uh-huh.
 4         Q    Was that in existence when you
 5    became the director or did you --
 6         A    It was already there from the
 7    previous gym.  Yeah.  It was already there.
 8         Q    So what did you know about
 9    Christi's Fitness when you were hired?
10         A    I didn't know much --
11              THE WITNESS:  I'm sorry.  Go for it.
12              MR. SONDHI:  Object to form.
13                But you can answer.
14         A    I didn't know much about the gym.
15         Q    Did you know anything about the
16    gym?
17         A    I knew it was gymnastics-based.
18         Q    Okay.
19         A    That's what I knew.
20         Q    And did you conduct any research of
21    your own consistent with what you described
22    earlier about your practices of getting to
23    know the locale?
24         A    I did.
25         Q    And what was the extent of the
```

1    research that you conducted?

2        A     So the first day that I went to

3    Vero Beach, I met with the general manager,

4    and I met with an assistant, the customer

5    service manager -- they are considered like

6    the assistant general manager -- and I asked

7    them nicely if they can take me around the

8    neighborhood.  The gentleman knew a lot

9    because he use to work with the company

10   before, so I questioned him a lot about the

11   demographics, do people go away and so forth.

12   So they both took me on a beautiful ride all

13   around the area.  And that really helped me a

14   lot, because then on my own, I just met all

15   the competitors.  Basically everything they

16   gave me, I started going to the competitor

17   gyms and seeing myself.  And they also told me

18   their struggles as well, their big struggles.

19   So it's like what I did to every other club.

20   I would go in there.  I assess.  And that's

21   exactly what I did.  And then from there form

22   an action plan.  And then basically that

23   action plan that we all had a conversation

24   with, I would do a recap and I would shoot the

25   manager an e-mail just, again, so we're all on

1  the same page.  And it's always worked.

2  Because then from there, we formalized kind of

3  an action plan and started taking the reigns.

4       Q    So was it your practice, you know,

5  was that something that you typically did upon

6  the initial meeting with a general manager or

7  the first time that you'd seen a club?

8       A    Yeah.  Getting to know them, you

9  know, and definitely a phone conversation.  My

10  goal of this, to getting to know the club, is

11  their needs.  That's my goal.  So whatever

12  they're telling me, I'm just trying to find

13  out what their needs are so we can better

14  support, and if I can't support, I can go back

15  to Anthony or my corporate team and say, hey,

16  you know, we're going to need X, Y, and Z,

17  whatever that is.  So for me, I'm trying to

18  find out marketing, how much are we marketing,

19  are we marketing enough, internally or

20  externally.  Do we need to pay ads.  So those

21  are all the things that I do based off my one

22  initial meeting.  And repeating myself.  Then

23  I send a recap of all the things that I'm

24  basically stating.  Um-hum.

25       Q    Do you send a recap after every

1  meeting that you have with someone?

2       A    No. It depends.  It really depends

3  on our meeting, you know, because it could

4  just -- I don't want to blast -- I want to

5  respect the other individual -- I don't want

6  to blast with e-mails.  So if we have a

7  meeting and we're good and we're moving on the

8  action, we're fine, you know, there should be

9  no -- but if there's something that they're

10  asking of me or I'm asking of them, I put it

11  in an e-mail so I can hold myself accountable

12  to say, hey, I'm going to do XYZ or you're in

13  charge of this.  And, again, I've always

14  worked that way.

15       Q    I understand.  You mentioned that

16  you knew that Christi's was having some -- and

17  when I say Christi's, you know I'm referring

18  to Christi's Fitness?

19       A    Of course.  I got you.

20       Q    So you mentioned that you learned

21  about the financial challenges Christi's had

22  been facing, right?

23       A    I didn't say that, that I learned

24  about financial challenges.  Did I say that?

25       Q    I thought that you mentioned that

```
 1   they were having some financial -- maybe I
 2   mischaracterized.
 3        A    You know, my goal is always to find
 4   out the needs, like I said.  So whether it's
 5   financial, sales or anything, what is the
 6   need.  Every club, like we had spoken about
 7   before, is different, so we have to find out
 8   what the clubs need.  Yeah.
 9        Q    So when you were hired -- actually,
10   strike that.
11        Did Patrick Walsh tell you anything
12   about Christi's when you were the business
13   consultant?
14        A    No, not that I recall.
15        Q    So he never mentioned Christi's to
16   you at all during that month period of time?
17        A    No. It was mostly concentrating on
18   me relocating.  No.
19        Q    Okay.  So when was the first time
20   that you learned about Christi's performance,
21   you know, financial performance?
22        A    Probably when I became a business
23   director, that first week, looking over all
24   the financials of all three clubs, you know.
25   But prior to that, as far as anything
```

```
 1   financial, I can't recall, no.
 2        Q    When did you learn about the
 3   programs and facilities that were unique to
 4   Christi's, for example, the gymnastic program
 5   and the swim program?
 6        A    The day that I went there is when
 7   everything clarified.  So prior to me going
 8   there days before is when I was learning about
 9   it.  And the struggles weren't financials.
10   From my end, from what I was hearing, the old
11   owner took all the instructors, so she's
12   putting a new gym.  So that was my big -- when
13   you mentioned financials, it kind of goes over
14   my head.  Sorry.
15        Q    No, you're fine.  So it was your
16   understanding that the old owner of Christi's
17   was taking business?
18        A    That's my understanding, yes.  But
19   when I went there is when I really got to know
20   the club, and that's how I get to, you know,
21   assess everything.  And then I really got to,
22   you know, look at the programs.  And it
23   excited me because I really wanted to get to
24   know the managers a little bit better.  I
25   learned that there was somebody just looking
```

```
 1   over aquatics, which was very exciting.  So I
 2   wanted to learn more from that person.  The
 3   personal training wasn't really doing much, so
 4   those were questions that I had.  Again, I
 5   could give you all the details, but these are
 6   the things that I was just seeing.  And then I
 7   spoke to the general manager, and then I said,
 8   can you please give me the struggles.  I want
 9   to hear it from your end.  And, again,
10   basically everything matched, you know, like,
11   what I was feeling and seeing and what she was
12   telling me at the time.
13        Q    Okay.  What specifically were you
14   feeling and seeing?
15        A    Well, a lot of excitement, okay,
16   and a lot of opportunity, okay.  So one of the
17   main things that I remember at Gardens and
18   Jupiter, we had older equipment.  This is
19   brand new gym equipment.  So in my mind, I'm
20   like, wow, how do we promote this a little bit
21   more, how do we promote our personal training
22   more.  You know, classes.  Oh, my goodness,
23   there was so many classes.  There were so many
24   different rooms of classes.  The demographics
25   there, from the times that I would get there,
```

```
 1   they had an older population, but this older
 2   population would bring in their coffee cake,
 3   would bring in coffee, and it was a beautiful
 4   community.  So there was a lot of excitement
 5   in the very beginning that I left there and I
 6   said, oh, my God, this is amazing.  Also, what
 7   I learned too, that I did not know, was that
 8   these guys were just breeding some champions.
 9   Gymnastics, you know, these kids were with
10   them from, like, six years old and they would
11   get older to 11.  This was new to me.  So that
12   was even more exciting.  So what I learned is,
13   like, how do we help this team here.  How do
14   we really help this, because we have a great
15   thing happening, a great opportunity.  So that
16   was my thing.
17        Q    You mentioned earlier, and correct
18   me if I'm wrong, that upon learning that you
19   were going to be overseeing all three of these
20   clubs in your role as the business director
21   that you reviewed the clubs' financial
22   information, right, to kind of... Is that
23   accurate?
24        A    Yes and no.  Because, here's what
25   we go by, every month, we're given a goal,
```

```
 1   right.  So we have to hit that goal.  So when
 2   you're entering it, you kind of want to see,
 3   like, what are we going to do to make sure
 4   that we're hitting this goal right now this
 5   month, okay.  So when you're saying that I'm
 6   reviewing the financials, I could review them,
 7   but our main thing is to make sure that we are
 8   moving forward with this month.  So those are
 9   the things that I'm looking at.  So when I'm
10   speaking to a manager and reviewing the things
11   that they need, how do we collectively make
12   sure that we can get to that number.  And
13   those are the main things that I'm reviewing.
14   And I'm reviewing with the managers, because I
15   have to go back to my directors, my
16   higher-ups, and make sure we hit these
17   numbers.
18        Q    I'm going to strike that response
19   as nonresponsive.
20         So what I need to know, and the
21   question that I'm asking you is, when you
22   learned that you would be overseeing these
23   three clubs.
24        A    Yes.
25        Q    You mentioned earlier that you
```

```
 1   reviewed financial documents.  Is that
 2   accurate, yes or no?
 3         A     For Jupiter and Gardens, yes; for
 4   Christi's, no.
 5         Q     So you did not reviews Christi's
 6   documents?
 7         A     I don't recall having the
 8   financials for Christi's in the very
 9   beginning, but as the month moved on, yes, I
10   had the financials.  But in the very
11   beginning, I don't remember seeing any
12   financials of Christi's.  For Jupiter and
13   Gardens, yes.
14         Q     When was the first time that you
15   reviewed Christi's financials?
16         A     Right in the middle of the month as
17   we were -- of October, okay, to see -- that's
18   when we're reviewing it.  I'm able to see the
19   big picture after me visiting the facility.
20         Q     So you didn't think it was
21   important to get a sense of the financial
22   state of the clubs over which you were the
23   business director?
24              MR. SONDHI:  Object to form.
25         Q     I'll rephrase.  My question is, why
```

```
 1    would you wait to review the financials of a
 2    club that you're overseeing and it's one of
 3    your three clubs?
 4         A    I just adopted that club in the
 5    very beginning, so once I got that, I was able
 6    to review it.
 7         Q    When did you learn that Sarah
 8    DeMartino was pregnant?
 9         A    The first day that I met her.
10         Q    And that was the first day you met
11    her in person?
12         A    Yeah.
13         Q    And what do you remember about that
14    meeting?
15         A    It was the first meeting that I
16    went to Christi's that I met with her and the
17    customer service manager as well, and that's
18    the meeting that I briefly mentioned that they
19    took me around, okay.  And I was very excited
20    about it because I learned that she also
21    worked for Town Sports International.  So
22    speaking to her in the first few minutes, not
23    only did I feel, but I knew that she had a lot
24    of experience as a general manager.  She
25    mentioned it to me several times.  She
```

```
 1   mentioned the things she's done.  And that was
 2   very, very exciting for me to hear as well
 3   because that's what we needed.  We needed a
 4   person to really help us out with that club.
 5   And it was a very friendly, very outgoing,
 6   very friendly, and it was a relief.  It was a
 7   sigh of relief that I felt this was going to
 8   be great, and it's in great hands as well.
 9   And that's what I recall.  And then, like I
10   mentioned earlier, they took me in the
11   neighborhood.  They showed me around.  They
12   showed me inside the club.  They explained
13   everything to me, for the most part, and I
14   spent a couple hours there.  And she mentioned
15   it to me, nonchalant.  I congratulated her.
16   But, again, very upbeat, very energetic.  And
17   it was very positive.  I left there very good,
18   like, and I sent an e-mail either that evening
19   or the following day on our action plan and
20   our recap.
21        Q    Okay.  So fair to say that your
22   first impression of her was a positive one?
23        A    Yeah.  Very positive.
24        Q    And she was qualified as a general
25   manager, correct?
```

```
1        A    Well, I didn't hire her.  She was
2   hired.  And I was happy to see somebody that
3   had all the right qualities.
4        Q    Okay.
5             MR. SONDHI:  Do we need a break?  J.C., do
6        you need a break?
7             THE WITNESS:  I'm good.
8             MS. RATTET:  I could use a couple minutes.
9             MR. SONDHI:  Okay.
10            MS. RATTET:  So maybe regroup at 2:30.
11            MR. SONDHI:  Sure.
12            MS. RATTET:  Okay.  Thanks.
13               (A brief recess was taken.)
14   EXAMINATION BY MS. RATTET:
15        Q    Mr. Marrero, you know that you're
16   still under oath, correct?
17        A    Yes.
18        Q    So we left off again discussing
19   Christi's financials.
20        A    Um-hum.
21        Q    And when you first learned about
22   the financial, you know, situation at the
23   club, as the business director, were you --
24   how often did you review a club's financials?
25        A    Once a month you review it.  Once a
```

1    month.

2         Q    And what does that review entail?

3         A    Your budget, sales, operating

4    budget, and the performance, and making sure

5    that we're ahead or how much behind we are in

6    our P&Ls.

7         Q    Are you responsible for reviewing

8    invoices?

9         A    No.

10        Q    Are there any circumstances under

11   which you would be perhaps looped in to

12   reviewing an invoice?

13        A    Sure.  If I were going to place an

14   order of equipment.  That's the only time.

15   Yeah.  Reviewing any invoices, things in a

16   club nature went through Jonathan Jenkins.  So

17   anything like that would be reviewed by

18   Jonathan Jenkins, yeah.

19        Q    And did Jonathan Jenkins, did those

20   types of, you know, bigger items, you know,

21   big purchases, renovations, did those go

22   directly through Jonathan Jenkins?

23        A    Yes.  And these are things that I

24   didn't take part, because, for example,

25   Christi's, the gymnastics, that was already up

1    and running.  I did not know about that until
2    after I came in, but those are all the things
3    that would go through Jonathan Jenkins, not
4    myself.
5         Q    When you say that you didn't know
6    about that before you came in in reference to
7    Christi's, what did you mean?
8         A    I did not know that they were doing
9    a project or they had a project to, I believe,
10   redo something with the gymnastics during some
11   time in, I don't want to say the date,
12   probably somewhere in December they had to do
13   something there.  But that was already
14   approved and something that they were just
15   waiting to do, and I remember just asking
16   about that, but no one would ask me for my
17   approval and they would not need my approval
18   for something like that.
19        Q    So when did you first learn about
20   the renovations or -- strike that.
21        When did you first learn about whatever
22   it was that you learned about the gymnastics
23   program at Christi's?
24        A    Probably, like, two weeks before
25   they started.

```
 1         Q    Okay.  Do you know the date on
 2    which they started?
 3         A    No.  Don't remember.  I don't
 4    remember.
 5         Q    And what specifically were they
 6    starting?
 7         A    I don't remember.
 8              MS. RATTET:  I believe this will be
 9         Exhibit 4.  It's a one-page document.
10         Bates-stamped 3432.
11                   (Exhibit 4 was introduced for the
12                   record.)
13         Q    Mr. Marrero, do you recognize this
14    document?
15         A    No.
16         Q    So you've never seen this document
17    before?
18         A    No.
19         Q    I can represent to you, and if you
20    want, you can take a look at it as well, but
21    this is a notice of commencement for the
22    reroofing and foam pit at Christi's Fitness.
23         A    Okay.
24         Q    And you mentioned that Jonathan
25    Jenkins was the person to whom this, you know,
```

```
1    project would run through?
2         A    That's his name, yes.  It's written
3    on there.
4         Q    And it looks like it was
5    acknowledged on November 10th of 2021.
6         A    Uh-huh.
7         Q    Did you know that the project, the
8    renovations to Christi's, were going to take
9    place before November 10th of 2021?
10        A    No. I don't remember.  I don't
11   recall.  I haven't seen that document either.
12        Q    Okay.  But with respect to the
13   document, I understand that you've never seen
14   this document before.  I'm purely looking at
15   it from a date perspective to perhaps give you
16   a sense of when you may have learned that
17   these renovations were taking place.
18             MR. SONDHI:  Object to form.
19        A    Like I mentioned, I don't recall.
20        Q    You can answer.
21        A    Like I mentioned, I don't recall,
22   but I think it was in December when they
23   started this.  Um-hum.
24        Q    At this point, you had been the
25   business director for Christi's and for Palm
```

```
 1   Beach Sports Club for approximately one month,
 2   correct?
 3        A     One month from when?
 4        Q     Well, earlier you testified --
 5        A     From November -- what, from this
 6   date of this document you're saying?
 7        Q     Right.  So the document is the
 8   acknowledge --
 9        A     November 10th.  And you're saying
10   for one month.  Okay.  Sorry, so what's your
11   question?
12        Q     So the question is, so at this
13   point, you had already been in the role of
14   business director for a little over a month,
15   correct?
16        A     A little bit over a month.  Hold
17   on, I want to get the dates straight now.
18   October.  Yeah.  Yes.
19        Q     And when did you typically review
20   financial records?  Was it at the end of the
21   month?
22        A     Every week there would be a phone
23   call with Anthony Messina to make sure that
24   we're going towards our goal and what are we
25   doing about that.  So I would also step in and
```

```
1    make sure that we're working towards that
2    goal.  So weekly, we're going over the monthly
3    goals.  Financials, you're always looking at
4    them one month after reviewing the month
5    prior.  And that would be through Mike
6    Montella that he would send to all his general
7    managers, and he would copy me on an e-mail.
8         Q    Okay.  So I believe that you
9    testified a few minutes back that you reviewed
10   the financials --
11        A    Correct.
12        Q    -- for the clubs at the end of each
13   month.
14        A    Yeah.  From the previous month, you
15   always get the financials one month after,
16   okay.  And then you review them from the
17   previous month.  So those financials, Mike
18   Montella would send to the GMs.  He would also
19   copy me on them, so I'm reviewing them myself.
20   And the general managers, if they had any
21   questions, they would question Mike Montella.
22   And I set a meeting and a call for Mike
23   Montella and the general manager of Christi's
24   to make sure that there was clarity amongst
25   all of this after me being there.
```

```
 1         Q    All right.  So what I'm trying to
 2    find out is, if you reviewed the financials,
 3    at what point would a, you know, a renovation
 4    project show up in the documents that you
 5    reviewed, you know, at the end of the month or
 6    discussed weekly with Anthony Messina such
 7    that you would have knowledge of a massive
 8    renovation project taking place?
 9         A    I wouldn't have had that knowledge,
10    like I mentioned before, like, these are
11    things that were already put into play.  So
12    any financial impact or anything like that, I
13    wouldn't have had at the time, especially me
14    being there four weeks.  I wouldn't have
15    access.  Nobody would have given me access to
16    those financials, so...
17         Q    You testified that each club had
18    its own budget, correct?
19         A    Correct.  But what you're saying
20    right now, just to be clear, just so I can
21    understand it well, you're mentioning this
22    pit, and how would I know the financials with
23    this pit?  And that's something that I
24    wouldn't have any recollection.  This was
25    already -- this wouldn't reflect off of the
```

```
 1   financials me being four weeks in.
 2       Q    What if I told you that the
 3   proposal was initiated in September of 2021,
 4   would that change your testimony?
 5             MR. SONDHI:  Object to form.
 6                But you could answer.
 7             THE WITNESS:  Do I answer or don't I
 8       answer?
 9             MR. SONDHI:  You can answer.
10       A    I'm still sticking to what I'm
11   telling you.  Like, what you're asking me, I'm
12   understanding, but I'm also not understanding
13   too.
14             MS. RATTET:  Ms. Stella, would you be so
15       wonderful to read back the last question for me
16       please.
17                (The question was read by the
18                stenographer.)
19       A    No, it doesn't make -- no.
20       Q    Okay.  So when would an approved
21   proposal for a massive renovation project
22   typically show up in a, you know, in the
23   financial report or the financial documents
24   that you reviewed for any clubs that you
25   oversaw?
```

```
 1        A    I haven't had that experience in at
 2   least two decades at this time.
 3        Q    So you have no knowledge of any
 4   proposed renovations of any of the clubs that
 5   you oversaw in your several decades of
 6   experience working in the fitness industry?
 7             MR. SONDHI:  Object to form.
 8             THE WITNESS:  Thank you.
 9        A    It would be with ample notice.  I
10   just walked into this role, you know, starting
11   October, you know.  I did not have a lot of
12   this information.
13        Q    What goes into reviewing monthly
14   performance metrics?
15        A    Sales.  Personal training.  Those
16   are the two major factors.
17        Q    Anything else?
18        A    Those are the two major factors.
19        Q    Are there any minor factors?
20        A    Those are the major factors.
21        Q    So there are no other factors that
22   go into a review of monthly performance
23   metrics?
24        A    Those are the ones that I recall,
25   sales, ancillary services.
```

```
 1          Q     Okay.
 2                MS. RATTET:  I believe that this is going
 3          to be Exhibit 5.
 4                      (Exhibit 5 was introduced for the
 5                      record.)
 6          Q     It's going to be Defendant's 499
 7    through 501.  And for purposes of chronology,
 8    we'll just start at the bottom.  I think --
 9    I'm going to scroll up, Mr. Marrero.  Please
10    let me know if you need me to slow down.  I
11    just want to know if you recognize this
12    document, okay.
13          A     Okay.  Yes.
14          Q     Okay.  And would it be fair to say
15    that this is one of the documents that we
16    previously discussed about, you know, the
17    action plan following a meeting with a GM?
18          A     That's fair.
19          Q     And you mentioned earlier that, you
20    know, there were certain circumstances where
21    you would send an e-mail like this typically
22    when you visited a club for the first time and
23    then, you know, other circumstances.  I don't
24    believe that you testified to what the other
25    circumstances would be.  What other
```

1   circumstances would, you know, would you send

2   a kind of e-mail that appears to have some

3   bullet points and headings and an action plan?

4        A    What other circumstances, other

5   than me seeing the club for the first time, is

6   that the question?

7        Q    Yes.

8        A    Probably each time that we met to

9   follow up.

10        Q    Okay.  And would you say that you

11   always send e-mails like this after you meet

12   with your GMs?

13        A    No.  But after our meeting, for the

14   first initial one, yes.  And if we're going

15   over an action plan, yes, at least once a

16   month.

17        Q    And this e-mail is dated Monday,

18   October 18th, and I believe...

19        A    Let's see... It was initial

20   meeting.  So I met her, as you can see in the

21   e-mail, that means that I met her the week

22   prior, so that was the second week of me being

23   there.

24        Q    And Jose, you mentioned, was the --

25   his title is escaping me.

```
 1        A     From what I remember at the time,
 2   it was customer service manager, which is
 3   assistant general manager.
 4        Q     Okay.  So those are synonymous
 5   terms.
 6        A     Um-hum.
 7        Q     So the e-mail says that you had
 8   some questions per the visit the prior week.
 9   Can you walk me through the beginning portion
10   where it says MCs.  Does MC refer to
11   membership consultant?
12        A     That is correct.
13        Q     Okay.  And what do they do?
14        A     They sell memberships, and their
15   jobs is to prospect, to go out in the
16   community and prospect.  And their job is also
17   performance-based.
18        Q     Okay.  And what do you mean by
19   performance-based?
20        A     Everybody is given a goal from
21   salespeople, managers, and we have to hit the
22   goal.  If we don't hit the goal, there'll
23   either be a verbal, a write-up, or even
24   termination.  What we do is we try to find
25   out, you know, how do we best help this, and
```

```
 1   help the individual, the manager, or the
 2   membership consultant and so forth.
 3        Q    Okay.  And membership consultants,
 4   they earn a commission?
 5        A    They do.  They get paid hourly, and
 6   they also earn a commission as well.  That
 7   also goes with front desk associates too.
 8        Q    Okay.  So you asked Ms. DeMartino,
 9   are you going to hire a full-time MC.
10        A    That is correct.
11        Q    What was your understanding of the,
12   you know, MC hiring situation at Christi's at
13   that point?
14        A    At Christi's.  When I asked her,
15   I'm like, who are your MCs?  She told me that
16   he's part-time MC and a part-time personal
17   trainer.  So we need a full-time MC, because
18   part time is not going to be able to drive
19   those leads.  So that's my question here, are
20   you going to hire a full-time MC?  Did you
21   post?
22        Q    What percentage of Christi's
23   revenue did the gymnastics program make up?
24        A    I don't remember.
25        Q    Do you -- you don't remember at
```

1    all?  Can you give me an estimate?

2         A    I don't recall.

3         Q    As the business director, you have

4    no understanding about what the percentage of

5    revenue of that massive program was?

6              MR. SONDHI:  Object to form.

7         A    It's been some time.  I don't

8    recall.

9         Q    Okay.  At the time, did you know or

10   would you have known?

11        A    I'm sure, but I just don't remember

12   at this time.

13        Q    Okay.  And then it says social

14   media.  Please send all pics and content to

15   Layton and Taylor and they will post.  What

16   does that mean?

17        A    So we have social media accounts.

18   We have an Instagram account, and each club

19   has one.  So to help with their social media,

20   we also had a marketing manager at the time.

21   Her name was Taylor.  So please send all your

22   pictures to Taylor so she can post them for

23   you.  Layton was my assistant general manager,

24   but she was also helping with marketing as

25   well.  So that's what that means.  Please send

```
 1   all pictures, pics, and content to Layton and
 2   Taylor as they will post.  Now, Taylor was
 3   also branding manager, and we have to make
 4   sure that everything is branded.  So that's
 5   why I wanted to make sure everything goes
 6   through the channels, and to give them help on
 7   social media as well.
 8           Q    Okay.  Then it says hires.
 9           A    Um-hum.
10           Q    What kind of hires were you
11   referring to?
12           A    Well, hires, what's the plan.  Her
13   and I spoke.  What I really loved is that she
14   was a senior general manager, so she would
15   understand immediately, you know, because she
16   was telling me that she needed to hire, she
17   needed to hire.  Okay, great, you know.  After
18   I came back to the office, I shot this e-mail.
19   So what is the plan, other than Indeed,
20   because in the past, and I shared this with
21   her and other mangers, I develop people.
22   Sometimes I'll go into another shop.  I'll
23   give them my business card and I'll invite
24   them to the gym.  So then all the sudden,
25   maybe they could do part-time work.  So I also
```

1    shared that with her.  So, but what is the

2    plan, you know, like, as a general manager,

3    your responsibility are all these things here

4    that I listed, hiring, training and

5    developing, all of these things.  So I just

6    want to know, what is your plan as we're

7    moving on through the month of October.

8         Q    Okay.  And you testified earlier

9    that you understood that the former owner of

10   Christi's was driving business away from

11   Christi's --

12        A    No.  I did not say that, no. What I

13   did say, and one of the concerns were, that

14   the owner, from my understanding, the owner is

15   opening up a new location, a whole new fitness

16   center, and she was basically taking all the

17   instructors with her.  That's what I had

18   heard.

19        Q    Okay.  So the instructors

20   meaning --

21        A    Fitness instructors, sorry, for

22   classes.

23        Q    Okay.  So fitness instructors.  Was

24   she -- did you have an understanding that she

25   was taking personal trainers away?

```
1          A    Again, this is what I heard.  So,
2     you know, I'm asking the manager, hey, you
3     know, what are we doing about hires, you know,
4     what are we going to do.  So those are all the
5     things.
6          Q    But you said that you went
7     prospecting around Vero Beach, correct?
8          A    That is correct, yeah.  I even went
9     to the lady's pre-sale, her own gym, and,
10    honestly, it wasn't a concern.
11         Q    Okay.  So did you feel like
12    Christi's was performing adequately at this
13    point?
14         A    The thing that I will say, and I
15    said it before, I was very excited after the
16    first time of going there.  And I felt that we
17    had a lot of potential because of all the
18    different ancillary services that included
19    gymnastics, that included personal training.
20    So we did not have to rely so much on sales.
21    We all had to work together.  So those are all
22    the things.  So I was very excited.  I did not
23    want to look behind me, like, how did we
24    underperform, but how do we make this better.
25    And that was my delivery in the meeting, the
```

```
 1   delivery in this e-mail, and, yeah, and it's
 2   always been that way.
 3        Q    So when you say that the focus
 4   shouldn't have been on sales --
 5        A    I did not say that.  I did not say
 6   the focus should not be on sales.  I didn't
 7   say that.  The focus is always on sales.  If
 8   you could repeat it please.  Maybe I
 9   miscommunicated.
10             MS. RATTET:  Ms. Stella, would you mind
11        reading back the answer.
12             THE WITNESS:  Thank you.
13                (The answer was read by the
14                stenographer.)
15        A    And I'll stick to that.
16        Q    Okay.  And when you reference
17   sales, does that refer to membership sales?
18        A    Overall.  Overall.  Because the
19   overall is bringing money, personal training,
20   gymnastics, membership sales.
21        Q    What is a localization sheet?
22        A    Sure.  That's something that I
23   adopted from corporate that they had in place
24   already and I really liked it.  So, basically,
25   it's a shared drive that the general manager
```

```
1    fills out, and they're basically writing down
2    all the events that are coming up for the
3    month that they're going to be attending to,
4    and then all the events that are going to
5    happen in the club, and basically all the,
6    like, their action plan.  So that was the
7    shared drive, and that's something that I
8    explained in my meeting, and I even shared the
9    link as well.  And then I said, hey, can you
10   please send me your localization sheet.  So
11   basically, like, oh, give me what your targets
12   there.  And then I write there, who is doing
13   our daily prospecting.  And then also Taylor,
14   which is our marketing person, will be
15   contacting her too, again, so she could help
16   with the social media aspect.
17        Q    Okay.  And then receivables, is
18   that the role of the customer service manager
19   to handle?
20        A    The AR calls.
21        Q    I'm sorry, I may have just
22   interpreted.  What does AR call stand for?
23        A    Yeah.  So, basically, anybody with
24   past due accounts, any cancelled members, or
25   anybody that is checking in that is not paying
```

```
 1    their membership, so we're able to pull a
 2    report.  And the customer service manager
 3    would normally do this.  So this is me
 4    highlighting the things that a general
 5    manager, her, the description is supposed to
 6    be overseeing, but just in case, I'm also
 7    highlighting, because these are the things
 8    that will drive our numbers as well, if we're
 9    able to do this daily.
10         Q    Okay.  And then you say, community
11    events.  I know you are having some great
12    events this month.  Please send me any plans
13    for November.
14         A    Um-hum.  That's correct.  So in the
15    gym industry, you always want to be at least
16    one to three months ahead of the game because
17    things happen, holidays, you know, the
18    following months, they may be working with
19    schools and so forth.  So just so we can
20    anticipate and know what kind of marketing
21    collateral we might need and so forth.
22         Q    And how many, on average, how many
23    events did you expect the clubs under your
24    purview to put on per month or, you know...
25         A    I left it up to the general
```

```
 1   manager.  Companywide, we always like seeing,
 2   like, once a month.  And, honestly, it's just
 3   more for the community, for the members.  One
 4   thing, as you can see that I wrote in there, I
 5   know you are having great events this month.
 6   Like I mentioned before, they had a great
 7   community to begin with.  Like I mentioned,
 8   some members would bring, like, coffee cake,
 9   coffee, and I saw that.  I saw that on my
10   first day.  So that's why I even highlighted,
11   like, hey, I know you're having some great
12   events, but please let me know what's
13   happening in November.  Again, so we could all
14   work together.
15        Q    Okay.  And then if we scroll up.
16   So this was Monday, October 18 at 1:42 p.m.
17        A    Okay.
18        Q    And if we continue.
19        A    Sending over the schedule by end
20   of, okay.
21        Q    And I believe that this is the end
22   of --
23        A    Um-hum.  I see that.
24        Q    -- the response e-mail.
25        A    Yep.
```

```
 1         Q    Okay.  It appears to me that Ms.
 2    DeMartino's responses are interlineated in
 3    italics.
 4         A    Um-hum.
 5         Q    Okay.  And in response to your
 6    question about hiring a full-time MC, she says
 7    that she would love to hire another MC and
 8    expect my MC back from maternity leave just in
 9    time for busy season in December.  Was that
10    the first time you had learned that her MC was
11    out on maternity leave?
12         A    Repeat that again.
13         Q    Sure.  So if you look at the first
14    paragraph under MC.
15         A    Um-hum.  I got that.
16         Q    It says, the first sentence of her
17    response about her MC being back from
18    maternity leave.  Was that the first time that
19    you had learned that her MC was out on
20    maternity leave?
21         A    I don't recall.  I don't remember.
22         Q    Did you ever meet the MC?
23         A    Yeah.  I met him.  Yes.
24         Q    And what was the name of the MC?
25         A    David, I believe.  Yes, David.
```

1    Q    So I'm actually asking if you met

2    the MC who was back -- if that MC ever came

3    back from maternity leave, the one that she's

4    referencing.

5    A    Yeah.  I guess, I met an MC, which

6    is David, and if he did go away for paternity

7    leave or anything like that, that already went

8    through HR, so I don't know.  I wasn't

9    managing that aspect of it.  I leave it up to

10   the general manager, which was Sara.

11   Q    Okay.  And what was your impression

12   of David Rankin, the MC?

13   A    Very cordial.  Very nice.  Very

14   nice, you know.  The only question that I had

15   for Sara, I would just tell her that we need a

16   full-time MC, because he was part time.

17   Q    Do you know why he was part time?

18   A    She mentioned that he's a part-time

19   personal trainer.

20   Q    Did she ever communicate that she

21   was having difficulty or the club -- strike

22   that.

23        If you look at the next sentence, it

24   says:  A struggle we will have is where we

25   will put that MC in the club and current

```
 1   budget.  What do you interpret that to mean?
 2        A    Yeah, it's just confusing.  So I
 3   might have spoken to her or I might have
 4   responded to her, but as far as another desk
 5   or anything, we could have worked that out,
 6   I'm sure I could have responded to her.  Did
 7   you post.  I probably asked her why is she not
 8   posting.  And I probably gave her instructions
 9   how to post.  And I probably -- I'm sure I
10   posted pretty immediate.  Not only did I post,
11   I'm sure I gave her instructions on how to
12   post, because managers are supposed to post as
13   well.  That's what they are responsible for.
14   So as far as going over budget or anything
15   like that, you know, I'm sure I probably still
16   asked, like, yeah, we still need a full-time
17   MC.
18        Q    Okay.  So if you look at the
19   sentence, I think a struggle we will have is
20   where we will put that MC.  Her first sentence
21   says, I would love to hire another MC.  So
22   would you interpret that as a reference to
23   your proposal to hire a full-time MC?
24        A    I don't understand that question.
25   I'm sorry.
```

```
1         Q    So I don't, you know, my
2    interpretation is going to be a bit different
3    than yours, and I don't want to put words into
4    your mouth.  But when I read the sentence, I
5    would love to hire another MC and expect my MC
6    back from maternity leave just in time for
7    busy season in December.  And then the
8    sentence that follows says, a struggle we will
9    have is where we will put that MC in the club
10   and the current budget.  So, you know, you are
11   asking her if she's going to hire a full-time
12   MC, and I believe that her response is that,
13   it's going to be a struggle to hire a new MC
14   because she already has the part-time MC
15   coming back, right, and so there's nowhere to
16   physically place the MC?
17        A    Yeah.  But being that I was at the
18   gym, you know, we could have worked around
19   that for sure.  And I'm sure I communicated
20   that with her.  And then putting it over
21   budget will also bring you sales, so --
22   because right now we're not bringing in sales.
23   So any time we don't bring in sales, in the
24   whole fitness industry, we hire MCs.  Because
25   who's making the calls?  So we need somebody
```

```
1   to designate themselves to do that.
2        Q    What was your understanding of
3   Christi's clientele?
4        A    What was my understanding of
5   Christi's clientele?  Happy members.
6        Q    Okay.  What about, you know,
7   typical age range?
8        A    When I was there, I would see an
9   older population and then a younger
10  population.  It varied.
11       Q    Okay.  And with respect to the
12  younger population, which facilities were they
13  using, the younger population?
14       A    All of them.  It depends what time.
15       Q    Okay.  And when you say younger,
16  how young do you mean?
17       A    I don't know.  I don't want to say
18  age group.  I don't know.  Christi's, the
19  difference that they had, they had children,
20  like I mentioned before, that were doing
21  gymnastics, and that's very young.  And the
22  rest of the demographic you would have, you
23  know, from an older population, retired, and
24  when I say younger, I'm talking about people
25  going to school, college.
```

```
1          Q     And so would your approach to
2     prospecting be different under circumstances
3     where perhaps you're trying to attract members
4     who are interested in a particular program
5     versus a, you know, a typical fitness facility
6     that, you know, like a Palm Beach Sports Club
7     for instance?
8          A     What about it?
9          Q     Well, I'm just asking you --
10         A     I don't understand your question,
11    yeah.  Um-hum.
12         Q     Yeah.  Let me rephrase.  So I just
13    want to know if you, as the business director,
14    would change your approach in prospecting in
15    going out and trying to, you know, figure out
16    these relationships and obtain memberships,
17    how is that different for a club like
18    Christi's where the members are interested in
19    a very unique feature?
20              MR. SONDHI:  Object to form.
21                   If you can answer, answer.
22         A     They're all the same at the end of
23    the day.  And you want to just look at what
24    the consumer really needs.  So it's all
25    lifestyle, you know, health.
```

```
1          Q    So what type of locations would you
2    prospect out to attract gymnasts?
3          A    I mentioned this before.  Community
4    events.  Charity events.  And you also look at
5    some of the competitors, and you look at their
6    instructors as well.  You can go to your
7    ordinary Starbucks where everybody is going
8    in, so from gymnastics to a regular spin
9    class.  So, yeah.  That's the way it would
10   work.
11         Q    Okay.  What events do you remember
12   that Ms. DeMartino put on while she was the
13   general manager at Christi's?
14         A    I just heard great things from the
15   members that I spoke to, and some of the
16   employees, that she took such a pride.  And I
17   saw her getting excited with the decorations,
18   with the events that I remember.  She's done
19   several, but one that stood out I remember, I
20   don't know if it was Halloween, but she did a
21   movie night outside.  And I just saw, like,
22   like a passion, you know, somebody really
23   loving what they do and just taking it upon
24   herself and really, like, just making a lot of
25   noise and, you know, and just bringing some
```

```
 1   excitement.  So I remember that one in
 2   particular.  And the other things that I
 3   remember, not so much events, but just her,
 4   like, decorating the club, you know, with
 5   passion.  So that's what I remember.
 6        Q    Okay.  Do you remember her putting
 7   on an event called a trunk or treat?
 8        A    Probably.  And I think that was the
 9   one with probably a movie night, if I'm not
10   mistaken.  Probably.  I can't recall.
11        Q    Okay.  Do you remember what the
12   turnout was for that event?
13        A    No.  No, I don't recall.
14        Q    Do you recall her -- Christi's
15   participating in a health fair?
16        A    I don't recall, but I'm sure --
17   this is what we did, you know.  We always try
18   to get into health fairs, but I don't recall.
19        Q    Did you participate in the runners
20   event?
21        A    Not with Christi's, no.
22        Q    Okay.  Did you participate with one
23   of the other clubs?
24        A    I participated a lot more in the
25   Jupiter and Gardens, because I lived closer,
```

1    so I did a lot more events there.

2         Q    So you were there from, or you

3    oversaw Christi's from October 2021 until

4    October 2022, your departure, correct?

5         A    Yeah.  Actually, it was until

6    somewhere from October until May of 2022.

7    That's when we hired a full-time general

8    manager.

9         Q    Okay.  And did you still oversee

10   the Palm Beach Sports Clubs?

11        A    Yeah.  It was a struggle, but yes.

12        Q    Was there a reason why Christi's

13   was removed from under your purview?

14        A    Yeah.  Absolutely.  Performance.

15        Q    What do you mean by performance?

16        A    Performance.  Not being able to hit

17   the sales, the metrics, all the things we're

18   responsible for that I mentioned here today.

19        Q    So Christi's performance caused

20   Empire to take that club away from you or, you

21   know, have you not oversee it?

22        A    Yeah, to have a full-time general

23   manager because I cannot oversee three clubs,

24   and the last thing I, you know, it was very

25   challenging to drive to Vero Beach.  We needed

```
 1  a general manager at Vero Beach, you know, we
 2  just needed one.  We always needed one.
 3       Q    But you had a general manager at
 4  Christi's from, you know...
 5       A    From when?
 6       Q    October 2021 until March 1st.
 7       A    Yeah.  But due to all the things
 8  you have, that general manager wasn't
 9  performing, so we had to take action.  And
10  that's what we did.
11       Q    And what specifically wasn't she
12  doing?
13       A    Sure.  Yeah.  Yeah.  So not going
14  through all the e-mails or anything like that,
15  but sales performance is one.  Hiring,
16  training and developing is the second.
17  Prospecting.  And all the things that I had
18  mentioned earlier what the duties were, those
19  fell short, and we communicated that with Ms.
20  DeMartino.
21       Q    Who's "we"?
22       A    Myself and Leah Molino.
23       Q    And when was that communicated to
24  Ms. DeMartino?
25       A    The first time was when we wrote
```

```
 1   her up, and I presented it to her for
 2   underperforming, underperformance.  And that
 3   was the first time.
 4        Q    Was there a second time?
 5        A    It was over the phone.  She had
 6   called me -- yeah, I believe she called me.
 7   It was somewhere around February that she got
 8   off the phone with Leah, and she was just
 9   asking me questions, like, hey, do I have to
10   worry, what's happening.  And I said, listen,
11   the club is still underperforming.  These are
12   things that you really have to do.  This is
13   the write-up.  And she said, I'm not signing
14   anything.  I go, okay.  Not a problem.  I'm
15   just letting you know.  And that was the
16   second time.  And then the club, once again,
17   dues from 2021, for the whole quarter, when
18   they presented it to me, the HR team, which is
19   Leah, then we took the action to say we had to
20   move on.  So that's when I went and I
21   addressed her.  And I had Leah Molino on the
22   phone as well.  And I explained to her, and
23   Leah helped me on the phone as well, that due
24   to the performance for the year, we're going
25   to have to move forward.
```

```
1          Q    Okay.  So that doesn't actually
2   address the question, which was, you know, you
3   said that you needed a GM.  And I know I'm
4   paraphrasing.  And I don't want to put words
5   into your mouth at all.  But you said that you
6   needed a GM.
7          A    Um-hum.
8          Q    In response, I said, didn't you
9   have a GM there from October 2021 until March
10  1st.
11         A    Uh-huh.
12         Q    And so, I guess my question is, is
13  that the testimony has been pretty positive to
14  this point with respect to my client, and
15  when, you know, when did that change?
16         A    Through the e-mails when the
17  performance stopped.  You know, the hiring.
18  Once again, I could repeat myself all over
19  again.  It has to do with performance.  And
20  what's performance?  All your sales, your
21  ancillary service.  What's next?  Hiring,
22  training and developing.  All those things.
23  When I would question her -- and, again, I'm
24  sure you have the e-mails -- have posts been
25  put up or anything, you know, the answer I
```

```
 1   would get would be, oh, I don't know how to.
 2   So I would go through the handbook that I know
 3   everybody has received in the company, and I
 4   would forward it to her.  And I'm like, the
 5   instructions are on these.  Please, help us
 6   out.  So as much as sales performance, hiring
 7   was a big, big thing for us to do here as
 8   managers.
 9        Q    Okay.  How much percentage, again,
10   of revenue did the gymnastics facility program
11   account for at Christi's?
12        A    I don't remember.
13        Q    Would it surprise you if it was 30
14   percent?
15        A    I don't remember.  I really don't.
16        Q    I'm not asking you if you remember.
17   I'm asking you if you would be surprised if it
18   was 30 percent?
19             MR. SONDHI:  Object to form.
20        A    I don't want to answer anything I'm
21   not certain about.  I don't know how surprised
22   I could be to be honest with you.
23        Q    I'm not, you know, you are, you
24   know, required to answer my question despite
25   the objection, so I would appreciate a
```

```
 1   response.
 2        A    Sure.
 3        Q    Would it surprise you if the
 4   revenue at Christi's was 30 percent driven by
 5   the gymnastics facility?
 6             MR. SONDHI:  Same objection.
 7                You can answer.
 8        A    No.
 9        Q    So it wouldn't surprise you?
10        A    No.
11        Q    Would it surprise you if it was
12   higher?
13        A    It wouldn't.
14        Q    When did the gymnastics facility
15   close down?
16        A    I don't recall.
17        Q    You started supervising Ms.
18   DeMartino in mid October, correct?
19        A    When I sent the e-mail out, that's
20   when I started, that is correct.
21        Q    Okay.  So it's your testimony today
22   that when -- to which e-mail?
23        A    October 2021.
24        Q    Right.  But there were a couple of
25   e-mails that we discussed.
```

```
 1        A    Let's say October 2021, when I said
 2   I would oversee the Florida market, and then
 3   when I'm also stating that I will visit you
 4   the following week, that's when I took it
 5   under my clubs.
 6        Q    Okay.  So mid October then, because
 7   I believe that the first day -- and I'll
 8   represent to you the first date of the e-mail,
 9   which was marked as Exhibit 3, was October
10   12th, and the visit to the club occurred
11   sometime between the 12th and the date of the
12   current e-mail that's from you, which is
13   October 18th.  So fair to say that it was mid
14   October?
15        A    It is fair.
16        Q    Yes.  Okay.  And you terminated Ms.
17   DeMartino on March 1st, 2022, correct?
18        A    Yes.
19        Q    Okay.  So I'm not great at math,
20   but that is approximately four and a half
21   months that you supervised Ms. DeMartino,
22   correct?
23        A    That I supervised Christi's and
24   Palm Beach Sports Clubs, correct?
25        Q    But you directly supervised my
```

1    client, correct?

2         A    Yes.

3         Q    Okay.  So from, again, October, mid

4    October -- I just want to make sure the

5    timeline is clear -- mid October 2021 to March

6    1, 2022, is approximately four and a half

7    months, correct?

8         A    Yes.

9         Q    Okay.  Would you consider a

10   three-month period of time -- or let me

11   rephrase.  How many months would be temporary

12   closure to you?

13        A    I don't know.  What do you mean by

14   that?  I don't understand the question.

15        Q    I didn't mean to speak over you.  I

16   apologize.  If an ancillary service was shut

17   down for, you know, a temporary period, right,

18   for whatever reason, then how long -- I mean,

19   in your mind, what would temporary be?  A

20   couple weeks?  A month?

21        A     It depends what it is.  Everything

22   is different.  It all depends.

23        Q    Well, in this case, it was, you

24   know, the renovation of the foam pit and the

25   reroofing, correct?

1      A    I'm not familiar with what really
2  happened there, you know, with the exact
3  things, so...
4      Q    Okay.  Well, I can represent to
5  you, and I may need to go off the record in a
6  minute to pull the testimony that, from my
7  client, that the facility was closed for
8  approximately three months.
9      A    Okay.
10      Q    Mid November and it reopened in mid
11  February.
12      A    Right.
13      Q    So approximately three months, the
14  largest revenue-generating stream was shut
15  down at Christi's Fitness, and so that was
16  nearly three quarters of the time that you
17  supervised her.  Do you think that that
18  factored into the performance metrics that
19  Christi's was experiencing on a regular basis?
20           MR. SONDHI:  Object to form.
21      A    No, you take different factors.
22  You take the factor of hiring, training and
23  developing.  You take the factors of the other
24  ancillary services from membership dues, not
25  gymnastic dues.  So you take those factors in.

```
1            Q    And you don't factor in the closure
2     of the facility?
3            A    Like I mentioned, you take these
4     factors as well.  You know, you take the other
5     factors.  So you take that, but then also,
6     what are we doing about the other things.  And
7     since those other things were not met, that's
8     why we parted ways.
9            Q    Okay.
10               MS. RATTET:  Ranjiv, I recognize it is
11          3:34.  What time does your next deposition
12          start?
13               MR. SONDHI:  It's at 4:30.
14               MS. RATTET:  I'm not sure that we're going
15          to be done before then.
16               MR. SONDHI:  Okay.  So you think we're
17          going to have to continue.
18               MS. RATTET:  Yeah.  I mean, we can go on
19          for a little bit longer, see where we're at,
20          and kind of discuss it at that point.
21               MR. SONDHI:  Okay.  Makes sense.
22          Q    How many times did you visit
23     Christi's Fitness when you were the business
24     director?
25               A    I don't recall.
```

```
 1            Q     Was it less than ten?
 2            A     No.  Probably ten and above.
 3            Q     Ten or above?
 4            A     Probably, yeah.
 5            Q     Would those instances of your
 6   visits be documented in e-mails?
 7            A     I don't remember.
 8            Q     Did you typically let the GMs know
 9   that you would be visiting the clubs before
10   you arrived there?
11            A     Sometimes.  Not all the time.
12            Q     Okay.  Was there a percentage of
13   time that...
14            A     I would work out.  I like working
15   out at different facilities to look at the
16   members and so forth.  Yes.  It's --
17            Q     I didn't mean to cut you off.  I
18   apologize.
19            A     Go ahead.  Please.  Keep going.
20            Q     Did you work out at Christi's
21   often?
22            A     I did twice, yes.
23            Q     Did Ms. DeMartino ever communicate
24   to you that she needed support to help
25   increase sales and profitability?
```

```
 1        A    Yeah.  Any of the support that she
 2   reached out to me, I e-mailed, and I looked
 3   for support immediately.  So after the first
 4   write-up, I set up a meeting with her and Mike
 5   Montella so that she could better understand
 6   the financials and see how we could
 7   collectively get out of this, so not to pin it
 8   on her, but so we can all collectively see
 9   what we can work on and what are the misses.
10        Q    I think earlier today we
11   discussed -- I asked you what your
12   interpretation or definition of support was.
13        A    Yes.  Uh-huh.
14        Q    And I believe you mentioned that
15   there were a couple of different components,
16   right.  It was the hands-on type of component
17   where you're prospecting.  And, again, I don't
18   want to misstate your testimony.  And I'm not
19   trying to do that.  I'm just trying to kind of
20   give you a summary of what I recall.  So it
21   was, you know, it was that particular
22   component.  And then you also mentioned...
23        A    Helping.  Helping.  Just helping
24   them.  Guiding them.  Helping them along the
25   ways.
```

```
1          Q     Yes.  Doing things to help your
2     team win.
3          A     Um-hum.
4          Q     Bring solutions in a very positive
5     way.
6          A     That's correct.
7          Q     So when did Sara or, sorry, Ms.
8     DeMartino communicate to you that she needed
9     support?
10         A     I don't recall, but I'm sure it was
11    probably in the very beginning, based off my
12    e-mail.  So whatever she highlighted, you
13    know, I wrote it back to her.  So those are
14    the things, you know.
15         Q     Okay.  And so I can pull that
16    e-mail up if you want to take a look at it.
17         A     Sure.
18         Q     Okay.  So is that --
19         A     I could see it perfectly.  So if
20    you like, I can talk about this and tell you
21    about support from my way.
22         Q     I just want you -- we're running
23    out of time for the day -- and I just want you
24    to identify for me in this e-mail the
25    particular portions that you, I mean, that
```

```
 1   communicate support in your mind.
 2        A    Sure.  Absolutely.  So one of the
 3   things, let's start off with Taylor.  She's
 4   our marketing manager and a brand ambassador.
 5   So that's a big one.  To take time away from
 6   her and to make sure that she can really,
 7   really focus on delegating time with Sara is a
 8   big one, as you can see there.  AR calls.
 9   These were things that have to happen
10   automatically.  So the fact that they weren't
11   happening is me not saying, why aren't these
12   things happening, but let's make sure we get
13   these calls, and is Jose doing it.  Because
14   part of a general manager is so they can train
15   and develop their manager.  So these are the
16   things that I'm highlighting immediately so
17   she can stay focused on the business and she
18   could pick up some business out of this.
19   Community events.  I'm even highlighting here
20   that she's doing a great job with it, but what
21   are we going to do the following month.  So
22   this is a way that is definitely supportive.
23   And then when her answer comes back, well, I
24   can't hire an MC or so forth, I can go back to
25   her, well, through experience, if you spend a
```

```
 1   little bit of money, it will come in return.
 2   So the fact that I'm taking my time, I'm
 3   putting these things together, and even
 4   putting an Indeed out, which is the general
 5   manager's responsibility, I have no problem
 6   posting, but, at the same time, let's just
 7   kind of get up to pace here, and that's what
 8   my e-mail is.  So I feel it is supportive.
 9   And I feel, based off our conversation, it
10   was, not only supportive, but then I also gave
11   them tips on what they can do while I was
12   there as well.
13        Q    Okay.  So you feel that this e-mail
14   that you testified that you send every time
15   pretty much, it may not be the same content,
16   but it is a pretty standard e-mail in terms of
17   an action plan to every GM with whom you meet
18   for the first time, you feel like that is --
19   the e-mail itself is the supportive function?
20        A    Yeah.  Based off our conversation.
21   And if they don't feel support, they would say
22   something, like, I'm not getting enough
23   support, so yes.
24        Q    Well, did Sara -- did Ms. DeMartino
25   say anything to you that she felt like she
```

```
1    wasn't getting support?
2         A    No.  I told her, I'm here, and
3    that's why I said in the beginning it was so
4    exciting, because I felt that, here she is
5    from TSI, so she's got all the skills that we
6    need.  So it's going to be fun.  It's going to
7    make our job easier.  So it felt like a great
8    conversation, like I mentioned to you before.
9    It was, you know, high energy, and I drove
10   back feeling very happy and excited that we
11   had a senior person doing this.
12        Q    Right.  But my question to you was,
13   did she ever communicate to you that she felt
14   like she needed more support?
15        A    No, not that I recall.
16        Q    So she never told you that she, you
17   know, she never said anything to you about
18   needing more help with Christi's or anything
19   along those lines?
20        A    If she did, it came back to this
21   e-mail.  Like, okay, we got to get more MCs.
22   We got to hire more trainers.  You know, we've
23   got to do the outreach, you know.
24        Q    So any --
25        A    Uh-huh.
```

```
 1          Q    I'm sorry.
 2          A    No.  No.  Go ahead.  Please.
 3          Q    I didn't mean to cut you off. So
 4    all of the support, to the extent that she
 5    requested additional support following this
 6    e-mail, the response -- this is my
 7    understanding -- is that you just directed her
 8    back to this e-mail?
 9          A    No.  We gave her support.  You
10    know, directed her back to the e-mail, with a
11    phone call, with our marketing manager, with
12    me going there the following week, making sure
13    that the customer service manager is trained
14    up by her.  Yeah.  And then on the phone, you
15    know, as well.  So, you know, and if she asked
16    for support, that's a good thing, you know.
17    Okay, well, what are we doing about -- let's
18    stick to our basics, you know.
19          Q    What specifically did you do to
20    support Ms. DeMartino?
21          A    Oh, okay.  So one of the things
22    that I did immediately, I got her in touch
23    with Mike Montella -- that wasn't happening
24    before -- so she can understand the
25    financials.  So that's number one.  Number
```

```
 1   two, I posted a couple of -- not one, but
 2   several -- posts on Indeed for the club.
 3   These are their responsibilities, but since
 4   she didn't know how to do it, I took it under
 5   my ownership and I said, not a problem, and I
 6   did it.  And I posted and I would forward it
 7   to her as well.  So those are all the things
 8   that I felt that I was very supportive.  And I
 9   was listening to her.  You know, we were all
10   struggling, you know, not Florida, but all the
11   clubs.  So what do we do now together and
12   collectively.  We hire people.  We train
13   people.  And then just keeping it calm and
14   keeping it to basics.  And make sure we're
15   following up with people, with the AR calls,
16   with our customer service managers.  So it
17   goes back to something like this.
18        Q    But...
19        A    But?
20        Q    Club-specific projects, you know,
21   like a renovation project, it comes right out
22   of Christi's budget, correct?
23        A    That's something that Jonathan
24   Jenkins and they had way before I came on
25   board, but something like that, the way I
```

1    would support is like, let's focus on the

2    classes.  Let's focus on driving in some sales

3    that's not gymnastics.  And those are the

4    things I really wanted to focus, especially

5    having brand new equipment in the clubs.

6    Aquatics.

7         Q    How long does it take to post on

8    Indeed?

9         A    Probably a few minutes.

10        Q    And when someone tells you, I mean,

11   you're telling me that, you know, this is one

12   of the means through which you supported Ms.

13   DeMartino.

14        A    Um-hum.

15        Q    Did you hold it against her that

16   she didn't know how to post on Indeed?

17        A    Absolutely not.  That's not

18   support.  That's the opposite of support.  I

19   would never hold anything against anyone.

20        Q    Okay.  I guess I'm just failing to

21   see, you know -- actually, strike that.

22         You don't recall any times that she

23   asked you for support after, you know, the

24   initial e-mail communication?

25        A    Like what specific support?  I

```
 1    don't recall.  I would e-mail her back.  I
 2    would be there.  I remember one of the big
 3    things for us I recall is just the hiring, and
 4    the training and developing to get a
 5    salesperson out there to prospect for us.
 6         Q    Right.  Did you participate in the
 7    hiring process or, you know...
 8         A    No. No. Not hiring for Christi's,
 9    no.
10         Q    Did you participate in hiring for
11    Palm Beach Sports Club?
12         A    Once or twice, yeah.
13         Q    If you knew that Christi's needed
14    the support, why --
15         A    I would be there.  Yeah.  If they
16    asked me to hire somebody or to interview,
17    yeah, absolutely.
18              MR. SONDHI:  J.C., wait for the question.
19              THE WITNESS:  Okay.
20         Q    Did Ms. DeMartino ever express to
21    you that she needed support with respect to
22    hiring?
23         A    I don't recall.
24         Q    And if she had expressed the need
25    for support with respect to hiring, how would
```

1   you have helped her?

2        A    Sure.  I would have asked her, how

3   are the Indeed ads happening?  How many people

4   did you interview?  Do you want me to meet

5   somebody?  Do you want me to phone screen

6   somebody?  Do you have somebody, you know, in

7   the pipeline?  Is Indeed not working?  All

8   right.  Can we look at some competitors.  Can

9   we ask Jose, the customer service manager,

10  being that he knows all the instructors in the

11  neighborhood.  These are the things I did

12  already.  Can you please, like, let's find out

13  who are our competitors, can we bring them in.

14  Do we need to pay more?  Like, let's just

15  really bring in a team.  So these are things

16  that I would discuss, and that's how I would

17  support in the hiring process.  But at the

18  same time, I would never hold anything against

19  anybody, but a senior manager will be able to

20  communicate that with me, and that's how I

21  felt, that we had that, you know, and so, I

22  felt like this was going to roll.  This was

23  going to evolve into hiring a lot of people.

24       Q    When you refer to the senior

25  manager, is that in reference to my client?

```
 1        A     That is correct, yeah, because she
 2   worked for Town Sports International.  And
 3   that's what I meant by senior.  Because it's
 4   the same things they did there, similar to the
 5   things we did here as well.
 6        Q     You testified earlier today that
 7   Ms. DeMartino disclosed her pregnancy to you
 8   on the first day that you met in person.
 9        A     I believe it was the first day.
10   That's correct.  Yes.
11        Q     Did you -- were you involved in Ms.
12   DeMartino's request for FMLA leave?
13        A     No.
14        Q     When did you first become aware
15   that she would be going out on leave?
16        A     I'm not sure to be honest.  The
17   first time I found out about her pregnancy,
18   she didn't show.  I was very happy for her.
19   She was, once again, very excited, very
20   energetic, and that was it.  But after that, I
21   don't recall what month or anything like she
22   was going to have a leave.  Because she
23   already had done all that with the HR team.
24        Q     Okay.  So you expected that she
25   would be going out on leave at some point upon
```

```
 1   the birth of her child?
 2        A    At some point, which she never
 3   mentioned, like, we never mentioned -- we
 4   never really spoke about it.
 5        Q    Do you have any kids, Mr. Marrero?
 6        A    No, I do not at this time.
 7        Q    Do you have any, you know, close
 8   friends or family who have kids?
 9        A    I love kids.  Absolutely.
10        Q    That wasn't my question.
11        A    Yes, I do.  Yes, I do.
12        Q    Okay.  And you know that carrying a
13   baby to term is approximately nine months,
14   give or take?
15        A    Yes.
16        Q    So when you met Ms. DeMartino for
17   the first time in October and she disclosed
18   her pregnancy, did you know how far along she
19   was at that point?
20        A    Not at all.
21        Q    But assuming that she was pregnant,
22   right.
23        A    Uh-huh.  Sure.
24        Q    It could have been one month, two
25   months, three months, you know, somewhere in
```

```
1    that range to the extent that you could
2    anticipate that she would be having her baby
3    around a certain month, correct?
4         A    No.
5              MR. SONDHI:  Object to form.
6         A    No. No. I'm not going to answer
7    that.  The first time I met her, I didn't know
8    how many months.  I didn't even know she was
9    pregnant.  So I wasn't able to assume how many
10   months or anything like that.  I just said
11   congratulations and that was it.
12        Q    But the first time you met her, you
13   did hear she was pregnant because she told
14   you, right?
15        A    She told me.  That's what I said.
16   That is correct.  But I cannot tell you how
17   far along.
18        Q    But you would expect that she would
19   need to take some sort of leave between, you
20   know, zero and nine months.  And, again,
21   that's an estimate.  I'm not saying that's an
22   exact number.  Right?
23        A    Yeah.  That is correct.
24        Q    Okay.  Did you have any plans in
25   place with respect to coverage for Ms.
```

```
 1   DeMartino when she eventually did go out on

 2   leave?

 3        A    No. This really hurt us actually.

 4        Q    What do you mean by that?

 5        A    Because we didn't have a plan and I

 6   had to step in temporarily, so, until we hired

 7   another general manager, which took some time.

 8        Q    Did you think it was important to

 9   have a coverage plan in place knowing that

10   you're or would you think --

11        A    Yeah.  This isn't -- sorry, please

12   finish.  I apologize.  Go ahead.

13        Q    Would you think it was important or

14   would be important to have a coverage plan in

15   place knowing that your GM would be out for a

16   minimum of 12 weeks?

17        A    Yes.  Absolutely.

18        Q    Why?

19        A    To keep the club running,

20   performing.

21        Q    So was that ever discussed with

22   anyone at Empire?

23        A    No, the only thing, if anybody

24   takes a leave, we also leave it up to the

25   manager to make sure that they have their
```

```
 1    assistant general manager taking over.  And,
 2    if anything, they would tell me how the club
 3    is going to be managed and how I can help.
 4    That's the way it's taken care of.
 5         Q    So it's your testimony today that
 6    it's the responsibility of the person who is
 7    going to be out on leave to ensure that
 8    there's coverage for that position while she
 9    is out on pregnancy-related FMLA leave?
10         A    Yeah, to get approval, to get all
11    the support, and, yeah, to have somebody
12    covering.  Absolutely.  Yes.
13         Q    That wasn't one of your
14    responsibilities as the business director?
15         A    To support, and that's to help.
16    And their responsibility, as the general
17    manager, she had a customer service manager,
18    and it's for that person to step up, because
19    the customer service manager is also in
20    training to move up, so she had that person.
21         Q    But the customer service manager
22    was in training to move up to what?
23         A    To general manager.  That's the
24    title.  Customer service manager is always
25    being trained to move up.  So you always want
```

```
 1    to train and develop your customer service
 2    manager.
 3         Q    And that was Jose --
 4         A    Yeah.  Jose or whoever that was.
 5         Q    So was that the plan to have Jose
 6    cover the desk while she -- or the club while
 7    she was out?
 8         A    That would be the plan that I would
 9    be expecting to hear from my general manager,
10    that she has coverage and what I can do to
11    help them.
12         Q    Okay.  Did you consider the
13    possibility that Ms. DeMartino might need to
14    go out prior to her due date?
15         A    No. I don't recall that.
16         Q    Were you aware that Ms. DeMartino's
17    pregnancy was considered high-risk?
18         A    No.
19         Q    She never told you that she was
20    experiencing a high-risk pregnancy?
21         A    No.
22         Q    Did anyone express concern that Ms.
23    DeMartino would not return from FMLA leave?
24         A    No.
25         Q    So no one at all was concerned that
```

```
 1  she wouldn't return?
 2       A    No.  Not that I know of.
 3            MR. SONDHI:  Object to form.
 4       Q    There wasn't -- was there an
 5  expectation that Ms. DeMartino would return?
 6       A    I don't recall.
 7       Q    Do you recall Ms. DeMartino testing
 8  positive for COVID-19?
 9       A    Yes.
10       Q    When did that occur?
11       A    I don't remember.  We had a big
12  case of all three clubs, a lot of our
13  employees were testing positive for COVID, and
14  it was during that time.  I don't remember the
15  month.
16       Q    And Ms. DeMartino, did she request
17  to work from home?
18       A    I believe so.  And I checked with
19  HR, with our Leah and, yeah, we were not
20  allowed to work from home or something like
21  that, yeah.
22            MS. RATTET:  I think we are on Exhibit 6,
23       but I could be wrong.
24       Q    So Ms. Molino told you that Ms.
25  DeMartino was not permitted to work from home
```

```
 1    following her COVID diagnosis?
 2         A    Yeah.  It was not Ms. DeMartino,
 3    any employee.  And it was based off the CDC or
 4    something.  We copied and pasted.  And I
 5    believe I forwarded it to Sara as well.
 6         Q    Did you ask -- when did you ask
 7    Leah Molino about whether or not she could
 8    work from home following Ms. DeMartino's
 9    request?
10         A    Immediately when Sara asked me, I
11    didn't have an answer, so I double-checked
12    with our HR team.
13              MS. RATTET:  This is going to be, I
14         believe, Exhibit 6.  Bates number Defendant
15         200.
16                   (Exhibit 6 was introduced for the
17                   record.)
18         Q    You testified earlier today that,
19    Mr. Marrero, that you reviewed the company's
20    policies upon hire, correct?
21         A    That is correct, yeah.
22         Q    Did you receive the policy that is
23    currently in view?  Can you see this document?
24         A    If you could scroll up a little
25    bit.  What is this, remote work.  Okay.
```

1        Q     I'll represent to you that it's an

2   excerpt from the handbook that was produced by

3   Empire to my client.

4        A     Okay.  Um-hum.

5        Q     And this is a remote

6   work/telecommuting policy?

7        A     Okay.

8        Q     Have you seen this before?

9        A     Yeah.

10        Q     Okay.  And are you certain that Ms.

11   Molino told you that there was no company

12   policy with respect to remote work?

13        A     She asked me if she could work from

14   home.  I immediately contacted our HR

15   department, and based off of the CDC,

16   basically copied and pasted and we shared that

17   with Sara.  So, you know, I wanted to make

18   sure that everything was up the line, so

19   that's why I checked out with our HR.

20        Q     And no one in HR pointed you to

21   this company policy with respect to remote

22   work/telecommuting?

23        A     This is based off Sara asking me

24   due to COVID.  I asked my HR team and sent her

25   the same response.

```
 1          Q    What specifically did you ask the
 2   HR team?
 3          A    Whatever she asked me, I just
 4   forwarded to my HR team.
 5          Q    What do you mean by that?
 6          A    Whatever she asked, so I think Sara
 7   was asking about could she work from home
 8   because of COVID.  I asked that to our HR
 9   department, and basically the answer was a
10   copy and paste from the CDC, and that's what I
11   replied to Sara.
12          Q    How did you ask the HR department
13   is what I'm asking?
14          A    I don't recall.  I really don't
15   recall.
16          Q    So you don't know if it was over
17   the phone or through text?
18          A    More than likely it was over the
19   phone.
20          Q    Okay.
21          A    In this situation, I would pick up
22   the phone.  Yes.
23          Q    Is it possible that the lines of
24   communication were crossed and, you know,
25   something was lost in translation?
```

```
 1         A    I don't think so.  I asked my HR
 2   department the same thing I just told you.  I
 3   don't know.  I can't answer that.  I'll tell
 4   you what I did.
 5         Q    Are you aware of any other
 6   circumstances where employees worked from home
 7   while you were the business director?
 8         A    Yeah, I wouldn't know that.
 9         Q    So as one of your responsibilities
10   as the business director, I believe it says --
11              MS. RATTET:  This is going to be No. 7.
12        It says four of 5.  I recognize that.
13                  (Exhibit 7 was introduced for the
14                  record.)
15         Q    Mr. Marrero, do you recognize this
16   document?
17         A    Yeah.
18         Q    Okay.  And this will be Exhibit 7
19   Bates numbered -- sorry, these aren't
20   Bates-stamped.  I just realized that.
21   Apologies.  What is this document?
22         A    I'm sorry, you're asking me that?
23         Q    Sure.  What is this document?
24         A    I'm not sure what to call it.
25              MR. SONDHI:  Can you scroll.  Can he
```

```
 1        review it.
 2             MS. RATTET:  Absolutely.
 3        Q    If ever you need me to scroll and
 4   you want to take time to review, I'm happy to
 5   do that.  Please don't be shy about asking.
 6        A    Okay.
 7        Q    You recognize this?
 8        A    Yes.
 9        Q    And is that your signature?
10        A    Yes, that's me.
11        Q    Okay.  So Interrogatory No. 12 asks
12   you to describe in detail your job duties and
13   responsibilities as defendant's business
14   director from the date on which you assumed
15   the title through the present time, describe
16   in detail, includes, but is not limited to a
17   description of your day-to-day activities as a
18   business director, the approximate amount of
19   time allocated to overseeing each fitness club
20   under your supervision, your daily
21   interactions with each general manager under
22   your supervision and your reporting
23   obligations regarding each fitness club's
24   financial performance to Empire.  And in your
25   response, you say:  I oversaw three clubs
```

```
 1   while maintaining staff accountability,
 2   conducted staff training, scheduled staff for
 3   each club, supported general managers in their
 4   roles, reviewed monthly performance metrics,
 5   oversaw all operations, including amenities,
 6   in each club, and brand marketing.  You
 7   equally oversaw each fitness club assigned to
 8   you -- I'm not reading that verbatim -- until
 9   June 2021 when I was assigned to solely
10   oversee Palm Beach Sports Club in Jupiter,
11   Florida.  I reported directly to Anthony
12   Messina regarding revenue and sales metrics on
13   weekly calls.  Is that a misprint for the date
14   of June 2021?
15        A    We hired somebody May 2021, so that
16   sounds more or less right, I would say.
17        Q    Well, Ms. DeMartino was terminated
18   on March 1st, 2022.
19        A    That's correct.  And during that
20   time, I was visiting the club and then we
21   hired somebody in May.  So I was overseeing
22   Christi's with the customer service manager
23   until we hired somebody in May.
24        Q    Right, but my question to you is,
25   it says June 2021, which was before your hire
```

```
 1   to Empire, so is that date -- did you mean
 2   June 2022?
 3        A    '22, that's correct, June 2022.
 4        Q    Okay.  And your responsibilities
 5   involved maintaining staff accountability,
 6   staff training, scheduled staff for each club,
 7   and supported general managers in their roles.
 8   Did you -- did Ms. DeMartino express to you
 9   that she felt unsupported when she was
10   diagnosed or tested positive for COVID?
11        A    Repeat that.  I'm sorry, supported
12   you said?  Can you repeat the question again.
13   Sorry.
14        Q    Sure.  Your answer says that one of
15   your job duties and responsibilities as the
16   business director is supported general
17   managers in their roles.
18        A    That's correct.  Right.  So what
19   was your question?
20        Q    So my question is, is -- strike
21   that.
22        A    Okay.
23        Q    Strike that.
24             MS. RATTET:  Let's end it here for today
25        if that's okay with you.
```

1       MR. SONDHI:  Great.

2           (The deposition of Juan Carlos Marrero

3   adjourned for the day at 4:15 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                    C E R T I F I C A T E
 3     STATE OF NEW YORK )
 4                      ) ss.
 5     COUNTY OF NEW YORK)
 6              I, ELIZABETH A. STELLA, a Stenographic
 7     Reporter and Notary Public within and for the
 8     State of New York, do hereby certify:
 9              That JUAN CARLOS MARRERO, the witness
10     whose deposition is hereinbefore set forth, was
11     duly sworn by me and that such deposition is a
12     true record of the testimony given by such
13     witness.
14              I further certify that I am not related
15     to any of the parties to this action by blood or
16     marriage and that I am in no way interested in the
17     outcome of this matter.
18              IN WITNESS WHEREOF, I have hereunto set
19     my hand this 18th day of May 2023.
20              _Elizabeth A. Stella_____
21              ELIZABETH A. STELLA, STENOGRAPHER
22              My Commission Expires:  May 31, 2024
23
24
25
```

```
 1
 2                            INDEX
 3   WITNESS               EXAMINATION BY     PAGE
     Juan Carlos Marrero    Ms. Rattet          4
 4
     Stenographer certificate                 195
 5
             (Exhibits attached to transcript.)
 6
                       E X H I B I T S
 7
     EXHIBIT               DESCRIPTION         PAGE
 8
     Exhibit 1             Personal notes of    11
 9                         Juan Carlos Marrero

10   Exhibit 2             Memo to Empire       65
                           introduction
11
     Exhibit 3             E-mail dated 10/12/21  73
12
     Exhibit 4             Notice of Commencement 132
13
     Exhibit 5             E-mail dated 10/18/21  139
14
     Exhibit 6             Handbook excerpt on  187
15                         remote/
                           telecommuting
16
     Exhibit 7             Defendant's objections 190
17                         and answers to
                           Plaintiff's first set
18                         of interrogatories

19

20

21

22

23

24

25
```

**From:** JC Marrero
**Sent:** Tuesday, October 12, 2021 1:49 PM
**To:** Sara DeMartino <Sara.DeMartino@christisfitness.com>
**Cc:** Layton Maxwell <Layton.Maxwell@palmbeachsportsclubs.com>
**Subject:** Christi's Meeting


Hi Sara-
I hope you are having a great week so far.
I am in charge of over seeing the Florida Market.
I will be there this **Thursday after 12pm**, with Layton.
We will discuss the clubs needs, hires, prospecting, marketing, competitors, support for you, and your team.
I am looking forward to meeting you and how to better assist you.
Let's get ready to take your club to the next level.
**JC Marrero | Business Director**
Palm Beach Sports Clubs & Christi's Fitness
561.799.1515
jc.marrero@palmbeachsportsclubs.com

EXHIBIT

Exhibit 3

1

DEF 000498

**From:** Sara DeMartino <Sara.DeMartino@christisfitness.com>
**Sent:** Thursday, October 28, 2021 4:04 PM
**To:** JC Marrero <JC.Marrero@palmbeachsportsclubs.com>
**Subject:** RE:

Heyyy JC!

**MCS:**
- Are you going to hire a full-time MC?- *I would love to hire another MC and expect my MC back from Maternity leave just in time for busy season early December. A struggle we will have is where we will put that MC in the club and current budget. We will need another desk and computer/phone setup.*
- Did you post? -*This has not yet been posted. I have been trouble accessing Indeed.*

**HIRES:**
- What is the plan, other than indeed? -*We have been sourcing from within the club. Jose has been a great help with this. We already have all shifts covered as of this coming week.*
- Please let us know (Taylor) if you want us to reach out to any instructor on social media, if you are not doing so. -*If a post can be created for social media calling on new instructors with exciting types of classes they might add that would be great.*

**OUTREACH PLAN/MARKETING LOCALIZATION**
- Can you please send me your localization sheet
- Who is doing daily prospecting? -*David goes prospecting as frequently as possible but he is only in part time. I often send Chris with him to increase volume when he is available.*

**AR CALLS:**
- Is Jose doing this weekly, what days -Yes, Wednesday and follow ups on Thursday.
- Who is working on the cxl calls and emails? -Jose is doing cancel calls every Monday and follow ups on Tuesdays.

**COMMUNITY EVENTS:**
- I know you are having some great events this month, please send me any plans for November. – *November 13th we will be setting up a table at the VBPF Tactical 10 mile race. It would be great if we had a first responder promo just for that day if you could help us out with that. We'll also be doing some sort of charity fund riser event for Thanksgiving but that is TBD.*

1

EXHIBIT

Exhibit 5

Sending over the schedule by EOB

*Thank you,*

*Sara DeMartino*
*General Manager*
*Office: 772-563-0905*
*1250 Old Dixie Highway*
*Sara.demartino@christisfitness.com*



---

**From:** JC Marrero <JC.Marrero@palmbeachsportsclubs.com>
**Sent:** Monday, October 18, 2021 1:42 PM
**To:** Sara DeMartino <Sara.DeMartino@christisfitness.com>
**Subject:**

Happy Monday Sara-
It was such a pleasure meeting you and Jose last week.
Some questions I had per my visit last week:

**MCS:**
- Are you going to hire a full-time MC?
- Did you post?

**SOCIAL MEDIA:**
- Please send all pics, and content to Layton and Taylor and they will post
**HIRES:**
- What is the plan, other than indeed?
- Please let us know (Taylor) if you want us to reach out to any instructor on social media, if you are not doing so.

**OUTREACH PLAN/MARKETING LOCALIZATION**
- Can you please send me your localization sheet
- Who is doing daily prospecting?
- Taylor will be contacting you at 2pm, to review

**AR CALLS:**
- Is Jose doing this weekly, what days
- Who is working on the cxl calls and emails?

**COMMUNITY EVENTS:**
- I know you are having some great events this month, please send me any plans for November.

2

Thank you and good luck this week.

**JC Marrero | Business Director**
Palm Beach Sports Clubs & Christi's Fitness
561.799.1515
jc.marrero@palmbeachsportsclubs.com

DEF 000501